# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

---

**ROGERS LACAZE ,**
    **Petitioner**

**v.**

        **CIVIL ACTION**
        **NO. 17-7252**
        **SECTION __**

**DARREL VANNOY, WARDEN LOUISIANA STATE PENITENTIARY**
    **Respondent**

---

## PETITION FOR WRIT OF HABEAS CORPUS
## UNDER 28 U.S.C. § 2254

Blythe Taplin, La. Bar No. 32715
Cecelia Trenticosta Kappel, La. Bar No. 32736

The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955
*btaplin@thejusticecenter.org*
*ctkappel@thejusticecenter.org*

*Counsel for Rogers Lacaze*

**TABLE OF CONTENTS**

**PETITION FOR WRIT OF HABEAS CORPUS** ................................................................... 1

Introduction .................................................................................................................. 4

PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254 .............................. 6

REQUIRED INFORMATION ............................................................................................ 6

STATEMENT OF THE FACTS ........................................................................................ 12

PROCEDURAL HISTORY ............................................................................................. 25

    A.    Trial and Direct Appeal .................................................................... 25

    B.    Post-Conviction Recusal Proceedings ............................................. 29

    C.    Post-Conviction Proceedings in the District Court ......................... 30

    D.    The State District Court Granted Post-Conviction Relief ............... 33

    E.    The State Appealed the District Court's Reversal of Mr. Lacaze's Conviction but not the Reversal of his Death Sentence ................................................................... 35

    F.    The Fourth Circuit Court of Appeal Reversed the District Court's Grant of a New Trial .............................................................................................35

    G.    The Louisiana Supreme Court Denied Petitioner's Writ ................ 36

    H.    The Louisiana Supreme Court Briefly and Wrongly Reinstated Mr. Lacaze's Death Sentence .................................................................................................... 36

    I.    Proceedings in the United States Supreme Court ........................... 38

CLAIMS FOR RELIEF .................................................................................................. 38

    CLAIM 1:    ROGERS LACAZE WAS TRIED BEFORE A BIASED TRIBUNAL ............. 38

    A.    Relevant Facts and Procedural History ........................................... 39

B.      Petitioner was Denied His Right to Trial by an Impartial Tribunal. ......................... 45

CLAIM 2:    ROGERS LACAZE WAS DENIED HIS RIGHT TO TRIAL BY AN

IMPARTIAL JURY ......................................................................................................... 47

   A.      Relevant Facts and Procedural History ..................................................... 48

   B.      Petitioner Satisfied the Clearly Established Test for Juror Misconduct ..................... 54

CLAIM 3:    DEFENSE COUNSEL WAS INEFFECTIVE DURING VOIR DIRE .............. 56

   A.      Defense Counsel's Performance was Deficient............................................... 58

   B.      Petitioner was Prejudiced ....................................................................... 60

CLAIM 4:    THE STATE SUPPRESSED FAVORABLE AND MATERIAL EVIDENCE IN

VIOLATION OF *BRADY V. MARYLAND* ....................................................... 61

   A.      The Suppressed Evidence Concerning Adam Frank ..................................... 63

   B.      The Suppressed Evidence Concerning the Likely Murder Weapon.......................... 72

   C.      The Suppressed Evidence Undermining the Eyewitness Testimony ......................... 74

   D.      Other Suppressed Evidence Contradicting the State's Theory that Rogers Lacaze was

Inside the Restaurant with Antoinette Frank ....................................................... 84

   E.    The Withheld Evidence Undermines Confidence in the Outcome of the Trial ............. 87

CLAIM 5:    THE STATE FAILED TO CORRECT THE FALSE TESTIMONY OF POLICE

WITNESSES AT TRIAL IN VIOLATION OF *NAPUE V. ILLINOIS* .................................... 92

   A.      The False or Misleading Testimony ........................................................... 93

   B.      Officer Morlier's False Testimony could, in any reasonable Likelihood, have affected

the Judgement of the Jury .............................................................................. 97

CLAIM 7:    DEFENSE COUNSEL WAS INEFFECTIVE AT TRIAL................................ 98

   A.      Counsel's Performance was Deficient................................................... 100

B.     Counsel's Deficiencies Undermine Confidence in the Outcome of Mr. Lacaze's Trial 125

CLAIM 10:     THE TRIAL COURT'S REASONABLE DOUBT INSTRUCTION UNCONSTITUTIONALLY DIMINISHED THE STATE'S BURDEN OF PROOF ........... 127

CLAIM 11:     PETITIONER WAS DENIED HIS RIGHT TO TRANSCRIPTS AND JUDICIAL REVIEW OF HIS DIRECT APPEAL BY THE INCOMPLETE RECORD ...... 128

CLAIM 13:     CUMULATIVE ERROR VIOLATED MR. LACAZE'S RIGHT TO DUE PROCESS AND RENDERED HIS TRIAL FUNDAMENTALLY UNFAIR ....................... 133

**CONCLUSION AND PRAYER FOR RELIEF**.................................................................... 136

3

## INTRODUCTION

In the early morning hours of March 4, 1995, a 911 call was placed reporting a shooting at the Kim Anh Restaurant in New Orleans East. New Orleans Police Officer Ronald Williams, and the children of the restaurant's owners, Ha and Cuong Vu, had been shot and killed. New Orleans Police Officer Antoinette Frank—Officer Williams' former partner—was arrested charged with the murders. Eighteen-year-old Rogers Lacaze was charged as her co-defendant.

Mr. Lacaze was brought to his first-degree murder trial within three months of indictment, represented by a single unqualified and ill-prepared attorney, convicted and sentenced to death. The justice system failed Rogers Lacaze in extraordinary ways, including the judge, the jury, the prosecution, and the defense counsel.

First, three of the seated jurors who voted to convict Mr. Lacaze never revealed during voir dire critical facts about their background that would have supported valid cause challenges. Despite being directly asked about his connections to law enforcement, one juror failed to reveal that he had been a police officer for seventeen years and was currently working in law enforcement. Another juror, who was a 911 dispatcher for the New Orleans Police Department, failed to reveal that she was on duty the night of the offense, was in the room when the initial 911 call came through *on this homicide*, and attended the victim's funeral.  And, a third juror failed to reveal that two of her siblings were murdered. In this case involving a police codefendant, a police victim, and two sibling victims, these three jurors were unquestionably unfit to serve.

Next, the judge who presided over Mr. Lacaze's trial was involved in a police inquiry into how Officer Frank obtained the likely murder weapon, but failed to disclose this to Mr. Lacaze or his attorney. The trial judge refused to participate in the ongoing investigation, and

instead rushed this capital case to trial. The fact that the trial judge may have placed a murder weapon in a murderer's hands never endured public scrutiny until post-conviction.

The prosecutors hid the very fact of this investigation, and remained silent as Mr. Lacaze's attorney helplessly tried to prove that his codefendant Antoinette Frank owned a 9 mm gun and that she and her brother, Adam Frank, had a motive to kill the victims. Documents in the State's possession supported each aspect of Mr. Lacaze's case, but those documents never saw the light of day. From the NOPD investigation into Adam Frank, to the eyewitness's statement that she never saw Antoinette Frank's accomplice, Mr. Lacaze was robbed of exculpatory evidence that could have raised reasonable doubt in the New Orleans jurors' minds if presented by a competent attorney.

Mr. Lacaze, however, did not have a competent attorney. Attorney Willie Turk went to trial with no co-counsel, no auxiliary assistance, and no investigation. He filed a total of three pretrial motions. He did not know how to conduct during voir dire. He had never represented a defendant at a capital trial, and had no idea what happened at a penalty phase. He failed to request records, present known alibi witnesses, or highlight the huge holes in the State's case to support the defense.

The state post-conviction court granted both guilt and penalty phase relief. After hearing the live testimony of Juror David Settle and reviewing his extensive employment records, the court found that Mr. Lacaze was denied his right to a fair and impartial jury. The court found that Mr. Lacaze met his burden, under the seminal case of *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 556 (1984), of showing that a juror failed to honestly answer a voir dire question and that an honest answer would have provided a valid basis for a challenge for cause.

However, in a terse one-paragraph opinion, the court of appeal ruled that "the trial court erred in finding that the seating of Mr. Settle on the defendant's jury was a structural error entitling him to a new trial." The Louisiana Supreme Court upheld this ruling, applying the wrong legal standard, and reinstated his death sentence before reversing itself days later and deleting the portion of the opinion mentioning the death sentence.

## PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254

Petitioner Rogers Lacaze, through counsel, respectfully petitions this Court to issue a writ of habeas corpus. Mr. Lacaze's case involves a number of substantial constitutional violations which require the issuance of the writ, as set forth below.

## REQUIRED INFORMATION[1]

Mr. Lacaze is in state custody at the Louisiana State Penitentiary, Angola, Louisiana, 70712. His Department of Corrections Number is 356705, and his date of birth is August 13, 1976.

The offense arises out of a triple homicide in Orleans Parish, Louisiana, on March 3, 1995. Mr. Lacaze was eighteen years old at the time and was prosecuted along with a co-defendant, Antoinette Frank. Ms. Frank was an officer with the New Orleans Police Department.

The Orleans Parish Criminal District Court, Hon. Frank Marullo presiding, imposed the conviction challenged in this proceeding.[2] The docket number is 375-992.

---

[1] This information is provided  to this Court pursuant to the Local Rules and the Model Form for use in applications for Habeas Corpus pursuant to 28 U.S.C. § 2254, prescribed by the Rules Governing § 2254 Cases in the United States District Courts.

[2] In post-conviction the district court reversed Mr. Lacaze's conviction and death sentence in two separate findings. On Writs to the Fourth Circuit Court of Appeal and Louisiana Supreme Court, the State declined to challenge the court's reversal of Mr. Lacaze's death sentence, or to seek the death penalty on remand. Mr. Lacaze has yet to be resentenced in the district court.

Mr. Lacaze pled not guilty, was tried by jury, and testified on his own behalf. He was represented by attorney Willie Turk at trial. Mr. Turk was a private attorney who had never tried a capital case previously. He had no co-counsel or support staff.

Opening statements began on July 17, 1995 and Mr. Lacaze was convicted of first degree murder on July 20, 1995. After a sentencing phase that lasted less than a day, the jury reached a sentencing verdict on July 21, 1995. The trial court formally sentenced Mr. Lacaze to death on September 15, 1995.

Mr. Lacaze appealed his convictions and sentence to the Louisiana Supreme Court, case number 1999-KA-0584. He was represented on appeal by Clive A. Stafford Smith and G. Ben Cohen. The Louisiana Supreme Court affirmed, over the dissent of Justice Bernadette Johnson. *State v. Lacaze* 99-0584 (La. 01/25/02); 824 So. 2d 1063 (hereinafter "*Lacaze I*"). The Court denied rehearing on March 15, 2002, also over the dissent of Justice Johnson.

On direct appeal, the following primary claims were raised:

I.    THERE WAS INSUFFICIENT EVIDENCE OF SPECIFIC INTENT TO KILL

II.   THE STATE TRAMPLED UPON DUE PROCESS WHEN IT ARGUED -- OUT OF BOTH SIDES OF ITS MOUTH -- THAT APPELLANT WAS RESPONSIBLE FOR THE KILLINGS IN THE FIRST TRIAL, AND THAT FRANK WAS RESPONSIBLE FOR THE KILLINGS IN THE NEXT

III.  TRIAL COUNSEL HAD A SEVERE CONFLICT AS HE WAS FORCED TO CHOOSE BETWEEN PROTECTING HIS OWN FREEDOM AND LIVELIHOOD, AND REPRESENTING APPELLANT.

IV.   ROGERS LACAZE'S STATEMENT SHOULD HAVE BEEN SUPPRESSED

V.    THE TRIAL COURT'S REASONABLE DOUBT INSTRUCTION DIMINISHED THE STATE'S BURDEN OF PROOF RENDERING APPELLANT'S TRIAL FUNDAMENTALLY UNFAIR

VI.   THE STATE PROCURED A CONVICTION AND DEATH SENTENCE BY INTRODUCING THE TAPE RECORDED STATEMENT OF APPELLANT'S

7

BROTHER, AND THEN ARGUING THE SUBSTANTIVE CONTENT OF THE STATEMENT TO THE JURY.

VII.    THE STATE INTRODUCED EVIDENCE SECURED BY AN ILLEGAL NO-KNOCK SEARCH OF MICHAEL LACAZE'S HOUSE.

VIII.   APPELLANT WAS FOUND "GUILTY BY ASSOCIATION" WHEN THE STATE INTRODUCED EVIDENCE THAT ESTABLISHED ANTIONETTE FRANK'S GUILT BUT THAT WAS ENTIRELY IRRELEVANT TO APPELLANT'S CULPABILITY

IX.     APPELLANT IS CONFRONTED WITH A RECORD FROM WHICH IT IS LITERALLY IMPOSSIBLE TO CONSTRUCT AN APPEAL

X.      MR. LACAZE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL

XI.     THE TRIAL COURT'S ERROR EXCUSING JUROR BAPTISTE WARRANTS A NEW TRIAL

XII.    THE TRIAL COURT DENIED APPELLANT' S RIGHT TO COMPULSORY PROCESS WHEN IT REJECTED HIS SUBPOENAS DUCES TECUM FOR CASH REGISTER RECEIPTS OF THE KIM ANH RESTAURANT

XIII.   THE TRIAL COURT PREVENTED APPELLANT FROM ESTABLISHING THAT ONE OF THE STATE'S KEY WITNESSES WAS DRUNK.

XIV.    THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE TO INTRODUCE UNRELIABLE IDENTIFICATION EVIDENCE

XV.     THE STATE GAVE A REBUTTAL ARGUMENT THAT WAS 9 8% PROSECUTORIAL MISCONDUCT.

XVI.    THE TRIAL COURT GAVE AN INADEQUATE INSTRUCTION ON PRINCIPALS, AND FAILED ENTIRELY TO PROVIDE INSTRUCTIONS ON THE UNDERLYING AGGRAVATING FACTORS.

XVII.   THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE DEADLOCKED JURY TO RETURN AND DELIBERATE UNTIL IT REACHED A VERDICT

XVIII.  APPELLANT WAS SENTENCED TO DEATH BASED UPON ARBITRARY, IRRELEVANT, AND UNPROVEN ALLEGATIONS

XIX.    THE TRIAL COURT REPEATEDLY DIMINISHED THE GRAVITY OF THE JURY'S DELIBERATION BY COMMENTING ON THE APPELLATE PROCESS AND DESCRIBING THE JURY'S VERDICT AS A RECOMMENDATION

XX.     THE TRIAL COURT FAILED TO ADEQUATELY RESPOND TO THE JURY'S QUESTION CONCERNING MITIGATING CIRCUMSTANCES

XXI.    EXECUTING A NON-SHOOTING PRINCIPAL TO A ROBBERY VIOLATES STATE, FEDERAL, AND INTERNATIONAL LAW.

XXII.   THE TRIAL COURT COMMITTED ERROR WHEN IT PRECLUDED THE DEFENSE FROM INTERVIEWING A JUROR, SUBPOENAING WITNESSES, AND FROM INTRODUCING EVIDENCE AT THE HEARING ON THE MOTION FOR NEW TRIAL.

XXIII.  CUMULATIVE ERROR WARRANTS REVERSAL OF APPELLANT'S CONVICTION AND SENTENCE

XXIV.   THE COURT'S RULING IN *STATE V. FRANK* REQUIRES REMAND FOR A DETERMINATION OF INDIGENCE IN THIS CASE

XXV.    IT WOULD BE ARBITRARY, CRUEL, EXCESSIVE AND UNUSUAL PUNISHMENT TO EXECUTE ROGERS LACAZE, A SEVENTEEN YEAR OLD WITH A SEVENTY ONE I.Q

XXVI.   THE CASE MUST DE REMANDED FOR A HEARING ON APPELLANT'S MOTION TO QUASH, WHICH WAS DENIED WITHOUT A HEARING DURING A PORTION OF THE PROCEEDINGS WHICH THE TRIAL COURT HAS OF YET NOT SEEN FIT TO TRANSCRIBE

XXVII.  THE TRIAL COURT'S DENIAL OF THE MOTION FOR NEW TRIAL, ALONG WITH HIS REFUSAL TO ALLOW DEFENSE COUNSEL TO SUBPOENA A JUROR CONCERNING SEQUESTRATION VIOLATIONS REQUIRES A NEW TRIAL, OR AT THE LEAST A NEW HEARING ON THE MOTION FOR NEW TRIAL

The U.S. Supreme Court denied certiorari on October 7, 2002. *Lacaze v. Louisiana*, 537 U.S. 865 (2002).

Mr. Lacaze filed an Application for Post-Conviction Relief on February 10, 2003, which was supplemented on May 7, 2010, October 17, 2012, and March 14, 2013, through counsel Sarah Ottinger, Blythe Taplin, Cecelia Trenticosta Kappel. The following claims were raised:

9

I.      THE STATE'S FAILURE TO DISCLOSE EXCULPATORY AND IMPEACHMENT EVIDENCE VIOLATED BRADY V. MARYLAND, THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, §§ 2, 3, 13, 16, AND 20 OF THE LOUISIANA CONSTITUTION

II.     COUNSEL WILLIE TURK PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL AT BOTH THE CULPABILITY AND SENTENCING PHASES OF TRIAL WITH THE DISASTROUS RESULT THAT AN INNOCENT MAN HAS BEEN SENTENCED TO DEATH

III.    MR. LACAZE IS BEING HELD IN VIOLATION OF THE U.S. AND LOUISIANA CONSTITUTIONS AS HE IS ACTUALLY INNOCENT

IV.     MR. LACAZE WAS DENIED THE RIGHT TO A FAIR AND IMPARTIAL TRIBUNAL IN THE TRIAL OF HIS CAPITAL CASE IN VIOLATION OF HIS RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 2 AND 20.

V.      MULTIPLE JURORS' FAILURE TO DISCLOSE INFORMATION DURING VOIR DIRE WHICH WOULD DEMONSTRATE A BIAS AGAINST THE DEFENSE DEPRIVED MR. LACAZE OF HIS RIGHT TO A FAIR AND IMPARTIAL JURY AND A RELIABLE SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 2, 3, 13, 16, AND 20 OF THE LOUISIANA CONSTITUTION

VI.     THE PROSECUTION'S USE OF INCONSISTENT, IRRECONCILABLE THEORIES DEPRIVED MR. LACAZE OF HIS RIGHT TO A FAIR AND RELIABLE SENTENCING DETERMINATION

VII.    ATTORNEY TURK WAS OPERATING UNDER AN ACTUAL CONFLICT OF INTEREST AT THE TIME OF MR. LACAZE'S TRIAL

VIII. TRIAL COUNSEL FAILED TO PERFORM TASKS RUDIMENTARY TO REPRESENTATION BOTH PRETRIAL AND DURING VOIR DIRE, IN VIOLATION OF MR. LACAZE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 2, 3, 13, 16, AND 20 OF THE LOUISIANA CONSTITUTION

IX.     COUNSEL UTTERLY FAILED TO INVESTIGATE OR PRESENT READILY AVAILABLE, EXTENSIVE MITIGATION EVIDENCE AT THE PENALTY PHASE OF ROGERS LACAZE'S CAPITAL TRIAL IN VIOLATION OF MR. LACAZE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 2, 3, 13, 16, 17 AND 20 OF THE LOUISIANA CONSTITUTION.

10

X. THE LACK OF A COMPLETE RECORD VIOLATES PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I §§ 2, 3, 13, 16, 19, AND 20 OF THE LOUISIANA CONSTITUTION, AS WELL AS HIS RIGHT TO PURSUE RELIEF FOR CONSTITUTIONAL VIOLATIONS IN STATE AND FEDERAL HABEAS PROCEEDINGS

XI. BECAUSE HE IS A PERSON WITH MENTAL RETARDATION, EXECUTING MR. LACAZE WOULD CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT

XII. LOUISIANA'S LETHAL INJECTION PROTOCOL VIOLATES PETITIONER'S EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENTS

XIII. WHEN VIEWED AS A WHOLE, THE PROCEDURAL AND SUBSTANTIVE ERRORS HEREIN ARGUED CANNOT BE HARMLESS SINCE THE COMBINATION OF ERROR DEPRIVED MR. LACAZE OF THE FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS

The state district court ordered an evidentiary hearing on Mr. Lacaze's post-conviction petition, which was held June 17-26, 2013. After the State moved to reopen the proceedings to take the testimony of a witness, an additional evidentiary hearing was held on November 22, 2013 at which witnesses testified for both parties.

On July 23, 2015, the state district court reversed Rogers Lacaze's conviction and death sentence on two separate claims, but denied other claims for relief.

The State filed an application for writs challenging the state district court's finding that Mr. Lacaze was entitled to a new trial, but did not challenge the court's ruling reversing the death sentence. On January 6, 2016, the Fourth Circuit Court of Appeal reversed the district court's ruling, and further found that the trial court properly denied all other claims for relief.

Mr. Lacaze timely filed an application for writs to the Louisiana Supreme Court, seeking reversal of the Fourth Circuit's Order and reinstatement of the district court's grant of a new trial. The Louisiana Supreme Court denied review on December 16, 2016. *State v. Lacaze*, 16-0234 (La. 12/16/16); 208 So. 3d 856. (hereinafter "*Lacaze II*").

11

All grounds for relief asserted herein have been presented to the district court and the Louisiana Supreme Court.

No previous challenges have been filed in federal court with regard to this conviction or sentence.

Mr. Lacaze is not serving any concurrent or consecutive sentence.

This petition is timely.

Mr. Lacaze incorporates all facts pled in his appeal and post-conviction proceedings.

Mr. Lacaze incorporates all facts of each claim pled herein in every claim pled herein.

Mr. Lacaze requests a reasonable amount of time to amend and supplement this Petition, and to file a Memorandum in Support of this Petition.

## STATEMENT OF THE FACTS

In the early morning hours of March 4th, 1995, three individuals were shot and killed at the Kim Anh Restaurant in New Orleans East. The victims were Ronald Williams, a New Orleans Police Officer who worker a security detail at the restaurant, Ha Vu and Cuong Vu, the children of the restaurant's owners. Three other individuals, Chau Vu, Quoc Vu, and Vui Vu, were present at the restaurant during the shooting, but survived by hiding in a walk-in cooler. New Orleans Police Officer Antoinette Frank was soon arrested and charged with the murders. Officer Frank was known to the Vus and Ronald Williams because she also worked a security detail at the restaurant. Upon questioning, Officer Frank ultimately implicated 18-year-old Rogers Lacaze as her accomplice. Detectives arrested Mr. Lacaze at his brother's house that night, interrogated him, and charged him with first degree murder.

*Background*

12

The tragic events that occurred at the Kim Anh Restaurant were set in motion in February of 1992, when Antoinette Frank began the process of applying to serve in the New Orleans Police Department. As part of the process, she was administered psychological testing. Dr. Drolley, who administered the test, wrote in his report that Frank exhibited "excessive over-valuation of her own worth, extreme lack of tolerance and flexibility, excessive use of repression and denial, and . . . suggestions of rebelliousness and problems with authority and regulations and marked assertiveness."[3] In September of 1992, Frank was referred to Dr. Phillip Scurria for further evaluation. Dr. Scurria found that Frank was "not suitable for the job of police officer."[4] Notwithstanding the findings of Dr. Drolley and Dr. Scurria, Dr. Dennis E. Franklin recommended that Frank be admitted to the New Orleans Police Academy. Dr. Franklin's report acknowledged that Frank had "some obsessive/compulsive features" and "a tendency to project herself with an overly positive self-image," but placed "heavy weight on the letters of recommendation" Frank produced, including one from former Judge Dennis Waldron.[5]

Two years later, in November of 1994, eighteen-year-old Rogers Lacaze was the victim of a shooting in which his close friend, Nemiah Miller, was killed. R. Vol. 5, Tr. 97. Rogers was a 5'2," 135-pound teenager with no convictions. While recovering at Charity Hospital, Antoinette Frank, who was by this time a Seventh District NOPD officer, came to speak to Rogers about the shooting. Soon afterwards, Officer Frank started coming around Rogers' home. He was living with his girlfriend and newborn daughter at the time, and Officer Frank frequently

---

[3] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Exs. 35, 36.

[4] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 19.

[5] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 39.

called the house and picked him up. She bought Rogers a pager and cell phone, and took him shopping at the mall. She even bought clothing for Rogers' baby. R. Vol. 7, Tr. 562-65.

During this brief period, Officer Frank started bringing Rogers on rides in her police cruiser. Transcript, June 21, 2013, at 70; R. Vol. 5, Tr. 112. Several individuals close to Rogers had serious concerns about Officer Frank's motives, and advised him to stop spending time with her. *See*, *e.g.*, R. Vol. 7, Tr. 486.

### *Adam Frank and the Altercation at Kim Anh*

During this same period Officer Frank was also frequently seen in the presence of her older brother, Adam Frank. Although Antoinette had lived alone in New Orleans with their father, Adam arrived in town around the time their father disappeared in late 1994 and was staying with Officer Frank. Officer Frank brought Adam along with her while on duty, including her paid security details.

NOPD Officer Precious Davis reported to her supervisors in December of 1994 that Adam Frank told her he was armed with a gun and had a police radio because he was a security guard. Officer Davis found this "odd." Adam Frank attempted to "ride with" her and other NOPD officers, but they turned him down. Consequently, Officer Davis ran Adam Frank's name through the NCIC database to determine if there were any outstanding warrants for his arrest. Officer Davis discovered that Mr. Frank was wanted for attempted manslaughter in Ouachita Parish. Ex. 11 (1994 Report of Officer Geraldine Prudhomme).

After speaking with Officer Davis, her supervisor, Sgt. Geraldine Prudhomme, alerted the Homicide Division of the NOPD that Officer Antoinette Frank's brother was wanted for manslaughter. Reports of this incident were submitted to Captain John Landry, who subsequently alerted the NOPD Internal Affairs Division ("IAD"). Officers were sent to Antoinette Frank's

14

house to locate Adam, but she denied that he was staying with her. Officer Frank denied knowing where Adam was, and claimed that he was living at an unknown residence in Metairie. The officers were allowed inside the home, but did not find Adam. Officer Frank was warned that "any concealment of [her brother's whereabouts] on her part may be construed as a criminal violation of the law, to wit, harboring a fugitive." Ex.12 (Report to Captain John Landry).

During this time, Officer Frank was working security details at the Kim Anh restaurant in New Orleans East along with Officer Ronald Williams. Adam frequently hung out at the restaurant while his sister was working. His presence began to bother the Vu family, who owned the restaurant. After word got around the NOPD that Adam was wanted in another parish for attempted manslaughter, Officer Williams tried to remove him from the restaurant. When Officer Williams confronted Antoinette about her brother, she went "ballistic" and later threatened to kill him. Ex . 16 at 10 (Transcript, June 19, 2013). "[W]hen he messes with my brother he's messing with me, and I'll take him out," Officer Frank warned.  Ex. 14 at 176 (Testimony of Officer Morlier).

Officer Frank was angry at Officer Williams for months after that incident. Frank R. 169. As Officer Stanley Morlier later testified, "during that three or four months, she was mad at us. She wouldn't speak to us.  She'd come to roll call, and she'd look the other way. . . . It was just obvious that she was angry." *Id.* Officer Williams confided in his wife, Mary Williams, that Antoinette Frank had made threats. . . against him based on her desiring to have. . . a larger share of the detail at Kim Anh Restaurant." Ex. 23 at 12 (Transcript, June 19, 2013 (In Chambers Conference)).

***Transfer of the 9 mm Beretta to Antoinette Frank***

15

A practice in Orleans Criminal District Court existed at that time where NOPD officers could obtain firearms for personal use from the Property and Evidence Room upon a court order. Through court orders, Officer Frank obtained two weapons, a 4" Smith and Wesson revolver, and a blue steel 9 mm Beretta semiautomatic. The order transferring the Beretta apparently bears the signature of Judge Frank Marullo. Officer David Talley, who was assigned to the Property and Evidence Room, assisted Officer Frank in obtaining these weapons. On February 22, 1995, Officer Frank reported that her 9 mm Beretta was stolen out of her police cruiser while parked in the Delgado parking lot. In the police report, she claimed that the gun was "broken." *NOPD Incident Report*, B-38846-95 (Exhibit D-15 at post-conviction hearing).

### *The Shooting at Kim Anh*

On the evening of March 3, 1995, Officer Frank picked Rogers Lacaze up to take him to a restaurant she wanted him to try. R. Vol. 7, Tr. 567. Officer Robert Miller had been working a detail at Kim Anh that evening, but was relieved by Officer Williams. R. Vol. 6, Tr. 371. Officer Frank called the restaurant several times asking if they needed her to work the security detail, but was told that they did not. Shortly before the restaurant closed, Officer Frank showed up and ordered two drinks, ostensibly to take to the movies at the Plaza. *Id.* Chau Vu, the restaurant owners' daughter, asked who Officer Frank was going to the movies with. Officer Frank pointed to the car and said she had her nephew with her. She wanted two orange juices, but only one was in the restaurant cooler, so she went to the grocery side of the restaurant to get it. Officer Frank then said she wanted to say hello to Chau's mom, in the kitchen. Officer Frank briefly went into the kitchen, and then left. *Id.* at 371-72.

Soon afterwards, at around 10:15 p.m., Officer Frank called the restaurant and ordered two hamburgers. *Id.* at 373. Chau told her that they were out of French bread and to order

16

something else. Officer Frank ordered steak instead. Officer Frank came back with her "nephew," Rogers Lacaze, and sat at a table. The restaurant was closing at the time, the owners had gone home, and the only people left were the four Vu siblings (Chau, Quoc, Cuong, and Ha), an employee named Vui Vu, and Officer Williams. Chau Vu later described the nephew as being short, with gold teeth, and that he had a cell phone with him. *Id.* at 375. The two sat and ate, and then left. Someone locked the front door after them. *Id.* at 374-76.

After they left, Mr. Lacaze and Officer Frank stood in front talking. *Id.* at 376. Chau opened the door and told them goodnight. Officer Frank asked if they needed her to work the next night, and Chau checked with Officer Williams before telling Officer Frank that he was already working that night. Officer Frank and Mr. Lacaze left. *Id.*

Ten to fifteen minutes later, Chau saw Officer Frank's car arrive again. Chau told Officer Williams not to let her in, because there was a large amount of cash out that they had been counting. Chau went into the kitchen and put the money in the microwave. *Id.* at 378. When she came back out, she ran into Officer Frank, who came in alone and was pushing her back into the kitchen. *Id.* at 379. Officer Frank was saying "Chau, Chau, I need to talk to you." *Id.* Chau's brother, Quoc Vu also moved to the kitchen in the back of the restaurant. While in the kitchen, Chau heard gunshots, and Officer Frank ran out. Chau, Quoc, and Vui Vu hid in the cooler. *Id.*

While in the cooler, Chau saw Officer Frank running back and forth, and rummaging around looking for something. Quoc later stated to police that he saw Officer Frank "shooting a gun in the kitchen area." He also saw a black man. Chau stated to police that she did not see a second perpetrator at all. Vui Vu also could not see the face of the male perpetrator. Ex. 7 at 77-78 (Transcript, June 18, 2013). She could see only "shadows" of a male and female, and

17

recognized the female police officer who worked details at the restaurant, but could not describe the male at all. *Id.*

Phone records would later show that Rogers Lacaze placed several phone calls on his cell phone during the time that the murders were taking place. He called Officer Frank at 1:26 a.m., 1:28 a.m., and 1:44 a.m., as well as a number of other friends and acquaintances.[6]

When Quoc exited the cooler, he saw his brother and sister, Cuong and Ha, lying on the floor in the kitchen. He ran from the restaurant and called 911, reporting that a police officer was shot. R. Vol. 6, Tr. 425.

Officer Williams was found lying in a pool of blood behind the bar, having been shot in the neck at close range. R. Vol. 6, Tr. 356. The Vu siblings had also been shot. Ballistics testing would confirm that all three victims were shot with the same 9 mm gun. R. Vol. 5, Tr. 185. Officer Williams' gun was missing from its holster, as was his wallet. Also missing was the ten thousand dollars that Chau Vu had hidden in the microwave.[7]

The first police unit arrived at the scene at 1:52 a.m. Officers spotted Chau Vu running from the restaurant, followed by Officer Frank. The officers recognized Frank as a fellow NOPD officer and did not question her presence at the scene. Officer Frank approached Chau and asked her what had happened to her brother and her sister. Chau answered, "You was there. You know everything. Why you ask me that. . . ."  R. Vol 6, Tr. 387.

In the early morning hours, Chau and Quoc Vu gave statements to police indicating that Officer Frank was involved in the crime, and that she had been to the restaurant with a young

---

[6] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 12.

[7] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 13 (NOPD Homicide Investigation Report).

black male that evening. Officer Frank gave three different statements. Upon questioning, Officer Frank identified Rogers Lacaze as the individual who was with her that night. She first claimed that she was in the kitchen area of the restaurant when she heard several gun shots coming from the front of the restaurant. At that point she tried to lead everyone out the back door to safety. Officer Frank later changed her story, admitting that she shot the Vu siblings, but claiming that Rogers Lacaze had forced her to. Officer Frank gave the police Rogers Lacaze's mother's address. She was placed under arrest.[8]

Despite their limited ability to view the male perpetrator during the crime, both Chau and Quoc gave a description of the young man that they had seen with Ms. Frank earlier that evening (short, black male with gold teeth). Ex. 8 (Statement of Chau Vu), Ex. 9 (Statement of Cuoc Vu). Quoc identified Rogers Lacaze in a photo lineup, but Chau could not. Police also showed Vui Vu a lineup including Mr. Lacaze, but she was unable to make an identification. Ex. 7 at 79 (post-conviction testimony of Vui Vu).

Although she was unable to identify Mr. Lacaze in a photo lineup, and originally told police that she did not see the male perpetrator, at trial and after months of media coverage, Chau Vu made an in-court identification Rogers Lacaze in the kitchen of the restaurant while she was in the cooler. R. Vol. 6, Tr.383-85, see also R. Vol. 6, Tr. 412. Quoc Vu also identified Mr. Lacaze as Antoinette Frank's accomplice. R. Vol. 6, Tr. 421. Vui Vu was never called to testify.

***Police Investigation of the Kim Anh Shootings***

At 3:30 a.m., police arrived at the home of Rogers Lacaze's mother, Alice Chaney. Ms. Chaney informed them that Rogers was staying at his brother Michael's house on the West Bank.

---

[8] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 13 (NOPD Homicide Investigation Report).

Ms. Chaney spoke with Rogers on the phone and confirmed that he was there. At 4:00 a.m., police arrived at Michael Lacaze's home and arrested Rogers.

Rogers Lacaze was brought to the police station for questioning. He was separated from his mother, who had come to the station with him, and held in a separate room. From the time they arrived at the station until 6:00 a.m., when police told Mr. Lacaze's mother to go home, multiple police officers went in and out of the room where Mr. Lacaze was being held in custody. R. Supp. Vol. 5, Tr. 81-83. Before giving his recorded statement, Rogers Lacaze was left alone with Officer Patrick Young. Officer Young engaged in an unrecorded pre-interview, where he claimed that Mr. Lacaze orally waived his rights. R. Supp. Vol. 5, Tr. 65-69. Following hours of interrogation—first with Officer Young alone, and then with Officers Demma, Rantz, Leblanc, and Young all together—Rogers requested medical attention from prison doctors. Although Officer Rantz denied at a post-conviction evidentiary hearing that he witnessed any abuse during the interrogation, he stated in a pre-hearing interview that he would not have had to beat Mr. Lacaze to get a confession because he was so "dumb." *Post-conviction Hearing Transcript*, June 26, 2013 at 32.[9]

Mr. Lacaze initially denied any involvement in the homicide. However, by the time he gave his recorded statement, Mr. Lacaze reported that he was with Antoinette Frank on the night of the homicides, but that he remained outside in the car during the shooting. He went into the restaurant only after he heard shots fired. *Rogers Lacaze's Custodial Statement* at 6. He denied that he participated in the shootings at all, or any subsequent robbery.

---

[9] Officer Rantz characterized this statement as a joke.

Police conducted searches of Antoinette Frank's home, Rogers Lacaze's girlfriend's home and his brother's home. Police never found the 9 mm gun used to commit the murders, the weapon stolen from Officer Williams,[10] or the ten thousand dollars hidden in the microwave.

Following the homicides, police received information that a credit card belonging to Officer Ronald Williams had been used on the morning of March 4, 1995, at a Chevron station on Terry Parkway—a major thoroughfare on the West Bank. More than three weeks after the offense, and amidst constant media coverage of Mr. Lacaze and Officer Frank's involvement in the crime, NOPD officers approached John Ross, one of the night cashiers at the Chevron station.[11]  The police openly discussed the homicide at the Kim Anh Restaurant with Mr. Ross and he admitted that he had seen television coverage of the offense. [12] Police then presented a photo array of six men, each photograph labeled with the name of the man in it.[13]  When asked if he recognized anyone in the photos, Mr. Ross pointed to the photograph labeled Rogers Lacaze. Two days later, on March 30, 1995, the police came back to the Chevron station and took a statement from Mr. Ross, where he stated that he realized he had seen Mr. Lacaze at the gas station. Then he started to admit that he had previously reconsidered whether the photograph he was shown matched the person he had encountered at the gas station. He also indicated that he had told his brother-in-law that the man in the photo was not the person he and his brother-in-law

---

[10] In 1997, two years after Mr. Lacaze was sentenced to death, police recovered Ronald Williams' service revolver at the scene of an attempted armed robbery. The perpetrator fled the scene, leaving the gun behind.

[11] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 18, at 3.

[12] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 18, at 2, 6.

[13] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 45.

had seen at the gas station.  The officer taking the statement quickly wrapped up the questioning at that point.[14]

Unbeknownst to counsel for Mr. Lacaze, police investigation quickly focused on Officer Frank and her possession of the possible murder weapon, the 9 mm Beretta. On Mach 7, 1995, Officers took a taped statement from Officer David Talley, who disclosed that he knew Officer Frank from when she was a recruit and worked in the Property Room with him. Ex. 13 (Talley Statement to NOPD). He stated that he helped her obtain a court order from Judge Marullo granting her ownership of the Beretta. "[A] couple of weeks" before the murders, Frank had come to see Talley and told him that the 9 mm Beretta had been stolen out of her automobile. Officer Talley added that "she had a lot of people fooled."  On March 22, officers went back to Officer Talley and grilled him about the 9mm gun and Antoinette's brother Adam Frank. Officers questioned Talley about Adam's history with Ronald Williams and the Kim Anh Restaurant. They asked him if he had heard that Antoinette Frank gave the 9 mm gun to Adam. They asked if he knew Adam's whereabouts. Officer Talley admitted that he knew that Adam Frank was wanted somewhere, and that the Seventh District police were looking for him. He stated that it sounded like Antoinette had some "personal animosity" towards Officer Williams.

Officer Stanley Morlier, who witnessed first-hand the personal animosity between Antoinette, Adam, and Officer Williams, believed that Adam Frank was involved in the murders. He employed a confidential informant, Henny Bahem, to find Adam. Mr. Bahem ultimately found Adam Frank in Northern Louisiana before trial, but could not bring him back to New Orleans. Ex. 16 at 6, 14-15 (Transcript, June 19, 2013).

---

[14] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Ex. 18, at 6-7.

During this time, Judge Frank Marullo was approached on three separate occasions by law enforcement about his participation in transferring the 9mm gun to Antoinette Frank before the homicide. NOPD investigators contacted Judge Marullo for the first time before Rogers Lacaze's case was allotted to his section. On March 28, 1995, Sgt. Robert Harrison approached Judge Marullo and showed him a court order transferring a 9 mm Beretta to Antoinette Frank from the NOPD Evidence and Property Room. Judge Marullo examined the order, and told Sgt. Harrison that "he did not believe the court order in question was his signature." Ex. 2 (PID Investigation).

Rogers Lacaze's case was allotted to Judge Marullo on May 1, 1995. At no time did Judge Marullo disclose to the defense that there was an investigation into Ms. Frank obtaining a 9mm from the evidence room, or that he was involved in that investigation. Sgt. Harrison continued with his investigation, interviewing multiple witnesses including Officer David Talley, Judge Morris Reed, and the judge's staff. He approached Judge Marullo for the second time on May 16, 1995. He left a message with Judge Marullo's clerk, to ascertain if the Judge "was willing to give Sgt. Harrison a taped statement." Judge Marullo called Sgt. Harrison back, refusing to give a taped statement because the case had been allotted to his court section. Ex. 2 (PID Investigation). Trial proceeded, and Judge Marullo never disclosed these contacts to the defense.

*Discovery of the 9 mm Beretta*

In 1998, Adam Frank reappeared with the same 9 mm gun inRayville, Louisiana. Adam had been living in Rayville for several years under the alias "Keith Jackson."

Richland Parish Sheriff's officers received a tip that "Keith Jackson" was heard "bragging about killing a police officer in New Orleans." According to Officer Perry Flemming,

23

"Keith" confessed this to a known and reliable confidential informant, who then reported it to Officer Flemming. Ex. 7 at 25-26 (Transcript, June 18, 2013). Rayville officers located "Keith," and pulled him over in his car. There they found an arsenal of weapons, including a ski mask, ammunition, and guns. A fight ensued, leaving one officer in the hospital with a fractured rib after "Keith" kicked him. Ex. 7 at 26-27 (Transcript, June 18, 2013). "Keith" was taken into custody, but escaped a day later when he strangled an officer who was driving him to the hospital. Ex. 7 at 26-27. When he was apprehended for the second time, he was carrying the same 9 mm Beretta that the State has long maintained is the likely murder weapon in this case. The gun was fully loaded, and its appearance had been altered with the serial number filed off.[15]

### Adam Frank Confesses to the Kim Anh Homicides

In 2003, Adam Frank was arrested again for armed robbery and held pre-trial at the South Louisiana Correctional Center. There he met an inmate named Darran Reppond. Adam Frank told Mr. Reppond that "he used to pull people over and steal their drugs, pretending to be a cop." *Transcript, November 22, 2013* at 66. During the planning of an aborted prison escape, Adam confided in Mr. Reppond that he had killed a police officer in New Orleans. He said that "**he had run down on a cop in a restaurant in New Orleans and shot him in the head because the cop shook him down**." *See Transcript, November 22, 2013* at 66. Adam further explained that his girlfriend and was the getaway driver, and that "his sister got messed up in the whole thing and took the rap for him, but he would take care of her and get her out." *Id*.

Adam Frank also told Mr. Reppond that "the bones of bodies were buried under his house." Indeed, shortly after Rogers Lacaze's trial, police found human remains under the house

---

[15] *Supplemental Application for Post-Conviction Relief* (May 7, 2010), Exs. 24, 25.

that Antoinette and Adam shared in New Orleans. It is suspected that the bones belong to their father, Adam Frank Sr., who allegedly abused Antoinette until his disappearance in 1994. His disappearance coincided with the arrival of Adam Frank Jr. in New Orleans and occurred shortly before the Kim Anh murders.[16]

## PROCEDURAL HISTORY

### A.      Trial and Direct Appeal

Officer Antoinette Frank and eighteen-year-old Rogers Lacaze were indicted for three counts of first degree murder on April 28, 1995. Trial for Mr. Lacaze began just twelve weeks later, on July 17, 1995. *R.* Vol. 1, Tr. 5, 27.  During the days leading up to trial, counsel failed to request a continuance. Trial went forth with the "haste of the mob;" indeed, in the last twenty-five years of reported jurisprudence, no capital case has proceeded to trial more quickly than Mr. Lacaze's. *See Powell v. Alabama*, 287 U.S. 45, 59 (1932).

Voir dire began on July 17th, 1995, and lasted approximately three hours from start to finish. Mr. Turk did not conduct jury selection himself, but asked an unrelated attorney to do it for him. R. Supp. Vol. 1, Tr. 101. Counsel posed virtually no direct questions to individual jurors, but generally elicited only nods from entire panels.   Jurors *were* asked to reveal any information about their connections to law enforcement or experiences as victims of crime – two issues that were unquestionably relevant in this capital case. However, as would later be revealed in post-conviction, three individuals failed to answer these material questions honestly, and were

---

[16] *See* Walt Philbin, *Frank Home Skull May have Bullet Hole*, New Orleans Times Picayune, Dec. 6, 1995 at B1 ("[a]lthough experts have yet to identify the remains found under the house at 7524 Michigan St., police are checking into the possibility that they are those of Adam Frank, sources said. Adam Frank is the father of Antoinette Frank, a former police officer who was convicted in October of murdering a fellow officer and two restaurant workers. Antoinette Frank filed a missing person report on her father in September 1994").

selected as jurors. The seated jury included: one veteran police officer; one 911 dispatcher for the New Orleans Police Department; and one woman who lost two of her siblings to homicides.

Opening statements began after lunch. In openings, defense counsel Willie Turk made vague suggestions that a second person was at the scene with Antoinette Frank. Mr. Turk pledged to reveal the identity of this alternative suspect and to present evidence of his involvement in the crime:

> Now, we concede that Ms. Frank was there on the scene. And, you will also hear from the evidence a family member of Ms. Frank's. You will hear his name mentioned several times during this trial.
>
> . . .
> Now, we concede that there was a second person, but as aforesaid, we will try to put on evidence to show who that second person was, and it was not Mr. Roger [sic] Lacaze.

Vol. 5, Tr. 59-60.

Mr. Turk made strained attempts to call witnesses in support of his theory that Adam Frank, and not Rogers Lacaze, had both the motive and the ability to kill Officer Williams. However, these witnesses failed to disclose the full extent of Adam Frank's history with Officer Williams and the Kim Anh restaurant. For example, Officer Stanley Morlier denied that he ever witnessed an argument between Adam Frank and Ronald Williams, or that he had witnessed Antoinette Frank threaten to kill Ronald Williams. R. Vol. 7, 466-67, Vol. 7, Tr. 555-56. Little evidence regarding Adam Frank's history or connections to the victims or restaurant materialized.

Mr. Lacaze testified in his own defense that he went to the Kim Anh Restaurant with Antoinette Frank earlier in the evening, but was not present when the shootings occurred. He denied that he was the one who committed the shootings with the 9mm, and reported that Officer

26

Frank told him, "I got a friend of mine down in the Property Room, and I should be getting a nine millimeter soon." R. Vol. 7, Tr. 565. Mr. Lacaze was not able to offer any support for this claim.

Although there were no witnesses to the shootings of Ronald Williams, Ha Vu and Cuong Vu, the State contended that Rogers Lacaze planned and carried out this triple homicide, killing all three victims

> Now, Officer John Treadaway told you nine casings, the same gun, pellets, the same gun.

> And, you know that Roger Lacaze was the one with the nine millimeter weapon who executed Ronald Williams and we know that both Ha Vu and Quong [sic] Vu were executed by a nine millimeter weapon.

R. Supp. Vol. 3, Tr. 57 (emphasis added). On July 20, the jury returned a verdict of guilty of first degree murder. Penalty phase took place on July 21, resulting in a verdict of death.

Antoinette Frank stood trial three months later, and was also convicted and sentenced to death. During her trial, it was revealed that Judge Frank Marullo had been involved in possibly providing Officer Frank with the murder weapon. An internal police investigation had been underway, to determine whether Officer Frank had obtained a 9mm Beretta handgun from the Property Room at NOPD, upon an order apparently bearing Judge Marullo's signature. Officer Frank had dubiously reported that gun stolen only ten days before the murders. All three victims were killed with the same 9mm gun that was never recovered. The State also presented testimony from Officer Stanley Morlier that he had witnessed an altercation between Antoinette and Adam Frank and Ronald Williams, and that Antoinette Frank had threatened to kill Ronald Williams– the same testimony that Rogers Lacaze's attorney had attempted to elicit at his trial. Morlier testified that he heard Officer Frank say, "[Y]ou tell Ronnie Williams that **when he messes with my brother he's messing with me, and I'll take him out.**" Ex. 14 at 176 (emphasis added).

27

The State argued that it was Antoinette Frank who was responsible for planning and committing the killings, and who had motive to kill.

> The reality of the situation, ladies and gentlemen, is in fact, and I think you see from the evidence, that Antoinette Frank was the one who was planning this robbery. That it was her who was moving everything forward . . . in each instance, that it's Antoinette that is *assuming the leadership role*. Antoinette that is leading the way . . . It's Antoinette Frank that steals those keys . . . It's Antoinette Frank that steals those phones . . . And, of course, *it's Antoinette Frank that executes these people with numerous, numerous shots* . . . She's the one that did that . . . who was really *directing the show here*.

Supp. Vol. *State v. Frank*, 99-KA-0553, Tr. 599-600 (emphasis added). In fact, at Frank's trial the State insisted not only that she shot Ha Vu and Cuong Vu, Supp. Vol. *State v. Frank*, 99-KA-0553, Tr. 17, but that she fired shots into Officer Williams as well, Supp. Vol. *State v. Frank*, 99-KA-0553, Tr. 17. "You already know she didn't like him. She has motive. We know from her actions she wanted him dead. I suggest to you she put two bullets in this wall." *Id*.[17]

Following the trials, after the jury had voted to put Mr. Lacaze to death, the trial judge ordered that he be evaluated by a forensic psychologist to determine his IQ—testing that defense counsel failed to even request prior to trial.[18]   Dr. Rafael Salcedo reported back to the court that Rogers had a full scale IQ 71, which he determined by administering the Weschler Adult Intelligence Scale, Revised Edition (WAIS-R).  R. Supp. Tr. 6 (Hearing, Sept. 7, 1995).

On September 15, 1995, Judge Marullo formally sentenced Mr. Lacaze to death. The judge signed an order that Mr. Lacaze's death sentence shall be executed on March 15, 1996.

Mr. Lacaze appealed his convictions and sentence to the Louisiana Supreme Court. The

---

[17] The State did not call Officer Talley at Mr. Lacaze's trial, or present any evidence regarding Frank's procurement of a 9mm gun. Indeed, the State withheld this favorable evidence from defense counsel.

[18] Attorney Turk had become so irrelevant at this point in the proceedings that Judge Marullo conducted the presentencing hearing with Dr. Salcedo outside of his presence. *R*. Supp. Tr. 4 (Hearing, Sep. 7, 1995) at ("I don't know if we are going to wait for Mr. Turk or not. It is really not an adversarial hearing.")

court affirmed his conviction and death sentence, over the dissent of Justice Bernadette Johnson. *State v. Lacaze* 99-0584 (La. 01/25/02); 824 So. 2d 1063 (hereinafter "*Lacaze I*"). The U.S. Supreme Court denied certiorari on October 7, 2002. *Lacaze v. Louisiana*, 537 U.S. 865 (2002).

### B.  Post-Conviction Recusal Proceedings

Mr. Lacaze filed a *pro se* Application for Post-Conviction Relief and request for counsel on February 10, 2003. However, post-conviction proceedings were delayed for several years as Antoinette Frank litigated her direct appeal claims.[19] On June 23, 2008, Mr. Lacaze was appointed counsel in his post-conviction proceedings, after Frank's conviction became final. Judge Frank Marullo presided over the initial post-conviction proceedings.

While investigating Petitioner's post-conviction claims, counsel discovered evidence that Judge Marullo had purportedly signed a court-order transferring the 9 mm gun to Officer Antoinette Frank. In light of this new evidence implicating the trial judge in the transfer of the likely murder weapon to Officer Frank, on February 3, 2009, Petitioner moved to recuse Judge Marullo from the post-conviction proceedings, alleging that he had a bias and interest in the cause and would be a necessary witness in post-conviction.

Judge Marullo did not self-recuse,, and so the case was allotted to Judge Laurie White to hear the recusal motion. Judge White ruled that an evidentiary hearing was necessary at which Judge Marullo would testify, but then recused herself from hearing the motion because Judge Marullo was a colleague of hers. Other members of the Criminal District Court followed suit and recused themselves. Finally, Judge Lynda Van Davis agreed to preside over evidentiary hearing

---

[19] On January 17, 2001, the Louisiana Supreme Court remanded Ms. Frank's case to the district court for an evidentiary hearing on whether she was entitled to state funded expert assistance during the penalty phase of her trial. *State v. Frank* 99-0553 (La. 01/17/01); 803 So. 2d 1. Ms. Frank's death sentence was affirmed on May 22, 2007. *State v. Frank*, 99-0553 (La. 05/22/07); 957 So. 2d 724.

on the recusal motion. Judge Marullo testified at the hearing that the document transferring the 9mm Beretta bore "a very bad imitation" of his own signature. Transcript of Sept. 17, 2010, at 33. He was aware before Mr. Lacaze's trial that there was an investigation going on into the use of false signatures to transfer weapons to NOPD officers. *Id.* at 42. At the conclusion of that hearing, Judge Davis found that "Judge Marullo's testimony may be necessary during the [post-conviction] hearing on this matter, which requires the recusal of Judge Marullo pursuant to La.C.Cr.P. Article 671 (A)(4)," and granted Petitioner's Motion to Recuse. The State applied for writs, and after hearing oral argument, the Louisiana Supreme Court affirmed the district court's ruling and appointed retired Judge Michael E. Kirby to preside over the post-conviction proceedings *ad hoc. See State v. Lacaze*, 09-2472 (La. 5/12/10); 41 So. 3d 479.

### C. Post-Conviction Proceedings in the District Court

Petitioner filed a *Supplemental Petition for Post-Conviction Relief* on May 7, 2010, alleging, *inter alia*, that multiple jurors failed to disclose information during voir dire that would have supported a that Mr. Lacaze's rights to a fair and impartial tribunal was violated when Judge Frank Marullo presided over his capital trial, that three seated jurors failed to disclose material information about their backgrounds, that the State failed to disclose favorable and material evidence, and that his counsel's woefully ineffective performance prejudiced him.

Judge Kirby ordered an evidentiary hearing on Mr. Lacaze's post-conviction claims, which was held from June 17 to 26, 2013. Thirty-three witnesses testified at the hearing.[20] Among those witnesses were Jurors David Settle, and Victoria Mushatt, and the brother of Juror Lillian Garrett. All three jurors provided information about their backgrounds that was never

---

[20] On November 22, 2013, Judge Kirby reopened the evidentiary hearing to hear the testimony of an additional State witness who had allegedly come forward after the June evidentiary hearing. Judge Kirby also heard the testimony of an additional witness for Petitioner.

disclosed during voir dire. For example, David Settle was a veteran law enforcement officer, and Victoria Mushatt was a NOPD employee. Mushatt was a 911 dispatcher and was present in the room when the 911 call came in pertaining to this very homicide. As her brother testified, Lillian Garret had siblings who had been the victims of homicide.

Judge Frank Marullo testified about his memory of the court order transferring a 9mm gun to Antoinette Frank. He maintained that he never signed the court order, but that he did participate in the police investigation into this incident. Also testifying were two police officers who investigated Antoinette's older brother, Adam Frank, as a suspect in this murder; alibi witnesses who were known to defense counsel at the time of trial, but never called to testify at trial; and eyewitness Vui Vu, who was presented with a photo lineup containing Rogers Lacaze's picture but did not identify him as the perpetrator. Several experts testified, including an expert in crime scene reconstruction, an expert in eyewitness identification, and a psychiatrist.

Witnesses also testified about their interactions with trial attorney Willie Turk, who is now deceased. As multiple members of the legal community reported, Mr. Turk was ill-prepared to represent Rogers Lacaze at trial and incapable of performing even the basic tasks required of a defense attorney. Attorney John Reed testified as an expert in the norms of criminal defense representation as of 1995, and stated his opinion that Willie Turk's performance fell far below those baseline standards.

In rebuttal, the State called the two lead homicide detectives on this case and Quoc Vu, who largely repeated their trial testimony. The State also presented testimony from experts in mental health and crime scene investigation, and Adam Frank himself. Mr. Frank denied from the stand that he committed this triple homicide, although he admitted that his sister did give him the 9mm gun that the State has long alleged was the likely murder weapon in this case.

31

At the conclusion of the evidentiary hearing, the district court ordered the State to file post-hearing briefing within two weeks. However, rather than file a brief, the State moved to reopen the evidentiary hearing, alleging that it had discovered a "new witness" who could provide pertinent testimony. In an extraordinary misuse of the grand jury function, the State convened a grand jury to take this witness' testimony, and then presented the testimony *ex parte* and *under seal* to the district court judge.

The district court ordered that the evidentiary hearing be reopened. On November 22, 2013, the court heard the testimony of Kim Carter, who claimed that Mr. Lacaze confessed to her in 1995 that he committed this homicide. The State argued that Ms. Carter's testimony was relevant to rebut Mr. Lacaze's claims of actual innocence and mental retardation. Ms. Carter testified that she had not told anyone about this confession until 2013, even though she was present in the audience during Mr. Lacaze's trial. Transcript, Nov. 22, 2013, at 43, 48. Ms. Carter's description of this alleged "confession" wholly conflicted with the evidence at trial. Ms. Carter also claimed that she did not know anything about Rogers Lacaze's post-conviction case until she ran across an article on nola.com, while viewing an obituary of someone who had recently died. When asked the name of her friend who had died, Ms. Carter responded, "I don't know." *Id.* at 49. After being reminded that she had previously stated that it was a friend's son who had died, she admitted that it was "a friend of mine's son." *Id.* at 50. When asked what her friend's name was, she answered, "I don't know the mom's name." *Id.* Ms. Carter admitted that she had given similar testimony in another case, where she testified on behalf of the prosecution that her children's father had confessed to murder ten years prior to his trial. *Id.* at 34. She also admitted that the Orleans District Attorney's Office had been seeking child support on her behalf as recently as August of that year. *Id.* at 37.

The district court denied Mr. Lacaze the opportunity to present witnesses to impeach Ms. Carter's credibility. Mr. Lacaze instead proffered the affidavits of witnesses who would have testified about Ms. Carter's reputation for dishonesty and her mental illness. The court did, however, allow Mr. Lacaze to present an additional witness in support of his actual innocence.

Darran Reppond testified that he was an inmate who was incarcerated with Adam Frank in 2003. During the planning of an aborted prison escape, Adam confided in Mr. Reppond that he had killed a police officer in New Orleans. He reported that "he had run down on a cop in a restaurant in New Orleans and shot him in the head because the cop shook him down." Ex. 17 (Affidavit of Darran Scott Reppond); Transcript, Nov. 22, 2013, at 66. Adam further explained that his girlfriend was the getaway driver, and that "his sister got messed up in the whole thing and took the rap for him, but he would take care of her and get her out." *Id*

### D. The State District Court Granted Post-Conviction Relief

On July 23, 2015, in a 128-page opinion, the state district court granted Rogers Lacaze's application for post-conviction relief on the basis that he was denied his constitutional right to an impartial jury. The court found that the record was "abundantly clear" that potential jurors were specifically asked about their connections to law enforcement and "for whatever reason, Mr. Settle did not honestly answer the question." Opinion, July 23, 2015, at 20. Juror Settle "sat there mute," even when potential jurors on his panel revealed more minor connections to law enforcement. Opinion, July 23, 2015, at 17. While the court was "reluctant to find that Mr. Settle . . . was actively seeking to be a part of the jury by his silence," the court nonetheless determined that there was no "legitimate reason for him not speaking up." Opinion, July 22, 2015, at 16-

17.[21] As Mr. Lacaze was accused of murdering a police officer (with a police officer), David Settle's position as an active duty officer and his seventeen-year history in law enforcement would have rendered him cause-challengeable. Indeed, at the time of Mr. Lacaze's trial, all police officers were ineligible for jury service in any criminal trial. *State v. Simmons*, 390 So.2d 1317, 1318 (La. 1980) (holding that no active duty police officer can be a competent juror), *overruled by State v. Ballard*, 98-2198 (La. 10/19/99); 747 So. 2d 1077.

The district court concluded that Mr. Lacaze had met his burden under the United States Supreme Court's test in *McDonough Power Equipment*, 464 U.S. at 556:

> Mr. LaCaze has met his burden, under *Donough*, of showing that a juror failed to honestly answer a voir dire question and that an honest answer would have provided a valid basis for a challenge for cause.

Opinion, July 23, 2015, at 20.

Separately, as an additional ground of relief, the district court also found that Mr. Lacaze was entitled to reversal of his death sentence because his attorney's representation in the penalty phase of trial "did not come close to the competent, effective representation Mr. LaCaze was entitled to." The court explained:

> This situation strikes me as quite similar to the one the Louisiana Supreme Court faced in *State v. Sullivan*, 596 So.2d 177 (La., 1992), rev'd on other grounds sub nom. *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). There the defendant's trial counsel admitted he had not prepared for the penalty phase because he felt the jury would return a verdict of second degree murder, a feeling the court deemed unreasonable under the facts of the case. The supreme court noted its agreement with the lower court that whenever a defendant faces capital punishment his attorney must prepare for the possibility that he could be convicted as charged.
>
> I have seen nothing in this record that evidences that Mr. Turk investigated defenses to place before the jury. If he did, he did not use it at trial. I can divine

---

[21] The court further noted that because of Settle's dishonesty, "there was no discussion with him regarding whether his employment would have a bearing on his decision-making process in the jury room."

no legitimate tactical reason for not investigating or presenting evidence from professionals to the penalty jury. As in Sullivan, supra, had he investigated he would have found evidence that Mr. LaCaze had been a slow learner in school which should have caused him to consult professionals. Such consultation would have led him to the information Dr. Salcedo developed post—trial and current counsel have built upon regarding his alleged mental retardation. That evidence in conjunction with humanizing testimony from teachers, family, neighbors and friends could have persuaded at least one juror to hold out for a sentence of life imprisonment

Opinion, July 23, 2015, at 123-24.

### E. The State Appealed the District Court's Reversal of Mr. Lacaze's Conviction but not the Reversal of his Death Sentence

The State filed for writ of review with the Fourth Circuit Court of Appeal, seeking reversal of the district court's ruling regarding Juror Settle. The State did not challenge the portion of the district court's order reversing Mr. Lacaze's death sentence. The State deliberately and strategically waived this sentencing issue in the Court of Appeal. *State's Writ to the Fourth Circuit* at 4, n. 2. The State asked only for the Fourth Circuit to reverse "the trial court's grant of a new trial" but not the court's sentencing decision. *Id.* at 6, 8. Mr. Lacaze filed an opposition to the State's writ, raising all possible grounds for upholding the district court's grant of a new trial. As the State did not contest the reversal of Mr. Lacaze's death sentence, no penalty-phase claims were raised in the Fourth Circuit.

### F. The Fourth Circuit Court of Appeal Reversed the District Court's Grant of a New Trial

On January 6, 2016, the Fourth Circuit Court of Appeal granted the State's Writ in part. In a one-paragraph opinion, the court ruled that "the trial court erred in finding that the seating of Mr. Settle on the defendant's jury was a structural error entitling him to a new trial." *State v. LaCaze*, 15–0891 (La. App. 4 Cir. 1/6/16) (unpub'd). The court offered no legal support for reversing the district court's ruling, and granted no deference to the district court judge who

observed the live testimony of David Settle and was able to assess his credibility. The Fourth

Circuit further found that the district court did not "err[] in denying the remaining claims." *Id*.

The Fourth Circuit "remanded to the trial court for consideration of the defendant's remaining

post-conviction claims." *Id*.

### G.  The Louisiana Supreme Court Denied Petitioner's Writ

Petitioner filed a non-capital[22] Application for Supervisory Writs with the Louisiana

Supreme Court, challenging the Fourth Circuit's reversal of a new trial. Petitioner raised all

relevant grounds for the court to grant relief and to reinstate the district court's order of a new

trial. As was true in the Fourth Circuit Court of Appeal, Petitioner did not address the penalty

phase implications of any of the district court's rulings in his writ. The State did not challenge

the district court's order reversing Mr. Lacaze's death sentence.

The Louisiana Supreme Court denied Petitioner's writ, finding that the seating of Juror

Settle did not violate his right to an impartial jury. The court also denied all other claims for

relief. *State v. LaCaze*, 16-0234 (La. 12/16/16); 208 So. 3d 856 (*per curiam*).

### H.  The Louisiana Supreme Court Briefly and Wrongly Reinstated Mr. Lacaze's Death Sentence

Although the prosecution expressly declined to appeal the reversal of Mr. Lacaze's death

sentence,[23] the Louisiana Supreme Court reinstated Mr. Lacaze's death sentence in its December

---

[22] The Louisiana Supreme Court has different page limits for capital and non-capital writs. A non-capital writ has a page limit of 25 pages, while a capital writ has a page limit of 50 pages. La. Sup. Ct. Rule X § 4. It is this page-limitation that accounts for the "terse presentation" of some of Petitioner's claims that this Court noted in the per curium opinion. *See State v. Lacaze*, 16-0234 at 5, n. 12 ("LaCaze also urges— by way of a bullet-point list accompanied by scant argument—that other items were suppressed. His terse presentation is insufficient to show that any of the alleged suppressions warrant this Court's intervention.").

[23] As was explained above, the State did not challenge the district court's reversal of Mr. Lacaze's death sentence. It filed writs, seeking only the reinstatement of the conviction in this (now) non-capital case. It

36

16, 2016, opinion. The court erroneously found that the Fourth Circuit Court of Appeal "correctly reversed the order for a new trial and reinstated Mr. Lacaze's convictions and death sentence." Ex. 28 (Louisiana Supreme Court Original Opinion Denying Writ). The Fourth Circuit had done no such thing. In a separate concurring opinion, Justice Crichton denounced Mr. Lacaze for "attempt[ing] to relitigate the penalty phase of this trial" in "this protracted and inappropriate utilization of the post-conviction process." Justice Crichton called for "justice to be served for these three horrific murders." Ex. 28.

On December 20, 2016, Petitioner filed a *Motion for Reconsideration*, pointing out the court's error. Ex. 18 (Petitioner's Motion for Reconsideration and Rehearing). Within a matter of hours, the court withdrew its original opinion, and issued a corrected opinion backdated to December 16, 2016. Ex. 29 In the corrected opinion, the portion of the opinion reinstating Mr. Lacaze's death sentence as well as Justice Crichton's concurring opinion were deleted. The court then denied Mr. Lacaze's *Motion for Reconsideration* "as moot," in an order dated December 16, 2017—four days before he filed the *Motion*. Ex. 19 (Denial of Motion for Reconsideration, December 16, 2016). The court officially reissued its new opinion, which was also backdated to December 16, 2016. The court then issued a second order, denying Mr. Lacaze's *Motion for Reconsideration* as "moot," dated December 20, 2016. Ex. 20 (Denial of Motion for Reconsideration, December 20, 2017). The original opinion reinstating Mr. Lacaze's death sentence still appears on Lexis Nexis. *State v. Lacaze*, 16-0234 (La. 12/16/16); 208 So. 3d 856; 2016 La. LEXIS 2507.

---

was for this reason only that the State was permitted to file its Writ in the Fourth Circuit at all. The Louisiana Supreme Court has exclusive appellate jurisdiction over cases where "the defendant has been convicted of a capital offense and a penalty of death actually has been imposed." La. Const. Art. V, § 5(D). Had the State challenged the reversal of Mr. Lacaze's death sentence (on any grounds), the case would have bypassed the Court of Appeal and proceeded directly to the Louisiana Supreme Court.

## I.    Proceedings in the United States Supreme Court

On March 16, 2017, Petitioner filed a *Petition for a Writ of Certiorari* with the United States Supreme Court, seeking a grant of certiorari or summary reversal on his claims of juror and judicial misconduct. The Court ordered the State to respond to the *Petition*, and subsequently ordered the Louisiana Supreme Court to submit the record for review. The *Petition* is scheduled for conference on September 25, 2017. In light of his pending Petition with the United States Supreme Court, Petitioner has filed a *Motion to Stay and Abey* concurrent with this *Petition for Writ of Habeas Corpus*.

## CLAIMS FOR RELIEF

### CLAIM 1:    ROGERS LACAZE WAS TRIED BEFORE A BIASED TRIBUNAL

An unparalleled chain of events occurred in this case, which embroiled the trial judge in a separate criminal investigation into Antoinette Frank's possession of the likely murder weapon, while he was simultaneously presiding over Rogers Lacaze's capital trial. Judge Frank Marullo was approached on multiple occasions by NOPD officers regarding a court order bearing his signature that transferred a 9mm gun to Antoinette Frank before the Kim Anh Restaurant murders. Judge Marullo did not reveal his involvement in the investigation to Rogers Lacaze when his case was allotted to the Judge's section. He said nothing when defense counsel moved to recuse him on the first day of trial. He even remained silent as Rogers Lacaze testified in his own defense that Antoinette Frank told him that she was getting a 9 mm gun from a friend at the NOPD evidence and property room. The facts of this case present an "extraordinary situation where the Constitution require[d] recusal" at trial, violating Mr. Lacaze's right to due process. *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 887 (2009).

38

## A.  Relevant Facts and Procedural History

On March 4, 1995, Officer Antoinette Frank and Rogers Lacaze were arrested on charges of first degree murder. The murder was committed with a 9 mm firearm that was never recovered by the NOPD. Shortly after the homicide officers from the Public Integrity Division of the NOPD launched an investigation into how Antoinette Frank was able to obtain two firearms from the Evidence and Property room before the crime.

NOPD investigators contacted Judge Marullo for the first time before Rogers Lacaze's case was allotted to his section. Ex. 2 at 3 (NOPD Public Integrity Division Report). On March 28, 1995, Sgt. Robert Harrison approached Judge Marullo and showed him a court order transferring a 9mm Beretta to Antoinette Frank from the NOPD Evidence and Property Room. Judge Marullo examined the order, and told Sgt. Harrison that "he did not believe the court order in question was his signature." *Id*.

Rogers Lacaze's case was allotted to Judge Marullo on May 1, 1995. At no time did Judge Marullo disclose to the defense that there was an investigation into Ms. Frank obtaining a 9mm, or that he was involved in that investigation.

Sgt. Harrison continued with his investigation, interviewing multiple witnesses including Officer David Talley, Judge Morris Reed, and the judge's staff. He approached Judge Marullo for the second time on May 16, 1995. He left a message with Judge Marullo's clerk, to ascertain if the Judge "was willing to give Sgt. Harrison a taped statement." *Id.* at 4.  Judge Marullo called Sgt. Harrison back, refusing to give a taped statement. He explained that,

> [T]he Antoinette Frank/Roger Lacaze case had been allotted to his court section for adjudication. According to Judge Marullo, he would not make a statement in the matter until the case has reached its final disposition.

39

*Id.* Again, Judge Marullo did not disclose to defense counsel that Antoinette Frank possessed a 9mm gun, that she got it through a court order with his signature, or that he was part of an ongoing NOPD investigation into this.

Rogers Lacaze's case proceeded to trial at rapid pace, commencing only two months later. Such a quick timeline was unheard of for a capital case, but Judge Marullo insisted that there would be no continuances of Mr. Lacaze's trial. As Attorney Robert Jenkins explained at the post-conviction evidentiary hearing,

> [T]he Judge said that there would be no continuance in this case and we're gonna resolve this case within three months down the line . . . Even in the nineties you could not get a felon with a firearm case in three months to trial. Just couldn't do it.

Ex. 7 at 57 (Transcript, June 18, 2013). Because of the rush to trial, Willie Turk "was not ready, he was not prepared, he needed more time." Ex. 7 at 48 (Transcript, June 18, 2013). Mr. Turk was also "terrified" of "what was going on in the proceedings," especially after confrontations with Judge Marullo. *Id.* at 47, 51. On the first day of trial defense counsel filed a motion to recuse Judge Marullo, alleging that the Judge "screamed" at him and made him feel "inadequate and incompetent," jeopardizing his ability to represent Mr. Lacaze. R. Vol. 1, Tr. 527. Judge Marullo testified at a recusal hearing before Judge James McKay that very day. Defense counsel asked whether Judge Marullo was able to be "fair and impartial in ruling in this particular trial with Mr. Rogers Lacaze?" Judge Marullo responded that he could. He said nothing about his connections to the likely murder weapon, and the motion to recuse was denied. R. Supp. Vol. 5, Tr. 127.

Evidence that Officer Frank owned a 9mm gun and reported it stolen just ten days before the murders was not only relevant to Mr. Lacaze's motion to recuse Judge Marullo, but was

critical favorable evidence. All three victims were killed by the same 9mm weapon, and the murder weapon was never recovered. Mr. Lacaze denied at trial that he was the one who had the 9mm gun and shot the victims, and testified that Ms. Frank had told him: "I got a friend of mine down in the Property Room, and I should be getting a nine millimeter soon." R. Vol. 7, Tr. 565. Hearing this testimony, and knowing that what Mr. Lacaze said was true, Judge Marullo again stayed silent.

Because the defense lacked any evidence to support Mr. Lacaze's testimony, the State was able to argue with impunity that it was Rogers Lacaze who planned the crime, had the 9mm gun, and likely murdered all three victims:

> Now, Officer John Treadaway told you nine casings, the same gun, pellets, the same gun.
>
> *And, you know that Roger Lacaze was the one with the nine millimeter weapon* who executed Ronald Williams and we know that both Ha Vu and Quong [sic] Vu were executed by a nine millimeter weapon.

R. Supp. Vol. 3, Tr. 57 (emphasis added); *See also* R. Supp. Vol. 4, Tr. 15 (the State arguing that Rogers Lacaze "ignored the tears of Ha Vu and Cuong Vu as he stood over them and executed them. He was their jury and executioner. He did it just like that.").

At Ms. Frank's trial months later, the State argued that Antoinette Frank was the one who obtained the 9mm weapon and shot the victims. The State sought to support this theory with the testimony of Officer David Talley, a friend of Antoinette Frank who worked at the NOPD evidence and property room. Ex. 3 (Testimony of David Talley at Frank Trial). Officer Talley was prepared to testify that he personally obtained a court-order from Judge Marullo's section, transferring a 9mm gun to Officer Frank. In the middle of Officer Talley's testimony, Judge Marullo requested that the parties approach the bench, and then conducted an off-record

41

conference with only ADA Woods. Ex. 3 at 113.[24] Judge Marullo then requested that all parties

step into chambers. Neither Mr. Lacaze nor his attorney was present for this conference. There,

Judge Marullo disclosed to Ms. Frank's attorneys (seemingly for the first time) that there was an

investigation into court orders transferring guns to Antoinette Frank. He explained:

> The person who investigated this took handwriting exemplars from different people. They asked if I – there was nothing - - they asked if I did that, and they asked other judges if they did that, and I said, "Well, not that I recall. But it would be perfectly logical and correct that I would do something like that. But, my recollection is I don't even know who this person is."

Ex. 3 at 113.

Judge Marullo further explained that the handwriting exemplars he produced were sent

"to be analyzed by an expert, they came back and told me it wasn't my signature." *Id.* This claim

is directly contradicted by Sgt. Harrison's later testimony before the Civil Service Commission

that Judge Marullo never provided handwriting exemplars during his investigation. Sgt. Harrison

testified that a sample of David Talley's handwriting was examined, but the results were

inconclusive. Ex. 21 at 5 (appeal from the Civil Service Commission).[25] He requested exemplars

from Judge Morris Reed, but never from Judge Marullo. Ex. 21 at 5.[26]

At Ms. Frank's trial, Officer Talley testified in chambers that he personally brought the

court order to a member of Judge Marullo's staff, Mr. Genovese, and watched him bring it back

into the Judge's chambers. Mr. Genovese then returned with the signed order. Ex. 3 at 127-129.

---

[24] The transcript from Antoinette Frank's trial is numbered in the bottom right hand corner with both typed numbers and hand written numbers. Undersigned counsel will cite to the handwritten numbers.

[25] Transcripts of the Civil Service Commission hearing have since been destroyed. Undersigned counsel relies on a summary of the transcripts included in the Fourth Circuit Court of Appeal opinion, *David Talley v. Department of Police*, No. 98-CA-2284.

[26] At the post-conviction evidentiary hearing, Judge Marullo testified that he did not remember anything about handwriting exemplars. Ex. 1 at 67 (*District Court Transcript,* June 17, 2013).

(Talley Testimony at Frank Trial). Judge Marullo responded: "Well, I'll tell you this doesn't appear to be, look like, or resemble my signature." Ex. 3 at 128. He then concluded, "But I mean, he received it, and he gave this to Officer Genovese." Ex. 3 at 129. Although Officer Genovese had died that very day, Judge Marullo assured Officer Talley that he did not suspect anything improper on Talley's part. Talley "wouldn't even have known" that Genovese died, because Judge Marullo had just learned this information about an hour earlier. Ex. 3 at 145.[27]

After hearing the testimony of Office Talley, Judge Marullo stated in chambers that the court-order "may have been my signature." Ex. 3 at 136. Officer Talley's description of the events had caused him "second guessing whether it is or not." *Id.*

When questioned by the trial court about the relevance of the testimony and documents, Prosecutor Woods stated:

> BY MR. WOODS:   Look, this crime was committed with a nine millimeter
>                 gun. If I have evidence that Antoinette Frank had- -
>
> BY THE COURT:   He can say that he turned over a gun to Antoinette Frank?
>
> BY MR. WOODS:   Right. Right. And that's it.

Ex. 3 at 116-117. Judge Marullo ultimately ruled that the State could only elicit testimony that David Talley provided a 9mm gun to Antoinette Frank, but not how he got it. Ex. 3 at 117, 144 ("I'm not letting this thing [the order] about all of that in. . . The only thing that will get in is that this man [Officer Talley] can testify that he gave her a nine millimeter pistol, and there is a document with his signature on it, and with Antoinette Frank's signature."). Judge Marullo

---

[27] In contrast, at the recent evidentiary hearing, Judge Marullo testified that he thought it was "convenient" that Talley used Officer Genovese's name. Ex. 1 at 63 (*District Court Transcript*, June 17, 2013).

prevented disclosure of evidence that he (or at least his chambers) was involved in this gun transfer.

Armed with evidence that Antoinette Frank possessed a 9mm gun, the State was able to argue in closing that Antoinette had the means and intent to kill:

> We know from John Treadaway that Ronnie Williams, Cuong Vu and Ha Vu were killed with what? A nine millimeter gun. That's it. That has no evidentiary value to us whatsoever, other than the fact that *we know Antoinette Frank either owned or has owned a nine millimeter*.

Frank R. Supp. Vol. 1 at 167; *see also* Frank R. 67. ("Antoinette attempted to buy nine millimeter shells and she owned a nine millimeter gun. She was the person who had an intent to kill.").

On October 4, 1995, Judge Marullo was approached for a third time by Sgt. Harrison regarding the court order and the gun. This was only three weeks after he formally sentenced Rogers Lacaze to death. Again, Judge Marullo refused to provide Sgt. Harrison with a taped statement:

> Judge Marullo related he did remember telling Sgt. Harrison he would give a statement after the case was completed. Judge Marullo stated the Antoinette Frank case would be with him for a long time because of appeals. It was this reason he would not be able to give Sgt. Harrison a statement.

Ex. 2 at 5 (Report of the NOPD Public Integrity Division).

Evidence that Judge Marullo's name was connected to the likely murder weapon was not revealed in open court during the trials of Rogers Lacaze or Antoinette Frank. It was never published in the media, and Judge Marullo consistently refused to give a formal statement to NOPD investigators. Judge Marullo did not testify at the hearing before the Civil Service Commission regarding Officer Talley's subsequent termination from the NOPD, although Sgt. Harrison and Judge Morris Reed did. Ex. 21.

Judge Marullo only spoke publically about the investigation and his role in it during Rogers Lacaze's post-conviction proceedings. At a recusal hearing in 2010 and at a post-conviction evidentiary hearing in 2013, Judge Marullo adamantly denied that he ever signed the order in question. In contrast to his in-chambers statements at Ms. Frank's trial that this "may have been" his signature, he testified definitively that he "never ordered the gun to be given to Antoinette Frank 'cause I would never do that." Ex. 1 at 63 (*District Court Transcript*, June 17, 2013). Judge Marullo recalled that there was an investigation into the 9mm gun, and that he refused to give a taped statement, but explained that he "didn't want to get involved in that investigation while I was trying this case." Ex. 1 at 66, 69. He denied that these events biased him against Mr. Lacaze. Ex. 1 at 71.

**B. Petitioner was Denied His Right to Trial by an Impartial Tribunal.**

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison,* 349 U.S. 133, 136 (1955). The denial of a defendant's right to a trial before an impartial court is structural error, warranting automatic reversal. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (holding that a defendant is deprived of due process of law where he is subject to the judgment of a court that has "a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case").

When determining if a defendant was tried before a biased tribunal, the court must apply an objective test, asking if the circumstances presented would "offer a possible temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true between the State and the accused." *Id*; *see Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986). Put another way, "[t]he Court asks not whether the judge is actually, subjectively biased,

45

but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton,* 556 U.S. at 881. As the Ninth Circuit explained:

> [The Defendant] need not prove actual bias to establish a due process violation, just an intolerable risk of bias. Thus, we must ask "whether 'under a realistic appraisal of psychological tendencies and human weakness,' the [judge's] interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" Due process thus mandates a "stringent rule" that may sometimes require recusal of judges "who have no actual bias and who would do their very best to weigh the scales of justice equally" if there exists a "probability of unfairness." But this risk of unfairness has no mechanical or static definition. It "cannot be defined with precision" because "[c]ircumstances and relationships must be considered."
>
> For instance, due process requires recusal where the judge has a direct, personal and substantial pecuniary interest in convicting a defendant. Other financial interests also may mandate recusal, even if less direct. Non-pecuniary conflicts "that tempt adjudicators to disregard neutrality" also offend due process. A judge must withdraw where she acts as part of the accusatory process, "becomes embroiled in a running, bitter controversy" with one of the litigants, or becomes "so enmeshed in matters involving [a litigant] as to make it appropriate for another judge to sit[.]

*Hurles v. Ryan*, 706 F.3d 1021, 1037-38 (9th Cir. 2013) (citations omitted).

As the United States Supreme Court has recently articulated, because bias is "difficult to discern in oneself," the Court "asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is 'likel'" to be neutral, or whether there is an unconstitutional 'potential for bias.''" *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (quoting *Caperton*, 556 U.S. at 881).

Here, the facts giving rise to the objectively impermissible risk of bias are undisputed and extraordinary:

- Judge Marullo participated as a witness in the police investigation pertaining to the release of a 9mm gun to Officer Frank (the codefendant who had implicated Petitioner in the murder);

46

- The investigation involved a dispute as to whether Officer Talley, a potential accomplice of Petitioner's codefendant, forged an order to release the weapon or Judge Marullo signed it himself;

- Judge Marullo refused to give an official statement to the investigating officers because he was presiding over Mr. Lacaze's capital trial

- Defense counsel had no knowledge of the investigation, release of the weapon, Officer Talley, or Judge Marullo's involvement; and

- Judge Marullo did not disclose any of these facts at any point during trial—even upon learning of the defense theory that Officer Frank's brother was the second shooter, and hearing Petitioner's (otherwise unsupported) trial testimony that Officer Frank had planned to get a 9mm gun from police evidence.

The integrity of the judicial system was degraded when Judge Marullo participated in the investigation and failed to disclose that fact, even upon defense counsel's motion to recuse, or upon hearing the defense theory that Officer Frank planned and carried out the murders with her brother, and told Petitioner she planned to get a 9mm gun from the police evidence room. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 856 (1988) ("To determine whether [a judge's impartiality] 'might reasonably be questioned,' it is appropriate to consider the state of his knowledge immediately before the lawsuit was filed, what happened while the case was pending before him, and what he did when he learned of [the conflict] in the litigation."). The undisputed facts in this case created, at a minimum, an unconstitutional potential for bias. Because the state court's adjudication was contrary to or an unreasonable application of federal law, this Court must review the claim *de novo* and Mr. Lacaze's conviction must be reversed.

**CLAIM 2:    ROGERS LACAZE WAS DENIED HIS RIGHT TO TRIAL BY AN IMPARTIAL JURY**

In 1995, Rogers Lacaze stood trial for the murder of a New Orleans Police Officer and two young restaurant workers. His co-defendant, Antoinette Frank, was also a police officer with

the NOPD. Twenty-two police officers and two police dispatchers testified at his trial.[28] Ann Williams, the widow of Officer Ronald Williams, testified in the penalty phase.

Given the facts of this capital case, Mr. Lacaze had a vested interest in discovering if anyone seated on his jury had connections to law enforcement. This was one of the first questions that defense counsel and the trial court asked potential jurors during voir dire. Yet despite direct questioning, Juror David Settle did not disclose that he had been a policeman for 17 years, and was an officer with the Louisiana State Police at the time of trial. Juror Victoria Mushatt did not disclose that had worked as a dispatcher for the NOPD for 20 years, that she was present in the room when the 911 call that Officer Ronald Williams had been shot came in, and that she attended Officer Williams' funeral. And, Juror Lillian Garrett did not disclose that she lost two of her brothers to murder. One was beaten to death, and the other was shot in the head. These three jurors' failure to disclose this critical information violated Mr. Lacaze's constitutional right to an impartial jury of his peers.

### A.  Relevant Facts and Procedural History

#### 1.  The Voir Dire Proceedings in 1995

At trial Mr. Lacaze was represented by a single attorney, Willie Turk, who had never tried a capital case before. Apparently Mr. Turk did not know how to conduct voir dire, so he asked a friend, Earnest Caulfield, to do it for him. Arriving late on the first day of trial, Mr. Caulfield addressed potential jurors and attempted to explain why he was conducting voir dire:

---

[28] These witnesses were as follows: James Gallager, Geraldine Prudhomme, Irvin Briant, Reginald Crier, Darryl Watson, Michael Morgani, Sandra Duncan, Debbie Rogers, Earnest Smith, David Slecco, Wayne Farve, Reginald Jacques, Yvonne Farve, Warren Fitzgerald, John Treadway, Earnest Bringier, Marco Demma, Edward Rantz, Patrick Young, Tuoc Tran, Stanley Morlier, John Landry, Sandra Jackson, and Dee Barnes.

> I am going to assist Mr. Turk with the jury selection in the case today.  I don't
> know why he asked me, but I agreed to assist him in this case.

R. Supp. Vol. 1, Tr. 101. Mr. Caulfield asked almost no questions that would elicit information

about jurors' potential biases. Voir dire lasted only three hours, at the end of which Mr. Caulfield

left the courtroom and never came back. The jury was selected by 1:20 p.m.

Notwithstanding the abbreviated pace of the proceedings, the trial court and counsel did

ask all potential jurors about their connections to law enforcement. When the first panel was

seated, defense counsel asked potential jurors if they were related to anyone in law enforcement.

R. Supplemental Vol. 1, Tr. 106. One potential juror disclosed that her nephew was a police

officer; another disclosed that his brother-in-law was a customs officer. R. Supplemental Vol. 1,

Tr. 107. Juror David Settle was seated in the audience during this questioning, and then was

called up in the second panel of potential jurors. When his panel was called, the trial court stated:

> you have heard the questions that have been previously asked the jurors that were
> sitting in this position before you, and I have asked you if you have anything to
> volunteer to go ahead and volunteer it…

R. Supplemental Vol. 2, Tr. 173.

Juror Settle said nothing. The trial court then specifically asked if anyone was "related to

anybody in law enforcement." *R.* Supplemental Vol. 2, Tr. 182. Potential Juror Massart disclosed

that his wife was a forensic pathologist and knew one state witness.[29] R. Supp. Vol. 2, Tr. 182.

Again, Juror Settle said nothing. The court then asked the second row of Mr. Settle's panel if

anyone was "involved or know anybody in law enforcement? -- any close personal friends or

anything like that?" R. Supplemental Vol 2, Tr. 183. A potential juror asked if the court was just

referring to New Orleans. The judge responded, "No, paint it with a wide brush. Anywhere in the

---

[29] Defense counsel did not challenge him for cause, but he later used one of his peremptory challenges on this juror.  Supp. Vol. 2, Tr. 251.

49

world?" R. Supplemental Vol 2, Tr. 183. The juror disclosed that her son was on the Atlanta police force. *Id*. Once again, Juror Settle did not respond to the court's questions. He was seated as a juror in Mr. Lacaze's capital case, ultimately voting to convict and sentence him to death.

At the beginning of jury selection, an unnamed juror seated in the audience (presumably, Juror Victoria Mushatt) disclosed that she was a dispatcher for the NOPD. Supp. Vol. 1, Tr. 150-151. The court instructed her to note this when her panel was called. She did not. When she was called to a panel, Mushatt was asked if she had acquired any knowledge about this case. R. Supp. Vol. 1, Tr. 111. She failed to disclose that she had any personal knowledge of this capital case. She was seated as a juror.

A third juror, Lillian Garrett, was questioned during voir dire about her experiences as a crime victim. Juror Garrett's panel was specifically asked during voir dire:

> [H]as anybody been the victim of a violent crime or knows someone close to them that has been the victim of a violent crime?

*R.* Supp. Vol. 2, Tr. 187. Juror Garrett said nothing, and was selected to serve on Mr. Lacaze's jury.

### 2. **Post-Conviction Evidence of Jury Misconduct**

#### a. *Juror David Settle's Background*

In post-conviction it was discovered that Juror David Settle had worked in law enforcement for his entire adult life. Officer Settle became a Commissioned Police Officer in 1978. He worked as a police officer for the Southern Railway Police Department in Tennessee and North Carolina until 1982. Officer Settle then became a Sergeant of Police for the Norfolk Southern Railroad Police until 1984. Ex. 4 at 24-25 (Employment Records of David Settle). He left the state of Alabama in 1993, and began working for the Louisiana Department of Public

Safety the following year. Ex. 4 at 1-27. Officer Settle testified at the post-conviction evidentiary hearing that he had worked as a "Railroad policeman on the railroad property" for a number of years. Ex. 1 at 35 (*District Court Transcript*, June 17, 2017). In that capacity he patrolled railroad property and had the power of arrest. Ex. 1 at 38.  He testified that in 1995 he believed that he worked at the Motor Vehicle Reinstatement Office in New Orleans as "a driver's license officer." Ex. 1 at 34-35. Mr. Settle's employment records reflect that he was employed as a Field Officer for the Louisiana State Police at the time he sat as a juror. Ex. 4 at 27; *See also* Ex. 4 at 13-20. After hearing testimony from Mr. Settle, the district court made a factual finding that Mr. Settle was a "badge-wearing law enforcement officer" at the time of trial. *District Court Order* at 19.

### b.  *Juror Victoria Mushatt's Background*

In post-conviction it was also discovered that Juror Victoria Mushatt had intimate connections to this capital case. Ms. Mushatt had worked as a dispatcher for the New Orleans Police Department ("NOPD") for 20 years. Both she and her husband, NOPD Officer Rannie Mushatt, were well-established in the department. Like Ronnie Williams, her husband was a patrol officer. Like Ronnie Williams, her husband worked off-duty security "details." Ex. 5 (Declaration of Victoria Mushatt); Ex. 1 at 21-22 (District Court Transcript, June 17, 2013). The Mushatts knew many NOPD Officers, both personally and professionally. Juror Mushatt knew many of the police officers who testified at Rogers Lacaze's trial. Ex. 5; Ex. 1 at 23-25. Juror Mushatt even dispatched calls for Officer Ronald Williams. Although she never met him in person, she "felt like [she] knew him." Ex. 5.

Juror Mushatt testified at the post-conviction hearing that she was present in the dispatch room on March 4, 1995, when Quoc Vu made a 911 call, reporting that Officer Ronnie Williams,

51

his brother, and his sister had been shot. Ex. 1 at 17. She stated in a sworn declaration that she recalled that the 911 caller stated that "on[e] of the perpetrators was named Antoinette and she was a police officer." Ex. 5. The caller "said she was on the scene." *Id.* She further recalls that she and other operators had to look through NOPD manuals to determine if there was a police officer named Antoinette. Ex. 5.

Juror Mushatt testified that she attended the funeral of the victim in this case, officer Ronald Williams. Ex. 1 at 21-23; Ex. 5. She was there along with hundreds of police officers from across the state that came to pay tribute to their fellow officer. As Juror Mushatt explained in her sworn declaration, "It was very emotional. Some people may have been angry – it was a time. I feel like there were feelings on both sides – some people maybe supporting Antoinette – but the funeral was about Ronnie and his family and the department." Ex. 5. In her testimony at the 2013 evidentiary hearing, she explained that she and other officers attended the funeral to support the "entity" and their co-workers. Ex. 1 at 23. "[W]e do go to the funerals as a support as a department," Mushatt explained. *Id.*

### c.   *Juror Lillian Garrett's Background*

It was further discovered in post-conviction that before she sat as a juror in this capital case, Lillian Garrett had lost two of her brothers to murder. One of her brothers was shot, and one was beaten to death. Ex. 6 (Declaration of Lillian Garrett). Garrett was forced to personally view the body of one brother after his shooting. *Id.* Garrett's brother testified at the post-conviction hearing that one of their brothers was "shot in the back of the head. Got his brains blowed out." Ex. 1 at 46.

### 3.   The State Court Rulings on Juror Misconduct

On July 23, 2015, the district court reversed Rogers Lacaze's conviction and death sentence. After hearing the live testimony of the three jurors and reviewing his extensive employment records, Judge Kirby found that Mr. Lacaze was denied his right to a fair and impartial jury when Juror David Settle failed to disclose his history as a law enforcement officer. The court found that the record was "abundantly clear" that potential jurors were specifically asked about their connections to law enforcement and "for whatever reason, Mr. Settle did not honestly answer the question." Opinion, July 23, 2015, at 20. Juror Settle "sat there mute," even when potential jurors on his panel revealed more minor connections to law enforcement. *Id.* at 17. While the district court was "reluctant to find that Mr. Settle . . . was actively seeking to be a part of the jury by his silence," he nonetheless determined that there was no "legitimate reason for him not speaking up." *Id.* at 16, 19.[30]

As Mr. Lacaze was accused of murdering a police officer (with a police officer), Settle's position as an active duty officer and his 17-year history in law enforcement would have rendered him cause-challengeable. Indeed, at the time of Mr. Lacaze's trial, all police officers were ineligible for jury service in any criminal trial. *State v. Simmons*, 390 So.2d 1317, 1318 (La. 1980) (holding that no active duty police officer can be a competent juror) (*overruled by State v. Ballard*, 98-2198 (La. 10/19/99); 747 So.2d 1077).

The district court concluded that Mr. Lacaze had met his burden under the United States Supreme Court's test in *McDonough Power Equipment*, 464 U.S. at 556:

---

[30] The court further noted that because of Settle's dishonesty, "there was no discussion with him regarding whether his employment would have a bearing on his decision-making process in the jury room." (App. Vol 5, Ex. L, p. 898).

53

> Mr. LaCaze has met his burden, under [Mc]Donough, of showing that a juror failed to honestly answer a voir dire question and that an honest answer would have provided a valid basis for a challenge for cause.

*District Court Ruling* at 20.

The district court, however, denied Mr. Lacaze's claims of juror misconduct as they related to jurors Mushatt and Garrett. The court found that (1) Ms. Mushatt did not lie in response to direct questioning, and (2) that it was "unlikely" that a challenge for cause would have been successful, had she disclosed her full background. *District Court Ruling* at 11-16. The court further found that "the record is simply insufficient for this court to find that Ms. Garrett lied and thus was impliedly biased." Opinion, July 23, 2015, at 22. The court posited that Ms. Garrett may have misunderstood the questions asked during voir dire, or not heard them at all.

However, the district court's grant of a new trial was reversed on writs. The Fourth Circuit Court of appeal found that the error was not structural in nature, and Louisiana Supreme Court found that none of the three jurors would have been successfully challenged for cause had the jurors revealed this crucial information about their backgrounds. *Lacaze II*, at 860-64.

### B.  Petitioner Satisfied the Clearly Established Test for Juror Misconduct

The right to an impartial jury is a fundamental Constitutional right, protected by the Sixth and Seventh Amendments, and "a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955).  "Where every member of a jury panel is not impartial, then the accused has not been convicted by an impartial jury as demanded by the United States Constitution." *Allen v. Cain*, 2014 U.S. Dist. LEXIS 19412 (W.D. La. Feb. 13, 2014). The United States Supreme Court has long recognized that the right to an impartial jury guarantees a jury free of bias, and that "[t]he bias of a prospective juror may be actual or implied." *United States v. Wood*, 299 U.S. 123, 133 (1936). Indeed, that guarantee derives from Blackstone and Chief Justice Marshall's

opinion in the trial of Aaron Burr. *United States v. Torres*, 128 F.3d 38, 46 (2d Cir. 1997) (Calabrese, J.). Actual bias is "bias in fact," while implied bias is bias "conclusively presumed as a matter of law." Both doctrines are firmly recognized by the federal courts. *See, e.g.*, *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988); *Brooks v. Dretke*, 444 F.3d 328, 329 (5th Cir. 2006) (finding that the doctrine of implied bias is "clearly established federal law as determined by the Supreme Court").

The United States Supreme Court has laid out a two-part test for determining whether a juror's non-disclosure during voir dire rises to the level of a constitutional violation. When (1) a juror "fail[s] to answer honestly a material question on voir dire," and (2) "a correct response would have provided a valid basis for a challenge for cause," reversal of the defendant's conviction and sentence is required. *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 556 (1984). Under *McDonough,* Petitioner need not prove that the juror admitted bias against the defendant at trial. Rather, the court will infer bias from the juror's omission of a material fact about his background.  *See Scott*, 854 F.2d at 700 (inferring bias where a juror did not reveal that his brother was a sheriff); *Dyer v. Calderon*, 151 F.3d 970, 982 (9th Cir. 1998) (inferring bias where a juror failed to disclose that her brother was a murder victim); *Clark v. United States*, 289 U.S. 1, 10-11 (1933) (finding that "[b]ias is to be gathered from the disingenuous concealment which kept her in the box").

Mr. Lacaze satisfied this clearly established test for three of the seated jurors at his capital trial. In a capital murder case involving police officers as both a victim and a co-defendant, any potential juror who worked in law enforcement would have been subject to a valid cause challenge. In a case involving the murder of two young siblings, any juror who had lost two of

her siblings to homicide would have been subject to a valid cause challenge. This Court must grant the writ of habeas corpus.

CLAIM 3:    DEFENSE COUNSEL WAS INEFFECTIVE DURING VOIR DIRE

Defense counsel began trial with little-to-no understanding of the capital proceedings. As was detailed above, defense counsel Willie Turk did not conduct jury selection at all, but rather, asked his friend to conduct voir dire for him. Mr. Caulfield conducted *all of voir dire* while Mr. Turk sat silently at counsel table. Voir dire lasted only roughly three hours – far shorter than was typical in an Orleans Parish case at that time. Ex. 22 at 46 (Testimony of John Reed, June 24, 2013). Few direct questions were posed to the jurors. At the end of the brief voir dire, Mr. Caulfield immediately left the courtroom and did not return. He was disbarred a year later. *In re Caulfield*, 683 So. 2d 714 (La. 1996).

Defense counsel was so inept in voir dire that basic information about the jurors' background, employment and connections to the case were not revealed. Unbeknownst to defense counsel or the court, the jury included: (1) a 911 operator with the NOPD who attended the victim's funeral, (2) a veteran police officer, and (3) a woman who lost two siblings to murder. A conviction under these circumstances violated Mr. Lacaze's right to counsel under the Sixth Amendment of the United States Constitution.

Both *United States v. Cronic*, 466 U.S. 648 (1984) and *Strickland v. Washington*, 466 U.S. 668 (1984) recognize that counsel must *have the opportunity* to be effective and *in fact be effective* as a matter of fundamental fairness and due process.  Indeed only through the assistance of counsel can *all* the protections accorded a defendant by the Sixth Amendment be guaranteed. *Strickland*, 466 U.S. at 685 (Sixth Amendment provisions are necessary elements of fundamental

fairness and right to counsel effectuates them).  Just the provision of "a person who happens to be a lawyer" does not, however, "meet the constitutional command":

> The *Sixth Amendment* recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.  An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

*Id*. "Essential fairness is lacking if an accused cannot put his case effectively in court."  *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942).

Strickland directs, therefore, that an ineffective assistance of counsel claim involves proof by less than a preponderance of evidence of two elements. First, that counsel's performance fell below a reasonable standard of representation. "The proper measure of attorney performance" is the attorney's "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. Second, that had counsel performed effectively, there is a reasonable probability that the outcome of trial would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 690, 694.

While courts must defer to trial counsel's "strategic" choices, the Court has "defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Where counsel totally fails to conduct an investigation before making decisions, those decisions could not "have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690.[31]

---

[31] In finding counsel's voir dire performance to be deficient, courts will often point to counsel's failure to ask reasonable follow up questions when jurors indicate a potential bias, or to strike a biased juror.  In *Virgil v. Dretke,* the Court found that counsel's failure to follow up when a juror testified about his mother's mugging was deficient performance. 446 F.3d 598, 613. (5th Circuit, 2006). In the recent case of *Allen v. Cain*, the court found that counsel's performance was ineffective when he failed to probe a juror who was employed with the local fire department and was familiar with two "peripheral" police witnesses. *Allen v. Cain*, 2014 U.S. Dist. LEXIS 19412, 16 (W.D. La. Feb. 13, 2014); *See also Biagas v.*

### A. Defense Counsel's Performance was Deficient

As those around Mr. Turk explained at the post-conviction evidentiary hearing, Willie Turk did not participate in voir dire because he simply did not know how. Attorney Robert Jenkins spoke with Mr. Turk frequently in the lead up to trial, and even advised him from the audience as the trial was proceeding. Mr. Jenkins explained that when Willie Turk told him that another attorney was conducting the voir dire, Mr. Jenkins was "surprised" and said that "it was in his best interest for his client for him to do the voir dire," Ex. 7 at 49 (*Transcript*, June 18, 2013). However, Mr. Turk "felt that he was not properly prepared and ready to do this, and this was a capital murder case." *Id.* When Mr. Turk met with Earnest Caulfield on the night before the trial "they had sat around drinking wine and [] Turk had asked him to enroll in the case," Ex. 7 at 65. Mr. Caulfield "said he wasn't gonna do that," but ultimately agreed to only conduct the voir dire. *Id.*[32]

Willie Turk did not know the procedure for death qualification under *Witherspoon* and *Morgan*.[33] He was not familiar with the kind of comprehensive voir dire that must be conducted in capital cases – a procedure that typically lasts several days, if not weeks. Earnest Caulfield, unfortunately, was not familiar with this process either.[34]

---

*Valentine,* 265 F. App'x. 166, 172 (5th Cir. 2008) (holding that counsel was ineffective for failing to challenge a police officer who stated his belief that police officers always are truthful).

[32] As Mr. Caulfield told attorney Ben Cohen, he and Mr. Turk "spent more time talking about who was gonna play who in the movie about the case than they did preparing for the trial." Ex. 7 at 65.

[33] *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Morgan v. Illinois*, 504 U.S. 719 (1992).

[34] As expert John Reed testified:

> The only inquiry he made on the death penalty was to ask, um, whether all you jurors can return the death penalty, and they said, "Sure." That's a Prosecution inquiry. It's not a Defense inquiry. And it was the only inquiry.

Defense counsel utilized his challenges with disregard. He did not exhaust his peremptory challenges, and even had to ask the Court at one point how many he was allotted. *R. Supp. Vol. 1, Tr.* 138 (Defense Counsel asking the Court, "Your Honor, what is my limit?"). Although biased individuals remained on the jury, he did not strike them for cause. He did raise a cause challenge against a catholic seminarian who opposed the death penalty, a decision that the Louisiana Supreme Court characterized on direct appeal as "unusual." *Lacaze I*, 824 So. 2d 1063, 1080.

Mr. Caulfield asked almost no questions of individual jurors, but preferred to address the panel as a whole. He never inquired into the jurors opinions about false confessions or eyewitness misidentifications – issues that were central to Mr. Turk's defense, and typically discussed during voir dire. Ex. 22 at 47 (Testimony of John Reed). When jurors indicated that they knew something about Rogers Lacaze's case – as 100% of potential jurors did – Mr. Caulfield did not ask what they knew or how it would affect them. *See, e.g., R.* Supp. Vol. 1, Tr. 109 (Mr. Caulfield stating "think that all of you or practically everyone in here has heard about this case in some form or fashion, is that correct?"); *id.* at 110 (Mr. Caulfield telling jurors "I would assume that you saw the information on the television and read about it in the newspapers, is that correct?" but asking no follow up questions).

When jurors hinted at a potential for bias, Mr. Caulfield failed to ask any follow up questions. Such questions could have uncovered, for example, potential jurors' connections to law enforcement. As expert John Reed noted in the post-conviction hearings, "it takes no more

---

Ex. 22 at 42 *(Testimony of John Reed,* June 24, 2013); *see also* Supp. Vol. 1 at 116-117. Mr. Caulfield's only other inquiry into the subject of capital punishment was to bizarrely instruct potential jurors: "You can't have sympathy for the defendant, nor can you have sympathy for the dead people," essentially eliminating the potential for mercy in the penalty phase deliberations. *R.* Supp. Vol. 1 at 114.

than a simple question, 'Could you tell us, please, what your occupation is?'". *Transcript,* June

24, 2013, at 34.[35] In the expert opinion of Mr. Reed, such a performance was simply "appalling":

> In almost any case, but certainly in a capital case, it is appalling. And it does not, ah, meet anyone's standards in 1995 for []the norms of our practice [] in a serious felony case, in a regular murder case, and certainly not in a capital case. The glare - - the omissions and the consequences of those omissions and failures to gather information and inquire are just horrific.

Ex. 22 at 33 *(*Testimony of John Reed, June 24, 2013).

### B.  Petitioner was Prejudiced

Had defense counsel questioned jurors individually about outside influences or

knowledge of the case, he may have also discovered all that the jurors were holding back.

Juror David Settle was asked virtually no questions when his panel was called up.

Although he was asked the critical questions regarding his connections to law enforcement –

which he failed to truthfully answered – he was not asked basic questions like "how are you

employed." Defense counsel similarly seemed unconcerned with questioning Juror Garrett, and

failed to obtain any information about her background with violent crime.

But the treatment of Juror Mushatt is the most extreme example of counsel's

incompetence.  While it is incomprehensible that Ms. Mushatt did not inform the Court that she

witnessed Quoc Vu's 911 call, assisted in the investigation that night, and attended the victim's

funeral, it is equally incomprehensible that Mr. Caulfield was unable to uncover this critical

information. As was noted above, at the commencement of voir dire an unnamed individual in

the audience (presumably Ms. Mushatt) identified herself as a police dispatcher and said that she

knew several witnesses involved in this case. She was told to notify the court of this if she was

---

[35] Juror Mushatt's employment is listed on the jury sheet. Mr. Caulfield either did not have access to this sheet, or, if he did, his conduct is even more incomprehensible. *See*  Ex. 22 at 37.

called up to a panel. When Ms. Mushatt was called up to panel she did not remind the court that she was a police dispatcher, and defense counsel never asked her about it. Indeed, had defense counsel bothered to ask each individual juror any basic biographical questions, he may have discovered her shocking connections to this case.

Armed with this information, defense counsel could have successfully challenged all three jurors for cause or intelligently exercise his peremptory strikes. As the state court ruling was contrary to and an unreasonable application of federal law, and an unreasonable determination of the facts, Mr. Lacaze is entitled to *de novo* review. Defense counsel's failure to adequately investigate the potential jurors denied Mr. Lacaze his Sixth Amendment right to effective assistance of counsel, and entitles him to relief.

### CLAIM 4: THE STATE SUPPRESSED FAVORABLE AND MATERIAL EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*

At trial, the State suppressed a wealth of evidence that undermined the credibility of its eyewitnesses—the only direct evidence that Mr. Lacaze participated in these murders—and pointed to Antoinette Frank's brother as her likely accomplice. The State's suppression of evidence violated Mr. Lacaze's rights under the Sixth and Fourteenth Amendments of the United States Constitution, requiring reversal of his conviction.

A defendant is denied due process of law where the State suppresses evidence that is "favorable to the accused" and "material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*,

61

556 U.S. 449, 469-70, (2009); *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Under the *Brady* doctrine, each individual prosecutor has an affirmative duty to learn about exculpatory or impeachment evidence and disclose it to the defense. The State fails in this duty where favorable evidence known to a government agent is not disclosed to the defendant, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

The suppressed exculpatory and impeachment evidence in this case is overwhelming. This includes evidence that:

1. Chau Vu told police that she did not see Antoinette Frank's accomplice during the shooting

2. Vui Vu did not identify Rogers Lacaze in a photo lineup

3. Quoc Vu told police that he saw Antoinette Frank, not Rogers Lacaze, shooting in the kitchen

4. Police conducted an unduly suggestive interview and photo lineup with John Ross

5. Chau Vu and Quoc Vu told police that that Rogers Lacaze was carrying a cellular phone when they saw him at the restaurant earlier that night.

6. Adam Frank was a likely alternate suspect:

   a) Adam Frank had a gun and a police radio, and was seen riding with his sister while she was on police duty.

   b) Officers Stanley Morlier and Ronald Williams fought with Adam Frank and Antoinette Frank at the Kim Anh Restaurant, and Antoinette Frank threatened to kill Officer Williams.

   c) Antoinette Frank later threatened to kill Ronald Williams if he messed with her brother again.

   d) Officer Stanley Morlier believed that Adam Frank was involved in the Kim Anh murders and subsequently investigated him.

e) NOPD Investigators probed Officer David Talley about Adam Frank, whether Antoinette Frank gave him her 9mm Beretta, and whether he ever fought with Ronald Williams.

f) Antoinette Frank obtained a 9mm Beretta from the NOPD evidence room, and then dubiously reported it stolen only 10 days before the murders.

The evidence suppressed by the State puts "the whole case in such a different light as to undermine confidence in the verdict." *Id. at 435*.

### A. The Suppressed Evidence Concerning Adam Frank

The State suppressed evidence that Adam Frank, Antoinette Frank's brother, was a suspect in this case and under investigation by the NOPD. In the months leading up to the Kim Anh Restaurant murders, Ronald Williams and other New Orleans Police officers had had several run ins with Antoinette Frank and her brother Adam. Officers discovered that Adam Frank was wanted in Opelousas for attempted manslaughter and was hiding out at his sister's house in New Orleans. Officers discovered that Adam Frank was armed with a gun and improperly accompanying Antoinette on police duty. Antoinette gained access to weapons from the NOPD evidence room and dubiously reported her 9mm Beretta stolen only ten days before the murders. Adam and Antoinette were involved in a hostile dispute with Ronald Williams at the Kim Anh Restaurant that ended with Ms. Frank threatening Officer Williams' life. Less than 36 hours before the murders, Antoinette Frank placed a phone call to Ronald Williams' home and then to Rayville Louisiana, where Adam was later found living under an alias. NOPD officers suspected that Adam Frank was involved in the Kim Anh Restaurant murders and continued to investigate him, long after Rogers Lacaze's arrest. Indeed, Officer Stanley Morlier not only believed that Adam Frank was involved in the murders, but he employed a confidential

informant to find Adam. Officer Morlier found Adam Frank in Northern Louisiana, but did not arrest him.

Virtually none of this critical evidence was presented to the jury at Rogers Lacaze's trial. In opening statements, attorney Willie Turk promised jurors that he would present evidence that Antoinette Frank committed the murders with one of her relatives. As he hazily explained:

> Now, we concede that Ms. Frank was there on the scene. And, you will also hear from the evidence [sic] a family member of Ms. Frank's. You will hear his name mentioned several times during this trial.
> . . .
>
> Now, we concede that there was a second person, but as aforesaid, we will try to put on evidence to show who that second person was, and it was not Mr. Roger[36] [sic] Lacaze.

R. Vol. 5, Tr. 59-60.

Mr. Turk's promises never materialized. Each time he attempted to presented evidence in support of his stated defense, he was blocked by the State's suppression of critical evidence. Rogers Lacaze's defense was a hollow shell, and Mr. Turk appeared to be reaching for a theory that had no support.

### 1. The State Suppressed Evidence that Adam Frank had a Gun and a Police Radio, and Was Seen Riding with his Sister While She Was on Police Duty.

Roughly two months before the Kim Anh Restaurant murders, NOPD Officer Precious Davis reported concerns to her supervisors about fellow Officer Antoinette Frank's brother, Adam Frank. As Sgt. Geraldine Prudhomme explained in her suppressed report, Adam was known to be armed with a gun and a police radio, and accompanying his sister on police duty:

---

[36] Mr. Turk consistently called his client "Roger" throughout the trial. Mr. Lacaze's name is Rogers.

> OFFICER DAVIS STATED THAT SHE RAN THE SUBJECT'S NAME BECAUSE HE IS ALWAYS RIDING AROUND WITH HIS SISTER OFFICER ANTOINNETTE FRANK AND HER PARTNER OFFICER CARY DUPART WHILE THEY'RE ON DUTY. OFFICER DAVIS ALSO SAID THAT ADAM FRANK TOLD HER THAT HE HAD A GUN AND A POLICE RADIO BECAUSE HE WAS A SECURITY GUARD. OFFICER DAVIS SAID THAT SHE HAS NEVER SEEN THE GUN OR THE RADIO BUT SHE THOUGHT IT WAS ODD THAT HE SAID HE HAD A JOB BUT HE COULDN't RETURN HOME. SHE ALSO FELT THAT THE SUBJECT WAS HIDING SOMETHING SO SHE RAN HIS NAME AND HE WAS WANTED. OFFICER DAVIS SAID THAT ADAM FRANK WAS ALWAYS ASKING HER AND OTHER OFFICERS COULD HE HANG OUT WITH THEM OR RIDE WITH THEM BECAUSE HE WAS BORED AND SHE TOLD HIM NO.

Ex. 11 at 2 (Prudhomme Report).

Sgt. Prudhomme contacted several NOPD Officers about Adam Frank, including Officer Stanley Morlier, Lt. W. Heller, and Lt. Cazenave. *Id.* She at first told Officer Davis that it was not true that Adam Frank was wanted because "Officer Stanley Morlier and myself talked to Homicide and N.C.I.C. about the same complaint which had been called into N.C.I.C. earlier that day, Dec. 27, 1994." I*d.* at 2. The Seventh District officers ultimately determined that Adam Frank was wanted, and they notified Captain John Landry about Precious Davis's findings.

Captain Landry then ordered Sgts. Anthony Tesvich and David Slicho to go to Antoinette Frank's house "to conduct a wanted check for her brother." Ex. 12 (Correspondence to Landry). When the officers arrived, they confronted Antoinette Frank about Adam. Officer Frank denied knowing where Adam was. The officers were allowed inside the home, but did not find Adam. Ms. Frank claimed that Adam was living at an unknown residence in Metairie. Sgts. Tesvich and Slicho left Officer Frank with a warning:

> Officer Frank was instructed to contact a Seventh District supervisor should her brother return or should she learn of his whereabouts. It was expressed to Officer Frank that any concealment of this information on her part may be construed as a criminal violation of the law, to wit, harboring a fugitive.

65

*Id.*

The State never disclosed these reports. Nevertheless, Mr. Turk called Antoinette Frank's Captain at trial and questioned him about any possible investigation into Adam Frank. Captain Landry falsely testified that a female officer in the district approached him about Adam Frank only because "he was trying to go out with her, and she didn't like his actions." *R.* Vol. 7, Tr. 464. Captain Landry explained that this officer thought that Adam Frank was "a little strange," and so she ran his name in the computer and found out that he was wanted for attempted manslaughter in a different parish. *Id.* Defense counsel then asked if there were "any additional reports" made on Adam Frank "in reference to his behavior." Captain Landry testified that there were not. *Id.* He did not disclose that Adam Frank was reported to have a gun and a police radio, that he claimed to be a security guard, or that he was seen riding with his sister and her partner when they were no duty.

## 2. Officers Stanley Morlier and Ronald Williams Fought with Adam and Antoinette Frank at the Kim Anh Restaurant, and Antoinette Frank Threatened to Kill Officer Williams

Around the time that Officer Precious Davis was reporting her concerns about Adam Frank to her superiors, Adam was spending time at the Kim Anh Restaurant with his sister. Officers Stanley Morlier and Ronald Williams both worked off duty security details at the restaurant. Officer Morlier believed that Adam was "a risk at the restaurant," and needed to be kicked out. Ex. 14 at 164-65 (Morlier testimony at Frank Trial). Officers Williams and Morlier approached Antoinette Frank and told her that her brother could no longer spend time at the Kim Anh Restaurant. Antoinette reacted angrily, swearing at both officers as they ejected Adam from the Kim Anh. Ex. 14 at 164-68; Ex. 16 at 7(*Transcript*, June 19, 2013). Antoinette stormed out

66

of the restaurant as she said to Adam, "If they don't want you here, you don't need to be here. . . Fuck those people." Ex. 14 at 168.

After that incident Antoinette Frank refused to speak to Ronnie Williams. When she was confronted by Morlier, she told him that the "stuff" was "over with," but clearly held animosity towards Williams. Antoinette told Morlier,

> [Y]ou tell Ronnie Williams that **when he messes with my brother he's messing with me, and I'll take him out.**

Ex. 14 at 176 (emphasis added); Ex. 16 at 11. Officer Williams subsequently told his mother, Ann Williams, that Antoinette Frank threatened him. As was disclosed at the recent evidentiary hearing, "Ronnie came to [Mrs. Williams], before his murder obviously and relayed to her that Antoinette Frank had made threats. . . made threats, ah, against him based on her desiring to have. . . a larger share of the detail at Kim Anh Restaurant." Ex. 23 at 12 (*Transcript*, June 19, 2013, In Chambers Conference).

On the day of the shooting at 9:00 am, Lieutenant Richard Marino called Morlier into the station for questioning. Ex. 16 at 7 (*Transcript,* June 19, 2013). Officer Marino was a Lieutenant with the Public Integrity Division of the NOPD, assigned to investigate the Kim Anh Restaurant murders. Records of this interview were not disclosed at trial, and indeed have never been disclosed by the State.[37] As will be addressed below, even when Officer Morlier was called to the stand at Rogers Lacaze's trial, he denied knowing anything about Adam and Antoinette's dispute with Ronald Williams or Antoinette's death threats.

---

[37] Lt. Marino participated in the questioning of witnesses David Talley, Reginald Cryer, Michael Morgani, Ernest Smith, Darryl Watson, Eric Davis, and Officer Antoinette Frank. Although transcripts of those interviews were turned over by the State in post-conviction, Petitioner has never received a transcript of Officer Marino's interview with Stanley Morlier.

### 3. Officer Stanley Morlier Believed that Adam Frank Was Involved in the Kim Anh Murders and Subsequently Investigated Him.

The State failed to disclose that Officer Morlier believed that Adam Frank was involved in the Kim Anh Restaurant shootings and investigated him as a suspect. Even when called to testify at Rogers Lacaze's trial, Officer Morlier made no mention of his negative encounters with Adam Frank or current investigation, and the prosecution stayed silent.

As he testified in post-conviction, Officer Morlier knew that all of the problems between Antoinette Frank, Ronald Williams, and the Vus stemmed from Adam Frank. Ex. 16 at 7 and 14 (*Transcript*, June 19, 2013); Ex. 15 at 2 (Morlier unsigned affidavit). Given his experiences with Adam, Officer Morlier believed that he was involved in the murder of Ronald Williams. As he stated in post-conviction interviews, he believed that "Rogers Lacaze, if involved, was involved on a more minor level than Adam Frank." Ex. 16 at 14.

Concerned that Adam Frank would come back and harm the Vus, Officer Morlier began looking for him. Ex. 15. Officer Morlier hired an informant named Henny Bahem to locate Adam. Mr. Bahem ultimately found Adam Frank in Northern Louisiana before trial, but could not bring him back to New Orleans. Ex. 16 at 6, 14-15; Ex. 15.

The State suppressed evidence that a key police witness – the victim's partner and fellow security officer at the Kim Anh – believed Adam Frank was involved in the murders, carried out an investigation, and even located Mr. Frank before trial. Both Lt. Richard Marino and ADA Glenn Woods interviewed officer Morlier before Rogers Lacaze's trial, and the State called him as their own witness at Antoinette Frank's trial to testify about Adam Frank. Regardless of what Officer Morlier told ADA Woods before Rogers Lacaze's trial, the State had an independent duty to investigate and locate this exculpatory evidence.

68

**4. NOPD Investigators Probed Officer David Talley about Adam Frank, Whether Antoinette Frank Gave Him Her 9mm Beretta, and Whether He Ever Fought with Ronald Williams**

While Officer Morlier was using Henny Bahem to locate Adam Frank, Lt. Richie Marino began asking his own questions about Adam. Three weeks after his interview with Stanley Morlier, Lt. Marino conducted another interview with Officer David Talley. Officer Talley worked at the gun vault at the NOPD Central Evidence and Property Division and was known to have procured a 9mm weapon for Antoinette Frank. In a 26 page interview conducted on March 22, 1995, NOPD investigators grilled Officer Talley about Adam Frank, the 9mm gun, and Adam's history with Ronald Williams and the Kim Anh Restaurant. These questions included:

```
QQ: What do you know of Antoinette's personal feelings towards Officer
Williams?
A:  Jus' from the way she talked about him once or twice . . . I heard
her talk . . . she didn't . . . she didn't care for him, she didn't
like him.

QQ: She had some personal animosity towards . . . Officer Williams?
A:  That's what it sounded like?

QQ: Do you have . . . any idea where Antoinette's brother . . . lives?
A:  No sir.

QQ: You . . . you had no idea when you met him?
A:  Sometimes he would stay at her house.  I thought they were from
out, out of the city somewhere.

Q:  Anytime before the uh . . . events of the 4th of March, 1995, the
murders . . . , did you become aware that Antoinette Frank's brother
was wanted?
A:  No sir.  She told me . . . a coupla months ago that . . . he was
wanted . . . maybe for a burglary or somethin' . . . somewhere.  And
uh . . . , she was, she was tellin' me how the Seventh District
hassled her or somethin' like that.  And she uh, kept on reiteratin'
that uh, this isn't . . . this doesn't apply to me.  It's him.  I'm
not . . . you know . . . I don't have anything to do with those
burglaries, that burglary or somethin'.

Q:  Was he livin' with her at this time?
A:  I think he had already moved out.  Cause they came to her house
lookin' for him and he wasn't there.

Q:  Do you know where he moved to?
A:  No sir.
```

69

Ex. 13 at 2 (NOPD Interview with David Talley).  These suppressed questions plainly indicate that investigators thought that Adam Frank was involved.

```
QQ: Do you know any relatives that Antoinette has that lives in
Metairie?
A:  No sir.  No I don't.
```

Ex. 13 at 10.  These suppressed questions plainly indicate that investigators thought that Adam Frank was hiding in Metairie, as Antoinette had previously told Seventh District officers when they came to her house.

```
Q:  Do you have any idea when she told you that the gun was uh, . . .
the nine millimeter was stolen from her?
A:  I don't recall, sir.

Q:  Any idea . . . ballpark . . . ?  Guess?
A:  No sir.  No.

Q:  It was reported stolen on February 22nd, 1995.  Okay.  Does that
give you any help . . . with . . . around the time she may have told
you?
A:  That sounds about right . . . around that time.

Q:  She didn't tell you uh, . . . per chance by . . . when y'all were
workin' your detail . . . and she gave it to her brother for any
reason?
A:  No sir.

Q:  Do you have any knowledge of, of her givin' it to her brother?
A:  No sir.  I didn't.
```

Ex. 13 at 10.  These suppressed questions plainly indicate that investigators thought that Antoinette Frank gave the likely murder weapon to her brother.

70

```
Q:  Did you ever hear her say how Ronnie Williams had . . . her
brother ejected from the restaurant and told him not to hang in it?
A:  No sir.

Q:  Do you have any knowledge of her brother . . . either hangin' in
the Kim Anh Restaurant or . . . workin' there as a security when the
police couldn't work there?
A:  No sir.

Q:  She never made any mention about this at all?
A:  No.  She told me one day that . . . she liked . . . that the
. . . the uh . . . manager or somethin' liked her.  (Inaudible) but
that was about it.  I don't know in what manner she liked him or
anything, but that was about it.

Q:  Did she indicate that he . . . he . . . went in there a lot?
A:  No sir.

QQ: Did Antoinette's brother obtain any guns from the Property Room?
A:  No sir.

QQ: Did Antoinette's brother or Antoinette attem..., attempt to obtain
any guns for Antoinette's brother?
A:  No sir.
```

Ex. 13 at 21. These suppressed questions plainly indicate that investigators knew that Ronnie

Williams and Adam Frank had an altercation, and were considering it as a motive for the current

offense.

Officer Talley denied knowing where Adam Frank was, or knowing much about him.

Unconvinced, investigators warned that, "anything comin' back later. . . if any of this would be .

. . would prove to be false, there's, there's a possibility of your being criminally involved in

this?" Ex. 13 at 11. Talley stated that he understood. The investigators continued, "And knowin'

that . . . if you lie and it was found, you could be charged." *Id*.[38] As was ultimately shown in

post-conviction, despite his denials, everything that investigators questioned David Talley about

was true.

---

[38] Officer Talley was also asked if he ever helped Officer Stanley Morlier get guns from the evidence room, but denied that he had. Ex. 13 at 3.

The interview with David Talley demonstrated a basis of knowledge about Adam Frank, and a department inquiry into his connections to Ronald Williams, the Kim Anh Restaurant, and the likely murder weapon. Prosecutors were obligated to disclose this favorable evidence, but failed to do so.

**B.  The Suppressed Evidence Concerning the Likely Murder Weapon**

Just as Judge Frank Marullo was duty-bound to disclose his involvement in an investigation into the 9mm gun, so too was the State.  Trial prosecutors did not disclose evidence that Antoinette Frank obtained a 9mm gun – the same caliber used to commit this crime – and then reported it stolen only 10 days before the murders. While prosecutors suppressed reports and interviews about this 9mm Beretta at Rogers Lacaze's trial, they used this same evidence only weeks later at Antoinette Frank's trial to place the murder weapon in her hands.

In his interview with Officers Marino and Italiano, Officer Talley did disclose that he procured a 9mm Beretta for Antoinette Frank from the NOPD evidence room before the murders. He explained that Ms. Frank reported the gun stolen only ten days before the Kim Anh Restaurant murders under questionable circumstances. Ex. 13. The State has long maintained that the same 9mm Beretta is the murder weapon in this case. At Antoinette Frank's trial, the State called Officer David Talley to verify that he obtained a 9mm gun for Antoinette Frank when he was working at the NOPD evidence room. The State then argued at Ms. Frank's trial:

> We know from John Treadaway that Ronnie Williams, Cuong Vu and Ha Vu were killed with what? A nine millimeter gun. That's it. That has no evidentiary value to us whatsoever, other than the fact that *we know Antoinette Frank either owned or has owned a nine millimeter*.

72

Frank R. Supp. Vol. 1 at 167; *see also* Frank R. 67. ("Antoinette attempted to buy nine millimeter shells and she owned a nine millimeter gun.  She was the person who had an intent to kill.").

However, the State suppressed any evidence that Ms. Frank possessed a 9mm gun at Rogers Lacaze's trial. Mr. Lacaze testified in his own defense that Antoinette Frank told him that she was getting a 9mm gun from "a friend" at the property room. *R.* Vol. 7, Tr. 565. He could present no evidence beyond his own testimony, however, that Ms. Frank ever owned a 9mm gun. Indeed, all the jury heard was that Antoinette Frank had only a 38 caliber weapon, and police never seized a 9mm weapon from her. *R.* Vol. 5, Tr. 56, 88, 90. The State then successfully argued that Rogers had the murder weapon. *See R.* Supp. Vol. 3, Tr. 57 ("*you know that Roger Lacaze was the one with the nine millimeter weapon* who executed Ronald Williams and we know that both Ha Vu and Quong [sic] Vu were executed by a nine millimeter weapon.") (emphasis added).

This evidence not only placed the likely murder weapon in the co-defendant's hands, but it demonstrated Antoinette Frank's singular actions in planning this crime. Antoinette Frank, and not Rogers, procured the gun with the help of her friends at NOPD. Antoinette Frank, and not Rogers, reported the gun stolen so that it wouldn't be traced back to her. And NOPD officers were investigating whether Ms. Frank ultimately gave this 9mm gun to her brother. This directly contradicted the State's theory at trial that Mr. Lacaze was the dominant party and the shooter, but was never disclosed.

## C. The Suppressed Evidence Undermining the Eyewitness Testimony

### 1. Chau Vu's Statement to Police that She Did Not See Antoinette Frank's Accomplice

The prosecution withheld a favorable statement of Chau Vu, one of the State's two eyewitnesses, which showed that she did not see Antoinette's accomplice during the crime. This suppressed statement contradicted Ms. Vu's trial testimony that she could see the second perpetrator, and impeached her positive identification of Mr. Lacaze at trial.

At trial, Ms. Vu made an in-court identification of Mr. Lacaze as the man who came into the restaurant twice with Frank, who introduced him as her "nephew." *R.* Vol. 6, Tr. 391. She testified that after the police arrived, she told a female police officer that Frank's "nephew"—Rogers Lacaze—had been present during the shooting and she described him as short, with gold teeth. *R.* Vol. 6, Tr. 389. She told the jury that she gave a statement to the police later that night and told them "everything." *R.* Vol. 6, Tr. 390.

Ms. Vu testified that as she hid in the cooler with her brother and another restaurant worker, she could see Frank's "nephew"—Rogers Lacaze. *R.* Vol. 6, at 384.

> Q. Were you able to see anything while you were in the cooler that was happening outside?
>
> A. Yes, I could see through the window. I can saw Antoinette.
>
> Q. Could you tell what she was doing?
>
> A. After we were stay in there, and we try to duck down, like this, so we can look through the window so that they can't see us from outside because we try to duck down. . . . And, then I went back and I saw Antoinette ran back and forth.
>
> Q. Where was she running back and forth?
>
> A. Where I can see it from the large window. And, from the side—the grocery convenience door, yes, I can see.

. . . .

Q.    Was the other man with her when you saw her?

A.    **I also saw her nephew at the large window**.  And, I saw her get—I saw Antoinette did something to the phone that was on the bar because when we discover it's gone.

*R.* Vol. 6, Tr.383-84. Chau Vu repeated that she saw the nephew "[a]t the window, and he just walk past the window like that.  Just walking.  Pass by." *R.* Vol. 6, Tr. 385; *see also* Vol. 6, Tr. 412.

Unbeknownst to Mr. Lacaze or the jury, on the night of the crime, Ms. Vu clearly identified Officer Antoinette Frank as being present at the restaurant and involved in the shootings, but stated that she did not see her accomplice during the incident. Ms. Vu stated,

Antoinette was pushing me.  She say, Chau, I want to talk to you….come…she, she like push…pushing me…go to the kitchen. Um…she…at that moment, I heard boom, boom, boom. . . . And…at that moment Antoinette went back in the front.  And I heard continuous boom, boom, boom.  And I, I went into the… hiding in the cooler.  And I saw… I, I looked out …. I saw Antoinette go… jus' go back and forth, back and forth in the… my, my restaurant . . . .

Ex. 8 at 5 (Chau Vu Statement to NOPD).  Ms. Vu described in detail what occurred from the moment that Antoinette Frank entered the restaurant and pushed her into the back room to the moment that the police arrived.  *Id.* at 4-6.  At no point in this description did she mention seeing anyone other than Antoinette Frank present at the scene. She did, however, mention that Frank had been in the restaurant earlier that evening with the "nephew."  *Id.* at 3-4.  After she recounted what had occurred during and after the shooting, the interviewing officer returned to the subject of the nephew:

Q.    Okay. This, this nephew that came· there with her, he was a black male?

A.    Yes. He have uh … uh, gold teeth.

. . . .

75

Q.      Did you see…did you see this person leave?

A.      Yes.

Q.      The black male?

A.      Yes.

Q.      Did you see him armed with any weapons? Did he have a gun?

A.      No. He was…had a, a hand phone like I have…exactly…

. . .

Q.      But you saw him leave?

A.      Yes.

. . .

Q.      He drove away by himself?

A.      With Antoinette.

Q.      He drove with… Antoinette?

A.      Yeah, Oh…he rode away…

Q.      After the shooting…?

A.      *Oh, after the shooting, I don't see…*

Q.      You didn't see him leave?

A.      *I jus' saw the car had left.*

Q.      But he was in the … he was in the restaurant at the time the shooting started, wasn't he?

A.      … [silence]

Ex. 8 at 7-8.  Only after the police suggested two more times that the black male returned with Antoinette Frank did Chau Vu tentatively acquiesce.  *Id.*  Even with the police's prodding, Ms. Vu's only description of "seeing" Mr. Lacaze was that Antoinette Frank pushed her into the back, "**So…so that I can't…see him**…" *Id.* at 8 (emphasis added).

76

Ms. Vu's statement on the night of the crime was materially different from her trial testimony. Her testimony at trial placing Mr. Lacaze on the premises at the time of the shootings and her identification of Mr. Lacaze in court was arguably some of the most damaging evidence in the State's entire case. The evidence kept in the State's possession had the potential both to destroy the reliability of Ms. Vu's in-court identification and to undermine the credibility of Ms. Vu's testimony that she had seen Mr. Lacaze during Frank's third visit to the restaurant. As such, the State's failure to provide defense with Ms. Vu's prior inconsistent statement to police constitutes a patent violation of its duty to provide the defense with exculpatory and impeachment material.[39] *See Smith v. Cain*, 132 S. Ct. 627, 629-30 (2012) (reversing the defendant's conviction where the Orleans Parish prosecutors suppressed inconsistent eyewitness testimony); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (finding that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within th[e] general rule" of *Brady*.).

## 2.  Vui Vu's Statements to Police

The prosecution withheld favorable evidence that a third eyewitness, Vui Vu, did not identify Rogers Lacaze in a photo lineup on the night of the homicide. This suppressed evidence conflicted with the testimony and arguments presented at trial, and would have supported the defense case that Rogers Lacaze was misidentified as the perpetrator.

During the State's opening statement at trial, the prosecutor noted that "there were three people in the cooler." *R.* Vol. 3, Tr. 57. Along with Chau and Quoc Vu, the prosecutor stated,

---

[39] It is notable that the State did not call Chau Vu to testify in post-conviction, and only called Quoc Vu. While neither witnesses' post-conviction explanations would carry much weight with the courts, the State has put on no evidence to rebut Mr. Lacaze's allegations about this *Brady* violation.

there was also "Vi (written phonetically) Vu, who speaks no English whatsoever." *Id.* The prosecutor promised the jury that "we will tell you what happened to her and where she is right now." *Id.* Chau and Quoc Vu also mentioned in their testimony the presence of a third eyewitness. When asked who was in the cooler as the shooting occurred, Chau Vu testified that it was herself, her brother Quoc, and "a helper, her name is Vuie [sic]." R. Vol. 6, Tr. 379.[40] No other evidence as to the third eyewitness was presented, and the jury never found out who Vui Vu was or "what happened to her."

Although the State revealed to jurors that Chau Vu did not make a photo identification on the night of the offense, prosecutors went to great pains to explain that this was only because she was too scared:

> Chad Vu looked at some pictures that night, and she couldn't pick him out. And, you saw how she was on the stand yesterday and this is months---months later. She was shown those pictures that same night, and she was hysterical.

R. Supp. Vol. 3, at 53 (State's guilt-phase closing argument). The State made clear that from her position in the cooler, Chau Vu could clearly see both perpetrators:

> . . . I know you know that she is telling you the truth when she comes into the courtroom yesterday and describes this horrible thing that any of us can only imagine, and she told you that from her position of hiding in the cooler that after running in the back they started to come forward when a second volley of gunshots started and they ran to the back again. And, she told you, and I know that you saw from inside that glass cooler with the lights off with the lights on in the kitchen, how [s]he saw Roger Lacaze, that man, walking past and Antoinette walking past, looking frantically for the money.

R. Supp. Vol. 3, at 54.

---

[40] *See also* Vol. 6, Tr. 383 ("I pull my brother and the helper, and went into the cooler to hide in case they have shooting and we don't get hurt."); Vol. 6, Tr. 424 (testimony of Quoc Vu) ("Q. Was there anyone else in the cooler with you? A. Yes, there was this helper that helped my mom cook in the restaurant.").

At the time of trial, however, the State had information that would have contradicted those very arguments. The "helper" referred to by Quoc and Chau Vu was a woman named Vui Vu, who testified for the first time at the post-conviction evidentiary hearing in this case. On the night of the offense, Vui Vu was working in the kitchen. Ex. 7 at 76 (*District Court Transcript*, June 18, 2013). Chau Vu ran back into the cooler, and Vui Vu followed behind. *Id.* Chau, Quoc, and Vui Vu sat together in the cooler. *Id.* at 77. "After a long while," Quoc Vu left the cooler to call the police. *Id.* Vui Vu testified that Chau remained sitting the whole time. *Id.*

Vui Vu testified that from their place in the cooler, she could not see the face of the male perpetrator. Ex. 7 at 77-78. She could see only "shadows" of a male and female, and recognized the female police officer who worked details at the restaurant, but could not describe the male at all. *Id.* Later that evening, she was taken to the police station and shown a photo lineup. *Id.* at 79. She could not identify the male perpetrator from the photos she was shown. *Id.*

As Vui Vu testified in post-conviction, a few days after the incident two people came to speak to her again about the murders. She explained to these people that she was moving, but gave them her contact information. Ex. 7 at 79-80. However, no one ever contacted her again and the State withheld all information about Ms. Vu from the defense. That Vui Vu had been shown a photo lineup and had declined to make an identification would have been important for the jury to hear. As Ms. Vu testified, from their vantage point in the cooler, she was unable to clearly see the male perpetrator. Chau Vu and Quoc Vu sat next to her the entire time, and would have had the same limited opportunity to view the perpetrator. Vui Vu's testimony would have been critical to rebut the State's argument that Chau Vu only failed to make a photo identification because she was "hysterical." Vui Vu was also "[v]ery scared." *Id.* at 77. But, unlike Chau Vu, after calming down, she was still unable to make an identification, and still maintained that the

79

witnesses would not have been able to see the second perpetrator. Armed with Vui Vu's testimony, a competent defense attorney could have made the compelling argument that two out of three eyewitnesses did not identify Rogers Lacaze on the night of the crime because *he was not there*.

### 3. Quoc Vu's Statement to Police

The State suppressed a favorable statement by Quoc Vu, made just hours after the murders, that Antoinette Frank was the shooter in the kitchen where his sister and brother were found. This statement conflicted with the State's argument at trial that Mr. Lacaze likely shot all three victims.

Quoc Vu was the State's other eyewitness at trial, and as such his testimony also carried great weight. On the night of the crime, Quoc Vu gave a statement to police that indicated that Antoinette Frank shot and killed his siblings, and not her male accomplice. Quoc described how Antoinette came in the restaurant alone and pushed him and his sister back into the kitchen area. As they stood there they heard gunshots in the front of the restaurant. Ex.9 at 4 (Quoc Vu Statement to NOPD). At that point Antoinette Frank ran into the front of the restaurant and Chau and Quoc hid in the cooler. *Id*. He then described seeing Antoinette Frank through the window of the cooler trying to "look for something...diggin' in the area that we usually hide our money." Ex. 9 at 4-5. The officers then asked,

> Q:     Did you see the persons who was doing the shootin'?
>
> **A:     Yes. uh . . . . I saw the partial side of her.**

Ex. 9 at 5 (emphasis added).

As Detective Eddie Rantz would later state in his supplemental police report, Quoc told police that **"he observed Antoinette Frank, partially from the side, shooting a gun in the**

**kitchen area.”** *Supplemental Police Report* at 27 (emphasis added). Neither a transcript of the statement (where Quoc identifies the shooter at one time as a female) or the Supplemental Homicide Report (where Quoc identifies the shooter as Antoinette Frank) was turned over to defense counsel.

At trial, Quoc Vu testified that he saw Antoinette digging in the area where the Vu's hid their money, but never mentioned that he saw Antoinette Frank shooting a gun. *R.* Vol. 6, Tr. 422. In closing, the prosecution argued that while Quoc Vu could not say who shot his siblings, the State's ballistics expert told the jury that there were "nine casings, the same gun, pellets, the same gun. And, you know that Roger Lacaze was the one with the nine millimeter weapon who executed Ronald Williams and we know that both Ha Vu and Quong Vu were executed by a nine millimeter weapon." *R.* Supp. Vol. 3, Tr. 57. The State went on to argue,

> [T]hat child of eighteen took a nine millimeter and he blew away Ronnie Williams, twenty-five years old. And, he had no sympathy for him. And he participated in the execution if not doing the actual killing himself of Ha Vu, and she was twenty-four. And, he had no mercy for her. And, he participated or did the killing himself of Quong Vu, the same thing. He had no sympathy for them.

*R.* Supp. Vol. 3, Tr. 60-61.

> **[Rogers Lacaze] ignored the tears of Ha Vu and Cuong Vu as he stood over them and executed them**. He was their jury and executioner. He did it just like that.

*R.* Supp. Vol. 4, Tr. 15 (emphasis added). Quoc Vu's suppressed statement directly contradicted this argument.

In addition, Quoc Vu's statements as a whole are inconsistent with his detailed testimony at trial about seeing Rogers Lacaze from the cooler window. Mr. Vu testified at trial that he saw Rogers Lacaze "running all around the store and banging," *R.* Vol. 6, Tr. 421. He pointed to photographs, and explained to jurors the area where he saw "the guy running back and forth," *R.*

81

Vol 6, Tr. 422. Quoc testified, "I saw them running in and out doing something. They were running in and out of the store, like, and then afterwards-- after a while, they left." *R*. Vol. 6, Tr. 423. However, any description of seeing the male perpetrator with Antoinette was relatively limited in Quoc Vu's suppressed statement to police. In his statement, Mr. Vu described how he saw Antoinette come into "the back and try to look for something." Ex. 9 at 4. He described seeing her "diggin' in the area that we usually hide our money," Ex. 9 at 5. He described seeing Antoinette "headin' towards the door," but stated that he did not see the black male. Ex. 9 at 5. While he states at the beginning of his statement – and again at police suggestion – that a "black male" was the person who did the shooting, Ex. 9 at 2 and 5, this black male is almost completely absent from Quoc's narrative. Mr. Vu's only statement that he saw the second perpetrator from the cooler came again after police suggestion, and was simply, "they crossed paths." Ex. 9 at 5.

"Since the evolution over time of a given eyewitness's description can be fatal to its reliability," these substantial changes in Quoc Vu's description would have "severely undermined" his trial testimony. *Kyles*, 514 U.S. at 444. These inconsistencies, especially Mr. Vu's statement that Antoinette Frank was the shooter, would have damaged his credibility and contradicted the State's argument that Rogers Lacaze "executed" Ha and Cuong Vu.  Like Chau Vu's statement, Quoc's statement to police was never disclosed and the defense was deprived of the compelling argument that no one clearly saw the male perpetrator that night.

### 4. John Ross's Statement to Police and Suggestive Lineup

Following the homicides at the Kim Anh restaurant, police received information that a credit card belonging to Officer Ronald Williams had been used on March 4, 1995, at a Chevron station on Terry Parkway—a major thoroughfare on the West Bank.  Police proceeded to the

Station and interviewed the attendant, John Ross. In his suppressed statement, Mr. Ross told police that prior to meeting with them, he had seen coverage of the Kim Anh Restaurant murders on the news. Ex. 10 at 6. Although he at first stated that he did not see pictures of the suspects on the news, it soon becomes clear that this statement is false. As Mr. Ross explained, he discussed the news coverage with his brother-in–law, who asked if the male suspect looked like a guy who came into the station. Mr. Ross stated that he did not think so:

> Q.    Okay.  And, and . . . nothin' jogged your memory until I showed you that photograph a coupla nights ago, is that right?
>
> A.    Right.
>
> Q.    Okay.  Um . . .
>
> A.    . . . well, other than my brother-in-law tellin' me that *it looks like the guy he met over here.*
>
> . . .
>
> Q.    And . . . and he mentioned that he had seen this fellow here at the gas station, before?
>
> A.    Well, he asked he had I seen him since, because they had a guy that looked kinda like him, along with that lady.  And I was tellin' him, I don't think so, cause . . .
>
> [officer cuts him off with another question]

Ex. 10  at 7.

Officers showed Mr. Ross a photo lineup that included a photograph of Rogers Lacaze. This lineup was also suppressed before trial. Had the State made a timely disclosure of the lineup, competent counsel could have impeached the NOPD procedures with one critical issue: the photographs of each suspect were labeled with the name of the suspect. Ex. 24 (Photo lineup shown to John Ross). After weeks of newspaper and TV coverage of the Kim Anh Restaurant shootings naming Rogers Lacaze as a suspect, police negligently handed the witness a

photograph with the name "Rogers Lacaze," and not surprisingly he made a positive identification.

Mr. Ross further stated to police that although he recalled seeing the man in the photograph using a credit card at the Chevron Station "a few weeks ago," he did not identify a particular night that this occurred. Ex. 10 at 4-5.[41]  Mr. Ross went on to explain that when he saw the man in question, a woman was in the car with him, *id*., suggesting that even if he had seen Rogers Lacaze, it may have been on a completely different night. None of the evidence the State presented at trial supported the theory that Rogers Lacaze drove to the West Bank with a woman. However, Mr. Ross's inconsistent statement was never disclosed.

**D. Other Suppressed Evidence Contradicting the State's Theory that Rogers Lacaze was Inside the Restaurant with Antoinette Frank**

The State suppressed statements by Chau Vu and Quoc Vu that they saw Rogers Lacaze carrying a cell phone on the night of the crime. These suppressed statements supported the defense theory that Mr. Lacaze was calling Antoinette Frank at the exact time that she was committing this murder – and therefore could not be with her. They directly contradicted trial testimony and State arguments that Michael Lacaze, and not Rogers, had the cell phone and was making those calls.

Cell phone records revealed that Rogers Lacaze called Antoinette Frank multiple times during the time in which the offense took place. The State presented records and testimony at trial that there was a call from Mr. Lacaze to Frank at 1:26 a.m., lasting three minutes, and then subsequent calls at 1:28 a.m., 1:44 a.m., and 1:49 a.m.  R. Vol. 5, Tr. 199-205. Mr. Lacaze's

---

[41] Similar statements ultimately came out at trial. However, the State's delayed and inadvertent disclosure does not cure the error.

attorney attempted to use these call records to show that Mr. Lacaze could not have been in the restaurant participating in the killings if he was calling Antoinette Frank's cell phone at the time.

To rebut this argument, the State presented evidence that Michael Lacaze was using Rogers' phone at the time and he was calling Antoinette. The State argued its theory forcefully in its opening statement:

> [Y]ou are going to find out that Antoinette Frank didn't just rent one cellular phone, but she rented two. And, based upon what you are going to hear, you may think—you may think that, "Well, gee, State, she rented one phone and gave him the other. So, how can he be where he said he was going to be if the cellular phone that Antoinette Frank gave him is being used at the same time that he's supposed to be with her?" A-ha! We are going to present to you some evidence— some strong evidence that that cellular phone—that second cellular phone was in the possession of his brother, Michael Lacaze.

*R.* Vol. 5, Tr. 50.[42]

In support, the State called Michael Lacaze's girlfriend's mother, Gracia Duplessis, to the stand to testify that she had seen Michael with a cell phone at some point. *R.* Vol. 5, Tr. 209. This testimony was apparently elicited in order to show that if Michael was seen with a cell phone, the phone must have been Rogers'. The State also called Tamesha Perry, who was called from Rogers Lacaze's phone at 12:30 a.m. on the night of the murder. Ms. Perry testified that although she was not home to receive the call that night, Rogers had never called her house before and Michael called frequently. The State used Ms. Perry's testimony to show that Michael was in possession of Rogers' cell phone at the time of the murders. In closing arguments, the State asserted to the jury that:

---

[42] According to testimony presented by the State, about ten minutes after Frank called in a food order at 12:51 a.m., she and Rogers arrived at the restaurant and sat at a table to eat it. *R.* Vol. 7, Tr. 475. They did not stay long—perhaps 15 minutes. They left, and Antoinette's car pulled back into the parking lot about 10-15 minutes later. Vol. 6, Tr. 377. The initial call to 911, reporting the murders, came in at 1:48 a.m. The murders, therefore, were occurring between about 1:25 and 1:48 a.m. Vol. 5, Tr. 53.

85

> You just heard from Ms. Perry (phonetically). She told you that Roger Lacaze never called her. Is she sure? Yes. He never called her. The person who had this telephone called her twice. Once at twelve twenty---excuse me---twelve thirty, and once at 12:42.
>
> I suggest to you, ladies and gentlemen, that that was Michael Lacaze, the man who did call Ms. Perry. He had this phone, and he made these telephone calls. You know from her testimony that Roger Lacaze never had this phone.

R. Supp. Vol. 3, Tr. 41.

Withheld from the defense, however, were two taped statements that contradicted the State's theory. Chau Vu and Quoc Vu both told police that they saw Rogers Lacaze with a cell phone on the night of the murders. Chau Vu told police that she had seen a man who matched Mr. Lacaze's description at the restaurant earlier that evening with Ms. Frank. Ex. 8 at 6. When the police asked if he had a gun, she responded

> A.    No. He was . . . had a, a hand phone like I have . . . exactly . . .
>
> Q.    He had a cellular phone?
>
> A.    Yeah. The phone that . . . that I have.

*Id.* at 7.[43] Similarly, when Quoc Vu was interviewed by police, he stated that "the guy that came with Miss Antoinette had a phone just like my sister." Ex. 8 at 7. The State therefore had uncontroverted eyewitness evidence that Mr. Lacaze had his cell phone in his possession when he was at the restaurant that night.[44]

---

[43] Chau Vu told police that Rogers' cell phone looked just like her own, which is why she noticed it.

[44] As will be discussed below, Chau Vu revealed briefly at trial that Rogers Lacaze had a cell phone on him at all times during the night of the murders. Vol. 6, Tr. 375. However, *Brady* and its progeny require that the prosecution make *timely* disclosure of the favorable evidence to provide the defense with adequate opportunity to present the material effectively in its case. *State v. Prudholm*, 446 So. 2d 729, 738 (La. 1984). Late disclosure of favorable evidence may deprive a defendant of a fair trial in the same way nondisclosure does. *State v. Williams*, 448 So. 2d 659, 665 (La. 1984); *State v. Landry*, 388 So. 2d 699, 702 (La. 1980); *State v. Roussel*, 381 So. 2d 796, 798 (La. 1980). The late—and inadvertent—

Clearly, the State knew this information was exculpatory—it went through the trouble of locating and calling witnesses to the stand to testify that Rogers had never called their homes, as indicated by the call records. Supported by the Vus' statements, the cell phone records would have constituted paper-and-ink demonstrations of the heart of Mr. Lacaze's defense at trial: that he was not at Kim Anh at the time of the murders, yet were not disclosed to the defense.

### E.  The Withheld Evidence Undermines Confidence in the Outcome of the Trial

The wealth of evidence withheld by the State before Mr. Lacaze's trial was material. Evidence is material where, "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The defendant need not prove that the result at trial necessarily would have been different had the state disclosed the withheld evidence, but only that there is a "reasonable probability that its disclosure would have produced a different result." *Id*. at 422.

To begin with, the State's case at trial that Mr. Lacaze was inside the Kim Anh Restaurant at the time of the shooting relied almost entirely on cross-racial identification of two witnesses who were hiding inside a cooler. The State presented no physical evidence against Mr. Lacaze. His fingerprints and shoeprints were not on the scene – even in the pools of blood around the victims. Although all three victims were shot at close range, there was no blood on Mr. Lacaze's clothing or shoes. Mr. Lacaze did not have the murder weapon, he did not have Officer Williams' service revolver, and he did not have the $10,000 stolen from the restaurant. Phone records demonstrate that Mr. Lacaze was calling Antoinette Frank at the time of the

---

disclosure of Chau Vu's eyewitness information that Rogers had a cell phone deprived Mr. Lacaze of a fair trial.

crime, and even Mr. Lacaze's statement to police placed him in the car outside during the shooting.

Each piece of evidence that the State did present at trial, is now called into question by the disclosure of the withheld evidence. Disclosure of Chau Vu, Quoc Vu, and Vui Vu's statements to police would have allowed a competent defense attorney to impeach the testimony of the State's key witnesses and call into question the reliability of the investigation itself. Upon hearing that Chau Vu stated that she did not see the second perpetrator, and that Quoc Vu gave a very different account of what he saw while inside the cooler, "a jury would reasonably have been troubled by the adjustments to [the witnesses'] original story." *Kyles,* 514 U.S. 419, 443 (1995). The inconsistent statements "would have fueled a withering cross-examination, destroying confidence in [the witnesses'] story and raising a substantial implication that the prosecutor had coached [them] to give it." *Id.; see also Smith v. Cain*, 132 S. Ct. 627, 629-30 (2012); *Mahler v. Kaylo*, 537 F.3d 494, 503 (5th Cir. 2008) (finding that the suppression of inconsistent eyewitness accounts violated *Brady*). The additional disclosure that a third eyewitness did not identify Rogers Lacaze in a photo lineup, and that none of the witnesses could clearly see from their position in the cooler, would have destroyed the lynchpin to the State's case.

The suppressed statements of John Ross demonstrated that: (1) his photo identification was tainted by media, (2) he originally told his brother-in-law that the man on TV did not look like the man who came into the gas station, and (3) regardless of who he saw purchasing gas, he did not know what night the man came into the gas station and used a credit card. In light of the suppressed statements, Mr. Ross's identification is easily impeached and lends little support to the State's case for murder. *See, e.g. Goldstein v. Harris*, 82 Fed. Appx. 592, 594 (9th Cir. 2003)

88

(reversing, where the state suppressed evidence that police investigators were impermissibly suggestive during the lineup).

Statements that Rogers Lacaze had his cellular phone, and was therefore calling Antoinette Frank at the time of the murder would have definitely placed Rogers Lacaze in a different place during the crime. Whether jurors believed that Rogers was at Mr. C's pool hall – as alibi witnesses testified – or inside Antoinette Frank's car – as Mr. Lacaze told police – he was not inside the restaurant and was not guilty of murder.

Suppressed records about Adam Frank and the 9mm murder weapon supported the defense theory – incompetently presented at trial – that Antoinette Frank planned and carried out a hit on Ronald Williams with her brother. Adam Frank often accompanied his sister on police duty, armed with a gun. Adam Frank carried a police radio, and was on the run.  Adam Frank fought with Ronald Williams and was kicked out of the Kim Anh Restaurant. Adam Frank made Chau Vu uncomfortable. Antoinette Frank procured a 9mm gun from the NOPD evidence room, and then reported it stolen only two weeks before the crime. Antoinette Frank threatened to kill Officer Williams if he ever messed with her brother again.

Finally, the suppressed evidence, considered collectively, would have raised doubts in the jury's mind about the reliability of the NOPD homicide investigation as a whole. In *Kyles v. Whitley*, the United States Supreme Court reversed Curtis Kyles' conviction and sentence where the Orleans Parish District Attorney suppressed an interview between the police and a likely alternate suspect named Beanie. 514 U.S. at 421. There, the suppressed interview did not contain definitive evidence that Beanie was the true killer – indeed, both Beanie and the police denied that he was involved in the homicide. Rather, the interview demonstrated the police department's

89

failure to explore the witness's inconsistencies or follow up on leads. As the Court explained, it was these failures that made the suppressed evidence favorable to the defendant:

> Since the police admittedly never treated Beanie as a suspect, the defense could thus have used his statements to throw the reliability of the investigation into doubt and to sully the credibility of [the] Detective, who testified that Beanie was never a suspect. . . .

*Id*. at 447.

The Court found that the suppressed evidence "revealed a remarkably uncritical attitude on the part of the police" in their investigation. *Id.* at 445. This alone would have "laid the foundation for a vigorous argument that the police had been guilty of negligence." *Id*. at 447.

As in *Kyles*, the suppressed evidence here demonstrated a "remarkably uncritical attitude" on the part of homicide detectives in investigating the murders of Ronald Williams, Cuong Vu, and Ha Vu. Withheld evidence shows that at least two NOPD Officers were investigating Adam Frank and his connections to the victim, but failed to follow up on critical leads. The two homicide detectives assigned to Mr. Lacaze's case testified in post-conviction that they were aware of information about Adam Frank, but immediately rejected him as a suspect without following up.[45] Both detectives were aware of an altercation between Ronald Williams and Adam Frank before his murder. *District Court Transcript*, June 25, 2013 at 93; *District Court Transcript*, June 26, 2013 at 20. Detective Demma was "aware that Adam Frank was wanted at some point in time, and attempts were made to locate Adam Frank, and they were unsuccessful." *District Court Transcript*, June 25, 2013 at 94. He conceded that he received

---

[45] Officer Demma testified that Adam Frank was not the subject of investigation, but had his investigators questioned witnesses about Adam Frank, that would be different. *District Court Transcript*, June 25, 2013 at 95. He was then shown the extensive interview between Officer Richard Marino and David Talley about Adam Frank.

information after the murders that Adam Frank had a gun, a police scanner, and was riding on duty with his sister. *District Court Transcript*, June 25, 2013 at 99. When asked if he knew about Ms. Frank's threats to kill Officer Williams if he messed with her brother, Detective Rantz testified, "Yeah, and apparently that came true." *District Court Transcript*, June 26, 2013 at 20. However, Adam Frank's name or a description of Antoinette Frank's prior death threats against Officer Williams do not appear anywhere in the supplemental report written by Detective Rantz. *District Court Transcript*, June 25, 2013 at 98.[46] Nor was there a description of the fact that two of the eyewitnesses in this case failed to identify Rogers Lacaze in a photo lineup. When Detective Marco Demma was questioned in post-conviction about this omission, he testified that he did not think it was important:

> Q. As a police officer, would you think it was significant if two out of three eyewitnesses could not identify the suspect in a photographic lineup?
>
> A. No, ma'am.
>
> Q. You don't think that's significant?
>
> A. No, ma'am.

*District Court Transcript*, June 25, 2013 at 105.

---

[46] Other Seventh District Officers were also negligent in their failure to investigate Adam Frank. Captain John Landry, upon learning Precious Davis' disturbing reports about Adam Frank, did no more than send officers to Antoinette Frank's house to look for her brother. Officer Stanley Morlier knew that Adam Frank was running from a warrant out of Opelousas, yet he did not arrest him. Both he and Officer Williams took matters into their own hands and ejected Adam Frank from the Kim Anh Restaurant to protect the Vus. Officer Richard Marino interrogated David Talley about Adam Frank and his whereabouts, but seemingly dropped the investigations when he encountered resistance. Officer Morlier hired a confidential informant to locate Adam Frank after the murders – and did successfully locate him in Rayville – but did not bring him into custody. And the District Attorney obtained Antoinette Frank's phone records which showed her calling a telephone number in Rayville shortly before the crime, yet didn't investigate further.

A competent defense attorney at trial could have used the suppressed evidence to "attack[] the reliability of the investigation in failing even to consider [an alternate suspect's] possible guilt," *Kyles*, 514 U.S. at 446.

The question for this Court "is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453. In light of the array of suppressed evidence, confidence in the jury's verdict in 1995 cannot survive. As the state court's ruling was contrary to and an unreasonable application of federal law, and an unreasonable determination of the facts, Mr. Lacaze is entitled to *de novo* review of these claims, and reversal of his conviction.

**CLAIM 5:    THE STATE FAILED TO CORRECT THE FALSE TESTIMONY OF POLICE WITNESSES AT TRIAL IN VIOLATION OF *NAPUE V. ILLINOIS***

At trial, Rogers Lacaze attempted to present evidence that Adam and Antoinette Frank had motive and opportunity to kill Ronald Williams. Any evidence that Adam and Antoinette fought with the victim shortly before his death, and that Antoinette threatened to kill the victim over a dispute with her brother, would have undoubtedly supported this defense. However, when Officer Stanley Morlier was called to testify at trial, he flatly denied witnessing any dispute between Ronald Williams and Adam Frank, and denied witnessing Antoinette Frank threaten to kill Officer Williams, although he had witnessed both. The prosecutor failed to correct this false or misleading testimony, and then later called Officer Morlier as his own witness at Antoinette Frank's trial and elicited the opposite testimony. Such misconduct mandates a reversal of Petitioner's conviction.

"The deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405

92

U.S. 150, 153 (1972). Where a prosecutor knowingly elicits false testimony or "allows it to go uncorrected when it appears," the petitioner's burden to prove materiality is diminished. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citations omitted). "When the question of materiality arises, 'a new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Tassin v. Cain*, 517 F.3d 770, 780 (5th Cir. 2008) (*quoting Napue v. Illinois*, 360 U.S. 264 (1959)). As the Fifth Circuit Court of Appeals has held:

> [T]his "reasonable likelihood" standard of materiality is a "low threshold" standard. It is a brother, if not a twin, of the standard ("harmless beyond a reasonable doubt") for determining whether constitutional error can be held harmless. A strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only "prosecutorial misconduct," but also "a corruption of the truth-seeking function of the trial process"

*United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) (internal citations omitted).

### A. The False or Misleading Testimony

Defense counsel Willie Turk called NOPD Officer Stanley Morlier as a witness in support of his defense that Antoinette and someone other than Rogers Lacaze planned and perpetrated this crime. Operating with limited information, defense counsel asked various ways if Morlier had any information about Antoinette Frank's brother Adam. Again and again Officer Morlier lied:

```
      Now, did you at any time encounter an altercation or witness
an altercation between Adam Frank and Officer Ronnie Williams?
A     No, sir.
Q     Did you at any time witness an argument between them?
A     No, sir.
Q     Did you have the occasion to arrest Adam Frank?
```

```
A    No, sir.

Q    So, in other words, you are telling the Court that the only
thing you know is you just know Adam Frank's name, is that cor-
rect?

A    I just know his name?  What are you saying?

Q    I'm saying that you never had the occasion to arrest him
and you never witnessed an altercation between he and Officer
Ronnie Williams, am I correct?

A    No,sir.

Q    Okay.

BY MR. TURK:

     No further questions.

BY MR. WOODS:

     Nothing.
```

*R.* Vol. 7, 466-67.

Prosecutors knew that Officer Morlier had witnessed an altercation, and that Antoinette Frank threatened to kill Officer Williams, yet they failed to correct this false testimony. The next day, defense counsel called Officer Morlier for a second time, and again struggled to present evidence of Adam and Antoinette Frank's motive to kill Ronald Williams. Again, Officer Morlier gave false testimony:

```
     Mr. Mollier, I just have one question to ask you and I hope
that it will be an easy question for you.  Let me ask you this.
At any time while being in the presence of Officer Ronnie Williams
did you hear Officer Antoinette Frank make a threat on his life?

A    No.
```

*R.* Vol. 7, Tr. 555-56.

94

Prosecutors said nothing, and jurors were left to believe that any disputes with Ronald Williams or threats to his life were a defense invention.

Other State witnesses were aware of these confrontations between the Franks and Ronald Williams,[47] but only Officer Morlier personally witnessed them. It is not surprising then, that Prosecutor Woods called Officer Morlier as his own witness at Antoinette Frank's trial (after Mr. Lacaze had been convicted), and elicited the very same testimony that Willie Turk tried to present. At Antoinette Frank's trial, Officer Morlier testified in detail about the fight at the Kim Anh Restaurant and Antoinette Frank's threats to kill Ronald Williams. Officer Morlier testified:

> We explained to [Adam] that he was a risk at the restaurant. And, for insurance reasons and all, and for the protection of the Vu family and all, who owned the restaurant, that he shouldn't be there because he—

Ex. 14 at 164-65 (Morlier testimony at Frank trial).[48]

Officer Morlier further testified that when he and Ronald Williams confronted Antoinette Frank about her brother, she grabbed her partner and went immediately to the Kim Anh Restaurant. Frank R. 168; Ex. D-31. At the restaurant, along with Officer Williams, Officer Morlier observed Ms. Frank pulling her brother out, stating "If they don't want you here, you don't need to be here."   Officer Morlier testified that Antoinette Frank "reacted angrily," shouting, "Fuck those people."  Ex. 14 at 168.

Later, Antoinette Frank would tell Morlier:

> [Y]ou tell Ronnie Williams that **when he messes with my brother he's messing with me, and I'll take him out.**

Ex. 14 at 176 (emphasis added).

---

[47] *See District Court Transcript*, June 25, 2013 at 93-99; *Transcript*, June 26, 2013 at 20 (post-conviction testimony of Detectives Marco Demma and Eddie Rantz).

[48] Ms. Frank's attorneys objected to any questions about Adam Frank's criminal activities and ultimately the State was prohibited from eliciting this testimony because it would be too prejudicial to Ms. Frank.

Not only did Officer Morlier witness the fight with Ronald Williams and threats to his life, but he personally believed that Adam Frank was involved in the murder and tracked him down before trial. Testifying at the 2013 post-conviction hearing, Officer Morlier conceded that he suspected that Adam Frank was involved in the homicide, and that he was looking for him with the help of an informant.  He conceded that he gave an undisclosed interview to NOPD Officer Richard Marino the day after Ronald Williams died. He testified that all of the problems with Antoinette "stemmed from the Adam Frank, um, thing. . .  Adam Frank was asked to leave the restaurant." Ex. 16 at 7 (*District Court Transcript*, June 19, 2013). To him, Adam Frank "could have been the root cause," *Id*. at 8.  Officer Morlier further testified that he met with post-conviction counsel prior to the hearing, and reviewed a prepared affidavit based on what he had told counsel. Although Officer Morlier verified that the affidavit was true, he refused to sign it. Ex. 16 at 11 ("I said it was true. Right. I -- I told you I don't sign anything"). The unsigned affidavit clearly states:

> When Ronnie and the Vus were murdered I knew that Adam Frank must have been involved. All of the problems with Antoinette started when we threw Adam out of the restaurant.
>
> I started looking for Adam right after the murders – talking to people about him and shaking trees. I really believed that Adam was going to come back and kill Chau and Quoc. I had a long- time informant track Adam down in northern Louisiana, but he couldn't bring Adam in. I had hoped that Adam would show up for Antoinette's trial so I could arrest him, but he never did.

Ex. 15 at 1-2.[49]

---

[49] At the post-conviction hearing Officer Morlier continued his pattern of deceit on the stand. Officer Morlier at first flatly denied that he was ever looking for Adam Frank or considered him a suspect in the murder. Ex. 16 at 5. He claimed that his informant, Henny Bahem, was not a "CI" but rather, "a guy that did security at different places out there," *Transcript*, June 19, 2013 at 6. He denied that Mr. Bahem was able to locate Adam Frank. *Id*.  Astoundingly, Officer Morlier contradicted his own testimony when he admitted that an affidavit drafted from his pre-hearing interviews was true, but he refused to sign it.

None of this information made it before the jury at Rogers Lacaze's trial because of State misconduct.

### B. Officer Morlier's False Testimony could, in any reasonable Likelihood, have affected the Judgement of the Jury

Officer Morlier's false testimony satisfies the relatively low threshold for materiality where the State fails to correct false testimony. Officer Morlier's truthful testimony would have provided vital support for the defense theory at trial that Antoinette Frank and Adam Frank had motive to kill Ronald Williams, and that they – and not Mr. Lacaze – committed the murders. While the State attempted in post-conviction to retreat from the trial prosecutors' association with Officer Morlier, it is clear that Officer Morlier consistently lied to further the *State's* interests in 1995. He consulted with Prosecutor Glenn Woods before both trials, he lied when called to support Mr. Lacaze's defense, and he served as Mr. Woods' witness at Antoinette Frank's trial. There, at the behest of prosecutors, he provided the very testimony that Rogers

---

Officer Morlier's false testimony was further impeached by investigator Angelique Thomas, who testified that she was present during two pre-hearing interviews with Officer Morlier. Officer Morlier stated in those interviews that undersigned counsel "would not like him after he testified," Ex. 16 at 15. Investigator Thomas elaborated on cross examination:

> [H]e said that when he used to testify regularly as a police officer, he was an expert at making trials go whichever way he wanted and so that he would be able to turn the hearing in the direction that he wanted it to go.

Ex. 16 at 19.

In Ms. Thomas's interviews with Officer Morlier, he stated on multiple occasions that he believed Adam Frank was involved in the murders. "He believed that, um, Rogers Lacaze, if involved, was involved on a more minor level than Adam Frank." Ex. 16 at 14. He stated that his confidential informant located Adam in Northern Louisiana. *Transcript*, June 19, 2013 at 14. He stated that he believed Adam Frank was a "bad dude" and that he was involved in a sexual relationship with his sister Antoinette. Investigator Thomas identified the affidavit that she presented to Officer Morlier. She testified that Officer Morlier read the entire affidavit, said that it was "100 percent true" but refused to sign it because he didn't want to be "locked in." Ex. 16 at 15.

97

Lacaze needed at his own trial. The prosecution's failure to correct Officer Morlier's blatant false testimony deprived Rogers Lacaze of favorable evidence that could have in any reasonable likelihood have affected the judgment of the jury.

### CLAIM 7:    DEFENSE COUNSEL WAS INEFFECTIVE AT TRIAL

Due to unconscionably poor trial representation, the specter of Mr. Lacaze's capital trial conjures up the constitutionally-prohibited image of a "sacrifice of unarmed prisoners to gladiators."[50] At the post-conviction evidentiary hearing, Petitioner's expert in criminal defense and the defense of capital cases variously opined that Mr. Lacaze's representation was "appalling," "extremely below prevailing professional norms," "winging it," "absolutely not" in line with prevailing professional norms, that of a lawyer "in over his head," "unpardonable," the "grossest kind of incompetence," a "total failure of the adversarial process," "just above the minimum of saying nothing but barely so," "desultory," and "stunningly below what one would expect" in Orleans Parish Criminal District Court in 1995. Ex. 22 at 33, 46, 48, 61-65, 71, 73 (Testimony of John Reed, June 24, 2013). Among other deficiencies, Mr. Turk failed to investigate either the guilt or penalty phases of the trial—he did not obtain an investigator, failed to hire experts in crime scene investigation or to assess his client, failed to request funding for expert and investigative assistance, and failed to file elementary pretrial motions critical to the defense. In addition, Mr. Turk made disastrous missteps at the trial itself which undermined the very defense he was presenting.

Mr. Turk had never represented a capital defendant, Ex. 7 at 48, 63 (*Transcript*, June 18, 2013). Counsel for the codefendant, Robert Jenkins, testified that Turk "was terrified of—of

---

[50] *Cronic*, 466 U.S. 648, 657 (1984) (citing *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir.), *cert. denied sub nom. Sielaff v. Williams*, 423 U.S. 876 (1975)).

what was going on in these proceedings." Ex. 7 at 47 (*Transcript*, June 18, 2013). Mr. Jenkins spoke with Mr. Turk, and testified that Turk was not prepared for trial, and indeed told him many times that he was not prepared for trial. *Id*. at 47-48. "He [Turk] felt that he was not properly prepared and ready to do this, and this was a capital murder case." *Id*. at 49. Indeed, even the best of lawyers, with extensive experience, would not have had time to adequately prepare for trial: "[w]e didn't have enough time to prepare. We didn't have enough time to put together this case." *Id*. at 54.

Mr. Turk's understanding of even the most rudimentary trial skills was lacking: he did not understand how to conduct voir dire in a capital case; at the preliminary hearing, he called an alibi witness, but then failed to call the witness at trial; he did not understand how to traverse or qualify expert witnesses, Ex. 22 at 41; *R*. Vol. 5, Tr. 182; the judge had to cue him to poll the jury after their verdict, *id*.; *R*. Supp. Vol 4, Tr. 10; and he appeared to think that the purpose of the sentencing phase of a capital trial was to put on the testimony of "character witnesses." Ex. 22 at 72; *R*. Vol. 8, Tr. 694. These deficiencies are symptomatic of the wholesale ineffectiveness that pervaded the proceedings.

At the post-conviction hearing, Mr. Lacaze presented substantial evidence supporting the *same defense* Mr. Turk bungled at trial. This is not a case of second-guessing a defense attorney's strategy at trial; rather, Mr. Lacaze has presented evidence that was readily available to competent defense counsel prior to trial. Mr. Turk utterly failed to investigate the defense he presented, and therefore failed to marshal any credible facts in support of it. Mr. Lacaze's Sixth Amendment protections of an impartial jury, confrontation of the evidence against him, and the ability to call witnesses in his defense all rang hollow, or did not ring at all, due to Willie Turk's

abysmal representation.  Layer upon layer of ineffective representation at every juncture reduced the trial to a farce that unquestionably could not produce a just result.

### A.  Counsel's Performance was Deficient

### 1.  Counsel Failed to Litigate a Motion for Indigency Determination or Request Funds for Expert or Investigative Services.

Willie Turk neither hired an investigator, nor did any meaningful investigation himself in this capital case. Ex. 7 at  46, 48, 49; Ex. 22 at 48. As the Louisiana Supreme Court noted on direct appeal, counsel also "took no steps to litigate the matter" of hiring experts. *State v. Lacaze,* 99-0584 (La. 01/25/02); 824 So. 2d 1063, Unpublished Appendix at 34.  The only "experts" Willie Turk called at trial were the State's own crime lab technician and a blood spatter expert hired by Antoinette Frank, and his preparation and examination of those witnesses were completely inadequate.  Ex. 22 at 62. Nearly every witness who appeared at the post-conviction hearing testified that they were not approached by the defense team before Mr. Lacaze's trial. The reason for this is clear: There was no team, there was only Willie Turk, hopelessly piecing together a capital case in only three months.

Testimony at the hearing established that Mr. Turk was not paid enough to hire an investigator or experts.  He was compensated for his representation in this case with a used car, which was taken mid-way through trial, and had to come out of pocket for any expenses.  Ex. 7 at 65.[51]

---

[51] After the question was answered, the State objected to undersigned counsel asking the witness how Mr. Turk was paid, and this Court sustained the objection on the grounds that the question sought information that was "a little far afield."  *Id*.  But it is relevant: Mr. Turk was not paid in money to represent Mr. Lacaze and the vast majority of used cars, even if sold, would not provide enough money to hire an investigator and experts, let alone pay for the attorney hours reasonable representation in a capital case requires.  Mr. Turk needed to seek funding from the court for those expenses.

There can be no strategic reason not to seek funding for investigative and expert assistance. At the time of Mr. Lacaze's trial, it was well within the professional norm for retained counsel to seek funds for auxiliary services where the client was unable to afford those services. *See*, *e.g.*, *State v. Jones*, 707 So. 2d 975, 978 (La. 1998) (noting retained counsel could seek funds for additional counsel and expert services if client was deemed indigent) citing *State v. Bourque*, 95-0280 (La. 4/21/95); 653 So. 2d 548 (per curiam).  Indeed, Mr. Turk need not have deeply considered the issue to determine the appropriateness of this avenue: all he needed to do was read the pleadings filed by his codefendant's lawyer. *See State v. Frank*, 99-0553 (La. 01/17/01); 803 So. 2d 1, 3-4 (noting that counsel for Antoinette Frank moved to have her declared indigent to obtain the assistance of state-funded experts).

The ineffective assistance of counsel claim in *Strickland* itself was based upon inadequate investigation.[52]  The Court addressed investigation generally, finding that:

> [The standards governing an assessment of unreasonable representation] require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case.  As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

---

[52] Ultimately, the court denied relief in *Strickland* because defense counsel *had* investigated the pertinent facts of his case, and made a strategic determination that putting on mental health evidence at sentencing would open the door to a large quantity of damaging information.  466 U.S. at 699.

466 U.S. at 690-91. Likewise, the Supreme Court has also recognized the need for expert assistance as a basic tool[] of an adequate defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) (quoting *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)).

Had Mr. Turk filed motions requesting funding, he would clearly have been entitled to it. On direct appeal, the Louisiana Supreme Court found that the trial court in Antoinette Frank's case "erred by failing to declare the defendant indigent for the purpose of allowing her the opportunity to show entitlement to state-funded psychiatric and mitigation expert assistance for the sentencing phase of her trial." *State v. Frank*, 99-0553 (La. 01/17/01); 803 So. 2d 1, 5. Mr. Lacaze did not receive the same relief on direct appeal because his attorney did not file the same request. *See State v. LaCaze,* 99-0584 (La. 01/25/02); 824 So. 2d 1063, 1089 (Johnson, J. dissenting) (arguing that the "that defendant should have an opportunity to show that he adopted Frank's motion for a determination of indigency"). The failure to even request funding for investigative and expert assistance was perhaps the fatal blow to an already crippled defense.

### 2. Counsel Failed to Call Known Alibi Witnesses that were Named on the Defense Witness List and Available to Testify at Trial.

#### a. The Trial Testimony

The defense at trial was that Rogers Lacaze was not in the restaurant during the murders, and that he was at Mr. C's Pool Hall at the time. Rogers Lacaze testified in his own defense that he was playing pool with his brother, a girl named Angela, and a man named Peter Williams on the night of the Kim Anh Restaurant murders. *R.* Vol. 7, Tr. 571-73. Mr. Lacaze's attempts to give a specific time for when he arrived at the pool hall and left the pool hall were directly contradicted by phone records presented by the State. *Id.*; *id.* at Tr. 601-02. Mr. Lacaze – a

102

teenager with a 71 IQ, charged with three counts of murder – often became confused on the stand and fell apart under cross examination.

The only other testimony supporting the alibi defense was Michael Lacaze, Mr. Lacaze's incarcerated brother, who appeared in the courtroom in a prison uniform. Michael Lacaze also testified that he and his brother played pool with girl named Angela and a man named Peter on the night of the Kim Anh Restaurant shooting. *R.* Vol. 7, Tr. 495-96. Yet the timeframe he gave was impossible. The State had phone records demonstrating that Mr. Lacaze was ordering food with Antoinette Frank at that time. Further, not only was Michael Lacaze's credibility called into question by his current incarceration and previous criminal convictions, but the State presented phone records demonstrating that Rogers Lacaze called his brother 85 times from prison, in an attempt to show that the two had created a false alibi together. *R.* Vol. 7, Tr. 597.

Two brothers, with little credibility, made claims that they were playing pool with witnesses who did not materialize at trial. Such a defense presentation was easily rejected by the jury. Even the Louisiana Supreme Court was quick to point out that the defense supported its alibi with only Michael Lacaze's testimony and "did not produce Angela" at trial. *State v. LaCaze*, 99-0584 (La. 01/25/02); 824 So. 2d 1063, 1070.

In contrast, as the Louisiana Supreme Court also pointed out, the State presented testimony from Patrick Mazant, the owner of Mr. C's Pool Hall to contest the alibi. *R.* Vol. 5, Tr. 65. Mr. Mazant testified that he only saw Michael Lacaze playing pool on the night of the murders. *Id.* He stated that Michael is noticeable, because he's in a wheel chair, and Rogers was not with him. He explained to the jury that although 100 to 200 people come in and out of the pool hall each day, *id.* at 66, he would have noticed Rogers come in because he watches

103

everyone from a platform and checks identification cards when they come in. *Id.* at 69. Mr. Mazant testified:

> My job is to maintain and watch all of my tables and make sure that no one puts any alcohol on my pool tables and to check my door for ID's to make sure I don't have no juveniles coming through there. If they do, I would lose my license.

*Id.* This testimony was uncontested, although defense witnesses were available to impeach Mr. Mazant.

In closing arguments, the State urged jurors to be "outraged" by Rogers Lacaze's attempts to present a false alibi. The timeline that he gave for that night conflicted with phone records of Antoinette Frank, and therefore, the State argued, it was clearly a lie,:

> The alibi is a fraud, and I suggest to you that it is not to be believed.

> You have every right to be outraged that this fraud has been attempted to be perpetrated upon you the jurors of this case.

*R.* Supp. Vol. 3, Tr. 58. The State reminded jurors that Rogers made "eighty-five phone calls" to his brother before trial, allowing them to "have those times down really well," before they testified. *Id.* at 59.

Willie Turk never contacted Angela Walker or Peter Williams to testify at trial. Mr. Turk not only knew that Peter Williams' testimony would support Mr. Lacaze's alibi defense, but he had already put him on the stand at a probable cause hearing. Mr. Turk called Mr. Williams to testify that he saw Rogers Lacaze playing pool at Mr. C's Pool Hall around 1:20 a.m. on March 4th, 1995. The State did not impeach him. Mr. Turk subsequently listed Peter Williams and Angela Walker as alibi witnesses in a pre-trial notice filed with the court. *R.* Vol. 4, Tr. 663. Mr. Turk never spoke to Peter Williams again, although he was available and willing to testify at trial. Mr. Williams only discovered that Rogers Lacaze had gone to trial by seeing it on

104

television. Ex. 25 at 135 (*District Court Transcript*, June 20, 2013. Nor did Mr. Turk ever interview Angela Walker, his second alibi witness, although she was willing to testify. Ex. 25 at 52. [53]

### b.   The Post-Conviction Testimony

In post-conviction, Peter Williams and Angela Walker testified that they were playing pool with Rogers Lacaze on the night of the murders. Ms. Walker explained that there was a group of friends at Mr. C's Pool Hall that night, including "myself, it was Rogers, it was his brother, Mike, um, and if I'm not mistaken, it was another guy, and if I'm not mistaken, it was a female." Ex. 25 at 51(*District Court Transcript*, June 20, 2013). They all stayed at the pool hall until it closed. *Id*. Mr. Williams testified that he saw Rogers at the pool hall with "the chick that he was dating." *Id.* at 134. Mr. Williams did not know the girl, but remembered that her name "start with a 'A,'" *Id*. Mr. Williams left the pool hall around 1:00 or 1:30, but Mr. Lacaze stayed there. *Id.* at 134. Both Mr. Williams and Ms. Walker remembered finding out the next morning that Rogers Lacaze was arrested for murder. *Id.* at 50. Rogers committing the murder was impossible because they were with him that night. *Id.* at 134.

Ms. Walker also established that Mr. C's owner Patrick Mazant *never* checked identifications, and was therefore unlikely to have noticed if Rogers Lacaze came in that night. Ms. Walker testified that she played pool frequently at Mr. C's when she was under the age of 18, and she never had to show ID. Ex. 25 at 50. Witness LaRhonda White also testified that she

---

[53] Although Ms. Walker testified that she was out of state during trial, courts have consistently found that an attorney's failure to secure the testimony of an out-of-state alibi witness is ineffective. *Bryant*, 28 F.3d at 1417-1418 (finding that counsel was ineffective for failing to interview and subpoena an alibi witness in California); *Nealy*, 764 F.2d at 1176 (finding that counsel was ineffective for failing to interview an alibi witness in Wisconsin or "attempt to obtain her presence through the use of the Uniform Witness Attendance Law").

started bringing Rogers Lacaze and Michael Lacaze to Mr. C's Pool Hall when they were 14 or 15 years old. *Id.* at 22.  No one ever checked IDs, and Patrick Mazant frequently allowed patrons in who were underage. *Id.* at 22-23. In contrast to Mr. Mazant's representations that he was concerned about losing his license if underage kids came in the pool hall, Mr. C's was a center of illegal activity, where people came to gamble and sell drugs. *Id*. at 22. Mr. Mazant was not vigilantly watching the door – he was "[p]laying cards, shooting pool, [and] drinking." *Id*. at 23. Like Ms. Walker, Ms. White was never interviewed by Willie Turk before trial. *Id*. at 23-24. Ms. White was not only available and willing to testify, but she was often sitting in the audience during trial with Rogers Lacaze's friends and family. Mr. Turk never spoke to her once. *Id*. at 35.

These witnesses would have provided consistent and credible alibi testimony that was glaringly missing at trial. Counsel's failure to contact these known alibi witnesses is inexcusable. Although the reasonableness of counsel's investigation will depend on the "'number of issues in the case, the relative complexity of those issues, the strength of the government's case and the overall strategy of trial counsel,'" counsel must, "at a minimum . . . interview potential witnesses and [] make an independent investigation of the facts and circumstances of the case." *Nealy v. Cabana*, 764 F.2d 1173, 1177-78 (5th Cir. 1985) (citation omitted). Courts have observed "that the reasonableness of an attorney's investigation may critically depend on the information forwarded by the defendant," *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994); *Strickland*, 466 U.S. at 691. Where, as Mr. Lacaze did here, the defendant provides counsel with the names of alibi witnesses, counsel's failure to even interview those witnesses or call them at trial is unreasonable. Courts have viewed such failures with particular concern when counsel ultimately relies on an alibi defense at trial, but does not call known witnesses to support it. *See Bryant,* 28 F.3d at 1415 (finding that "when alibi witnesses are involved, it is unreasonable for counsel not

106

to try to contact the witnesses and 'ascertain whether their testimony would aid the defense"); *Nealy,* 764 F.2d at 1177-78 (finding that counsel was unreasonable for not interviewing alibi witnesses).[54]

Willie Turk "did not choose, strategically or otherwise, to pursue one line of defense over another. Instead, [he] simply abdicated his responsibility to advocate his client's cause." *Nealy*, 764 F.2d at 1178. Here, counsel relied on a defense at trial that Rogers Lacaze was playing pool at the time of the murders with a man named "Peter" and a woman named "Angela" but then inexplicably failed to produce Peter or Angela. Such a clear abandonment of counsel's duty to investigate can never be seen as strategic. Mr. Turk's actions fell far below a reasonable standard of professional representation at a capital trial.

### 3. Counsel Failed to Investigate a Known Alternate Suspect or the Murder Weapon.

#### a. The Trial Testimony

Adam Frank was a critical element of the defense Willie Turk attempted to present at trial. Yet Mr. Turk did not hire an investigator, and proceeded to trial without ever investigating Mr. Frank. The only witnesses who were subpoenaed to testify about Adam Frank did not speak to Mr. Turk before trial and were therefore blindly questioned by an uninformed defense

---

[54] *See also Lawrence v. Armontrout*, 900 F.2d 127, 129 (8th Cir. 1990) (Finding that where a defendant provides "his trial counsel with the names of potential alibi witnesses, it [is] unreasonable of [him] not to make some effort to interview all these potential witnesses to ascertain whether their testimony would aid an alibi defense."); *Grooms v. Solem*, 923 F.2d 88, 90 (8th Cir. 1991) (finding that "[o]nce a defendant identifies potential alibi witnesses, it is unreasonable not to make some effort to contact them to ascertain whether their testimony would aid the defense"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (Holding that there was "no reasonable excuse for failing to notify the state of [the defendant's] alibi and to secure the attendance of alibi witnesses."); *Commonwealth v. Stewart*, 2013 PA Super 317 (Pa. Super. Ct. 2013) (noting that "[f]ailure to prepare is not an example of forgoing one possible avenue to pursue another approach; it is simply an abdication of the minimum performance required of defense counsel.").

attorney. As a result, he did not discover or present available evidence about Adam Frank and allowed police witnesses to falsely testify without any way to impeach them.

Officer Stanley Morlier testified at the post-conviction hearing that he met with ADA Glenn Woods before Rogers Lacaze's trial, but did not remember meeting with Willie Turk. Ex. 16 at 16 (*Transcript*, June 19, 2013). If he met with Mr. Turk at all, it would have been "the day of trial." *Id*. Trial counsel blindly subpoenaed Officer Morlier to testify for the defense – on two occasions – and elicited only denials that Adam Frank had a history with Ronald Williams.

Because he never interviewed Officer Morlier before trial, Mr. Turk was unable to impeach Officer Morlier when he falsely testified at trial. After Officer Morlier lied for the second time at trial, denying that Antoinette Frank had ever threatened to kill Officer Williams, trial counsel attempted to impeach his testimony by proving that Morlier had been influenced by Detective Marco Demma. This too was met only with denials from Officer Morlier:

> Q.     Officer Mollier [sic], let me ask you this. Do you recall having a conversation with Detective Demma?
>
> A.     I've had a lot of conversations with Detective Demma.
>
> Q.     Yesterday?
>
> A.      Sir?
>
> Q.     Did you have a conversation after you left the witness stand yesterday with Detective Demma?
>
> A      Not that I remember.
>
> BY MR. TURK: No further questions, Your Honor.

*R*. Vol. 7, Tr. 556.

No reasonable attorney would subpoena a witness to testify at trial without first interviewing him, in the presence of an investigator, and discerning what he knew. This is

particularly true where the witness in question is a police officer and the former partner of the victim. *See, e.g., Elmore v. Ozmint*, 661 F.3d 783, 859 (4th Cir. 2011) (finding a "healthy skepticism of authority, while generally advisable, is an absolute necessity for a lawyer representing a client charged with capital murder"). As will be addressed below, had Mr. Turk interviewed Officer Morlier before trial, he could have easily impeached his false testimony.

Mr. Turk also knew from his client that Antoinette Frank owned 9mm gun. He never investigated the issue, and instead, simply put his client on the stand to testify to the fact. Other evidence was available had Mr. Turk sought it out. But he did not. As expert John Reed testified:

> Not everybody may agree with where that goes, but that investigation [of the 9mm gun] and the results of that investigation informs a decision by counsel as to what defense to present. That investigation was not done, and the state, therefore, was able to present this as the case in which Rogers Lacaze is the bad guy with the 9 millimeter doing the deed … rather than Antoinette, and I would submit there is not a homicide officer around who doesn't want to try to find out who and what and how about the murder weapon. It's a critical piece.

Ex. 22 at 51.

### b.  The Post-Conviction Evidence and Testimony

At the post-conviction hearing, Mr. Lacaze presented evidence establishing Antoinette and Adam Frank's dispute with Ronald Williams in the Kim Anh Restaurant, and the death threats Antoinette Frank made. Additional evidence implicated Adam and Antoinette as the co-perpetrators of the murder:

- Adam Frank was known to be armed with a gun and a police radio, and seen riding with Antoinette Frank on police duty shortly before the murders. Ex. 11 at 2.

- Adam Frank had an extensive criminal history, including two counts of simple burglary in 1989, Ex. 46, one count of simple burglary in 1991, Ex. 47, and a warrant for violating

the conditions of his parole in 1992. *Adam Frank Criminal Records, District Court Exhibits 46, 47, and 48.*[55]

- Adam Frank was hiding out in Northern Louisiana.

- Antoinette Frank called the home of Adam Frank's friend Laronne Pierre in Rayville less than 36 hours before the murders. *Antoinette Frank Phone Records* [56]

- Antoinette Frank owned a 9mm gun which was reported stolen ten days before the murders.

The existence of a potential alternate suspect, with a similar motive and opportunity as his sister's, lends credibility to the assertion that Rogers Lacaze did not commit the murders.

Had counsel hired an investigator and interviewed Officer Stanley Morlier before trial, he would have also successfully impeached the officer's false testimony on the stand. As post-conviction investigator Angelique Thomas testified at the evidentiary hearing, Officer Morlier freely admitted in her pre-hearing interviews that he believed Adam Frank was involved in the murders, and that Rogers Lacaze, if involved at all, had a more minor role. Ex. 16 at 14-15 (*Transcript*, June 19, 2013). He freely admitted that he investigated Mr. Frank, and located him in Northern Louisiana with the help of a confidential informant. He also freely admitted that he would not admit this, if subpoenaed to testify. As Officer Morlier told investigator Thomas, "when he used to testify regularly as a police officer, he was an expert at making trials go

___

[55] Counsel presented no records that Opelousas issued a warrant for Adam Frank's arrest in 1994 for two counts of attempted manslaughter, but did elicit this from Captain John Landry at trial, seemingly to Mr. Turk's surprise. Vol. 7, Tr. 464 ("Q. Did you issue the warrant for his arrest? A. No, sir. The warrant was issued by some other parish. It was two counts of attempt manslaughter. Q. It was attempt manslaughter?"). Mr. Turk elicited no details about the charges.

[56] The State disclosed Antoinette Frank's phone records to Mr. Turk before trial, documenting every call Ms. Frank made in days leading up to the homicide. Those records show that than 36 hours before the murders, Ms. Frank placed a phone call to Ronald Williams' home and then immediately to a man named Laronne Pierre in Rayville.[56] Ex. 7 at 28 (*District Court Transcript*, June 18, 2013). Had Mr. Turk interviewed Mr. Pierre, he would have discovered that he was close friends with Adam Frank, and lived 300 yards apart from him. Ex. 7 at 29. Officer Perry Flemming testified that Laronne Pierre is now deceased.

whichever way he wanted and so that he would be able to turn the hearing in the direction that he wanted it to go." Ex. 16 at 19. Officer Morlier's threats came to pass at the evidentiary hearing, as he attempted to back down from his many admissions and manipulate the court proceedings. However, unlike the trial in 1995, Officer Morlier was exposed for what he truly is through defense investigation.

There could have been no conceivable strategic reason not to investigate the very defense counsel attempted to put before the jury, and failure to do so was an abdication of counsel's professional duty to Mr. Lacaze.

### 4. Defense Counsel Failed to Interview a Third Eyewitness or Move to Suppress the Inherently Suggestive Identifications.

Counsel Willie Turk did not investigate or litigate the lynchpin to the State's case: the eyewitness identifications of Mr. Lacaze. He did not interview a third eyewitness to the homicide. He did not request access to the photo lineups, or consult with an expert about the suggestibility of the police procedures. Although the identifications of Rogers Lacaze had all the hallmarks of a misidentification, counsel did not file a motion to suppress. On March 26, 1995, counsel declared that he "waived all motions as to the identification of Defendant Lacaze." *R.* Vol. 3, Tr. 375. He subsequently did nothing to call these identifications into doubt at trial.

Trial counsel was aware of the existence of a third eyewitness, but inexplicably failed to interview her. At the preliminary hearing on March 16, 1995, twelve days after the offense, Chau and Quoc Vu were called as witnesses and examined by the defense. Chau Vu testified that she, her brother, "and the helper" went into the cooler. Ex. 26 at 42 (preliminary hearing testimony). During Mr. Turk's examination of Chau Vu, he failed to ask as single question about the

presence of this third eyewitness. He failed to ascertain the identity or whereabouts of the "helper," and failed to interview her.

That "helper," Vui Vu, testified for the first time at the post-conviction evidentiary hearing. that it was impossible for Chau or Quoc Vu to see Ms. Frank's accomplice that night. From her position in the cooler (which was right next to Quoc Vu and Chau Vu), she could only see shadows of people walking by. She further testified that she viewed a photo lineup on the night of the homicide, but did not identify Rogers Lacaze as Ms. Frank's accomplice. Ex. 7 at 77-79.

There was no acceptable justification for counsel's failure to interview this known eyewitness to the crime. Failure to interview a known eyewitness to the crime is *per se* ineffective, *See Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994); *Soffar v Dretke*, 368 F.3d 441, 476-47 (5th Cir. 2004) (finding that there was "no acceptable justification" for trial counsel's failure to investigate the eyewitness); *Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003) ("[g]uided by *Strickland*, we have held that counsel's failure to interview eyewitnesses to a charged crime constitutes 'constitutionally deficient representation.'"); *Com. v. Perry*, 644 A.2d 705, 709 (Pa. 1994). Without so much as investigating a witness, much less interviewing them, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness." *Anderson*, 338 F.3d at 392, and cannot know if the eyewitnesses could present exculpatory testimony. Counsel's failure to interview an eyewitness that the State *does not call at trial*, as Willie Turk failed to here, is unconscionable.

Even absent Ms. Vui Vu's account, counsel's failure to file a motion to suppress Quoc and Chau Vu, and John Ross's identifications was ineffective. Willie Turk could easily have filed a form motion, and challenged the circumstances of the identifications at a suppression

112

hearing, yet he failed to do so. The circumstances surrounding these eyewitness identifications created a substantial likelihood for misidentification. Chau Vu could not identify Rogers Lacaze in a photo lineup at all. She first identified Mr. Lacaze in person, at a pre-trial hearing, weeks after the crime. Ex. 26 at 38. Mr. Lacaze was also accompanied by Antoinette Frank at the hearing, who Ms. Vu definitively knew committed this crime. There, Ms. Vu explained that he was the man that Ms. Frank called her "nephew" when she came into the restaurant earlier in the evening. *Id.* At trial, Ms. Vu pointed again to Rogers Lacaze, this time identifying him as Ms. Frank's accomplice at the time of the shooting. R. Vol. 6, Tr. 391. These identifications amounted to a one-man show up, which courts have consistently excluded because of its suggestiveness.

The lineups presented to Quoc Vu and Mr. Ross were also highly suggestive. Willie Turk never asked to see the photo lineups and he never inquired into the line-up procedures. Had he done so, counsel would have discovered that NOPD officers did not follow proper procedure when choosing the "filler photographs" to include in the six person photo lineup. The individuals chosen for the line-up differed significantly in age, size and skin tone. This made for a very easy—inherently suggestive—test. For the photo lineup shown to John Ross, each of the six individual pictures was labeled with the name and identifying features of the person. Mr. Ross was literally shown a picture labeled "Rogers Lacaze" and he picked the correct picture.

Notably, the identification of each eyewitness was shaky, at best. Quoc Vu testified at a pretrial hearing that he did not see the person who came into the restaurant with Antoinette Frank – a statement that the trial court assumed was due to a misunderstanding. Ex. 26 at 55. John Ross testified that he saw Rogers Lacaze at his gas station one night, but "The exact date, I don't know," *R.* Vol. 6, Tr. 308. And Chau Vu failed to identify Mr. Lacaze in a lineup, and originally

113

told detectives (unbeknownst to defense counsel) that she did not see the second perpetrator. In a case where eyewitness testimony was the only direct evidence that Mr. Lacaze was inside the Kim Anh Restaurant during the shooting, Mr. Turk's failure to investigate and litigate the suppression issue, or effectively cross examine these witnesses "resulted from inattention, not reasoned strategic judgment," *Wiggins v. Smith*, 539 U.S. 510, 526 (2003). Such a performance falls greatly below minimum performance standards for any criminal defense attorney.

### 5. Counsel was Ineffective in his Failure to Present Credible Evidence that Mr. Lacaze was Calling Antoinette Frank at the Time of the Murders.

As was discussed above, the State also presented the testimony of witnesses who were familiar with Michael Lacaze to support the argument that Michael, and not Rogers' was calling Antoinette Frank at the time of the shooting. The State supported its theory with the testimony of individuals who appeared on Rogers Lacaze's call log that night. These individuals all testified that Michael Lacaze generally calls their home, but not Rogers. None of these witnesses testified that they spoke to Michael Lacaze on March 3rd or 4th when someone called them from Rogers Lacaze's phone. Although this testimony was admittedly weak, Mr. Turk made no attempts to put on evidence that Rogers Lacaze possessed the cell phone that night. The State then argued to jurors that they could disregard the phone calls entirely, because Rogers wasn't making them:

> [Y]ou are going to find out that Antoinette Frank didn't just rent one cellular phone, but she rented two. And, based upon what you are going to hear, you may think—you may think that, "Well, gee, State, she rented one phone and gave him the other. **So, how can he be where he said he was going to be if the cellular phone that Antoinette Frank gave him is being used at the same time that he's supposed to be with her?"** A-ha! We are going to present to you some evidence—some strong evidence that that cellular phone—that second cellular phone was in the possession of his brother, Michael Lacaze.

R. Vol. 5, Tr. 50 (emphasis added).

Had Willie Turk interviewed eyewitnesses Chau Vu or Quoc Vu, he would have discovered that they both saw Rogers with his cell phone on the night of the crime. Ex. 8 and Ex. 9. Chau Vu mentioned this briefly when she testified at trial, explaining to the prosecutor that when she saw Mr. Lacaze eating dinner she thought that he looked like "a business man," because he had a cellular phone. R. Vol. 6, Tr. 375.  The prosecution quickly changed topics, and Mr. Turk made no mention of this on cross examination. He also failed to mention this critical fact in closing argument. The State, however, argued freely that Rogers did not have the phone – in conflict with its own witnesses' statements. R. Supp. Vol. 3, Tr. 41 ("I suggest to you, ladies and gentlemen, that that was Michael Lacaze, the man who did call Ms. Perry. He had this phone, and he made these telephone calls. You know from her testimony that Roger Lacaze never had this phone"). Willie Turk's failure to investigate and failure to note at trial the critical facts placing Mr. Lacaze's phone in his possession, and therefore placing Mr. Lacaze in a different location during the commission of the crime, was patently deficient.

### 6. <u>Counsel was Ineffective in his Presentation of Michael Lacaze as a Witness at Trial.</u>

Although Michael Lacaze gave inconsistent statements to the police about Mr. Lacaze's culpability, Willie Turk still called him as a witness, and allowed the State to present these statements to the jury. These statements did not come in during the State's case-in-chief, and had no substantive probative value. They only came in as a prior inconsistent statement to impeach the credibility of Michael Lacaze's alibi testimony.  *See* La. C.E. art. 607; Ex. 22 at 64-65. Indeed, the majority of Michael Lacaze's time on the stand was spent discrediting his prior inconsistent statements against a badgering prosecutor. Michael Lacaze testified that he told the police that he was with Rogers during the incident, but after extensive intimidation, he relented

115

and gave a taped statement inculpating his brother. *R*. Vol. 7, Tr. 500. The trial prosecutor, in turn, asked Michael Lacaze multiple times if he was a "pathological liar." Vol. 7, Tr. 505, 507.

Mr. Turk also did not have access to Michael Lacaze's grand jury testimony, where he apparently testified that Rogers Lacaze was playing pool at the time of the shooting, and was therefore unable to bolster his credibility with this prior consistent statement.

Not only did Mr. Turk allow the devastatingly harmful statements to come in, but *he never requested that a hearsay impeachment instruction be given to jurors*, and so the jurors presumably gave the "brother to brother" confession substantive weight. As Expert John Reed concluded, "no competent counsel would set in motion for the minimal, almost nil value of that alibi testimony, a sequence of events that was sure to put before the jury a hearsay in an otherwise inadmissible confession from brother to brother." Ex. 22 at 65. In Mr. Reed's opinion, calling Michael as a defense witness thereby opening the door for the jury to consider hearsay evidence as reliable evidence constituted "a total failure of the adversarial process." *Id*.

### 7. **Counsel was Ineffective in his Failure to Hire a Crime Scene Expert or Even Challenge the State's "Implausible" Theory of the Case at Trial.**

Ronald Williams was a 6'½'', 225-pound, police officer. He was working as a security guard at the time of his murder, standing behind the bar at the Kim Anh Restaurant, armed with a gun. Rogers Lacaze was a 5'2'', 135-pound teenager. The perpetrator shot Officer Williams at close range, creating pools of blood around him, and then got close enough to steal both his wallet and gun. When Rogers Lacaze was arrested there was no blood on his clothing or shoes. In light of the dearth of physical evidence and the vast difference in size between Mr. Lacaze and Officer Williams, jurors needed to believe, as the prosecution argued at trial, that Rogers snuck into the restaurant and surprised Officer Williams with three shots across the bar. This would

116

explain how he was able to take down a much larger police officer, and avoid getting blood spatter on his clothing or shoes in the process. As the Louisiana Supreme Court noted on direct appeal, such a theory was implausible, yet attorney Willie Turk did nothing to challenge it. Speaking for the majority on direct appeal, Justice Traylor emphasized that,

> The defense did not stress the *implausibility* of the 5'2" 135 lb. never-before-convicted 18-year-old defendant sneaking up on the fully armed 6' 1/2 " 225-pound policeman in the manner suggested by the state. In the state's version, the defendant would have had to have entered the restaurant, crossed to the bar, leaned up and over the bar as well as some looseleaf binders piled atop the bar and, still unnoticed, brought the gun within 18 inches of the officer's neck and, holding it parallel to the floor, shot him under the right ear. The victim's immediate collapse also would have made it difficult for the shooter in the state's version to have produced the other two wounds sustained by the officer.

*State v. Lacaze*, 99-0584 (La. 01/25/02), 824 So. 2d 1063, 1072 n. 9 (emphasis added).

### a. The Trial Testimony

Willie Turk could have taken basic steps to challenge the State's theory of the shooting, yet he did nothing. He failed to request court funds for expert assistance or hire an expert on crime scene reconstruction. The only expert that Mr. Turk presented at trial was Sherry Gutierrez, a blood spatter analyst hired by Antoinette Frank's attorneys to assist in *her defense*. Although Ms. Gutierrez drafted a report for Ms. Frank, not Mr. Lacaze, Willie Turk borrowed her for trial. *Report of Ms. Gutierrez*. Setting aside this obvious conflict of interest, Mr. Turk did little to prepare his expert to testify.

At trial, Ms. Gutierrez was asked about the probability of back-spatter on the perpetrator's clothing. She testified on direct examination that the shooting of Ronald Williams would result in back spatter which would have deposited on the clothing of the shooter. *R.* Vol. 7, Tr. 446. As Mr. Lacaze was arrested wearing the same clothing that he wore that night and there was no blood on his shirt, pants or shoes, the absence of any physical evidence would have

117

raised doubts in jurors' minds. However, the State quickly made clear that Ms. Gutierrez lacked familiarity with the evidence, and was therefore not qualified to give an expert opinion.

Willie Turk did not provide Ms. Gutierrez with: (1) photographs of the crime scene; (2) photographs of the victims; (3) photographs of or access to Mr. Lacaze's clothing; (4) access to the crime scene; (5) or information about what kind of weapon was used, despite the availability of this information. The only records Mr. Turk provided to Ms. Gutierrez were autopsy reports. The prosecution capitalized on this lack of preparation during cross-examination, questioning whether Ms. Gutierrez had reviewed basic information in reaching her opinion: visiting the crime scene, looking at photographs of the crime scene, viewing the bodies of the victims or photographs of them, or examining Mr. Lacaze's clothing. Ms Gutierrez confessed on the stand that she had not viewed or reviewed any of that information. The prosecutor concluded, "would it be fair to say that…that *the sole basis of your testimony today is reading someone else's report about the cause of death of the three victims in this case?*" Ms. Gutierrez responded, "Yes." Vol. 7, Tr. 452- 454 (emphasis added).

The State then explained to Ms. Gutierrez its theory that there was a bar separating Ronald Williams and the shooter, causing her to completely reverse her position about the presence of blood spatter. Vol. 7, Tr. 459. Ms. Gutierrez testified that she would "anticipate seeing back spatter on the person that was shooting only in those areas of the body which were actually exposed to the injury." *Id*.[57]

---

[57] As noted in the Louisiana Supreme Court's opinion, Ms. Gutierrez also testified that the shot to Cuong Vu was at close range and would have created back spatter. However:

> The expert also retreated from her conclusions with respect to Cuong Vu's wounds, after learning that the pathologist determined that these were not close wounds and thus would not likely produce back-spatter.

In closing, the State mocked Ms. Gutierrez, telling jurors that "she was more important for what she did not do and was not asked to do than for what she did." Supp. Vo. 3 at 55. The State suggested that defense counsel did not ask Ms. Guttierez to examine Rogers' Lacaze's clothing because he "[d]id not want her to examine the clothes," *Id*. The State then repeated its trial theory that blood would not be on the perpetrator because of where he was standing:

> And, remember where Officer Williams was. Remember how the bar was. When he shot him that shot, he was behind the bar, and you all saw from the photographs the things that are in the way. And, you all know that Roger Lacaze was attempting to conceal himself. And, I suggest to you that he simply stuck his arm with that gun between those objects and fired.

Supp. Vol. 3 at 55. Willie Turk did nothing to attack this version of the shooting or present an alternate reconstruction that corresponded to the evidence.[58]

### b. The Post-Conviction Testimony

At the post-conviction hearing, Expert Rex Sparks testified that in his expert opinion, the State's theory of the shooting at trial was incompatible with the evidence. Given the position of the victim, the layout of the restaurant, and the placement of bullet holes on the wall and floor, the shooter was likely standing behind the bar with Officer Williams when he fired that first shot. Ex. 25 at 107 (*Transcript*, June 20, 2013). The shooter was not reaching across the bar, and hiding behind a pile of binders. Officer Williams then dropped down to the floor before the other shots were fired. *Id.* at 109. This expert opinion, while supported by the evidence, is inconsistent

---

*Lacaze*, 824 So. 2d at 1071 n.8.

[58] The State went on to suggest in closing arguments that Rogers Lacaze may have changed his clothing before arrest. *R.* Supp. Vol. 3 at 55. This assertion is directly contradicted by suppressed police report, where a witness told police that Mr. Lacaze was wearing the same clothing when he was arrested that he had been earlier that day. Supplemental Police Report at 35 (Witness Earnest Smith told detectives that when he saw Rogers Lacaze earlier that day he was wearing "the same clothes" that he wore on television during his arrest).

with the State's theory that Mr. Lacaze was able to take down an armed police officer by sneaking into the restaurant and crouching down on the opposite side of the bar. Unlike Ms. Gutierrez, Mr. Sparks reached this conclusion after reviewing all of the crime scene photographs, autopsy photographs, police reports, and witness statements. *Id.* at 75.

Mr. Sparks also made findings similar to those of Ms. Gutierrez – before she reversed her position on the stand – about the probability of blood spatter, this time supported by a review of the evidence. While Mr. Sparks could not say definitively that blood spatter occurred, from the shooter's position on the inside of the bar he "would have been within the distance that back spatter travels." Ex. 25 at 109. Mr. Sparks testified that Ms. Gutierrez could not properly "answer that question from what she was given." *Id.* at 111.   However, as was shown through the testimony of Rex Sparks, a prepared and competent expert could have credibly challenged the State's trial theory and raised doubts in the jury's mind that Rogers Lacaze shot Ronald Williams.

As Mr. Sparks acknowledged, much about the crime scene is now unknown, making it difficult to reconstruct. *Id.* at 79. In his expert opinion, the NOPD was negligent in their processing of the crime scene, and the defense did no independent analysis in 1995. *Id.* at 77.

Defense counsel's failure to obtain expert assistance or challenge the State's unsupportable theory of the shooting was ineffective. In the recent case of *Hinton v. Alabama*, defense counsel failed to seek funds for expert services, and as a result hired a firearms expert who was willing to do the job for only $1,000. 134 S. Ct. 1081, 1085 (2014). The expert in question presented incompetent testimony at trial and was "badly discredited" by the State on cross examination. *Id.*  The Supreme Court found that it was unreasonable for the defendant's lawyer to fail to seek the funds necessary to hire a competent expert. *Id.* at 1088. Defense

counsel had a duty to make "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and his failure to investigate and obtain the proper expert funds rose to the level of unreasonable performance under *Strickland*. *Id*. at 1088-98 (*quoting Strickland v. Washington*, 466 U.S. 668, 690 (1984)).

Here, Mr. Turk did not request *any* funds for expert assistance, although his client (an unemployed eighteen year old) was unquestionably indigent. He did not hire an independent expert *at all*, but merely borrowed the expert obtained by Ms. Frank's attorneys. Mr. Turk did nothing to prepare the codefendant's expert for trial, and her limited testimony was eviscerated in cross examination. Mr. Turk's failure to secure expert assistance and provide that expert with the necessary information pertaining to the crime scene constituted deficient representation.

**8. <u>Counsel Was Ineffective in his Efforts to Suppress Mr. Lacaze's Statements to Police and His Failure to Investigate and Introduce Evidence Demonstrating that the Statement Was Unreliable and False.</u>**

### a. *Pre-trial Litigation of a Motion to Suppress*

Willie Turk orally joined in a motion filed by Ms. Frank's attorneys that pertained to her statement only, and then failed to investigate and present evidence specific to his own client, Mr. Lacaze, at a suppression hearing. *R.* Supp. Vol 5. As the expert in capital defense testified, Mr. Turk "piggy-backed on" the motions filed by the co-defendant's lawyer, thereby failing to file motions pertaining to his "unique client." Ex. 22 at 59. It was Mr. Reed's expert opinion that Mr. Turk's pretrial motions practice was "absolutely not" in line with prevailing professional norms at the time. *Id*. at 61.

### b. *Evidence Presented in Post-Conviction*

It was not discovered until after trial that Rogers Lacaze has an IQ within the range of mild mental retardation. At the age of 18, pursuant to court-ordered testing by a court-appointed

expert, Mr. Lacaze tested with a full-scale IQ of 71 on the WAIS-R standardized test. Ex. 27 at 83 (Dr. George Woods Testimony).[59] Dr. George Woods testified in post-conviction that, based on the expert testing conducted on Mr. Lacaze and his own evaluation, Mr. Lacaze's impairments would lead to him making an inaccurate, or false, statement to police. Ex. 27, See also Report of Dr. George Woods. Dr. Greenspan echoed the assessment, pointing particularly to the ease with which the police can manipulate someone with Rogers' vulnerabilities into making a statement that is not true. See Greenspan Report at 8 ("Mr. Lacaze… [would] be equally, if not more, vulnerable to manipulations inherent in any police interrogation, even those that are relatively non-coercive."). The inaccuracies in Mr. Lacaze's custodial statement, and his willingness to go along with the detectives' suggestions, exemplify this behavior. Time and time again Mr. Lacaze simply assented to the officer's version of what happened:

> Q:    Okay. And when she gave you that gun and told you, don't shoot, unless you have to, you knew at that time, that she was plannin' to shoot someone? Am I correct?
>
> A:    I guess so. I didn't know what was goin' through her mind.
>
> Q:    Did she give you a gun?
>
> A:    Uh huh.
>
> Q:    Did she tell you, don't shoot unless you have to?
>
> A:    Yes.
>
> Q:    So, you knew she had a gun with her, right?
>
> A:    Yes.
>
> Q:    And you knew on the way there that she was goin' to pay someone back? Am I correct?

---

[59] In 2009, testing by a defense expert, Dr. Myla Young, yielded an IQ score of 73 on the TONI-3. *Ex. 27* at 86

A:      Uh huh. Uh huh.

Q:      So you knew she was goin' to shoot someone?

A:      Uh huh.

Q:      Yes or no?

A:      Yes.

*Lacaze Statement* at 13; *See also id.* at 14 ("Q. Weren't you worried that you were goin' to this restaurant, knowin' that they have a uniformed police officer on duty, there?; A. I guess so."). Inaccuracies were also apparent. For example, Mr. Lacaze stated unequivocally that he entered the restaurant after the shootings, looked around (including "by the um, cash register"), but did not see Ronald Williams. *Lacaze Statement* at 6-7. In reality, Ronald Williams was found lying in a pool of blood very close to the cash register and it would have been impossible to miss him.

If competently presented, the circumstances of Mr. Lacaze's interrogation, combined with his impairments, warranted suppression. Mr. Lacaze – a teenager with a 71 IQ – was brought into the station around 6:00am. Before giving his recorded statement, Rogers Lacaze was left alone with Officer Patrick Young. Officer Young engaged in an unrecorded pre-interview, where he claimed that Mr. Lacaze orally waived his rights. Supp. Vol. 5, Tr. 65-69. Following hours of interrogation – first with Officer Young alone, and then with Officers Demma, Rantz, Leblanc, and Young all together - Rogers requested medical attention from prison doctors. As he put it:

123

Although Officer Rantz denied at the post-conviction evidentiary hearing that he witnessed any abuse during the interrogation, he stated in a pre-hearing interview that he would not have to beat Mr. Lacaze to get a confession because he was so "dumb." *See District Court Transcript*, June 26, 2013 at 32.

Trial counsel's failure to investigate and litigate the motion to suppress Mr. Lacaze's statements was unacceptable. Soo too was his failure to present evidence at trial undermining the reliability of that statement. Even when a court denies a defense motion to suppress statements, the defense is authorized to introduce evidence at trial that calls into question the reliability of that statement. United States Supreme Court has recognized that such evidence is critical to a defendant's state and federal constitutional rights to present a defense:

> [R]egardless of whether the defendant marshaled the same evidence in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

*Crane v. Kentucky*, 476 U.S. 683, 689 (1986). *See Williams*, 831 So.2d at 843 (quoting *Crane*).

Under the law, evidence of the Mr. Lacaze's impairments would have also been admitted to challenge the veracity and reliability of his statement to police. Mr. Reed, the capital defense expert, testified that evidence of the falsity of Mr. Lacaze's statement was "critical to defending the case"—so much so, that false confessions should have been one of the topics to cover with prospective jurors in voir dire. Ex. 22 at 47. Failure to pursue evidence that was readily available through investigation and the retention of an expert fell below prevailing professional norms at the time of Mr. Lacaze's trial.

**B. Counsel's Deficiencies Undermine Confidence in the Outcome of Mr. Lacaze's Trial**

The only direct evidence placing Rogers Lacaze inside the Kim Anh restaurant at the time of the shooting was the testimony of two eyewitnesses. There was no physical evidence linking Rogers Lacaze to the crime scene, he did not have the murder weapon, he did not have Ronald Williams' service revolver, and he did not have the $10,000 stolen from the restaurant. None of these items were found at his home or his brother's home. Telephone records showed that Mr. Lacaze was calling Antoinette Frank on her cellular phone at the exact time that she was committing the murders, belying the State's theory that he was with her inside the restaurant. Even Mr. Lacaze's statement to police placed him in the car when the victims were shot – not inside the restaurant.

As expert John Reed testified at the post-conviction evidentiary hearing , a viable defense theory put forth at trial was that "this was not just some robbery of a restaurant" but rather "a hit and execution of a police officer" by Antoinette and likely Adam Frank. Ex. 22 at 84. There was substantial evidence to be uncovered that pointed to Antoinette Frank as the authority figure in uniform—the leader—while Rogers Lacaze was just a kid who got mixed up with her and ultimately set up. *Id.*

Willie Turk attempted to advance this theory at trial. He relied upon an alibi defense and called Stanley Morlier as a witness twice in an attempt to elicit testimony that pointed to Adam Frank as the likely accomplice.  But Willie Turk had not investigated Mr. Lacaze's case, and so the jury never heard a wealth of evidence supporting the very defense Mr. Turk urged.  Instead, the jury heard Mr. Turk's admission of his failure to present evidence of innocence, and his factually unsupported (at trial) belief that "there may come a time in the very near future that

125

other evidence might be shown that [Mr. Lacaze] may not have committed this crime." *R.* Supp. Vol. 4 at 21. The time has now come.

At the post-conviction hearing, Mr. Lacaze presented evidence, available at the time of trial, which throws in doubt whether Rogers Lacaze was involved in the Kim Anh murders at all. Taking into account, as the Court must,[60] all of the foregoing evidence that Mr. Lacaze's counsel failed to expose, the evidentiary picture presented to the jury at trial is dramatically altered. *See Strickland*, 466 U.S. at 695-96 (recognizing that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture"); Ex. 22 at 96 (John Reed opining that different outcome from presentation of this theory and evidence supporting it to jury). The evidence produced in post-conviction—clearly available to competent counsel at the time of trial—tends to cast doubt on Mr. Lacaze's guilt, points to the likelihood of another perpetrator, and "eliminates any portrayal of the police as infallible and truthful experts impervious to cross-examination." *See Elmore v. Ozmint*, 661 F.3d 783, 871 (4th Cir. 2011).

Had Willie Turk provided competent representation, the jury that convicted Mr. Lacaze and sentenced him to death would have heard that evidence. The evidence presented at the post-conviction hearing establishes that there is a reasonable probability – something less than a preponderance of the evidence – that the outcome of Mr. Lacaze's trial would have been different. This claim was properly presented in the state courts, and as the state court decisions were unreasonable, de novo review is required and Mr. Lacaze is entitled to relief.

---

[60] *See Porter v. McCollum*, 558 U.S. 30, 41 (2009) (taking into account all mitigating evidence that would have been before the judge and jury "[h]ad Porter's counsel been effective"); *Rompilla v. Beard*, 545 U.S. 374, 390-91 (2005) (considering all mitigating evidence that Rompilla's lawyers would have found by looking at his prior conviction file); *Wiggins*, 539 U.S. at 534-35 (including all "mitigating evidence counsel failed to discover" in totality-of-evidence review).

**CLAIM 10: THE TRIAL COURT'S REASONABLE DOUBT INSTRUCTION UNCONSTITUTIONALLY DIMINISHED THE STATE'S BURDEN OF PROOF**

For decades in Orleans Parish, jurors were given various incarnations of an instruction which "vitiate[d] the burden of proof" and violated the due process right "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Cage v. Louisiana*, 498 U.S. 39 (1990). Mr. Lacaze's trial occurred in Orleans Parish Criminal District Court, Section "D," at a time when these unconstitutional instructions were still in use. In Mr. Lacaze's case, the jury was given the following reasonable doubt charge:

> This doubt [to acquit] must be a reasonable one. That is one that is founded upon a real and tangible basis. It is not upon a mere caprice, or a fancy, or a conjecture. It must be such a doubt that it would give rise to an uncertainty raised in your mind by the reason of the unsatisfactory character of the evidence, one that would make you feel that you did not have an abiding conviction of the defendant's guilt . . . It should be an actual doubt. It is such a doubt that a reasonable man or woman would seriously entertain. It is a serious doubt for which you can give a good reason . . . A reasonable doubt in it's [sic] most simple definition is when you have a doubt about one of the elements essential in proving the case, and you can say to the other eleven people that sit with you in making this decision, "I have a doubt." And, you can articulate and say, "And, this is the reason why I have the doubt." That is a reasonable doubt.

R. Supp. Vol. III, Tr. 5-6.

When taken as a whole, the charge has the same effect as the instruction given in *Cage v. Louisiana*, which was found to be unconstitutional because it "suggest[ed] a higher degree of doubt than is required for acquittal." 498 U.S. at 40. By defining reasonable doubt as a "[a] *serious doubt* for which you could give *a good reason*" and, further, that a juror should be able to "articulate" that doubt to the other eleven jurors, the charge given to Mr. Lacaze's jury diluted

the State's burden and suggested a higher degree of guilt than required by the Due Process

Clause. In dealing with a similar charge, the Fifth Circuit has explained:

> To insist . . . that the jury must find a "serious doubt for which you could give good reason" lightens the state's burden and removes a substantial protection assured defendants . . . Insisting that a juror be able to articulate *a reason* is troublesome step upon residual doubt. But our focus today is upon an instruction that went further. A juror favoring guilt would have a powerful tool if he could demand that undecided jurors articulate *good reasons* for considering acquittal… Under this sort of pressure, inarticulate and undecided jurors are less likely to give defendants the benefit of their doubts. Requiring articulation of good reasons, then, skews the deliberation process in favor of the state by suggesting that those with doubts must perform certain actions in the jury room.

*Humphries v. Cain*, 120 F.3d 526 (5th Cir. 1997). *See also Dunn v. Perrin*, 570 F.2d 21 (1st Cir.

1978) (holding jury instruction that requires "good and sufficient reason" for reasonable doubt

improper); *Pettine v. Territory of New Mexico*, 201 F. 489, 496 (8th Cir. 1912) (The ability to

give sound reasons for their doubts or their beliefs is not given to many men, and . . . doubts for

which [a person] can formulate no convincing reason often induce him to act or to refuse to

act").

The reasonable doubt instruction given at Mr. Lacaze's trial irreparably destroyed his

right to due process a fair trial, and was structural error. *Sullivan v. Louisiana*, 508 U.S. 275

(1993).

### CLAIM 11:   PETITIONER WAS DENIED HIS RIGHT TO TRANSCRIPTS AND JUDICIAL REVIEW OF HIS DIRECT APPEAL BY THE INCOMPLETE RECORD

Despite a request for a complete appellate record, there were several relevant sections

missing, and the record as a whole was inaccurate or unreviewable. On direct appeal, counsel

filed several motions to complete the record, had staff review the audio recordings of the trial

and certify the missing portions of the record, and even interviewed trial counsel to determine

128

what critical events were not documented in the transcripts.[61] The Louisiana Supreme Court openly acknowledged that the record on appeal was "abysmal," but unreasonably denied Petitioner's claims for relief.[62]

### *The Missing Portions of the Record*

Multiple pretrial and post-trial hearings are not in the record, including those that occurred on June 13, July 6, July 12, and July 14, 1995. Some relevant portions of the missing pre-trial record include a request for appointment of counsel on May 25, 1995, as well as arguments and rulings on a series of motions on May 26, 1995, including a motion to quash.

During voir dire, at least twenty-two different unidentified prospective jurors made comment that, to varying degrees, would have supported a challenge for cause.[63] Several unnamed jurors had connections to law enforcement, while others had been victims of crimes, or had close associations with victims of crime. However, without knowing the identities of each of these jurors, appellant counsel was unable to effectively review the record of voir dire for reversible error.

The transcription flaws continue beyond voir dire. For instance, on May 3, 1995, the court held hearings on this case. Two excerpts are included in the record – one is repeated twice, but

---

[61] *See* Original Brief on Appeal and Appendix A, Supplemental Brief on Appeal and Appendix.

[62] All audio recordings of trial were destroyed in the 2005 flooding from Hurricane Katrina, and were therefore unavailable for additional review in post-conviction.

[63] *See e.g.* Supp., Vol. I, Tr. 103; Supp., Vol. I, Tr. 107; Supp., Vol. I, Tr. 150; Supp., Vol. I, Tr. 153; Supp., Vol. I, Tr. 155; Supp., Vol. I, Tr. 158; Supp., Vol. II, Tr. 174; Supp., Vol. II, Tr. 180-81; Supp., Vol. II, Tr. 181; Supp., Vol. II, Tr. 185; Supp., Vol. II, Tr. 186; Supp., Vol. II, Tr. 187; Supp., Vol. II, Tr. 188; Supp., Vol. II, Tr. 189; Supp., Vol. II, Tr. 231; Supp., Vol. II, Tr. 235; Supp., Vol. II, Tr. 270; Supp., Vol. II, Tr. 271.

neither is complete (See R. Vol. V, Tr. 1-18). On May 15, 1995, the court also held hearings on the case. The record contains a one-page transcription, dealing with a gag order. It is clearly not the entire hearing, as the transcript begins in the middle of a conversation: "It's those kids of statements, Judge, that I think can create more harm than good." (Supp. Vol. V, Tr. 21). It ends with the court reporter's note: "OTHER MATTERS ARE HANDLED BY THE COURT PERTAINING TO THE CASE." (Supp. Vol. V Tr. 21). Yet another portion of the transcript of the hearing held on May 15, 1995, begins "what else? Anything else open in this case?" (Supp. Vol. V, Tr. 25). Following a request for production of cash register receipts, the record provides: "Other matter are handled by the court." (Supp. Vol. V, Tr. 25). The transcript of the hearing held on June 19, 1995, similarly begins with "what else . . ." (Supp. Vol. V, Tr. 29). There is no logical way to piece together a full transcript of either hearing.

Additionally the trial record does not include: objections by defense counsel concerning the admission of photographs; objections by defense counsel to the State's decision to bring Antoinette Frank into the courtroom for identification purposes; discussions concerning a juror who was sleeping during portions of trial; and arguments and rulings on the introduction of a number of exhibits by the State.

The transcripts do not reflect multiple events that occurred at trial, such as the surviving witness Chau Vu becoming hysterical while on the witness stand. The transcript of July 19, 1995 reflects what (appears to be) only minor mishap involving a spectator who refused to turn off a beeping wristwatch. R. Vol. 3, Tr. 407-08. The judge appears calm and the issue is resolved quickly. However, the sound recording tells a different story: the judge was yelling, and Chau Vu, a surviving victim of the crime who had been on the witness stand at the time of the incident, was crying hysterically and asking if her brother, another survivor, was all right. Ex. 62. The

130

transcript also omits the content of the statement the spectator gave to the judge. Ex. 62; Vol. 3, Tr. 408. This occurrence may have caused the jury to become confused or unfairly partial to the witness; yet the extent of the disruption is unknown and unknowable by virtue of the transcript alone.

The transcripts also do not reflect defense counsel Turk's attempt to call a police officer who invoked his Fifth Amendment privilege and refused to testify. As trial counsel reported in an Affidavit on direct appeal, this officer was a "key witness" who "would fully contradict much of the state's case." Original Brief on Appeal, Appendix A. Absent a transcript of this event, or even an indication that the officer was called to testify, appellate counsel was unable to raise this error that went to the heart of Mr. Lacaze's constitutional right to present a defense. *See also* Supplemental Brief on Appeal, Affidavit of Jorge Baron.

As appellant counsel was not trial counsel, it was simply impossible to ascertain what occurred when drafting the direct appeal.

### *Controlling Precedent*

It is well established that a criminal defendant, represented by new counsel, has a right to a record on appeal, which includes a complete transcript of the proceedings at trial. *Hardy v. United States*, 375 U.S. 277, 84 S. Ct. 424, 11 L.Ed.2d 331 (1964) ("The right to notice 'plain errors or defects' is illusory if no transcript is available at least to one whose lawyer on appeal enters the case after the trial is ended."). This right is violated when portions of the transcript are missing or unreviewable. As the Fifth Circuit has explained:

> Often . . . even the most careful consideration of the available transcript will not permit [the court] to discern whether reversible error occurred while the proceedings were not being recorded. In such a case, to require new counsel to establish irregularities that may have taken place would render illusory an

131

appellant's right to notice plain errors or defects, and render merely technical his right to appeal.

*U.S. v. Selva*, 559 F.2d 1303, 1306 (5th Cir. 1977) (citing *Hardy*). When, as here, new counsel represented the defendant on appeal, there is no need to show specific prejudice when substantial and significant portions of the record are missing. *See United States v. Rosa*, 434 F.2d 964 (5th Cir. 1970) (reversed conviction when no records of trial proceedings); *Atilus v. United States*, 425 F.2d 816 (5th Cir. 1907)(reversed conviction when no records of trial proceedings); *United States v. Garcia-Bonifascio*, 443 F.2d 914 (5th Cir. 1971)(reversed conviction when the transcript omitted State's closing argument); *United States v. Upshaw*, 448 F.2d 1218 (5th Cir. 1971)(reversed conviction when transcript omitted defense closing argument). Substantial portions of the transcript in Mr. Lacaze's case are missing or unreviewable, thereby making it impossible for defense counsel to notice plain errors or defects and deprives the defendant of his right to an appeal.

The Louisiana Supreme Court acknowledged in its opinion on direct appeal that the "condition of the record is abysmal." *State v. Lacaze*, 99-0584 (La. 01/25/02), 824 So.2d 1063, 1078. The court conceded that "[t]ranscripts of various proceedings are missing, along with the objections, arguments and ruling contained therein." *Id.* [64] However, the court ultimately held that the record was sufficient for full judicial review. The court did not give a justification or explanation to support this blanket ruling. Further, the court found, without support, that "[a] through [sic] reading of the voir dire supports a conclusion that any juror exhibiting a basis for disqualification was removed for cause." *Id.*

---

[64] Regarding the penalty phase transcripts, the court concluded that the transcripts "are out of chronological order, are duplicated, and are very difficult to read."

Clearly established federal law mandates that counsel on appeal should not have to speculate and show "irregularities that may have taken place." In this case it was impossible for counsel, who did not serve as trial counsel, to show what testimony was missing, what hearings were missing, and which jurors were questioned during voir dire.

As the Louisiana Supreme Court openly acknowledged the abysmal state of Mr. Lacaze's record, relief is warranted.

**CLAIM 13: CUMULATIVE ERROR VIOLATED MR. LACAZE'S RIGHT TO DUE PROCESS AND RENDERED HIS TRIAL FUNDAMENTALLY UNFAIR**

As set forth above, Mr. Lacaze's capital murder trial was tainted with multiple constitutional errors. Although courts often face isolated claims of constitutional violations in petitions for writs of habeas corpus, this case, by contrast, presents an extraordinary array of well-documented, constitutional deprivations resulting from misconduct, incompetence, and constitutional error that combined to infect the trial with fundamental unfairness in violation of the Sixth, Eighth, and Fourteenth Amendments. These errors of constitutional magnitude prevented the jury from properly assessing the State's evidence of Mr. Lacaze's guilt.

The State prosecuted Mr. Lacaze with little regard for the risk of wrongful conviction. It withheld multiple items of material and favorable evidence from the defense, including prior inconsistent witness statements, non-identifications of Mr. Lacaze by two of the three eyewitnesses, witness statements that Mr. Lacaze was carrying a cell phone, documents establishing that the murder weapon had been obtained by Officer Frank just before the murders, witnesses establishing that Officer Williams had argued with Adam Frank, and a death threat made by Antoinette Frank to the victim. Each single non-disclosure merits reversal; cumulatively, the effect is even more egregious. Reviewing courts are required to consider "the

133

cumulative effect of all such evidence suppressed by the government." *Kyles*, 514 U.S at 421. Materiality of suppressed evidence must be assessed collectively, and not just individually item by item, because the prosecution is "responsible for gauging that effect regardless of any failure by the police to bring favorable evidence to the prosecutor's attention." *Id.*

Trial counsel's multiple harmful errors, viewed in the aggregate, also prejudiced Mr. Lacaze's case at trial. Counsel failed to litigate a motion to suppress Mr. Lacaze's statement or present evidence of a false confession. Counsel failed to move for a mistrial at crucial junctures, such as when Chau Vu identified Rogers Lacaze as the perpetrator, even though the state had indicated previously that she could not identify the person with Antoinette Frank. Vol. 7, Tr. 557. Because the State's case rested primarily on the testimony of eyewitnesses, none of whom had seen Lacaze shoot the victims, counsel's failure to interview witnesses prior to trial irreparably prejudiced the defense. Numerous alibi witnesses were known to counsel, and available to testify, yet not one was contacted. The trial lost its character as a confrontation among adversaries and became a sacrifice of an effectively defenseless mentally retarded teenager to the lions of the State. *See United States v. Cronic*, 466 U.S. 648, 657 (1984). The jury was given instructions that unconstitutionally lessened the State's burden of proof. Then, on direct appeal, Mr. Lacaze was denied his right to a meaningful appeal due to the "abysmal" state of the record.

The combined effect of multiple constitutional errors requires habeas relief if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal. *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992). The ultimate question here is whether in fact Rogers Lacaze's conviction and sentence were obtained in accord with the Constitutional guarantees of a fair trial and due process of law. Cumulative error warrants habeas relief where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial

134

of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Federal courts in this and other circuits have recognized that where pervasive constitutional error has infected a state criminal trial, a defendant has been denied due process of law and is entitled to relief. *See Derden*, 978 F.2d at 1454 (when trial court errors "so infect[] the entire trial that the resulting conviction violates due process" reversal is warranted) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *Guerra v. Collins*, 916 F. Supp. 620, 637 (S.D. Tex. 1995), *aff'd*, 90 F.3d 1075 (5th Cir. 1996) (applying *Derden*, the Court held that the "number of instances of [prosecutorial] misconduct [including intimidation of witnesses, suggestive identification procedures, a Brady violation, and the use of false evidence at trial,] as well as the type and degree [of that misconduct,] compel the conclusion that the cumulative effect . . . rendered the trial fundamentally unfair");[65] see also *Moore v. Johnson*, 194 F.3d 586, 619-22 (5th Cir. 1999) (considering the "cumulative errors" of counsel and finding them to be prejudicial); *United States v. Johnston*, 127 F.3d 380, 398 (5th Cir. 1997), *cert. denied*, 522 U.S. 1152 (1998) (considering, in narcotics case, the cumulative effect of prosecutorial misconduct and finding prejudice sufficient to cast doubt upon the correctness of the jury's verdict). As the Fifth Circuit has explained: "It is important to keep in mind that in a cumulative error analysis no single error is ground enough to grant the writ. There must be a cumulation of errors which

---

[65] The majority of other circuits also have adopted a cumulative effect rule with respect to due process violations in this context. *See Lundy v. Campbell*, 888 F.2d 467, 481 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990) (considering the prejudicial effect of procedural errors cumulatively); *Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir. 1988*), cert. denied,* 489 U.S. 1088 (1989) (noting in *dicta* that errors "cumulatively" causing sufficient harm can make a conviction fundamentally unfair); *Walker v. Davis*, 840 F.2d 834, 839 (11th Cir. 1988) (considering circumstances of prosecutorial misconduct "in their entirety").

135

results in a deprivation of due process." *Derden v. McNeel*, 938 F.3d 605, 610 (5th Cir. 1991); *see also Brown v. Sirmons*, 515 F.3d 1072, 1097 (10th Cir. 2008) ("A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."). *Harmless* errors, viewed in aggregate, can be—and are in this case—harmful and produce a fundamentally unfair result. It is only when the errors are not *constitutional* in nature that cumulative error does not apply. *Turner v. Quarterman*, 481 F.2d 292, 301 (5th Cir. 2007) (quoting *Derden*, 978 F.2d at 1454).

Given the number of constitutional errors in this case, and the gravity of the constitutional rights at stake, Mr. Lacaze received a fundamentally unfair trial. This Court must grant habeas relief.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Petitioner Rogers Lacaze respectfully prays that this Court:

1) Issue an order to have him brought before this Court, to the end that he may be discharged from an unconstitutional confinement;

2) Conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in this petition;

3) Permit him because of his indigence to proceed without payment of costs;

4) Grant him funding for investigative and expert assistance;

5) Allow a reasonable time to supplement and amend this Petition;

6) Stay and abey resolution of this petition and remand to state court for exhaustion of any unexhausted claims;

7) Grant any other such relief as may be necessary and appropriate.

Respectfully Submitted,

s/ Blythe Taplin

Blythe Taplin, La. Bar No. 32715
Cecelia Trenticosta Kappel, La. Bar No. 32736
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955

Certificate of Service

I hereby certify that a that a true and correct copy of the foregoing document has been filed with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to all counsel of record on this 28th day of July, 2017.

/s Blythe Taplin

137