**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**ROGERS LACAZE**                                                    **CIVIL ACTION**

**VERSUS**                                                                **NO. 17-7252**

**TIMOTHY HOOPER, WARDEN,**                            **SECTION "B"**
**LOUISIANA STATE PENITENTIARY**

## OPINION

Before the Court are petitioner Rogers Lacaze's amended and superseding petition for writ of habeas corpus under 22 U.S.C. § 2254 (Rec. Doc. 28), the State's opposition (Rec. Doc. 45), and petitioner's reply (Rec. Doc. 48). Having considered parties' briefing, the extensive state court proceedings—including post-conviction evidentiary hearing and judgments—parties' supplemental authority submissions[1], parties' presentations at hearing with oral argument (*see* Rec. Doc. 58), petitioner's supplemental briefings (Rec. Docs. 59 & 61), and for the reasons discussed below,[2]

**IT IS ORDERED** that petitioner's amended and superseding petition for writ of habeas corpus under 22 U.S.C. § 2254 (Rec. Doc. 28) is **DENIED**.

---

[1] Joint list of pre-hearing supplemental authorities included:

From petitioner:  *Neal v. Vannoy*, 78 F.4th 775, 796 (5th Cir. 2023) (reversing Petitioner's conviction and death sentence, finding that the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984)); *Jackson v. Cool*, Nos. 21-3207/3280; 2024 U.S. App. LEXIS 19600, at *13 (6th Cir. Aug. 6, 2024) (holding that the state court's subjective judicial-bias standard was contrary to clearly established federal law under *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868 (2009), and concluding that "the objective risk of Judge Stuard's bias against Jackson was 'too high to be constitutionally tolerable.'"); *Holberg v. Lumpkin*, No. 21-70010; 2023 U.S. App. LEXIS 5928, at *8-9 (5th Cir. Mar. 13, 2023) (Granting COA on the question of whether the State's suppression of a witness's informant status violated *Brady v. Maryland*); *Settle v. Fowler*, No. 93-4293; 1995 U.S. Dist. LEXIS 16310, at *1 (E.D. La. Oct. 19, 1995)(A civil action filed by David Settle, the juror in question in Mr. LaCaze's case. The court noted that, "Mr. Settle worked as a policeman for Norfolk and had risen through the ranks of the Norfolk Southern Police Department to become its highest ranking officer in New Orleans."); and

From respondent: *Granier v. Hooper*, No. 22-30240, 2023 WL 4554903, at *3 (5th Cir. July 17, 2023), *cert. denied*, No. 23-6661, 2024 WL 2805787 (U.S. June 3, 2024).

[2] Unsurprisingly for this matter and related state court proceedings, relevant exhibits consisted of 25,000+ pages – while many were found to be duplications from multiple writ petitions, responses, etc..

**IT IS FURTHER ORDERED** that, pursuant to 28 U.S.C. § 2253(c)(2) and Rules Governing § 2254 Cases Rule 11(a), a certificate of appealability will issue for:

- Claim 1: Biased Tribunal
- Claim 2: Impartial Jury
- Claim 3: Ineffectiveness During Voir Dire
- Claim 4: *Brady* Material
- Claim 6: Ineffectiveness at Trial
- Claim 8: Reasonable Doubt Instruction
- Claim 10: Cumulative Error

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Petitioner Rogers Lacaze is currently serving a life sentence for the murders of New Orleans Police Officer ("NOPD") Ronald Williams, Cuong Vu, and Ha Vu inside the Kim Anh Restaurant in New Orleans East in the early morning hours of March 4, 1995. Indicted for three counts of first-degree murder along with NOPD Antoinette Frank, petitioner's case was severed from Antoinette Frank's, and his trial began on July 17, 1995 before Judge Frank Marullo in the Criminal District Court of Orleans Parish. Petitioner was found guilty on all charges three days later; the following day the jury recommended the death penalty, to which Judge Marullo sentenced him on September 15, 1995. On direct appeal, petitioner's conviction and sentence were affirmed. *State v. LaCaze*, 99-0584, (La. 1/25/2002), 824 So. 2d 1063 (hereinafter *LaCaze I*).

The Louisiana Supreme Court recited the facts presented at trial as follows:

> Evidence at trial established that Antoinette Frank had worked security at the Kim Anh and knew the Vu family. Around 9 p.m. on Friday, March 3, 1995, she called to inquire if she would be needed for the detail that night. Frank spoke with Chau Vu, the 23 year old daughter of the owner. Chau advised Frank that she was not needed, as Officer Ronald Williams would work from 11 p.m. until closing time, normally around 1 a.m. Frank completed her shift at the 7th District Police Station at 11 p.m. After changing clothes at home, she picked up the defendant and drove directly to the Kim Anh. She entered alone, asking for cold drinks 4 Doc. 28. 5 Doc. 44. Case 2:17-cv-07252-ILRL-JVM Document 45 Filed 07/08/22 Page 5 of 66 6 for herself and a "nephew," who remained in the car. Frank spoke with Officer Williams, whom she knew, and with Mrs. Vu. Frank told Chau that she and her nephew

were going to a midnight movie, and left with the drinks. Business was slow that evening, and the family decided to close early. Mrs. Vu went home, leaving her children to clean up. Frank telephoned a pick-up food order about fifteen minutes later to order some food, indicating that she had missed the movie. At this point there were six people in the restaurant: Chau, her 24–year–old sister Ha Vu, her 18–year–old brother Quoc Vu, and her 17–year–old brother Cuong Vu, a waitress named Tu, and 25–year–old Officer Williams. Frank and a man she introduced as her nephew arrived at the restaurant minutes later and were the only customers. Their order was brought out in styrofoam containers, but Frank and her dinner companion decided to eat in the restaurant. Chau took close notice of Frank's dinner partner, later describing him to police as a short African– American with several gold front teeth, carrying a cellular phone. Quoc, who was sweeping up around the tables, also made note of Frank's companion because he "kept staring" at Quoc. Frank and the man left without finishing their meal, exited the restaurant, but remained outside, talking. Chau went to attached grocery side of the building, unlocked the doors, and bid them good night. Frank asked if she would be needed Saturday night for the security detail. After checking with Officer Williams, Chau said no, that Williams would handle it. The two got in Frank's car and drove off. Shortly thereafter, Frank and the man returned for a third time. Chau Vu and Quoc Vu were certain that the man accompanying Frank on her third trip to the restaurant was the man she introduced as her nephew, the same person who had eaten with her. Chau was frightened when she saw Frank approaching for the third time. Shouting to Officer Williams and Quoc not to open the doors, Chau gathered the money and ran to the kitchen where her sister Ha and brother Cuong were cleaning. As Chau hid the money in a microwave, she heard Quoc calling for her to come quickly to the front. Quoc had interrupted his sweeping to watch Frank pull into the parking lot, maneuver her car, then exit and walk up to the glass door and begin shaking it. He called to Chau and moved toward the kitchen. Chau was leaving the kitchen area and coming towards him when, suddenly, Quoc saw Antoinette Frank there inside the restaurant. Frank began pushing Chau backward, forcefully and rapidly, toward the kitchen, saying that they needed to talk. Frank tried but failed to grab Quoc. Officer Williams was behind the bar. He had started moving in Chau's and Quoc's direction when Quoc heard "lots of gunshots" from that area. Case 2:17-cv-07252-ILRL-JVM Document 45 Filed 07/08/22 Page 6 of 66 7 Frank spun around and ran towards the bar and the front of the restaurant. Chau and Quoc ran in the opposite direction, going deeper into the building. They raced through the kitchen and into a large, roomsized cooler, situated between the kitchen and a small grocery the family also operated. As they ran they called to Ha and Cuong, who were by the stoves, to come along. But Ha and Cuong did not follow. Chau testified similarly, that suddenly Antoinette Frank was inside the restaurant pushing her roughly toward the kitchen. It was at a point when she, Quoc, and Frank were together that Chau heard gunfire from the bar area where Officer Williams was located. When Frank left them, Chau, Quoc, and

3

a helper hid in the cooler. Quoc turned off the cooler's lights as they entered and crouched down. From the darkened interior he and Chau were able to see into parts of the kitchen and bar through a small window. Chau saw Frank and her companion running back and forth, all over the kitchen. She saw Frank do something to the phone at the bar. Chau heard more gunfire but was unable to see who was shooting. Quoc observed Frank and her companion running around, rummaging, "digging in this little area where we always hide our money." Then she heard gunfire from the area where he had last seen his siblings, Ha and Cuong. Quoc was positive that the defendant was the man who was with Frank during the shooting. Then Frank and the defendant were gone. From her vantage point inside the cooler, Chau looked through the windows of the grocery to the parking lot and watched Frank's car pull out and drive away. Yet she and Quoc hesitated to leave the relative safety of the cooler, uncertain what they would find and unsure whether Frank and the defendant had left or would return. Chau left the cooler on the grocery side to try to reach the telephone or her cellular phone at the bar. The telephone normally kept on the bar was gone. Going to retrieve her cellular phone, Chau spotted Officer Williams's body and lost all "confidence ... because the person that protects us is lying right there." She returned to the cooler with her cellular phone and attempted unsuccessfully to call 911. She finally reached a friend and asked him to relay news of the shooting and that an officer was hurt. The friend's call was received by 911 operators at 1:48 a.m. While Chau was calling, Quoc left the cooler on the kitchen side to look for his brother and sister. He returned with news that both were lying in pools of blood. Quoc decided to try to reach a friend's house and call police from there. He left through the kitchen and back door. Quoc's call from his friend's home was received by 911 operators at 1:50 a.m. Case 2:17-cv-07252-ILRL-JVM Document 45 Filed 07/08/22 Page 7 of 66 8 The first police unit arrived on the scene at 1:52 a.m. Officers Wayne Farve and Reginald Jacques pulled into an empty parking lot. Jacques went around to the back, while Farve approached the front. A young female Vietnamese darted out of the building and ran toward him. Officer Farve also observed "a black female running a short distance behind [the Vietnamese female]," whom he recognized as another police officer, Antoinette Frank, who told him that the injured officer and perpetrators were "in the back." Farve entered the restaurant, with the semi-hysterical Vietnamese female right behind him. After quickly checking on the three victims, Farve made the appropriate notifications by radio then withdrew to the front of the restaurant. Arriving close behind him in another unit was Officer Yvonne Farve, who pulled in as her husband, Wayne, entered the restaurant. She attempted to follow him but was stopped by Chau who bolted from the building, crying and shouting. Yvonne Farve later testified that she "just grabbed on to me. So, I held her." Chau had waited "so long" in the cooler for help to arrive. She saw one patrol car pull up but hesitated, not "want[ing] to go outside because I know Antoinette is police too...." When she heard more sirens approaching she felt safe enough to leave the building. Exiting on the grocery side, Chau began running toward the

policeman. But from "somewhere[] Antoinette" appeared. Frank kept asking where she and her brother had hidden and what happen to her sister and other brother. Chau answered, "You was there. You know everything. Why you ask me that...." Frank reached out to grab her but Chau "saw the lady with the uniform [and] ran to her, and she hug me[.]" Later, after the Yvonne Farve calmed her down, Chau was able to relate that Antoinette and a short black man with gold in his teeth had come in and "were just shooting everybody." Chau was unable make an identification from a photo line-up that morning. At trial she positively identified the defendant as Antoinette Frank accomplice. Quoc picked out the defendant's picture from a photo array in the hours following the shootings. At trial he, too, positively identified the defendant as the man who was with Antoinette Frank at dinner and at the time of the shooting. Antoinette Frank was questioned on the scene and taken into custody. She gave several statements implicating the defendant. By 3:30 a.m. Saturday morning police were at the home of the defendant's mother. From there they proceeded to Michael LaCaze's West Bank apartment, where they took the defendant into custody. By approximately 5:00 a.m. he was in the homicide office where he gave verbal and taped statements placing himself inside the restaurant during the shooting, even while Case 2:17-cv-07252-ILRL-JVM Document 45 Filed 07/08/22 Page 8 of 66 9 insisting that he had neither fired a weapon nor killed anyone. The bodies of Ha Vu and Cuong Vu were found next to the stoves, each shot multiple times. Ha Vu had been shot at least twice: once to the top of the head, which killed her instantly; and, once to the back of the head. There were minor wounds to the left knee and right arm which may have been caused by bullet fragments. Cuong Vu suffered four wounds, each of which would have been fatal. Two bullets were fired close together into the back of his head, exiting in the forehead. Their parallel trajectories suggested a rapid-fire type weapon. A third bullet struck a shoulder blade and exited in the chest area. A fourth bullet entered the victim's front chest, striking the liver and exiting the back. Two other wounds were superficial. Officer Williams was shot three times. Forensic pathologist Paul McGary testified that the likely first shot was fired at close range to the right side of the victim's neck, under and beneath his ear, which severed the spinal column and exited just below his left ear. The bullet's trajectory was almost horizontal, slightly forward and upward. The victim would have been standing upright when this shot was fired. Death would have been instantaneous. The second wound was high on the neck at the base of the skull, with the bullet traveling into the head on an upward trajectory and exiting above the left ear. This would have been inflicted while the victim was down or falling down. Similarly the third bullet, which entered the right lower back and exited in the left chest area below the collar bone after passing through the right kidney, diaphragm, liver and right lung, was fired when Williams was down or falling down. The microwave oven where Chau Vu tossed the uncounted currency was empty. The murder weapon was never found.6 Three weeks after the murders detectives were contacted by the widow of Officer Williams, advising that someone had used her husband's

gasoline credit card on March 4, the date of his death. Investigators had recovered the slain officer's identification folder, which most members of the force use in lieu of wallets. With the new information they realized that Williams also carried a wallet and that it and its credit cards had been taken after he was killed. Further investigation led detectives to the night manager of a Chevron Gas Station located a short distance from the home of the defendant's brother, Michael LaCaze, who told them that the defendant had made a credit card purchase around 2:30 a.m. in early March. Matching transaction records kept at the service station of "swipe card" purchases not requiring a signature with credit card billing information established that a credit card issued to Officer Ronald Williams was used to purchase $15.29 of gasoline at 2:29 a.m., Saturday, March 4. The manager positively identified the defendant as Case 2:17-cv-07252-ILRL-JVM Document 45 Filed 07/08/22 Page 9 of 66 10 the person making that credit card purchase. The prosecution's theory of the case was that Antoinette Frank became involved with the defendant in November of 1994 when she responded to a report of a disturbance and encountered a gunshot LaCaze. She followed his medical progress, then called and visited after his discharge from the hospital. Frank began giving him money, buying him gifts and clothes, and tried to get him a job. According to the defendant, Frank saw to it that he got a G.E.D. She also warned him that Eastern New Orleans was unsafe, as the person for whom he sold cocaine actually worked for 7th District police officers. Asked the nature of their relationship, defendant testified that he and Antoinette were friends. By February of 1995, she purchased two cellular telephones, one for him and one for herself. By this point the two were acting in concert while Frank was on duty. On March 2, for example, Frank responded to a report of an auto accident at Chef and Downman Streets. An African–American male rode in the front seat with her in the patrol unit. At Frank's direction the man got behind the wheel and repositioned the unit; at another point, he directed traffic. Other officers on the scene took him for an off-duty or plain-clothes police officer. Also on March 2, while still on duty and in uniform, Frank drove the defendant in her patrol unit to apply for a job. The following day, a uniformed Frank and a young African–American male with gold teeth were in Wal–Mart inquiring about 9mm cartridges. They left without making a purchase. That evening Frank and a young man she introduced as a "trainee" responded to a residential call in the 7th District. In addition to their play-acting, prosecutors theorized that Frank was becoming increasingly angry over being cut out of what she considered an equitable share of the paid details at the Kim Anh Restaurant. The defendant told detectives that Frank resented the fact that her former partner, "Ronnie [Williams, was] always [] fuckin' over her.... He be messin' over her .... [and the Vus] do anything he say." The defendant took the stand in his own behalf at trial. At the guilt phase he repudiated his statements to detectives. Instead, he explained to jurors, he and Antoinette Frank went to the restaurant twice, the last time to eat. Afterwards, Frank dropped him at his girlfriend's apartment around 12:20 a.m. Saturday morning. That was the last time he

6

saw her. Minutes later his brother called, inviting him to play pool. His brother picked him up about 12:30 a.m. They picked up Angela, a friend of his brother's, then went to Mr. C's Pool Hall in Eastern New Orleans. They stayed until about 2:00 a.m. They left, dropped off Angela, then drove to his brother's West Bank apartment, arriving about 2:30 a.m. There the Case 2:17-cv-07252-ILRL-JVM Document 45 Filed 07/08/22 Page 10 of 66 11 defendant remained until police arrived between 4:00 and 4:30 a.m. The defendant denied returning to the Kim Anh for a third time, denied any part in the killings, and insisted that his oral and taped statements to the contrary were products of police threats and coercion. He would confess again, he testified, because he "kn[ew] for a fact that New Orleans police get away with anything...." The defense supported the alibi through testimony from the defendant's brother, Michael LaCaze. It did not produce Angela, however, and the manager of Mr. C's Pool hall testified unequivocally that Michael played pool late that Friday night without his brother. Further, the defendant contradicted the time line of his alibi when he testified that he was with Frank when she called the restaurant to order the food. Telephone company records established that the order was placed by cellular phone at 12:51 a.m. Saturday. This was some twenty minutes after he testified that Michael picked him up. In addition to its alibi evidence, the defense raised for juror consideration the possibility that Antoinette Frank's brother, Adam Frank, was the accomplice. Cross-examination of Chau Vu established that Frank brought her brother to the restaurant when she worked a detail there. Later she began to drop Adam off at the restaurant, "just to hang around," while she performed her regular shift at the 7th District. Chau had a benign view of Adam Frank, however. He would come in, watch people having fun and enjoy the karioke. When Antoinette Frank got off work, she pick up Adam. The defense established that at relevant times Adam Frank had outstanding warrants for two counts of attempted manslaughter. The defense also attempted to show that the wounds suffered by Cuong Vu and Officer Williams would have caused "back spatter" of blood on the shooter. The importance of this was the lack of blood spatter on the clothes of the defendant, which were seized at his arrest. However, the prosecution established through cross-examination of the defense blood pattern expert that defense counsel had neither provided any data on the murder weapon nor asked her to visit the scene, review photographs of the scene or the victims, or asked her to examine the defendant's clothes. The state conceded in closing that no one saw the shootings. On the other hand, it maintained that it had proved that Antoinette Frank did not kill Officer Williams. The evidence identified his killer as the defendant, Roger LaCaze. While Frank made a commotion by gathering people together, LaCaze sneaked in and shot Williams from behind. The defendant then rummaged with Frank for money. The prosecutor also Case 2:17-cv-07252-ILRL-JVM Document 45 Filed 07/08/22 Page 11 of 66 12 conceded that "we will never know [precisely] what happened" to Ha and Cuong Vu in the kitchen. Neither survivor, Chau or Quoc Vu, saw who shot their siblings. It appeared that only one gun was

used and, the state argued, while reasonable to suppose that LaCaze kept and used the gun again, it made no difference who pulled the trigger on the Vus. That was "because whether that gun was in Antoinette Frank's hands or in [the defendant's] hand, [LaCaze] was there, he was helping, and he was intending to kill everybody, and he is guilty under the law of [p]rincipals." Jurors were urged to find LaCaze personally killed Officer Williams then participated as a principal in an armed robbery and the killings of the Vus.

*State v. LaCaze*, 1999-0584 (La. 1/25/02), 824 So. 2d 1063, 1066–72.

During the consideration of his state post-conviction relief, petitioner successfully moved to have Judge Marullo recused due to his involvement in the investigation into the possible murder weapon. *See* Rec. Doc. 45-95 (State's writ application); *State v. Lacaze*, 2010-2576 (La. 1/28/11), 56 So. 3d 964 (writ denial). Appointed *ad hoc*, retired Judge Michael Kirby granted petitioner a new trial after a lengthy evidentiary hearing: "Although I find the evidence of Mr. LaCaze's actual guilt compelling, he is entitled to a new trial because his trial was afflicted with a structural defect, *i.e.* the violation of a constitutional right so basic to a fair trial it cannot be treated as a harmless error." Rec. Doc. 45-8 at 4 (Opinion, July 23, 2015).

Although considering many of the arguments petitioner currently raises, Judge Kirby found only one valid ground for a new trial: the seating of juror David Settle, one of three jurors petitioner challenges for bias. Specifically, Settle failed to reveal during voir dire that he was an active Louisiana State Police officer at the time of the trial. As Judge Kirby observed, "I cannot fathom a legitimate reason for him not speaking up when the trial court directly asked the first row of his panel if anyone was related to anybody in law enforcement." *Id.* at 16. Applying the *McDonough* standard, Judge Kirby determined Settle both failed to answer a voir dire question honestly and an honest answer would have provided a valid basis for a challenge for cause of the active-duty law enforcement officer. *Id.* at 20.

In its writ application in opposition to the ruling, the State did not challenge the reversal of

8

petitioner's death sentence. *See* Rec. Doc. 28 at 40; Rec. Doc. 45 at 4 n.3. Thus, as to all but the capital sentence, the Louisiana Fourth Circuit Court of Appeal reversed the district court, which the Louisiana Supreme Court, in turn, affirmed. *State v. LaCaze*, 2016-0234 (La. 12/16/16), 208 So. 3d 856 (hereinafter *LaCaze II*). Following this denial, petitioner filed his petition for writ of habeas corpus in this Court, with the proceedings stayed pending his petition for writ of certiorari with the United States Supreme Court. *See* Rec. Docs. 1, 3, and 5.

Granting certiorari, the United States Supreme Court vacated the state high court's ruling, remanding it to the Louisiana Supreme Court "for further consideration in light of *Rippo v. Baker*, 580 U.S. 285, 137 S. Ct. 905, 197 L.Ed.2d 167 (2017)." *Lacaze v. Louisiana*, 583 U.S. 801 (2017).

On remand however, the state court determined the *Rippo* decision did not change the analysis of the propriety of Judge Marullo's hearing the case, reaffirming the previous rulings by its own and the Louisiana Fourth Circuit courts. *State v. LaCaze*, 2016-0234 (La. 3/13/18), 239 So. 3d 807 (hereinafter *LaCaze III*). The United States Supreme Court denied certiorari. *Lacaze v. Louisiana*, 139 S. Ct. 321 (2018).

On December 13, 2019, Judge Kirby denied petitioner's remaining post-conviction claims and resentenced Lacaze to life imprisonment without the possibility of parole. *See* Rec. Doc. 45-31 at 4–6, 9. Petitioner's writ applications were denied by the Fourth Circuit Court of Appeal and the Louisiana Supreme Court. *See State v. Lacaze*, 2020-00534 (La. 10/5/21), 325 So. 3d 362 (hereinafter *Lacaze IV*). Nine days after the Louisiana Supreme Court's denial, petitioner moved this Court to lift the stay and reopen his federal habeas proceedings, asserting exhaustion of related state court petitions. Rec. Doc. 11. That unopposed motion was granted. Rec. Doc. 21.

## II.   LAW AND ANALYSIS

### A.   Standard of Review

9

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to habeas petitions filed after its effective date of April 24, 1996. *See* Pub. L. No. 104-132, 110 Stat. 1214. The threshold requirements on habeas review are: (1) a timely petition; (2) exhaustion of state court remedies; (3) no "procedural default" on a claim. *See* 28 U.S.C. § 2244(d); *see also Nobles v. Johnson*, 127 F.3d 409, 419–20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)). There is no argument that petitioner's application is timely, based on exhausted claims, and is not subject to any state court procedural default. *See* Rec. Doc. 28 at 16–17; Rec. Doc. 45 at 12–13.

Under AEDPA, a federal court may not grant an application for a writ of habeas corpus for claims adjudicated on the merits in state court, unless that state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). Thus, the standard is a deferential one, established "to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citations omitted).

The Supreme Court reminds in *Brumfield v. Cain*, 576 U. S. 305, 313-15, 135 S. Ct. 2269, 2277-2278, 192 L.Ed.2d 356 (2015):

> We may not characterize state-court factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010). Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference. If " ' [r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.' " *Ibid.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–342, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006)). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

As § 2254(d) indicates, the applicable standard of review depends on the type of question presented: a pure question of fact, a pure question of law, or a mixed question of law and fact. As to questions of fact, state court factual determinations are presumed correct, requiring the petitioner to rebut the presumption through clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Wiggins v. Smith*, 539 U.S. 510, 528–29 (2003) (determining state court factual assumption "clearly erroneous" within ineffective assistance of counsel challenge); *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023) (describing a "two-step approach", beginning with the § 2254(e)(1) presumption and then applying § 2254(d)(2)); *but see Wood v. Allen*, 558 U.S. 290, 301 (2010) (refusing "to decide whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1)" or based on the unreasonableness standard of § 2254(d)(2)); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("We have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."). No matter the standard employed—whether the petitioner must show the factual determination unreasonable or rebut the factual correctness by clear and convincing evidence—courts regularly reach the same conclusion. *See, e.g., Wood*, 558 U.S. at 300–01; *Burt*, 571 U.S. at 18; *Haynes v. Thaler*, 438 F. App'x 324, 327 n.2 (5th Cir. 2011).

Questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1). *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001) (citations omitted) ("We review questions of law and mixed questions of law and fact under the 'contrary to' and 'unreasonable application' prong of 28 U.S.C. § 2254(d)."). With such questions, the Supreme Court has distinguished the "contrary to" and "unreasonable application of" grounds in § 2254(d)(1). *See, e.g., Williams v. Taylor*, 529 U.S. 362, 405–13 (2000).

11

A state court decision is "contrary to" clearly established federal law where it applies "a rule that contradicts the governing law set forth in [Supreme Court] cases[,]" through an incorrect legal standard or a contrary decision from Supreme Court precedent based on "facts that are materially indistinguishable". *Id.* at 405–06. Further, even if the correct standard is named but its substantive principles differ in the state court's application of it, a decision is "contrary to" the established law. *Id.* (describing ineffective assistance of counsel application of a "preponderance of the evidence" standard as contrary to the clearly established "reasonable probability" standard).

As the alternative measure, a state court decision is an "unreasonable application" of clearly established federal law where the governing legal rule is identified but an objectively unreasonable application of that rule to the facts occurs. *Id.* at 409–10. This unreasonable application is "different from an incorrect one." *Bell*, 535 U.S. at 694; *see also Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("[A]n incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). As the Supreme Court has explained, a writ application must be denied "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and internal quotation omitted).

Nonetheless, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Williams v. Taylor*, 529 U.S. 362, 387, n.13 (2000) (Stevens, J., concurring) (distinguishing deference under AEDPA from the higher requirement from congressionally delegated power, as in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)[3], and concluding, "Whatever 'deference' Congress

---

[3] The *Chevron* opinion was overruled in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399, 413, 144 S. Ct. 2244, 2265, 2273, 219 L. Ed. 2d 832 (2024).  Chief Justice Roberts found that "*Chevron* cannot be reconciled with the APA, as the Government and the dissent contend, by presuming that statutory ambiguities are implicit delegations to agencies. … But courts need not and under the APA may not defer to an agency interpretation of the law simply

12

had in mind with respect to both phrases, it surely is not a requirement that federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in error."). In particular, "[a] federal court can disagree with a state court's [factual determinations] and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El*, 537 U.S. at 340.

Although in a deferential posture, the federal habeas court is not merely a rubber stamp for any possible post-conviction reasoning; instead, we must engage "the facts and circumstances that were adduced in support of the prima facie case" and, thereby, review for unreasonable determinations. *See id.*

The AEDPA relitigation bar, however, does not apply to claims not adjudicated on the merits in state court. *See Cullen v. Pinholster*, 563 U.S. 170, 185–86 (2011). Merits-based denials include unexplained, summary decisions. *Richter*, 562 U.S. at 99 ("There is no merit to the assertion that compliance with § 2254(d) should be excused when state courts issue summary rulings because applying § 2254(d) in those cases will encourage state courts to withhold explanations for their decisions."). Instead, a decision is not on the merits where it is based on procedural grounds. *Valdez*, 274 at 946–47.

Where the state supreme court provides only a summary denial, the federal habeas court "looks through" to the last reasoned state court decision. *See Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Where there is no

_____

because a statute is ambiguous."  Contrary to petitioner's argument, *Loper* is not applicable here.  This habeas action does not involve ambiguous statutes or rules.  Loper does, however, reinforce application of clear Congressional mandates. As shown above, the AEDPA is such a mandate.

reasoned state court decision on a claim, the federal habeas court "must hypothesize the reasons or theories that could have supported the denial of relief." *Floyd v. Vannoy*, 894 F.3d 143, 160–61 (5th Cir. 2018) (citation omitted). The federal habeas court may find an unreasonable application of clearly established federal law "only if, after this hypothetical inquiry, we determine there was no reasonable basis for it." *Id.* at 161 (citing *Richter*, 562 U.S. at 98, 101).

If the relitigation bar is lifted, petitioner's claim is reviewed *de novo*, namely, for whether "he is in custody in violation of the Constitution or laws or treaties of the United States." *See Langley v. Prince*, 926 F.3d 145, 163 (5th Cir. 2019) (en banc) (citing 28 U.S.C. § 2254(a)). Thus, "[o]vercoming AEDPA's relitigation bar is necessary but not sufficient to win habeas relief." *Id.* at 156. This *de novo* review has been considered as "a most deferential one." *Richter*, 562 U.S. at 105. As the Fifth Circuit further explained the appropriate standard in an ineffective assistance of counsel context, "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Id*.

In accord with above-cited authorities and as correctly stated in petitioner's post-argument brief, the instant claims are "considered within the existing structure of AEDPA." See Rec. Doc. 59, p. 3. An erroneous application of federal law or baseless interpretation of the factual record by a state court will not withstand federal review, rendering them invalid.[4]

## B.    Claim 1: Bias of Tribunal

---

[4] As stated earlier, *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), cited by petitioner, found federal courts were no longer required to defer to "permissible" federal agency interpretations of federal law, thus eliminating the Chevron deference doctrine under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and significantly altering the landscape of judicial review of federal agency actions. In addition to previously stated reasons, and considering the standards of review under AEDPA, the Loper decision is inapplicable in the context of this habeas action and distinguishable based on this opinion's analysis of the existing legal and factual framework, *infra*.

### 1. Standard of Review

Although "[a]ll questions of judicial qualification may not involve constitutional validity[,]" the Due Process Clause of the Fourteenth Amendment extends to those that do. *See Tumey v. Ohio*, 273 U.S. 510, 523 (1927). "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). This standard has classically included a judge who has no actual bias or personal interest in the matter. *See, e.g., Bracy v. Gramley*, 520 U.S. 899, 905 (1997) (citations omitted). However, in 2017, the Supreme Court clarified that "the Due Process Clause may sometimes demand recusal even when a judge has no actual bias." *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (quotation cleaned up, citation omitted). An objective test, the recusal of a judge is necessary where there is "the probability of actual bias" that is "too high to be constitutionally tolerable." *Id.* (quoting *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)). As alternative framings of inquiry, the *Rippo* Court asked whether, based on the totality of the circumstances, the "average judge" is likely to be neutral and the potential or risk for bias is unconstitutional. *Id.* (quoting *Williams v. Pennsylvania,* 579 U.S. 1, 8 (2016)); *see also Caperton*, 556 U.S. at 881 ("The inquiry is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'").

### 2. Claim Background

Due to his involvement in a parallel, internal investigation into the alleged murder weapon, petitioner contends Judge Frank Marullo possessed an unconstitutional potential for bias in trying his case. Rec. Doc. 28 at 44. Begun on March 17, 1995—thirteen days after the murders but before petitioner's case was allotted to Judge Marullo—an investigation by the NOPD Public Integrity

15

Division reviewed a complaint that Officer Antoinette Frank had obtained weapons from the NOPD property room. Rec. Doc. 28-1 at 81 (NOPD Public Integrity Division Report).

Two court orders released guns to Antoinette Frank—one purportedly signed by Judge Morris Reed, the other by Judge Marullo. *Id.* at 81–82. When questioned, Judge Reed contended his signature on the order was a forgery, providing to the investigator three handwriting samples and pointing out that the signature incorrectly spelled his name "Reid." *Id.* at 82. On March 28, 1995, the NOPD investigator met with Judge Marullo, who compared the signature on the order to "several other documents with his signature." *Id.* at 83. The investigator concluded, "[b]ased on the conversations with the two Judges, it appears the two orders allegedly signed by those Judges were forgeries of their signatures." *Id.*

This determination was supported by conflicting statements made by the focus of the investigation: Officer David Talley. As the officer overseeing the property room, Officer Talley initially stated that he personally saw Judge Reed sign the first order and that he personally delivered the second to Judge Marullo's clerk; later, in sworn, *in camera* testimony during the Frank trial, Officer Talley denied seeing the orders signed and, instead, relayed a recently deceased officer had presented them for signature. *See id.* at 84–85.

Once Judge Marullo was allotted the case, he refused to make further statement in the investigation "until the case has reached its final disposition." *Id.* The investigation concluded with allegations sustained against Officer Talley for untruthfulness, abuse of position, neglect of duty, and false or inaccurate reports. *Id.* at 90–92. Judge Marullo was neither determined to have signed the order nor to have committed any wrongdoing.

Although attaching the Public Integrity Division Report as an exhibit, petitioner concludes that an exoneration of Judge Marullo's wrongdoing is not the measure of constitutionality. Instead,

petitioner insists "the facts giving rise to the objectively impermissible risk of bias are extraordinary and created, at a minimum, an unconstitutional potential for bias.[] Judge Marullo's failure to disclose this information and recuse himself from Mr. LaCaze's case was structural error, requiring the reversal of Petitioner's conviction[.]" Rec. Doc. 28 at 54. Petitioner believes Judge Marullo's "objective self-interest in avoiding disclosure of his association with the release of a weapon to Officer Frank" establishes an appearance of bias and eliminates the likelihood of his neutrality. *Id.* at 57–58.

### 3. Last Reasoned State Court Decision

On its initial post-conviction consideration, the Louisiana Supreme Court affirmed the Louisiana Fourth Circuit Court of Appeal unpublished summary writ disposition, *see* Rec. Doc. 45-28, specifically finding no basis to rebut the presumption of Judge Marullo's impartiality. *See LaCaze II*, 208 So. 3d at 863–64. However, the United States Supreme Court vacated the state high court's ruling, remanding it to the Louisiana Supreme Court "for further consideration in light of *Rippo v. Baker,* 580 U.S. 285, 137 S. Ct. 905, 197 L.Ed.2d 167 (2017)." *Lacaze v. Louisiana*, 583 U.S. 801 (2017). On remand, the state high court determined the *Rippo* decision did not change the analysis of the propriety of Judge Marullo's hearing the case, reaffirming its previous ruling. *LaCaze III*, 239 So. 3d 807. As noted infra, the United States Supreme Court subsequently denied certiorari in *Lacaze v. Louisiana*, 139 S. Ct. 321 (2018).

In this last reasoned state court decision, the Louisiana Supreme Court understood *Rippo* to provide a two-part, objective test: (1) that, based on the totality of the circumstances, there was a probability of actual bias, a risk of bias, or a potential for bias; and (2) that the probability of actual bias, risk of bias, or potential for bias "rises to a level that 'is too high to be constitutionally tolerable.'" *Id.* at 815–16 (quoting *Rippo*, 580 U.S. at 287). Focusing on the second half of its

*Rippo* consideration, the Louisiana Supreme Court concluded Judge Marullo's involvement in the NOPD investigation did not fall within Supreme Court constitutional cautions. *See id.* at 816–17 (collecting cases). "The association between the potential source of bias in this case and what might reasonably be expected to be a judge's anticipated psychological reaction are far too remote and attenuated to show a probability of actual bias on the part of Judge Marullo that is too high to be constitutionally tolerable." *Id.* at 820 (quotation cleaned up).

With less expansive treatment, the Louisiana Supreme Court also determined that the first half of the *Rippo* consideration was not met. The state high court concluded the investigation circumstances would not lead "the average judge to favor one party so as to be objectively suggestive of bias or a 'probability of actual bias.'" *Id.* at 819. Thus, the average judge was likely to be neutral. *Id.* at 819–20.

The denial of relief on this issue by the Louisiana Supreme Court was not contrary to clearly established federal law. On remand from the United States Supreme Court, the state high court properly identified constitutional due process standard for recusal, rejecting arguments both that proof of actual bias was necessary and that any probability of bias was sufficient. *See id.* at 816 (describing the latter as "inconsistent with the wording of the *Rippo* standard . . . render[ing] the 'too high to be constitutionally tolerable' portion of the standard extraneous"). Further, the Louisiana Supreme Court's application of the rule was not objectively unreasonable. Considering precedent, the Louisiana Supreme Court concluded Judge Marullo's involvement in the NOPD investigation was not too high to be constitutionally tolerable. Having considered the totality of circumstances in the record, the average jurist was likely to be neutral. To the extent factual determinations are challenged, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings. Petitioner is not entitled to federal habeas

18

corpus relief as to this issue.

### C.    Claim 2: Bias of Juror

#### 1.    Standard of Review

The Sixth Amendment guarantees the right to an impartial jury. *See* U.S. CONST. amend. VI. Relief from an individual's presence on a jury, therefore, may be granted only if jury impartiality has thereby been deprived. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 549 (1984) ("We . . . now hold that respondents are not entitled to a new trial unless the juror's failure to disclose denied respondents their right to an impartial jury.").

Where the partiality of a juror is alleged, a trial court should conduct a post-trial hearing to assess the presence of actual bias. *See Smith v. Phillips*, 455 U.S. 209, 215–18 (1982). Further, in certain "extreme situations," implied bias can be established in the absence of actual bias. *Id.* at 948 (O'Connor, J., concurring) ("Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."); *see also United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001).

Conduct during voir dire has specifically raised juror impartiality concerns. In *McDonough Power Equipment, Inc. v. Greenwood*, the Supreme Court adopted a two-part test for a party to show that a prospective juror's inaccurate response deprived the court of a fair trial: (1) "a juror failed to answer honestly a material question on *voir dire*," and (2) "a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc.*, 464 U.S. at 556. As with the bias inquiries, the *McDonough* Court tied the voir dire assessment to the Sixth Amendment's impartiality protection: "The motives for concealing information may vary, but only

those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id*.; *see also Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009) ("Actual bias exists when the juror failed to answer a material question honestly on voir dire, and a correct response would have provided a valid basis for a challenge for cause."). The concurrences to the *McDonough* plurality opinion also clarified that this inquiry did not unseat the more traditional bias challenge. *See McDonough Power Equip., Inc.*, 464 U.S. at 556–57 (Blackmun, J., concurring) ("[R]egardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred."); *id.* at 557–58 (Brennan, J., concurring) (distinguishing the plurality's holding from a showing that "the juror was biased against the moving litigant"). The United States Fifth Circuit has applied the *McDonough* test in habeas corpus proceedings. *See, e.g., Montoya v. Scott*, 65 F.3d 405, 419 (5th Cir. 1995).

Courts have expressed the pertinent descriptive in the second half of the *McDonough* test alternatively as "valid," "successful," and "meritorious." *See Buckner v. Davis*, 945 F.3d 906, 911 (5th Cir. 2019) ("valid basis" for a challenge for cause); *United States v. Wilson*, 116 F.3d 1066, 1086 (5th Cir.), *reversed on other grounds on reh'g en banc sub nom. United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) ("basis for a successful challenge for cause"); *Lawrence v. McCain*, No. 19-13300, 2020 WL 5167594, at *12 (E.D. La. Aug. 4, 2020), *report and recommendation adopted*, No. 19-13300, 2020 WL 5107298 (E.D. La. Aug. 31, 2020) ("meritorious basis for a challenge for cause"). We observe no practical distinction based on the chosen descriptive term.

To evaluate if a challenge for cause is valid, federal habeas courts review state law. *See Buckner*, 945 F.3d at 911 (citing *Montoya*, 65 F.3d at 419)) ("The question of cause turns on state

20

law."). The Louisiana Code of Criminal Procedure provides various grounds for a cause challenge: the prospective juror lacks legal qualifications to serve; "is not impartial, whatever the cause of his partiality;" has a "relationship whether by blood, marriage, employment, friendship, or enmity" with "the defendant, the person injured by the offense, the district attorney, or defense counsel . . . such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;" refuses to accept the law provided by the court; or served on the grand jury of the instant charge or a previous jury that tried the instant defendant. La. Code Crim. Proc. art. 797. As the Louisiana Supreme Court has explained the cause provisions, "[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Brown*, 2018-01999 (La. 9/30/21), 330 So. 3d 199, 265 (citation omitted).

Louisiana courts have long been cautious of the impact a juror associated with law enforcement can have on jury impartiality. *See, e.g., State v. Lewis*, 391 So. 2d 1156, 1158 (La. 1980) ("[S]ervice on a criminal jury by one associated with law enforcement duties must be closely scrutinized and may justify a challenge for cause, although such association does not automatically disqualify a prospective juror."). This concern led to the Louisiana Supreme Court to determine "an actively employed criminal deputy sheriff is not a competent criminal juror." *State v. Simmons*, 390 So. 2d 1317, 1318 (La. 1980), *overruled by State v. Ballard*, 98-2198 (La. 10/19/99), 747 So. 2d 1077. Although appearing to present a *per se* bar to jury service for any "badge-wearing law enforcement officer," the *Simmons* court's concern and reasoning focused on an employment tie between the officer and the case. *See State v. Ballard*, 97-233 (La. App. 1 Cir. 7/14/98), 718 So. 2d 521, 525, *writ granted*, 98-2198 (La. 1/8/99), 734 So. 2d 646, *aff'd,* 98-2198 (La. 10/19/99),

21

747 So. 2d 1077 ("An examination of the out-of-jurisdiction cases cited by the *Simmons* court reveals that, in all instances, each potential juror under scrutiny worked for the prosecuting or complaining witness of the district attorney trying the case, i.e., the law enforcement agency investigating and raising the charges for which defendant was being tried.").

However, the Louisiana Supreme Court acknowledged the subsequent narrowing of *Simmons*, as "courts of appeal limited its holding and carved out exceptions for law enforcement personnel not actively engaged in the field in making arrests and enforcing the law." *State v. Manning*, 2003-1982 (La. 10/19/04), 885 So. 2d 1044, 1079 (collecting cases). Accordingly, the Louisiana Supreme Court explicitly overturned the "broad brush" ruling in *Simmons*, finding constitutional fair trial concerns sufficiently ensured through Louisiana Code of Criminal Procedure Article 797. *State v. Ballard*, 98-2198 (La. 10/19/99), 747 So. 2d 1077, 1080 ("Specifically, the legislature enacted La. Code Crim. Proc. art. 797 to enumerate grounds by which a juror may be removed for cause, providing lack of impartiality and employment relationship as two possible grounds for removal among many.").

### 2. Claim Background

#### a. David Settle

From 1978 to 1993, David Settle worked as a commissioned law enforcement agent for the Norfolk Southern Railway Police Department. Rec. Doc. 28-1 at 161–62. In his post-conviction testimony, Settle described his role as a "[r]ailroad policeman on the railroad property[,]" for which he had the power of arrest. *Id.* at 39, 42. From 1984 to 1993, Settle served as a lieutenant supervisor. *Id.* at 162.

At the time of trial, Settle had transitioned to a role with the Louisiana Department of Civil Service. *See* Rec. Doc. 28-1 at 157. Settle's specific work obligations remain unclear, but petitioner

22

avers "employment records reflect that he was employed as a Field Officer for the Louisiana State Police at the time he sat as a juror." Rec. Doc. 28 at 62; *see also* Rec. Doc. 28-1 at 157 (listing Settle's job title as "MOTOR VEH OFFICER/FIELD" for the "STATE POLICE" with a start date of Mar. 28, 1995). During post-conviction relief testimony, Settle stated he had "no idea" of the meaning of the job title listed on his paystub. Rec. Doc. 28-1 at 37. Instead, Settle indicated he had worked at the Department of Motor Vehicles office "clear[ing] up driver's license[s] for people under suspension." *Id.* at 37–39 (The Court: "So you were a driver's license officer?" The Witness: "Yes."). In that position, Settle stated he "didn't have arrest powers." *Id.* at 38.

Settle was seated on the second voir dire panel for questioning. *See* Rec. Doc. 45-59 at 7. While in the gallery for the first panel, Settle heard petitioner's counsel inquire if any prospective juror was "related to anyone in law enforcement?" Rec. Doc. 45-58 at 108. Answers ranged from a nephew as an NOPD officer to a brother-in-law as a custom's officer. *Id.* at 109. Upon seating for questioning, Settle and his panel-mates were asked by Judge Marullo to volunteer any responses based on questions presented to the first panel. *See* Rec. Doc. 45-59 at 8. Subsequently, Judge Marullo asked prospective jurors if any were "related to anybody in law enforcement?" *Id.* at 17–22. Judge Marullo presented the question to each row of the second panel. *Id.* at 17 (first row), 18 (second row), 19 (third row). Responses included those from a husband of a forensic pathologist, a mother of a member of the Atlanta police force, friends of testifying NOPD officers, and wives of NOPD employees. *Id.* Settle did not respond. *See id.* During his post-conviction testimony, Settle affirmed that his guilty verdict was not based on any experience as an officer but upon the evidence and facts presented at trial. *See* Rec. Doc. 28-1 at 43–44.

### b. Victoria Mushatt

Victoria Mushatt was also seated on Settle's voir dire panel. *See* Rec. Doc. 45-59 at 7.

Mushatt was married to an NOPD officer, knew various NOPD officers who testified at trial, attended Officer Ronnie Williams's funeral, and worked as a 911 dispatcher for twenty years—including on the night of the murders. Rec Doc. 28-1 at 166–67 (post-conviction declaration). Although she did not answer the specific 911 call, Mushatt admitted to hearing at the call center that an NOPD officer had been murdered and an officer named Antoinette was the alleged perpetrator. *Id.* at 166; *see also id.* at 22 (post-conviction hearing testimony). Mushatt recalled looking through the NOPD manuals that night to identify Antoinette Frank as the officer in question. *Id.* at 22.

In her post-conviction declaration, Mushatt also reflected on the mood in the department after the murders:

> After the murder happened it was very emotional for everyone in the department. My husband has been a police officer for 20 years. We were all like family in the department. It was a tough time. We lost and [sic] officer, and he was killed by an officer. I remember dispatching calls for Ronald Williams. I didn't meet him in person, but I felt like I knew him.

*Id.* at 166. Mushatt explained her going to the funeral as support for her husband and the department. *Id.* at 26–27 ("It's just as a, as a department. Everybody who's available to go just go. It's a support as a, um, as an entity. Your co-workers or whatever.").

While still in the venire audience, an unnamed juror indicated she knew various potential witnesses due to her work as an NOPD dispatcher. *See* Rec. Doc. 45-58 at 151–53. Judge Marullo instructed the juror to remind parties when she reached the panel for individual questioning. *Id.* at 153. During the questioning of the initial panel, Mushatt also heard asked if anyone had learned anything about the case other than what was provided in the media. Rec. Doc. 45-58 at 113–14 (a different potential juror responding affirmatively). When Mushatt herself was seated on the voir dire panel, a juror acknowledged being married to an NOPD officer and knowing a number of the

testifying officers. Rec. Doc. 45-59 at 22 ("I know some of them just by associating them with names I have come across, but I don't really know any of them, but my husband might."). Judge Marullo then confirmed from her that these relationships would not "preclude [her] from looking at them and judging whether they are correct or not in their testimony[.]" *Id.* ("No, it wouldn't.").

During her post-conviction testimony, Mushatt recalled her guilty verdict and assumed she would have responded affirmatively that she could be impartial. "Q. Now, ah, did your employment as a police officer affect your decision to vote guilty? A. I don't think so. Q. So it was based on the evidence that the State presented? A. Yes. Uh-huh." Rec. Doc. 28-1 at 32.

### c.   Lillian Garrett

Lillian Garrett also sat on the second voir dire panel. *See* Rec. Doc. 45-59 at 7. During that questioning, the first row of her panel was asked if anyone or anyone close to them had been a victim of a violent crime. *Id.* at 22. After one juror responded, Judge Marullo inquired of the general panel, "Has anybody else been the victim of violent crime or have a close person [sic] friend or relative who has been the victim of a violent crime? Armed robbery? Murder? Rape, etcetera?" *Id.* at 23. Garrett did not respond. *Id.* Subsequently, it was revealed that Garrett had two brothers who were murdered. Rec. Doc. 28-1 at 169–70. In a produced declaration, Garrett provided the details that one brother "was beaten to death" and the other was shot. *Id.* Garrett viewed the gunshot victim herself. *Id.* At the post-conviction hearing, another brother of Garrett testified that the gunshot was to "the back of the head. Got his brains blowed out." *Id.* at 50.

### 3.   Last Reasoned State Court Decision

Following a post-conviction hearing, Judge Michael Kirby determined petitioner merited a new trial due to David Settle's seating on the jury. *See* Rec. Doc. 45-8 at 4 (Opinion, July 23, 2015) ("Although I find the evidence of Mr. LaCaze's actual guilt compelling, he is entitled to a

25

new trial because his trial was afflicted with a structural defect, *i.e.* the violation of a constitutional right so basic to a fair trial it cannot be treated as a harmless error.”). Judge Kirby concluded that petitioner “met his burden, under [*Mc*]*Donough*, of showing that a juror failed to honestly answer a voir dire question and that an honest answer would have provided a valid basis for a challenge for cause.” *Id*. at 20. Specifically, Judge Kirby determined that *Simmons* controlled, barring Settle, “a badge-wearing law-enforcement officer”, from jury service. *Id.* at 19. Judge Kirby also analogized the facts to those in *United States v. Scott*, 854 F.2d 697 (5th Cir. 1988), but found it “not necessary” to make a determination, even absent an application of *Simmons*, of a negative inference bias as to Settle. *Id.* at 19–20.

On review, the Louisiana Fourth Circuit Court of Appeal summarily reversed Judge Kirby’s ruling as to jury impartiality. Rec. Doc. 45-28 at 1 (“After review of the State’s writ application in light of the applicable law and arguments of the parties, we find that the trial court erred in finding that the seating of Mr. Settle on the defendant’s jury was a structural error entitling him to a new trial; we do not find that the trial court erred in denying the remaining claims.”).

In the last reasoned state court decision on the issue, the Louisiana Supreme Court affirmed the Fourth Circuit’s reversal. *See LaCaze II*, 208 So. 3d at 860–63. The state high court recites the *McDonough* standard: “[A] petitioner who collaterally attacks his conviction based on alleged juror dishonesty during voir dire must demonstrate (1) that the juror failed to honestly answer a material question and (2) that a correct response would have provided a meritorious basis for a challenge for cause.” *LaCaze II*, 208 So. 3d at 861 (citing *McDonough Power Equip., Inc.*, 464 U.S. at 556). The Louisiana Supreme Court then linked the *McDonough* test to Article 797 of the Louisiana Code of Criminal Procedure, which provides the grounds for a cause challenge of a juror. *Id*.

Despite apparent reluctance, the Louisiana Supreme Court adopted Judge Kirby's position that the first prong of the *McDonough* test is satisfied as to David Settle: "[B]ecause several questions were aimed at whether panelists had any connections with law enforcement, the inquiries were sufficient to have prompted a reasonable person in Mr. Settle's position to disclose his employment experience." *LaCaze II*, 208 So. 3d at 861. In its current briefing, the State concedes as much. *See* Rec. Doc. 45 at 25. The state high court, however, understood petitioner's challenge of Settle to fail on the second, "valid basis" prong. *LaCaze II*, 208 So. 3d at 860–63.

Admittedly, the standard applied by the state high court is a bit opaque. The reasoning supporting its second-prong conclusion begins with an analysis of *Simmons* and *Ballard*,[5] reviews aspects of Settle's work responsibilities, and references a need for a showing from petitioner that Settle "harbored actual bias, or at least point to specific facts from which bias must be presumed." *Id.* at 860–62. Petitioner concludes therefrom that the wrong standard has been applied: "The Louisiana Supreme Court failed to make this fact-specific inquiry, and focused on *per se*

---

[5] The Louisiana Supreme Court takes pains to assert the applicability of *Ballard*'s overruling of *Simmons*, despite Settle's seating as a juror four years before the *Ballard* opinion and the issue being raised only on collateral appeal: "[T]he *Simmons* ban does not apply, given that it was overruled it while LaCaze's appeal was pending. *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987)." *LaCaze II*, 208 So. 3d at 860–61. The position misapplies the precedent and misdirects the post-conviction inquiry.

*Griffith* itself dealt with the retroactive effect of a voir dire issue, namely, the peremptory challenge rule in *Batson v. Kentucky,* 476 U.S. 79 (1986). Repeatedly, the *Griffith* court characterized its decision to extend the *Batson* rule to those defendants on direct appeal who would "benefit" from the new rule. *Griffith*, 479 U.S. at 327, 328, 331, 332. Accordingly, *Griffith* did not establish a "rights-stripping" mechanism for criminal defendants on direct appeal. Any reliance on *Griffith* is inapt.

Further, the *Simmons-Ballard-Griffith* discussion distracts from the instant habeas inquiry: whether a state court decision was contrary to or an unreasonable application of clearly established federal law. This inquiry requires analysis of relevant United States Supreme Court holdings on a rule of law. *See Granier v. Hooper*, No. 22-30240, 2023 WL 4554903, at *3 (5th Cir. July 17, 2023), *cert. denied*, No. 23-6661, 2024 WL 2805787 (U.S. June 3, 2024) (citing, *inter alia*, *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Carey v. Musladin*, 549 U.S. 70, 74 (2006)). Accordingly, our review of the *LaCaze II* court's application of *McDonough* assesses Settle's jury placement in light of overarching Sixth Amendment concerns, not specific—and at times inconsistent—holdings of Louisiana state courts on the law enforcement-as-juror issue. However, as "[t]he question of cause turns on state law[,]" it is appropriate to conduct a limited review of Louisiana law as it relates to a valid basis for a cause challenge, generally, and Louisiana Code of Criminal Procedure 797, particularly. *See Buckner v. Davis*, 945 F.3d 906, 911 (5th Cir. 2019) (citing *Montoya v. Scott*, 65 F.3d 405, 419 (5th Cir. 1995)).

ineligibility, contrary to clearly established federal law." Rec. Doc. 48 at 27. We disagree with petitioner's contention.

In review of Louisiana Code of Criminal Procedure Article 797 application, Louisiana courts have considered "if the juror's responses, as a whole, reveal facts from which bias, prejudice, or inability to render a judgment according to law may be reasonably inferred." *State v. Mickelson*, 2012-2539 (La. 9/3/14), 149 So. 3d 178, 187. This "reasonably inferred" standard appears in concert with *McDonough* "valid basis" applications. In consideration of the *McDonough* test, a valid basis has been found where the juror's voir dire misrepresentation affected a relationship ***connected to the instant trial***. *See Williams v. Taylor*, 529 U.S. 420, 440–41 (juror bias where juror concealed relationships with a prosecution witness and the prosecutor); *United States v. Scott*, 854 F.2d 697 (5th Cir. 1988) (juror failed to disclose that his brother was a deputy sheriff in an office involved in the case); *State v. Aguillard*, 2014-0316 (La. App. 4 Cir. 3/4/15), 158 So. 3d 976, 982, *writ denied*, 2015-0589 (La. 10/15/18), 254 So. 3d 685 (vacating conviction for failing to strike for cause police lieutenant whose "very unit [was] responsible for the instant investigation" and state's witness was his supervisor).

However, even some ties to the instant case have not proven a close enough connection for a valid basis. *See Hatten v. Quarterman*, 570 F.3d 595, 603 (5th Cir. 2009) (from federal due process standard on *McDonough*'s second prong juror's "occasional drug deals with or around [intended victim] are not enough to prove actual bias"); *State v. Halford*, 2020-0585 (La. App. 1 Cir. 6/4/21), 327 So. 3d 1004, 1014, *writ denied*, 2021-00866 (La. 11/3/21), 326 So. 3d 884 (finding no abuse of discretion in district court's denial of cause challenges on reserve deputy and civil deputy, despite both knowing multiple sheriff's office witnesses).

Petitioner does cite two cases from other circuits that provide habeas relief despite a lack

of personal connection to the case. *See* Rec. Doc. 48 at 26–27 (discussing *Sampson v. United States*, 724 F.3d 150, 165 (1st Cir. 2013); and *Dyer v. Calderon*, 151 F.3d 970, 982 (9th Cir. 1998)). In *Sampson*, prospective jurors in a capital carjacking case were required to complete a seventy-seven-question questionnaire. *Sampson*, 724 F.3d at 155. After those responses narrowed the juror pool, voir dire itself lasted seventeen days. *Id*. Ultimately, the jury convicted the defendant of two counts of death-resulting carjacking and recommended the death penalty. *Id.* at 153.

During a post-conviction hearing on juror bias as it related to the penalty-phase, it was revealed that a seated juror—"Juror C"—had responded falsely to ten questions about situations of substance abuse and domestic violence involving her daughter and then-husband. *Id.* at 162–63. Juror C stated she thought her personal life would not affect her jury service, but her testimony "evinced her emotional pain and humiliation; she was visibly distraught when discussing [her husband and daughter], crying and incoherently attempting to excuse her mendacity." *Id.* at 163. Considering the valid-basis prong of the *McDonough* test, the First Circuit provided the measure:

> Any inquiry into potential bias in the event of juror dishonesty must be both context specific and fact specific. The outcome of this inquiry depends on whether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed).

*Id.* at 165–66. Weighing Juror C's emotional post-conviction testimony and the similarities between the evidence presented during the penalty phase and her own life experiences, the appellate court determined "any reasonable judge would have found that the cumulative effect of those factors demonstrated bias (and, thus, a valid basis for excusal for cause)[,]" remanding the case for a new penalty-phase hearing. *Id.* at 168.

29

In *Dyer*, the Ninth Circuit Court of Appeals determined a juror biased who twice lied about having a family member murdered in a manner similar to the allegations against the defendant. *Dyer*, 151 F.3d at 972–73. After the juror denied having family or friends who were victims of a crime, she sat on the jury that rendered a guilty verdict. *Id*. Before the penalty phase, the defense alerted the judge that the juror's brother had been shot and killed six years earlier. *Id*. Questioned by the trial judge, the juror assured the court that her brother had died in an accidental shooting. *Id*. She was allowed to remain on the jury, which recommended the death penalty. *Id*. at 973. However, the case file on the juror's brother revealed more than an accident: he was pistol-whipped four times and then shot in the back of the head. *Id*. Thus, the court concluded the juror twice lied. *Id*. The appellate court also determined the lies presented a valid basis for a cause challenge:

> Jessica Freeland was not involved in the crime which was the subject of the case, nor did she have a personal relationship with any of the trial participants. But there is every indication that she was not indifferent to service on the jury . . . . The inference we draw from all this is that Freeland lied in order to preserve her status as a juror and to secure the right to pass on Dyer's sentence.

*Id*. at 982. Both prongs of the *McDonough* test satisfied, the Ninth Circuit remanded the case for a new trial. *Id*. at 985.

The persuasive authority from the First and Ninth Circuits presents different factual circumstances than those involving petitioner Mr. Lacaze. In *Sampson*, the juror's emotional reaction at the post-conviction hearing was a significant factor in finding a valid basis for a cause challenge. *Sampson*, 724 F.3d at 168. As to Settle, the record does not reveal lack of impartiality from unrelated, personal circumstances. Instead, during his post-conviction testimony, Settle stated his guilty verdict was not based on any experience as an officer but upon the evidence and facts presented. See Rec. Doc. 28-1 at 43–44. Similarly, in *Dyer*, the personal circumstances presented are more indicative of juror bias. The *Dyer* juror twice affirmatively lied to the court.

30

*Dyer*, 151 F.3d at 972–73. Here, it is accepted that Settle misrepresented his career in law enforcement, but he did so through silence, when his row was asked if any were "related to anybody in law enforcement?" Rec. Doc. 45-59 at 17–22. Although sufficient to establish the first prong of *McDonough*, Settle's misrepresentation does not supply the additional circumstance through which we can draw an inference that Settle "was not indifferent to service on the jury." *Dyer*, 151 F.3d at 982. More to the point, it is not unreasonable to distinguish the persuasive caselaw.

In this case, through its second-prong analysis, the Louisiana Supreme Court assessed whether a valid basis for a cause challenge existed as to Settle. It concluded one did not. Rather than basing its determination on the absence of per se ineligibility, the *LaCaze II* court examined Settle's work responsibilities, his post-conviction hearing testimony, and cause-challengeable law and precedent. *See LaCaze II*, 208 So. 3d at 861–62. Thus, the court determined, based on the circumstances of the case and Settle's employment history, that Settle would not be subjected to a meritorious cause challenge.

*Is there a valid basis for a cause challenge of a DMV officer with a career in law enforcement in a case involving a slain police officer and a police officer co-defendant?* The Louisiana Supreme Court answered the question "no." Although petitioner requests that we also supply an answer, there are deferential constraints upon considering the question. No caselaw application of established federal law has been unearthed to present a valid basis for a cause challenge of a prospective juror with no personal or professional relationship to facts and witnesses of a case without additional concerning circumstances. Thus, however dissatisfying the Louisiana Supreme Court's conclusion may be or how we might rule, we cannot find it an unreasonable application, as the term is understood in the habeas context. Assuredly, a *de novo* review would

31

present a close call on the issue. Again, however, this Court is not in a *de novo* stance. The Louisiana Supreme Court accurately cites the applicable rule and law, considered the factual record, properly tying petitioner's challenge to constitutional protections of an impartial jury. As such, the decision was not contrary to or an unreasonable application of clearly established federal law. Moreover, we are reminded that a writ application must be denied "so long as fair minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and internal quotation omitted).

Similarly, the Louisiana Supreme Court determined petitioner's challenge of Lillian Garrett failed the *McDonough* test's second prong: "Even if Ms. Garrett failed to honestly answer the question, LaCaze has not shown she would have been subject to a meritorious challenge for cause if she had." *LaCaze II*, 208 So. 3d at 863 n.2. This conclusion mirrors Judge Kirby's more substantial treatment of the issue, deciding that the murders of her two brothers did not "*ipso facto* subject [her] to a challenge for cause." Rec. Doc. 45-8 at 22. Moreover, Judge Kirby questioned whether Garrett lied at all by not speaking up about her brothers, finding the record "simply insufficient" to make that determination. *Id*. The Louisiana Supreme Court apparently also followed suit, posing its analysis of the second *McDonough* prong akin to one considered *arguendo*. *LaCaze II*, 208 So. 3d at 863 n.2 (emphasis added) ("*[e]ven if* Ms. Garrett failed to honestly answer the question . . . ."). Albeit tucked in a footnote, this denial of relief on this issue by the Louisiana Supreme Court was not contrary to or an unreasonable application of clearly established federal law.

As to Victoria Mushatt, the Louisiana Supreme Court rejects petitioner's claims on an actual or implied bias standard. *See LaCaze II*, 208 So. 3d at 863 n.2. Petitioner, however, argues the *McDonough* standard should apply to Mushatt. As previously noted, during voir dire

questioning, Mushatt heard asked if anyone had learned anything about the case other than what was provided in the media. Rec. Doc. 45-58 at 113–14. In light of this question, petitioner argues Mushatt's failure to disclose being in the dispatch room at the time of the 911 call and her attendance at Officer Williams's funeral satisfies the first part of the *McDonough* test. Rec. Doc. 28 at 72. And petitioner asserts this conclusion parallels Judge Kirby's determination: "While the parties dispute the amount of information she obtained at work on the night of the murder, it is likely that she learned something. Likewise, it seems inconceivable that she was not exposed to extrajudicial information about the case at the funeral." *Id.* (quoting Rec. Doc. 45-8 at 9).

Despite the foregoing observations, Judge Kirby ultimately rejected the contention of juror misconduct as to Mushatt. When seated for individual questioning, a juror presumed to be Mushatt indicated that she was married to a police officer and knew several police officers. Rec. Doc. 45-59 at 22. In response, Judge Marullo asked, "Well, the fact that you might know them, would that preclude you from looking at them and judging whether they are correct or not in their testimony?" *Id*. The juror responded, "No, it wouldn't." *Id.* Taking Mushatt's responses during voir dire on the whole, Judge Kirby concluded Mushatt did not lie, had provided answers that parties could have (but did not) explore in more depth, and if anything, was rehabilitated by her colloquy with Judge Marullo. *See* Rec. Doc. 45-8 at 10–13. More pertinently, the Louisiana Supreme Court also rejected Mushatt's seating presenting a constitutional violation, seemingly finding that she had obtained no prejudicial outside information about the case: "As for LaCaze's assertion that Ms. Mushatt became privy to sensitive details because she was working when the shooting was reported, he [Lacaze] altogether fails to show that she—who was not the dispatcher to accept the related 911 calls—was aware of any prejudicial information, let alone specify those prejudicial details." *LaCaze II*, 208 So. 3d at 863 n.2.

33

Although also placed in a footnote, the denial of relief on this issue by the Louisiana Supreme Court was not contrary to clearly established federal law. The *LaCaze II* court built on Judge Kirby's factual determinations to conclude the *McDonough* test was inapplicable as to Mushatt. Those factual determinations and applications thereof have not been shown unreasonable. Under the foregoing circumstances, the Louisiana Supreme Court's bias assessment was not contrary to clearly established federal law. In sum, petitioner is not entitled to federal habeas corpus relief as to the juror impartiality issue.

**D.    Claims 3 and 6: Ineffective Assistance of Counsel**

### 1.    Standard of Review

Embedded in the Sixth Amendment's guarantee of a fair trial, a criminal defendant has a right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 684–85 (1984). Under *Strickland v. Washington*, a petitioner claiming ineffective assistance of counsel must prove: (1) that counsel performed deficiently, and (2) that counsel's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687. Courts may dismiss any claims that fail either prong of the *Strickland* test. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995) (citation omitted) ("In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.").

To show that the performance was deficient, petitioner must establish that "counsel's representation fell below an objective standard of reasonableness." *Hill v. Lockhart*, 474 U.S. 52, 57 (1985) (quoting *Strickland*, 466 U.S. at 687–88). Further, "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104

34

(2011) (citing *Strickland*, 466 U.S. at 689). Accordingly, the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted). In other words, the petitioner bears the burden of overcoming this presumption. *See Harrington* 562 U.S. at 104. In evaluation of this trial strategy, moreover, courts are to consider the circumstances of the representation:

> If counsel does not conduct a substantial investigation into each of several plausible lines of defense, assistance may nonetheless be effective. Counsel may not exclude certain lines of defense for other than strategic reasons. Limitations of time and money, however, may force early strategic choices, often based solely on conversations with the defendant and a review of the prosecution's evidence. Those strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based.

*Strickland*, 466 U.S. at 681. Nonetheless, where it is substantiated that a trial attorney did not review key evidence it is unreasonable to determine the actions strategic. *See Neal v. Vannoy*, 78 F.4th 775, 787–89 (5th Cir. 2023) (lifting the relitigation bar where trial attorney stated in a sworn declaration he did not "review the physical or forensic evidence in the case" and finding on *de novo* review deficient performance and prejudice thereby).

Where an ineffectiveness claim is related to voir dire, the Fifth Circuit has described a decision must be "so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995) (citation omitted). Moreover, the entirety of the voir dire is considered in relation to this claim, as courts refuse to draw bright-line rules on the manner or style of questioning. *See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) ("[Petitioner] cites no authority, and we have found none, that would require a defense attorney to ask specific questions at voir dire . . . . We must consider the full scope of the questions asked and answers given at voir dire to meaningfully evaluate the adequacy of trial counsel's attempts to identify juror bias.").

35

To show counsel's deficient performance prejudiced the defense, the petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Taylor*, 529 U.S. 362, 391 (2000) (quoting *Strickland*, 466 U.S. at 694). To that end, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The Supreme Court has further described that measure as requiring "a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation omitted).

### 2. Claim Background

#### a. During Voir Dire

Petitioner contends the three-hour selection process conducted by an attorney not associated with the case was riddled with constitutional problems. *See* Rec. Doc. 28 at 75. The night before the trial, petitioner's trial attorney, Willie Turk, asked attorney Ernest Caulfield to enroll as additional counsel. *See* Rec. Doc. 28-1 at 236 (testimony of Ben Cohen of the Capital Appeals Project relaying conversations with Willie Turk, who had died by the time post-conviction relief hearing occurred, and Ernest Caulfield). Caulfield refused to enroll but agreed to conduct the voir dire. *Id.* ("[Caulfield] said he had gotten into the case the night before and that they had sat around drinking wine and that Turk had asked him to enroll in the case, and he said he wasn't gonna do that . . . . He agreed to do the voir dire and that was it."). In his introduction to the first voir dire panel, Caulfield explained his role and asked if petitioner would suffer any prejudice therefrom: "I ask you right off with the mere fact that I am participating in this case only for just this one day, will that affect you decisions in any way whatsoever after you heard the evidence in the case and go to deliberate?" Rec. Doc. 45-58 at 103. He received no response. *Id.* He then made clear the question was not limited to the twenty prospective jurors seated: "Anyone out in the

audience?" *Id*. Again, he received no response, interpreting the silence as communicative of no issues with his participation. *Id.* at 103–04.

In addition to Caulfield's belated involvement in the case itself, petitioner insists representation fell below a reasonable standard of care during voir dire itself. Petitioner contends Caulfield asked few questions during the process—and those that he did were directed primarily to the general panel, had little to do with the issues of the case, and did not explore responses that indicated a possibility of bias. *See* Rec. Doc. 28 at 78–79. During state post-conviction testimony, petitioner's expert John Reed reviewed the performance harshly:

> In almost any case, but certainly in a capital case, it is appalling. And it does not, ah, meet anyone's standards in 1995 for []the norms of our practice [] in a serious felony case, in a regular murder case, and certainly not in a capital case. The glare— the omissions and the consequences of those omissions and failures to gather information and inquire are just horrific.

Rec. Doc. 28-3 at 24.[6]

---

[6] Reed also criticized Caulfield for using a peremptory challenge on Catholic seminarian John Arnone. *See* Rec. Doc. 28-3 at 29–30. The challenge was described by the Louisiana Supreme Court on direct appeal as "unusual." *LaCaze I*, 824 So. 2d at 1080. The strike is presented by petitioner in his instant habeas application as an example of Caulfield's deficient voir dire performance. *See* Rec. Doc. 28 at 78. As Judge Kirby remarked when he addressed the same example in his 2015 opinion, the argument leaves this Court "somewhat perplexed." *See* 45-8 at 29.

As support for its "unusual" assessment, the Louisiana Supreme Court stated, "Caulfield struck a Catholic seminarian who opposed capital punishment but said he could consider it and who had been the subject of a state cause challenge." *LaCaze I*, 824 So. 2d at 1080 n.40. Although repeatedly recycled by petitioner, the state high court's assertion is inaccurate. Significantly, nowhere in the voir dire transcript does Arnone state his opposition to capital punishment. Instead, when questioned by the prosecution, Arnone indicated he could consider meting out the penalty. *See* Rec. Doc. 45-59 at 48 ("BY MR. WOODS: Can you seriously consider the imposition of capital punishment, sir? BY MR. ARNONE: Yes."). Later, during a bench conference, the prosecution requested further questioning of Arnone, not due to any voir dire responses, but simply because he was a Catholic seminarian. *See id.* at 76. Judge Marullo instantly refused the request, noting that seminarians and priests have individual views on the subject. *See id.* "So, he answered the question that he could consider it, and that is all that is necessary." *Id*. Thus, Arnone never voiced opposition to the death penalty, nor did the prosecution ever challenge Arnone for cause.

Further, the prosecution did not use a peremptory challenge on Arnone. However, Caulfield did. *Id.* at 86–87. At the post-conviction hearing, Judge Kirby stopped petitioner's expert Reed amid his criticism of the Arnone strike to supply a possible explanation to Caulfield's action: "Well, would it have anything to do . . . with the idea that it was widely publicized that one of the Vu victims intended to become a priest?" Rec. Doc. 28-3 at 30. Reed responded, "Well, it would—I would grab that if that were the case." *Id*. In his written opinion, Judge Kirby cited a *N.Y. Times* article about Cuong Vu's priestly aspirations, concluding, "I find it quite appropriate for defense counsel in the trial of one accused of murdering, *inter alia,* an aspiring seminarian to strike from the jury a current seminarian who could

37

Caulfield was not alone in asking the voir dire panelists general questions. At one point, after a series of questions that generated no responses, the prosecution remarked on the prospective jurors' silence: "All right. You are all making me afraid. You all just don't have any questions." Rec. Doc. 45-59 at 60. The government's attorney then continued his questioning with more inquires to the panel as a whole on reasonable doubt, production of the murder weapon, and fingerprint evidence. *Id.* at 60–61. None generated any response. *Id.*

The prosecution did individually question each panel member about three topics: their feelings on capital punishment, *see* Rec. Docs. 45-58 at 17–29 and 45-59 at 28–48; their ability to set aside outside information and judge the case based on the presented evidence, *see* Rec. Docs. 45-58 at 32–37 and 45-59 at 49–52; and their ability to put aside any possible racial prejudices or biases, *see* Rec. Docs. 45-58 at 63–66 and 45-59 at 55–58. The topic of capital punishment generated the liveliest discussion. One prospective juror was questioned at length by the prosecution and Judge Marullo after she indicated she would "consider" the death penalty but "have a problem with it." *See* Rec. Doc. 45-59 at 37–42. At times during this colloquy, the prospective juror stated she would automatically vote for life imprisonment instead of the death penalty. *See id.* at 38, 41–42. During Caulfield's examination, however, the prospective juror agreed she would not automatically exclude a death penalty sentence and would evenly weigh the evidence in both the guilt and penalty phases. *Id.* at 68. Judge Marullo refused the prosecution's cause challenge of the juror. *See id.* at 78. Caulfield also personally questioned others who had indicated an inability to consider the death penalty. *See id.* at 69–70.

Among his general-response questions, Caulfield asked both panels, "Now, can you tell me if there is anyone in the panel here today who cannot follow the law regardless of whether or

---

'seriously consider the imposition of capital punishment.'" Rec. Doc. 45-8 at 29–30. Petitioner misconstrues the record—and, thereby, misrepresents Caulfield's performance—by again citing this example.

not you believe or disbelieve in it?" Rec. Doc. 45-59 at 72; *see also* Rec. Doc. 45-58 at 107. Neither question generated a response, indicating to Caulfield agreement. *See* Rec. Doc. 45-58 at 107–08 ("So, I take it by your silence that all of you can take the law from the Court. That you can apply the law to the facts of the case, and you can reach a decision based upon the law and the evidence in the case.").

Caulfield also exercised several challenges. Over the course of both panels, he made seven challenges for cause. *See* Rec. Doc. 45-58 at 124–135 (six challenges); Rec. Doc. 45-59 at 79–80 (one challenge). As for peremptory challenges, Caulfield exercised eight of defense's allotted twelve challenges during the initial voir dire proceedings and one out of two for the selection of a second alternate juror. *Id.* at 88, 113–14.

### b.  During Trial

Shifting focus to trial representation, petitioner also contends that Willie Turk was ineffective. Citing the *Strickland* standard, petitioner contends Willie Turk's performance was deficient and, collectively, those deficiencies establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See* Rec. Doc. 28 at 165 (quoting *Strickland*, 466 U.S. at 697).

### i.    Failure to Seek a Continuance

Noting that the trial took place less than three months after arraignment, petitioner first argues Turk was deficient to not seek a pretrial continuance. *Id.* at 128. Only during voir dire did Turk seek a continuance—and not out of consideration of his trial preparation but because of unsubstantiated information that slain Officer Williams had a pending federal indictment against him. *See* Rec. Doc. 45-62 at 79. Judge Marullo denied the motion because of its lack of support and its arrival on the first day of trial. *Id*. at 85.

39

In contrast, the State notes that Antoinette Frank's trial counsel, Robert Jenkins, who testified for petitioner at the post-conviction hearing, also sought and received a speedy trial for his client. Rec. Doc. 45 at 42. Further, petitioner does not specify the benefit of a longer lead-up to trial beyond a generalized "more time to prepare" contention. *Id.*

### ii. Failure to Hire Additional Experts

Petitioner also argues Turk was deficient for failing to request funds for expert or investigative services. Turk was retained by petitioner; however, he was not paid in money but in property, namely, a used car. Rec. Doc. 28 at 135–36. Petitioner contends this manner of payment further restricted Turk's ability to hire independent experts. *Id.* at 136 n.67. According to petitioner, "The only 'experts' Willie Turk called at trial were the State's own crime lab technician and a blood spatter expert hired by Antoinette Frank[.]" *Id.* at 135. Petitioner insists there was no strategic reason to not seek an indigency determination and, thereafter, expert funding. *Id.* at 136.

However, Attorney Turk not only had a blood splatter expert, but he retained and paid for the expert. Rec. Doc. 45 at 43. The State contradicts petitioner's assertion that Turk merely relied on Antoinette Frank's expert. *Id.* Further, no prejudice is found from the use of the same expert. Nor is there showing what additional favorable evidence or information would have resulted from the hiring of an expert or investigator. *Id.* This expert was tendered as "an expert in crime scene reconstruction and blood stain pattern analyses." *Id.* at 49.

### iii. Failure to Call Additional Alibi Witnesses

Petitioner additionally insists Turk was deficient for failing to call alibi witnesses. During his own trial testimony, petitioner asserted he was playing pool at the time of the murders. Rec. Doc. 45-66 at 137–39. Although other people were mentioned to have been at the poolhall, Turk called petitioner's brother Michael Lacaze to support the alibi. Rec. Doc. 45-66 at 59–67. And

40

according to petitioner, the timeframe Michael Lacaze provided "was impossible." Rec. Doc. 28 at 138. Turk did not call certain other alibi witnesses despite their being listed as witnesses. Rec. Doc. 45-63 at 109.

Petitioner also faults Turk for the alibi witness who was called. By calling petitioner's brother Michael Lacaze, Turk provided the State with the opportunity to question him about many inconsistent statements, including a taped interview inculpating petitioner. Rec. Doc. 28 at 151–52; Rec. Doc. 45-66 at 67–95 (cross-examination of Michael Lacaze). Minimally, petitioner contends Turk should have asked for a hearsay impeachment instruction to be given for the brother-to-brother confession. *Id.* at 152.

In contrast, the State considers strategic Turk's decision not to call additional alibi witnesses. According to the State, other evidence—including the testimony of petitioner and his brother Michael Lacaze—already revealed the alibi to be a "fiction." Rec. Doc. 45 at 43–45. In addition to conflicting pretrial and trial statements of petitioner and Michael Lacaze, the prosecution confronted Renee Braddy, "the very first alibi witness", by pointing out that her poolhall timeline was impossible due to petitioner's established food order that evening. *Id.* at 45; 45-66 at 41–42 ("Q. Are you aware that Antoinette Frank called the Kim Anh Restaurant at 12:51 A.M., approximately, to tell them that she and Roger [sic] were coming to get something to eat? A. No, I don't know that."). Witnesses who petitioner faults the prosecution for not calling both would have had their testimony similarly impeached, according to the State. Rec. Doc. 45 at 44.

The State also contends calling petitioner's brother Michael Lacaze was a strategic decision, not grounds for an ineffectiveness claim. Although petitioner argues Michael Lacaze's testimony was harmful, the State characterizes the argument as "the classic Monday morning quarterbacking that Strickland cautioned against." *Id.* at 49. The State, instead, insists Michael

41

Lacaze's testimony was "crucial," as petitioner claimed his brother picked him up, giving the alibi a necessary time limit. *Id.*

### iv.    Failure to Assert Adam Frank as an Alternate Suspect

Petitioner further argues Turk was deficient for his investigation of Adam Frank as an alternate suspect and of Antoinette Frank as possessing the possible murder weapon. Specifically, petitioner faults Turk for not interviewing Officer Morlier before his trial testimony, so as to have a record with which to possibly impeach him. Rec. Doc. 28 at 143–44. According to petitioner, "No reasonable attorney would subpoena a witness to testify at trial without first interviewing him, in the presence of an investigator, and discerning what he knew." *Id.* at 144.

The State counters that presenting Adam Frank as a suspect would have undercut Turk's credibility. Highlighting the over one-foot height difference, petitioner's gold teeth, and a seven-year-age gap, the State contends Adam Frank and petitioner had a "stark contrast in appearance." Rec. Doc. 45 at 45–46. The State also insists that Chau and Quoc Vu were familiar with both men and consistently identified petitioner as Antoinette Frank's accomplice. *Id.* at 46–47.

### v.    Failure to Interview Vui Vu

As another investigation issue, petitioner contends Turk was deficient for failing to interview the third eyewitness, Vui Vu. Although Chau and Quoc Vu faced defense questioning at a preliminary hearing, Vui Vu did not. Rec. Doc. 28 at 147. Petitioner argues "[f]ailure to interview a known eyewitness to the crime is per se ineffective." *Id.* (first citing *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994); then citing *Soffar v Dretke*, 368 F.3d 441, 476–47 (5th Cir. 2004); then citing *Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003)).

The State, however, reframes Vui Vu's post-conviction testimony. Rec. Doc. 45 at 47–48. Specifically, the State contends that Quoc Vu's testimony on his positioning in the cooler is more

credible than Vui Vu's testimony on the matter. *Id.* Having considered the post-conviction testimony of each, the state courts agreed with that credibility assessment, the State argues, rejecting petitioner's claim. *Id.*

### vi.    Failure to Suppress Identifications

In the same vein, petitioner claims Turk's representation was deficient for failing to attempt to suppress the identifications of Chau Vu, Quoc Vu, and John Ross. Counsel for Antoinette Frank moved for the suppression of identification as to her. *See* Rec. Doc. 45-63 at 57. In a hearing on that motion, the trial court noted that "COUNSEL FOR DEFENDANT LACAZE WAIVED ALL MOTIONS AS TO THE IDENTIFICATION OF DEFENDANT LACAZE." Rec. Doc. 45-61 at 98. The trial court denied counsel for Antoinette Frank's motion to suppress the identifications. *Id.* As petitioner understands the circumstances, each identification had a "substantial likelihood of misidentification." Rec. Doc. 28 at 148. Petitioner particularly emphasizes that Chau Vu could not identify him in a photographic lineup but only amid suggestive circumstances during her testimony and that John Ross's photographic lineup contained dissimilar filler images and the names of each person pictured. *Id.* at 149. Petitioner envisions the evidence with those identifications suppressed: "[T]he State's only evidence that Mr. LaCaze was inside the restaurant would have been the testimony of Quoc Vu—a witness who testified to seeing Frank's accomplice for only a moment through the window of a walk-in cooler." Rec. Doc. 48 at 72.

Rather than faulting Turk for not moving to have identifications suppressed, the State notes "there were two identifications of Petitioner subject to a suppression hearing—the state court did not suppress either of them." Rec. Doc. 45 at 47 (apparently alluding to counsel for Antoinette Frank's motion to suppress identifications, *see* Rec. Doc. 45-63 at 57; Rec. Doc. 45-61 at 98). That conclusion, the State contends, was supported by there being no substantial likelihood of

misidentification. *Id*. Further, the State argues Chau Vu's in-court identification of petitioner lacked any showing of a suggestive procedure.

### vii.    Failure to Pursue Call Log Evidence

As another error, petitioner argues Turk was deficient for not fully pursuing call-log evidence. Calls from petitioner's cellphone were made to Antoinette Frank's the night of the murders. In response to the State's theory that Michael Lacaze was the one making calls on his brother's cell phone the night of the murders, "Turk made no attempts to put on evidence that Rogers LaCaze possessed the cell phone that night." Rec. Doc. 28 at 150. To petitioner, this failure is all the more glaring because Chau Vu momentarily testified at trial what she had indicated in her undisclosed interview: that petitioner was seen in the restaurant with a cell phone while he ate. *Id.* at 150–51; *see also* Rec. Doc. 45-65 at 148–49 ("Q. Can you describe this person that Antoinette introduced as her nephew? A. He short, and he have gold teeth, and he have a cellular phone with him too. He look like a business man. Q. He had a cellular phone with him? A. Yes. I told him, 'You look like a business man.', and he smile.").

The State, in contrast, contends petitioner's cell phone-related ineffectiveness claims are undercut by the admittedly "weak" evidence presented and Chau Vu's trial testimony. According to the State, petitioner tries to have it both ways: contending that evidence of Michael Lacaze's possession of petitioner's cell phone on the night of the murders was weak but that Turk was ineffective for not more robustly challenging the assertion. Rec. Doc. 45 at 48. The State insists "[t]here is no support in the law for such a contention." *Id.* Further, as Chau Vu testified to petitioner's cell phone possession, the State contends that any other evidence would merely be cumulative. *Id.*

### viii.    Failure to Suppress Petitioner's Statement

Petitioner also contends Turk was deficient for failing to suppress or otherwise attack petitioner's confession. First, petitioner avers post-conviction IQ testing has established that he is in the range of intellectual disability. Rec. Doc. 28 at 157–58. Next, petitioner insists his statements to the police indicate intellectual vulnerability, as he repeatedly agreed to the officer's leading questions. *Id.* at 158–59. Petitioner also questions his statements which were made around the time he requested medical attention, writing: "My head is beting right now whit pian. Win the Deputy pushed my head into the wall." *Id.* at 159. Petitioner argues Turk should have sought suppression of the confession or, minimally, to question its reliability. *Id*. Petitioner does not consider Turk's orally joining a pretrial motion to suppress by Antoinette Frank's counsel to meet the professional standard. *See id.* at 157; *but see* Rec. Doc. 45-57 at 4–118 (transcript of motion to suppress hearing).

In opposition, the State argues Turk was not ineffective for failing to successfully suppress petitioner's statement to police. For one, the State notes that a pre-trial suppression hearing occurred, wherein Turk questioned three detectives and petitioner's mother. Rec. Doc. 45 at 51; *see also* Rec. Doc. 45-57 at 4–118 (transcript of motion to suppress hearing). For another, the State contends Turk was not deficient for failing to get petitioner's IQ tested. Rec. Doc. 45 at 52. As the State asks, "What facts concerning Petitioner's allegedly low IQ have been presented that were known to trial counsel that trial counsel ignored? No facts were presented in State court." *Id*. Further, Turk did confront an NOPD detective at trial regarding petitioner's recorded injuries after his statement. Rec. Doc. 45-65 at 73. Despite the presentation of evidence, the State concludes the jury believed the detective. Rec. Doc. 45 at 52.

### ix.    Failure to Seek Change of Venue

Finally, petitioner deems Turk's performance deficient for failing to seek a change of trial

venue. Despite intense media coverage—"100% of the 125 potential jurors [having] been exposed to prejudicial media coverage"—Turk did not seek to move the trial to another parish court. Rec. Doc. 28 at 161. Petitioner concludes "Rogers LaCaze could not have received a fair trial in this media circus." *Id.* at 162.

To rebut the change of venue argument, the State relies on petitioner's post-conviction expert: "I do not fault Mr. Turk for failing to file a Motion for a Change of Venue. I didn't so testify, and ah, wouldn't have so testified. . . . Orleans Parish is a, uh, a good place to try a case." Rec. Doc. 45 at 52. The State makes no further argument on the matter.

### 3.   Last Reasoned State Court Decision

The Louisiana Supreme Court found petitioner's ineffective assistance of counsel claims meritless. *See LaCaze II*, 208 So. 3d at 863, 867. The state high court described the *Strickland* standard as a petitioner's showing that "(1) counsel erred and (2) the error rendered the proceedings unfair and the conviction suspect." *Id.* at 863.

### a.   Voir Dire Representation

As to the voir dire proceedings, the Louisiana Supreme Court determined neither prong established. First, the *LaCaze II* court notes "decisions during voir dire lie at the core of trial strategy[.]" *Id.* (citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997) (itself citing *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995))). Petitioner contends that the Louisiana Supreme Court did not thereby make a finding on *Strickland*'s first prong, but merely provided "a statement of a legal principle." Rec. Doc. 48 at 47–48. We disagree. After its "trial strategy" statement, the *LaCaze II* court only allows itself to assume *arguendo* that "counsel's voir dire questions should have been more searching[.]" *LaCaze II*, 208 So. 3d at 863. By the very nature of that inquiry, the Louisiana Supreme Court did not find the voir dire representation deficient.

Further, and to the degree that the brevity of its finding is due to a reliance on Judge Kirby's opinion, the Louisiana Supreme Court affirms the previous ruling. *Id.* ("The district court correctly rejected this claim."). The district court opinion observed the requirements of voir dire to be satisfied: "A careful review of the record herein reveals that each panel examined was informed, by one participant or the other, of the key issues involved in a capital murder case." Rec. Doc. 45-8 at 27. Most concerning to Judge Kirby was Caulfield's failure to pose follow-up questions to Victoria Mushatt. *Id.* at 30–31. Laying out the information obtained from Mushatt during earlier voir dire stages, Judge Kirby notes it was revealed she was an NOPD dispatcher, married to an NOPD officer, knew various witnesses, and had a brother awaiting trial for murder. *Id.* at 30. Nonetheless, Judge Kirby was "not able to conclude that keeping Ms. Mushatt on the jury was unsound strategy." *Id.* at 31. He explained, "Counsel could reasonably have believed that she could be sympathetic to Mr. LaCaze because she had a brother awaiting trial on a murder charge despite her connections to the NOPD and certain of the witnesses." *Id*.

Caulfield's failure to more robustly question prospective jurors—especially his silence in the face of Mushatt's multiple disclosures—is confusing. However, confusion is not the standard of review—an unreasonable application of established federal law is. And on that measure, it was not unreasonable for the Louisiana Supreme Court to find Caulfield's actions strategic. Petitioner's best argument to the contrary is Caulfield's avoidance of Mushatt. Significantly, however, her disclosures did not come from attorney questioning. Instead, Judge Marullo conducted the initial portion of the questioning of Mushatt's panel. He received her answer from the gallery about being an NOPD dispatcher. *See* Rec. Doc. 45-58 at 151–53. He questioned her further about being married to an NOPD officer and knowing multiple witnesses. Rec. Doc. 45-59 at 22. Finally, he was told by Mushatt "I have a brother that's awaiting trial on a murder." *Id.* at 24. After Judge

Marullo's questioning, the prosecution presented questions to the panel, which included a colloquy with Mushatt about her brother's upcoming trial. *Id.* at 53. Only then did Caulfield get his turn to address the panel. With the information presented to him, we cannot say it was unreasonable for the Louisiana Supreme Court to determine strategic Caulfield's limitation of the focus on a prospective juror whose brother was being tried for murder the following month.

In sum, the *LaCaze II* decision to not find a deficient performance during voir dire was not contrary to or involved an unreasonable application of clearly established federal law. On this ground alone, the voir dire ineffectiveness claims can be rejected. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995) (citation omitted). For completeness, however, we address the prejudice prong as well.

Even more clearly, the Louisiana Supreme Court also did not determine the voir dire performance to cause prejudice. Petitioner contends the *LaCaze II* court articulated an incorrect standard for the second *Strickland* prong by requiring a showing that "counsel's performance rendered the proceedings fundamentally unfair or his convictions suspect." Rec. Doc. 48 at 50 (quoting *LaCaze II*, 208 So. 3d at 863). Instead, petitioner insists prejudice should be weighed on a lower standard, namely, if the defective performance presents a reasonable probability of a different result. *Id*. We do not observe a decision contrary to clearly established federal law.

The Louisiana Supreme Court again avoids a crystalline explanation of a previously correctly cited rule. However, inelegance is not synonymous with incorrectness. By its reasoning, the *LaCaze II* court is placing the *Strickland* standard under its proper constitutional consideration: the Sixth Amendment's protection against fundamentally unfair trials. Raising this concern in a prejudice assessment does not thereby heighten the *Strickland* measure. Further, neither does the court's analysis that voir dire did not "render[] . . . [petitioner's] convictions suspect." *LaCaze II*,

48

208 So. 3d at 863. We do not read into this statement a different standard from *Strickland*'s reasonable probability of a different result. In defining the adjective, Black's Law Dictionary states "suspect" has a meaning that ranges from "probable" to "possible." Black's Law Dictionary (11th ed. 2019). Helpfully, the dictionary also provides the definition of "reasonably suspect," that is, "[t]o consider (something) to be probable under circumstances in which a reasonable person would be led to that conclusion." *Id*. Thus, the overlap with "reasonable probability" is apparent. The *LaCaze II* court's entry into the definitional terms—"because LaCaze has not shown that any seated juror would have been subject to a meritorious challenge for cause"—is of no moment. *See LaCaze II*, 208 So. 3d at 863. The *LaCaze II* decision to not find resultant prejudice from voir dire performance was not contrary to or involved an unreasonable application of clearly established federal law.

### b. Trial Representation

As to trial representation, the Louisiana Supreme Court also determined petitioner had not established an ineffectiveness claim. *See Lacaze IV*, 325 So. 3d at 362; *LaCaze II*, 208 So. 3d at 867. As a general assessment, the Louisiana high court concluded "the district court provided thorough reasons for rejecting" all claims. *LaCaze II*, 208 So. 3d at 867. Specifically addressing petitioner's claims regarding alibi witnesses and identification suppressions, the *LaCaze II* court found no deficient performance by Willie Turk at trial. *See LaCaze II*, 208 So. 3d at 867. To the extent individual claims are unaddressed by the Louisiana Supreme Court, we "look through" to the district court decision. *See Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Two claims—failure to seek a continuance and a change of venue—apparently have no reasoned state court decision.[7] Therefore, we "must hypothesize the

---

[7] In an oral ruling following the Louisiana Supreme Court's remand, Judge Kirby summarily found both the continuance and change of venue claims meritless. *See* Rec. Doc. 45-31 at 6.

reasons or theories that could have supported the denial of relief." *Floyd v. Vannoy*, 894 F.3d 143, 160–61 (5th Cir. 2018) (citing *Hittson v. Chatman*, 576 U.S. 1028, 135 S. Ct. 2126, 2127 (2015)). This court may find an unreasonable application of clearly established federal law "only if, after this hypothetical inquiry, we determine there was no reasonable basis for it." *Id.* at 161 (citing *Richter*, 562 U.S. at 98, 101).

Further, Judge Kirby's opinion found no merit to any particular ineffective assistance of counsel claim. Thus, Judge Kirby concluded, "it goes without saying that those claims do not undermine confidence in the ultimate outcome of the trial." Rec. Doc. 45-8 at 120.

### i.    Failure to Seek a Continuance

As previously noted, no state court opinion provided reasons for rejecting petitioner's claim of ineffectiveness based on failure to seek a continuance. Yet, the claim was summarily denied. *See Lacaze IV*, 325 So. 3d at 362 (rejecting claims related to continuance and change of venue because "[a]pplicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*."). We, therefore, may grant petitioner's claim only if there is no reasonable basis we can hypothesize for the state court denial.

Petitioner specifically faults counsel not for seeking no continuance but for seeking one too late. Turk only sought a continuance in relation to a subpoena on the United States Attorney for the Eastern District of Louisiana for documents that slain Officer Williams had a pending federal indictment against him. *See* Rec. Doc. 45-62 at 79. In chambers during voir dire, Judge Marullo orally denied the motion:

> All we have here is some communication made to you by some unknown somebody and you want a continuance based merely on that, and I would deny that unless you can show me something. The jurors are called, and the trial has begun, and I will not grant a continuance in this case. At this point that is not an appropriate motion to make.

50

Rec. Doc. 45-58 at 85.

In part, petitioner relies on the post-conviction testimony of Antoinette Frank's trial counsel, Robert Jenkins, for his argument on the propriety of a continuance. *See* Rec. Doc. 28 at 129–30; Rec. Doc. 28-1 at 217–30 (post-conviction hearing testimony of Robert Jenkins). Jenkins's recollection was Judge Marullo "said there would be no continuance in this case, and we're going to resolve this case within three months down the line." Rec. Doc. 28-1 at 228. Although he did not recall doing so—or any possible reasons therefor—Jenkins filed a motion for a speedy trial. *Id.* at 221–22; Rec. Doc. 45-63 at 54. Later, eight days before Antoinette Frank's trial, Jenkins filed for a continuance, which Judge Marullo denied. Rec. Doc. 45-62 at 29–30.

Although the benefit of additional preparation time can always be imagined, other trial considerations must be weighed. For one, a criminal defendant has the right to a speedy trial, as protected by the Sixth Amendment. The United States Supreme Court has identified speedy trial interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker v. Wingo*, 407 U.S. 514, 532 (1972). It is not unreasonable to hypothesize that Turk weighed these interests in electing to forego an earlier motion to continue.

For another, the *Strickland* standard requires assessment of the realities of the representation. "Limitations of time and money . . . may force early strategic choices, often based solely on conversations with the defendant and a review of the prosecution's evidence. Those strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based." *Strickland*, 466 U.S. at 681. Turk faced an unenviable set of factual allegations, which included two eyewitness identifications. Turk, presumably after consultation with petitioner, chose a litigation strategy of

51

an alibi defense coupled with a coerced confession. Both aspects of the defense were undercut by testimony of petitioner and the alibi witnesses presented. Moreover, Turk did not unthinkingly choose this trial strategy, but frequently consulted with the more seasoned Jenkins on the case, joining in numerous of his motions. *See* Rec. Doc. 28-1 at 222 ("A. We talked about many aspects of this—this case. Q. But he would . . . ask you what you thought? A. Without a doubt. Q. He would seek your advice? A. Without a doubt. We spoke at night. We spoke at my office. Um, um, there were times when he was worried about going before the judge himself."). Jenkins filed a motion for a speedy trial. *Id.* at 221–22; Rec. Doc. 45-63 at 54. Turk joined the motion. *See* Rec. Doc. 45 at 42. It is not unreasonable to hypothesize that Turk assessed his limited options and believed it was in petitioner's interest to proceed to trial. Further, such a decision would not be contrary to or involve an unreasonable application of the *Strickland* standard. The disagreement of reasonable minds over Turk's performance is insufficient to reverse a state court denial. *See Brumfield v. Cain*, 576 U.S. 305, 314 (2015). Furthermore, although the second *Strickland* prong is unnecessary, any resultant prejudice "is speculative at best, and insufficient to establish a reasonable probability that the result of his trial would have been different." *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985). Finally, to the extent factual determinations are challenged, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### ii. Failure to Hire Additional Experts

Petitioner's claim for ineffectiveness over Turk's failure to hire additional experts was summarily denied by the Louisiana Supreme Court during its post-conviction consideration. *LaCaze II*, 208 So. 3d at 867. In his review of petitioner's claim, Judge Kirby found that ineffectiveness from pretrial investigative services was fully litigated on direct appeal and,

therefore, "[did] not permit [him] to revisit the issue." Rec. Doc. 45-8 at 75–76. Judge Kirby supported his reading by citing Justice Bernette Johnson's dissent on petitioner's indigency status. *Id.* at 76 (citing *LaCaze I*, 824 So. 2d at 1088 (Johnson, J., dissenting)). The *LaCaze I* court denied ineffectiveness claims under the heading "Assignment of Error Regarding Few Pre-trial Motions". *LaCaze I*, 824 So. 2d at 1079. However, no discussion surrounding the hiring of additional experts occurred. Thus, we may grant petitioner's claim only if there is no reasonable basis we can hypothesize for the state court denial. *See Floyd v. Vannoy*, 894 F.3d 143, 160–61 (5th Cir. 2018) (citing *Hittson v. Chatman*, 576 U.S. 1028, 135 S. Ct. 2126, 2127 (2015)).

There are reasonable bases for denial of this claim. At trial, Turk did present an expert. *See* Rec. Doc. 45-66 at 6–17 (direct examination). The defense witness was accepted as an expert "in crime scene reconstruction and blood stain pattern analyses." *Id.* at 9–10. Although the expert also testified for the defense in Antoinette Frank's case, she stated that she was paid by Turk for her services. *Id.* at 17 ("Q. And, who is paying you today? A. The Defense. Q. That being Mr. Turk? A. Yes."). It would not be unreasonable for the state court to conclude Turk was not ineffective through his retainment of the expert.

In his challenge, petitioner draws parallels to the facts in *Hinton v. Alabama*, wherein the United States Supreme Court found ineffective assistance of counsel where an attorney mistakenly believed his expert funding was limited to $1,000 for a firearms expert needed to contradict the only identifying evidence from the multiple crime scenes. Rec. Doc. 28 at 156–57 (discussing *Hinton v. Alabama*, 571 U.S. 263 (2014)). The point of law petitioner contends the *Hinton* opinion stands for is overstated. As the Court expressly holds, "The only inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him—that caused counsel to employ an expert that *he himself*

53

deemed inadequate." *Hinton*, 571 U.S. at 275 (emphasis in original). No such parallel is present here.

The state court denial would not be contrary to or involve an unreasonable application of the *Strickland* standard. To the extent factual determinations are challenged, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings and reviewed here. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### iii.   Failure to Call Additional Alibi Witnesses

On post-conviction review, the Louisiana Supreme Court did make a reasoned decision on petitioner's ineffectiveness claim as it relates to Turk's failure to call additional alibi witnesses. Discussing Peter Williams and Angela Walker—both listed by Turk as possible witnesses but not called at trial—the state high court found Turk's decision "reasonable" due to the timeline incongruencies already presented through defense witnesses. *LaCaze II*, 208 So. 3d at 867.

The trial testimony of petitioner, Michael Lacaze, and Renee Braddy complicated the alibi defense. With Antoinette Frank's call to the Kim Anh Restaurant established as taking place at 12:51 AM with petitioner alongside, each witness presented a conflictual timeline. *See* Rec. Doc. 45-66 at 136–39 (petitioner's testimony that he was picked up by Michael Lacaze to go to the poolhall around 12:35); *id.* at 156–57 (petitioner's testimony that he was with Antoinette Frank during her 12:51 AM call to Kim Anh); *id.* at 166–67 (petitioner being confronted with phone records); *id.* at 60 (Michael Lacaze's testimony that he picked up petitioner between 12:35–12:45); *id.* at 73–89 (Michael Lacaze being confronted with tape-recorded statement to police in which he admitted to contriving an alibi story with Renee Braddy); *id.* at 41–42 (Braddy "Q. And, what time did you say Roger [sic] got back home? A. It had to be about 12:30 . . . . Q. Are you aware that

54

Antoinette Frank called the Kim Anh Restaurant at 12:51 A.M., approximately, to tell them that she and Roger [sic] were coming to get something to eat? A. No, I don't know that.").

The Supreme Court's conclusion was supported by the district court's resolution. No matter the possible additional witnesses, Judge Kirby determined the alibi story impossible "[a]bsent some sort of time warp[.]" Rec. Doc. 45-8 at 77–78. Neatly tying together the phone records with the "concrete, immutable fact" of the 12:51 AM phone call, Judge Kirby presents the steps necessary before petitioner's 1:00 AM arrival at the poolhall:

> Mr. LaCaze and Ms. Frank: 1.) had to make their way back to the restaurant; 2.) introduce Rogers to the Vus and Ofc. Williams (Vol. 7, 569:21–25); 3.) eat a little (*Id*. 569:7–29 and 570:8–16); 4.) Allow Mr. LaCaze to use the restroom (Vol. 6, 374:24); 5.) collect their leftovers and prepare to leave (374:27); 6.) pause briefly outside the door and talk (376:9–11); 7.) have Chau go outside through the connected grocery's door to bid Ms. Frank goodnight (376:12–16); 8.) have Ms. Frank chat with Chau about possibly working the detail the next day (376:16–17); 9.) have Chau return inside to confer with Ofc. Williams then return to advise Ms. Frank that Ofc. Williams was going to work that detail (376:17–21); 10.) take Mr. Lacaze to Cindy Place (Vol. 7, 570:22–26); 11.) have Rogers go inside to contact Michael; and 12.) get picked up, drive to Angela's and then to Mr. C's.

*Id.* at 78. Taking the times testified to—and not including any time associated with travel to the restaurant—Judge Kirby estimated an earliest arrival time at the poolhall as between 1:16 and 1:18 AM. *Id.* at 78 n.30. Based on the phone records, Judge Kirby concluded the triple murder was already in process.[8] As the trial testimony developed, the alibi defense clearly became less viable.

---

[8] Judge Kirby's timing of the murders is helpful—and more reasonable—in comparison to petitioner's alibi story:
> [I]t is clear that there is no telephone activity between these codefendants between the seminal 12:51 AM call and Mr. LaCaze's call to Ms. Frank at 1:26 AM. It is reasonable to conclude that that is when these ghastly crimes occur. I am reinforced in this finding by the fact that after the 12:51 AM call Ms. Frank and Mr. LaCaze had to return to the restaurant, eat a bit, use the restroom, pack up, converse the front door among themselves, then with Chau, leave and then return for the final, deadly, visit. The first 911 report of the crime, at 1:48 AM, occurred before Mr. LaCaze could make his final call at 1:49 AM. That happened after the survivors waited for a while to be sure the perpetrators were gone and then they surveyed scene. After that, Chau had to struggle to get a call out on her cell phone because the battery had been tampered with. Quoc's 911 call at 1:50 AM followed his exit from the restaurant through the rear door and then a short run to his friend's house on Pressburg Street.

The state court denial on this claim was not contrary to or involve an unreasonable application of the *Strickland* standard. Further, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings and reviewed here. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### iv.   Failure to Assert Adam Frank as an Alternate Suspect

Petitioner's claim for ineffectiveness over Turk's failure to present Adam Frank as an alternate suspect was summarily denied by the Louisiana Supreme Court during its post-conviction consideration. *LaCaze II*, 208 So. 3d at 867. However, in consideration of petitioner's argument of actual innocence, the Supreme Court noted the marked differences between petitioner and Adam Frank:

> Adam had such different physical appearances that for the surviving victims to have confused Adam—whom they had known for some time—with LaCaze would have been nearly impossible, even under the traumatic conditions: The survivors identified Frank's accomplice as a black male with gold teeth across the top, less than 20 years of age, and just over five feet tall. LaCaze was 18 years old, 5'3" in height, and had gold teeth. Adam was 24 years of age and 6'5" in height.

*Id.* (citing *LaCaze I*, 824 So. 2d at 1066 n.4).

Based on these differences in physical characteristics, the State contends that presenting Adam Frank as a suspect would have undercut Turk's credibility. *See* Rec. Doc. 45 at 45–46. Petitioner, however, counters that Turk was not ineffective for not presenting Adam Frank as his sister's accomplice—because Turk attempted to do just that. *See* Rec. Doc. 48 at 73. In Turk's opening statement, he alludes to an accomplice of Antoinette Frank who is not petitioner:

> Now, we concede that Ms. Frank was there on the scene. And, you will also hear from the evidence a family member of Ms. Frank's. You will hear his name

---

Considering the first responders arrived at 1:53 AM and Ms. Frank, unquestionably a perpetrator, was already back on the scene after dropping her accomplice off somewhere, going to the Seventh District police station, changing vehicles and returning to the restaurant, there was plenty of time for Mr. LaCaze to be reunited with his brother and begin calling Ms. Frank for status updates.
Rec. Doc. 45-8 at 58–59.

56

mentioned several times during this trial . . . . Now, we concede there was a second person, but as aforesaid, we will try to put on evidence to show who that second person was, and it was not Mr. Roger [sic] Lacaze.

Rec. Doc. 45-64 at 61–62. At trial, Turk also twice unsuccessfully questioned Officer Stanley Morlier about Adam Frank's connection to the murders. *See* Rec. Doc. 45-66 at 32–33 ("Q. How do you know Adam Frank? A. I've seen him frequent the area of the Kim Anh Restaurant. Q. Okay. Now, did you at any time encounter an altercation or witness an altercation between Adam Frank and Officer Ronnie Williams? A. No, sir."); *id.* at 120–21 ("Q. At any time while being in the presence of Officer Ronnie Williams did you hear Officer Antoinette Frank make a threat on his life? A. No."). Petitioner concludes the exchanges evidence a deficient performance: "Mr. Turk did not follow through on his promise. He did not present any evidence that Adam Frank was the second person, although there was ample available evidence. Once again, Mr. Turk made a strategic choice to present a specific defense but did no work to support it." Rec. Doc. 48 at 73.

In his review of the claim, Judge Kirby agreed with petitioner that Turk did attempt to present Adam Frank as an alternative suspect. *See* Rec. Doc. 45-8 at 67 ("[I]t is clear that Mr. Turk was aware of a possibility that Adam Frank was involved because he attempted, unsuccessfully, to make something of it at Mr. LaCaze's trial."). However, he thoroughly ruled out Turk's investigation of the claim or its presentation at trial as a ground for ineffective assistance of counsel. *See id.* at 80. Judge Kirby grounds this conclusion on previous Adam Frank-related determinations. Judge Kirby found that there was "no evidence in this record that there was ever a confrontation or argument between Adam Frank and Ofc. Williams. All the evidence suggests Adam Frank agreeably complied with the order to stay away." *Id.* at 74. Further, as supported by Chau Vu's identification of petitioner and not the more familiar Adam Frank, Judge Kirby determined that "the police could not have had an honest, good faith belief that the male perpetrator

was Adam Frank." *Id.* at 60.

In our look-through analysis, we do not find Judge Kirby's decision to be contrary to or involve an unreasonable application of the *Strickland* standard. Turk's halting presentation of Adam Frank as a perpetrator was not deficient based on the facts considered. Judge Kirby's thorough consideration and ultimate resolution of those factual determinations were not unreasonable in light of the evidence presented. Finally, although the claim fails on *Strickland*'s deficiency prong, any prejudice suffered from a failure to present a wildly dissimilar suspect is "speculative at best[.]" *See Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985).

### v.    Failure to Interview Vui Vu

In the last reasoned opinion, Judge Kirby rejected petitioner's ineffectiveness claim based on Vui Vu as "meritless." Rec. Doc. 45-8 at 83. As support, Judge Kirby pointed to his rejection of the *Brady* claim related to the suppression of Vui Vu's statement to the police immediately after the murders. Finding the statement not material, Judge Kirby determined that the evidence indicated Vui Vu remained fixed in one position in the cooler until crawling out, whereas Chau Vu and Quoc Vu moved back and forth to catch glimpses of the ongoing event. *See id.* at 46. Thus, Judge Kirby concluded Vui Vu's sight of only "silhouettes" could be reconciled with Chau Vu and Quoc Vu's more descriptive statements. *Id.* at 46–47. These factual determinations were not unreasonable in light of the evidence presented.

By referencing the *Brady* claim rejection, Judge Kirby clearly thereby made a *Strickland* finding of no prejudice as to Turk's investigation and presentation of Vui Vu. If the evidence was not even material, it could certainly not be prejudicial. This decision was not contrary to or involve an unreasonable application of the *Strickland* standard. An interview of Vui Vu and her trial testimony does not present a reasonable probability of a different result.

58

Judge Kirby, however, makes no such obvious determination of the deficiency prong. The Fifth Circuit has repeatedly held that failure to interview an eyewitness is constitutionally deficient. *See Adekeye v. Davis,* 938 F.3d 678, 683 (5th Cir. 2019); *Soffar v Dretke*, 368 F.3d 441, 476–47 (5th Cir. 2004); *Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003); *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994). Even from a hypothetical inquiry, there is no reasonable basis to not determine Turk deficient for his failure to interview Vui Vu. Nonetheless, this claim demonstrably fails on the prejudice prong.

### vi.    Failure to Suppress Identifications

In the last reasoned decision, the Louisiana Supreme Court rejected petitioner's ineffectiveness claim related to Turk's failure to suppress identifications. Using Chau Vu's identification as an example, the state high court could "find no logic" in petitioner's assertion that identification suppression was possible. *See LaCaze II*, 208 So. 3d at 867. The *LaCaze II* court also explicitly relied on the district court's conclusions on the matter: "As the district court found, 'the law does not require attorneys to engage in vain and useless acts' and counsel's failure to file a motion to suppress on this ground 'does not meet the threshold for ineffective assistance of counsel.'" *Id*.

As a pretrial motion, counsel for Antoinette Frank moved for the suppression of identification as to her. *See* Rec. Doc. 45-63 at 57. In a hearing on that motion, the trial court noted that "COUNSEL FOR DEFENDANT LACAZE WAIVED ALL MOTIONS AS TO THE IDENTIFICATION OF DEFENDANT LACAZE." Rec. Doc. 45-61 at 98. The trial court denied counsel for Antoinette Frank's motion to suppress the identifications. *Id*.

The one identification not subject to the suppression hearing was that of John Ross, a gas station attendant who identified petitioner after Officer Williams's credit card was used miles away

59

shortly after his murder. The presented photo array contained the name of each subject as a computer terminal printout to the right of the photograph. *See* Rec. Doc. 28-3 at 141–52. In review of the array, Judge Kirby found the names difficult to notice, all photos to be similarly composed, and the six subjects to have similar facial features. *See* Rec. Doc. 45-8 at 96–97. Judge Kirby determined the lineup was not suggestive, nor were there other factors that could open the process up to the likelihood of misidentification. *See id.* at 98–102. Judge Kirby summarized his factual supports:

> •Mr. Ross first became acquainted with Rogers in November or December of 1994, or possibly as late as January or February 1995. Vol. 6, 313:19–32.
>
> •Rogers had always paid for his purchases in cash. Ex. D-13, p. 4. That is the unmistakable import of Mr. Ross' trial testimony relating how he joked with Mr. LaCaze about his getting a credit card. 308:11–27.
>
> •Mr. Ross knew Mr. LaCaze used the credit card on a Friday night because he worked Fridays through Tuesdays and he was not at work the night before he saw him with the card. 314:20–32.
>
> •The witness had "no doubt" it was Mr. LaCaze he saw pumping gasoline with a credit card, but he was surprised to learn that that event would connect him to this case. 315:21–29.
>
> •On March 30, 1995 he told Det. Demma that the single occasion on which Mr. LaCaze had used a credit card was "a few weeks ago." Ex. D-13, p. 4. March 30, 1995 was 26 days—not even four weeks—from the night on which Ofc. Williams' credit card was used at Mr. Ross' gas station.
>
> •Quite striking was Mr. Ross' revelation to Det. Demma that he had not seen Mr. LaCaze since he had used a credit card to purchase gasoline at his station.
>
> •If Mr. LaCaze had truly used a credit card at the Chevron store on some other night, that would have been an objective, verifiable, "immutable fact" so obviously exculpatory that it should have been the first thing he told Mr. Turk upon learning the state was making an issue of his use of a credit card. His deafening silence betrays the veracity of this contention.
>
> •Even if he had stolen the card he would have used on that "other night," admitting to it bore significantly lighter consequences than three first degree murder convictions. Yet, despite all the expense, time and effort exerted by a multitude of

60

> lawyers, investigators and experts to prepare this post-conviction proceeding, he has proffered nothing to connect himself to any credit card on any night. Nevertheless, when taken as a whole Mr. Ross' testimony leaves virtually no doubt Mr. LaCaze used a credit card at the Chevron station on March 4th.

*Id.* at 102. As Judge Kirby concluded on the *Brady* issue, "I find the outcome would have been no different had Mr. Turk attempted to suppress or challenge the eyewitness identifications as asserted above." *Id.* at 104.

The underlying factual conclusions support Judge Kirby and the Louisiana Supreme Court's rejection of this claim. The factual determinations were not unreasonable considering the evidence presented and reviewed here. Further, this decision was not contrary to or involve an unreasonable application of the *Strickland* standard. Both prongs are rejected by the state courts. Although the factual determinations more clearly support a finding of no prejudice, Judge Kirby's conclusions also rule out any deficient performance. Judge Marullo rejected suppression arguments as to Chau Vu and Quoc Vu's identifications. Judge Kirby found no error in that judgment and determined a challenge to Ross's identification "would have been ludicrous." *Id.* at 103. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### vii.    Failure to Pursue Call Log Evidence

Judge Kirby carefully considered the various cellphone-related arguments presented by petitioner at the post-conviction hearing, going so far as to compile an appendix of calls by and to petitioner's and Antoinette Frank's phones. *See id.* at 136 (Appendix II). Reflecting on the meaning behind the phone records, Judge Kirby observed, "That analysis causes me, and should have caused Mr. Turk, to doubt Rogers' possession of the cell phone from which the calls were made at those times." *Id.* at 106. After thoroughly wading through possible challenges—and determining petitioner's current factual allegations to lack reasonable support, Judge Kirby determined Turk's performance to neither be deficient nor prejudicial. Instead, Turk's decisions were strategic: "The

61

jury was well exposed to the fact that Mr. LaCaze's cell phone was in service during the time he claimed to have been calling Ms. Frank. Had he gotten into more detail about the phone calls after midnight, he risked accentuating the abundant evidence supporting the state's contention that someone else had the phone." *Id.* at 107.

Petitioner again recycles previously rejected arguments. In response to the State's theory that Michael Lacaze was the one making calls on his brother's cell phone the night of the murders, petitioner states, "Turk made no attempts to put on evidence that Rogers LaCaze possessed the cell phone that night." Rec. Doc. 28 at 150. Further, petitioner contends "[t]he prosecution quickly changed topics" when Chau Vu mentioned that petitioner had a cellphone in the restaurant. *Id.* at 151. This contention, however, is at odds with the transcript record:

> Q.    Can you describe this person that Antoinette introduced as her nephew?
> A.    He short, and he have gold teeth, and he have a cellular phone with him too. He look like a business man.
> Q.    He had a cellular phone with him?
> A.    Yes. I told him, "You look like a business man.", and he smile.

Rec. Doc. 45-65 at 148–49. The factual determinations by Judge Kirby were not unreasonable in light of the evidence presented and reviewed here. Further, this decision was not contrary to or involve an unreasonable application of the *Strickland* standard. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### viii.    Failure to Suppress Petitioner's Statement

In the last reasoned state court decision, Judge Kirby rejected petitioner's ineffectiveness claim as it relates to Turk's failure to suppress petitioner's statement to the NOPD. Turk orally joined a pretrial motion to suppress by Antoinette Frank's counsel. *See* Rec. Doc. 45-57 at 4–118 (transcript of motion to suppress hearing). During a pretrial hearing on the motion, Turk questioned three detectives and petitioner's mother. *Id.* at 55–114. Judge Kirby did not hesitate on his

evaluation of the *Strickland* claim, "I am unimpressed with the first contention because I find no evidence Mr. LaCaze was prejudiced by joining Ms. Frank's motion." Rec. Doc. 45-8 at 117. As Judge Kirby continued, "Although he was unsuccessful in suppressing the statement, he did get to preview the testimony that would be used against him at trial." *Id*.

To the contention that Turk did not attack the veracity of the confession at trial, Judge Kirby simply states, "This is incorrect." *Id.* At the suppression hearing, Turk questioned Officer Patrick Young regarding his perception of petitioner's intelligence and his possible use of force to obtain a confession. *See* Rec. Doc. 45-57 at 68–70. Turk later confronted the NOPD detective at trial regarding petitioner's recorded injuries after his statement. Rec. Doc. 45-65 at 73. Judge Kirby resolved that choosing to pursue police brutality tact instead of an IQ-related attack on the statement's voluntariness was a strategic selection. Rec. Doc. 45-8 at 118–19. The choice was particularly sensible in light of a recorded statement in which petitioner "lucidly and coherently relate[d] the events of March 3 and 4, 1995". *Id.* at 119.

The state court's failure to find either *Strickland* prong satisfied is not contrary to or involve an unreasonable application of clearly established federal law. To the extent factual determinations are challenged, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### ix.    Failure to Seek Change of Venue

Finally, petitioner deems Turk's performance deficient for failing to seek a change of trial venue. As previously noted, no state court opinion provided reasons for rejecting petitioner's claim of ineffectiveness based on failure to seek a change of venue. Yet, the claim was summarily denied. *See Lacaze IV*, 325 So. 3d at 362 (rejecting claims related to continuance and change of venue

63

because "[a]pplicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*."). We, therefore, may grant petitioner's claim only if there is no reasonable basis we can hypothesize for the state court denial. *See Floyd v. Vannoy*, 894 F.3d 143, 160–61 (5th Cir. 2018).

Despite critiquing various aspects of Turk's representation, petitioner's post-conviction expert John Reed testified there was nothing deficient about not seeking a change of venue of the highly publicized case: "I do not fault Mr. Turk for failing to file a Motion for a Change of Venue. I didn't so testify, and ah, wouldn't have so testified . . . . Orleans Parish is a, uh, a good place to try a case." Rec. Doc. 28-3 at 94. Any concern Reed harbored related to publicity was directed to voir dire questioning, not change of venue. *Id.* at 94–95. From petitioner's own expert, therefore, we can hypothesize a reasonable basis for the state court denial. The state court's failure to find either *Strickland* prong satisfied is not contrary to or involve an unreasonable application of clearly established federal law. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### c.  Cumulative Review

Absent a state court finding contrary to or an unreasonable application of clearly established federal law, or any unreasonable determination of the facts in light of the evidence presented in the state court proceeding, the ineffective assistance of counsel claims cannot cumulate. Moreover, this conclusion is supported by a review of the record and the reasoned conclusion of Judge Kirby as it related to all but the continuance and change of venue claims. *See* Rec. Doc. 45-8 at 120. Those latter claims were summarily rejected by the Louisiana Supreme Court, for reasons we have hypothesized that were not unreasonable. *See Lacaze IV*, 325 So. 3d at 362. Citing the circuit's "clear precedent", the United States Fifth Circuit Court of Appeals had held "ineffective assistance of counsel cannot be created from the accumulation of acceptable

64

decisions and actions." *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) (first citing *Miller v. Johnson,* 200 F.3d 274, 286 n.6 (5th Cir. 2000); then citing *Yohey v. Collins,* 985 F.2d 222, 229 (5th Cir. 1993)). As such, as to this pure question of law, the state court decisions rejecting cumulation were not contrary to or an unreasonable application of clearly established federal law. Petitioner cannot receive relief from the accumulation of his rejected *Strickland* claims.

### E.    Claim 4: Suppression of *Brady* Evidence

#### 1.    Standard of Review

The Due Process Clause of the Fourteenth Amendment prohibits state prosecutors from suppressing evidence that is favorable to a defendant and material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Glenn*, 935 F.3d 313, 319 (5th Cir. 2019) (citation omitted). The prosecution's duty to disclose attaches regardless of the good or bad faith its actions. *See Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). Evidence within this duty to disclose includes what is known by police and investigators alone, and not merely what is known by the prosecutor. *See Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (quoting *Kyles v. Whitley,* 514 U.S. 419, 438 (1995)). Accordingly, the *Brady* standard attaches a duty to learn on the prosecutor, requiring the awareness of "any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Id.* (quoting *Kyles*, 514 U.S. at 437).

Although the disclosure duty is wide, evidence subject to a *Brady* challenge must be material. "Suppressed evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"

65

*Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (quoting *United States v. Bagley*, 473 U.S. 667, 685 (1985)). "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." *Turner v. United States*, 582 U.S. 313, 324 (2017) (internal quotations omitted) (quoting *Kyles*, 514 U.S. at 434). Relying on *Kyles*, the Fifth Circuit has named four materiality considerations:

> First, materiality does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal. Second, he need not weigh the withheld evidence against the disclosed evidence to show he would have been acquitted by the resulting totality. Third, if evidence is found material, there is no need to conduct a harmless error analysis. Fourth, the withheld evidence should be considered as a whole, not item-by-item.

*DiLosa v. Cain*, 279 F.3d 259, 263 (5th Cir. 2002) (citing *Kyles*, 514 U.S. at 434–37). Accordingly, *Brady* claims are not measured through a sufficiency-of-the-evidence test. *See Strickler*, 527 U.S. at 290 (citing *Kyles*, 514 U.S. at 434–35) ("[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."). Instead, a *Brady* violation occurs where the cumulative weight of the suppressed material evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Therefore, although not a sufficiency-of-the-evidence test, "[t]he materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Murphy*, 901 F.3d at 598 (internal quotation omitted). Where the value of the suppressed evidence is only "incremental"—as especially may be the case with impeachment evidence—it is not material. *Id.* (quoting *Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005)). Even clearer, "merely cumulative" evidence fails to meet the *Brady* materiality standard. *Reeder v. Vannoy*, 978 F.3d 272, 279 (5th Cir. 2020) (citation omitted).

### 2. Claim Background

### a. Evidence Concerning Adam Frank

Petitioner contends that Antoinette Frank's brother, Adam Frank, was investigated as an alternate suspect, but evidence of such an investigation—and the information obtained therefrom—was never disclosed to defense counsel. *See* Rec. Doc. 28 at 83–84. Petitioner cites suppressed evidence from an investigation into Adam Frank's relationship with his sister, Officer Stanley Morlier's suspicions and independent actions, and the probe into Antoinette Frank's acquisition of the possible murder weapon.

Months before the murders, Adam Frank was under investigation by the NOPD for accompanying his sister while on patrol. A fellow NOPD officer ran Adam Frank's name through a crime database because he was "always riding around with his sister Officer Antoinette Franks and her partner . . . while they're on duty." Rec. Doc. 28-2 at 38. Adam Frank had told the officer "he had a gun and a police radio because he was a security guard," although the officer had not seen either on his person. *Id*. Attempting to extend his ride-alongs, Adam Frank had asked other officers if he could "hang out with them or ride with them because he was bored." *Id*. The circumstances struck the officer as "odd," leading her to run his name and discover a warrant for his arrest. *Id.* at 37–38. This report was not disclosed to defense counsel. *See* Rec. Doc. 28 at 85.

In response to this report, two NOPD sergeants visited Antoinette Frank at her home. Rec. Doc. 28-2 at 40. She informed the sergeants Adam Frank no longer resided with her, having left before she was made aware of a warrant for his arrest on attempted manslaughter charges in Opelousas, Louisiana. *Id.* "Officer Frank was instructed to contact a Seventh District supervisor should her brother return or should she learn of his whereabouts. It was expressed to Officer Frank that any concealment of this information on her part may be construed as a criminal violation, to wit, harboring a fugitive." *Id*. This report was not disclosed to defense counsel. *See* Rec. Doc. 28

at 86. At trial, Antoinette Frank's captain explained the internal investigation into Adam Frank was due to his unrequited advances on another officer. Rec. Doc. 45-66 at 30 ("Well, one of the female police officers in the district came to me and she said that she saw him and he was trying to go out with her, and she didn't like his actions. So, she didn't like him at all."). The captain acknowledged Adam Frank's warrant for attempted manslaughter in another parish. *Id*. However, the captain indicated any connection to Antoinette Frank was only made after the discovery of the warrant: "[The fellow NOPD officer] felt like he was a little strange. So, she ran his name in the computer only to find out that he was wanted. And, then, later on, we found out that it was Antoinette Frank's brother." *Id*. Finally, the captain indicated there had been no other reports on Adam Frank's behavior. *Id.* at 30–31.

Officer Morlier also testified regarding Adam Frank's relationship with his sister but did so much more expansively during Antoinette Frank's trial. At the later trial, Officer Morlier relayed a confrontation he and Officer Ronald Williams had with Antoinette Frank over the presence of her brother at the Kim Anh Restaurant. *See* Rec. Doc. 28-2 at 71–72 (Officer Morlier describing Adam Frank as "a risk to the restaurant"). Officer Morlier testified that Antoinette Frank left the restaurant, announcing to her brother, "If they don't want you here, you don't need to be here. . . Fuck those people." Rec. Doc. 28-2 at 77. Antoinette Frank also later used Officer Morlier to communicate a message to Officer Williams: "[Y]ou tell Ronnie Williams that when he messes with my brother he's messing with me, and I'll take him out." Rec. Doc. 28-2 at 78. However, Officer Morlier did not interpret the words as a threat, believed everyone had reconciled, and, after a period of Antoinette Frank's absence, described all three officers to be back working the Kim Anh detail. Rec. Doc. 28-2 at 80.

In contrast, Officer Morlier's testimony at petitioner's trial was muted: "Q. Okay. Now,

did you at any time encounter an altercation or witness an altercation between Adam Frank and Officer Ronnie Williams? A. No, sir. Q. Did you at any time witness an argument between them? A. No, sir." Rec. Doc. 45-66 at 32; *see also id.* at 120–21 ("Q. At any time while being in the presence of Officer Ronnie Williams did you hear Officer Antoinette Frank make a threat on his life? A. No.").

More pressing to petitioner's *Brady* argument are Officer Morlier's statements in an interview with NOPD Lieutenant Richard Marino the morning of the shooting. *See* Rec. Doc. 28-2 at 94 ("Q. After Ronald Williams was murdered, were you interviewed by an Officer Richie Marino? A. Yes. Q. Was that interview recorded? A. I don't know. Q. About how long after Officer Williams was murdered were you interviewed? A. Ah, it was early the next morning, about 9:00 a.m."). Although other interviews conducted by Lieutenant Marino were made available in post-conviction proceedings, "[r]ecords of this interview were not disclosed at trial, and indeed have never been disclosed by the State." Rec. Doc. 28 at 88.

In addition to his unknown statements the morning of the murders, Officer Morlier's investigation into Adam Frank was not disclosed to petitioner. In his post-conviction testimony, Officer Morlier indicated he believed Adam Frank was a driving cause of the murders but did not commit them himself. *See* Rec. Doc. 28-2 at 94, 96 ("I believe that it all stemmed from the Adam Frank, um, thing . . . . I believe that he was [involved in the crime]—he could have been the root cause of it, but, again, that's speculation."); *id.* at 97 ("Q. You never suspected Adam Frank was actually involved in the commission of the murder? A. Not in the commission of the murder. If . . . you want me to speculate, ah— Q. I don't. I don't want you to speculate, sir. A. Right. But, no. If he was involved with it, I think he would have watched the back door, and nobody would have escaped out the restaurant."). Angelique Thomas, an investigator at the Capital Appeals Project,

further testified that Officer Morlier admitted to her that he sent a confidential informant to locate Adam Frank and bring him back to New Orleans for Antoinette Frank's trial.[9] *Id.* at 101.

Finally, as it relates to Adam Frank, petitioner contends information of the NOPD probe into Antoinette Frank's acquisition of two firearms qualifies as *Brady* material. Specifically, a twenty-six-page interview of Officer David Talley, who staffed the gun vault at NOPD central property and evidence, expanded from the events surrounding the release of a 9mm firearm to Antoinette Frank and into her relationship with her brother and Officer Williams. *Id.* at 42–67. According to Officer Talley, Antoinette Frank "didn't care for [Officer Williams], she didn't like him." *Id.* at 43; *see also id.* at 67 (quotation cleaned up) ("Q. So you know there was some personal problem or animosity between Officer Williams and Officer Frank, is that correct? A. Yes sir. Yes sir."). Officer Talley did not associate Adam Frank as the root of her sister's issues with Officer Williams. *Id.* at 61–62. However, the interview probed for connections between Antoinette Frank's actions and her brother. *Id.* ("Q. Did Antoinette's brother obtain guns from the Property Room? A. No sir. Q. Did Antoinette's brother or Antoinette . . . attempt to obtain any guns for Antoinette's brother? A. No sir."); *see also id.* at 51 ("Q. Do you have any knowledge of, of her givin' [the gun reported stolen] to her brother? A. No sir. I didn't.").

### b. Evidence Concerning the Possible Murder Weapon

Continuing earlier arguments as it related to Judge Marullo and Officer Talley, petitioner contends the State had a duty to disclose the NOPD's investigation into the alleged murder weapon.

---

[9] At the state post-conviction hearing, petitioner introduced an affidavit attested to but unsigned by Officer Morlier. *See* Rec. Doc. 28-2 at 98 ("I said it was true. Right. I—I told you I don't sign anything . . . . You get people to sign something, and then you use it against them."). His unsigned affidavit corroborates the testimony of Angelique Thomas as to his independent investigation. *See id.* at 86 ("I started looking for Adam right after the murders—talking to people about him and shaking trees. I really believed that Adam was going to come back and kill Chau and Quoc. I had a long-time informant track Adam down in northern Louisiana, but he couldn't bring Adam in. I had hoped that Adam would show up for Antoinette's trial so I could arrest him, but he never did."); *but see id.* at 96 (cross-examination by the State of Officer Morlier) ("Q. Did you do any kind of independent investigation? A. No.").

Rec. Doc. 28 at 92. Although it was defense theory at trial that Antoinette Frank possessed a 9mm, petitioner had no evidence to support his testimony. *Id.* at 93. According to petitioner, "This evidence not only placed the likely murder weapon in the co-defendant's hands, but it demonstrated Antoinette Frank's singular actions in planning this crime." *Id.* at 94. Petitioner concludes the suppressed reports and interviews "directly contradicted the State's theory at trial that Mr. LaCaze was the dominant party and the shooter, but [the evidence] was never disclosed." *Id*.

### c.   Evidence Concerning Eyewitness Testimony

Petitioner also argues suppressed evidence related to statements by Chau Vu, Vui Vu, Quoc Vu, and John Ross cast the trial in a new light.

Chau Vu provided an initial statement to the NOPD shortly after the murders that went undisclosed. *See* Rec. Doc. 28-2 at 5–17. From her location in the cooler, Chau Vu described Antoinette Frank "go[ing] back and forth, back and forth in the . . . my, my restaurant." *Id*. at 9. Chau Vu was then asked if she had seen petitioner leave after the shooting, to which she responded: "Oh, after the shooting, I don't see . . . . I jus' saw the car had left." *Id*. at 12. The detective immediately followed up, "But he was in the . . . restaurant at the time the shooting started, wasn't he?" *Id*. Chau Vu offered no response to the question. *Id*. Nonetheless, shortly thereafter Chau Vu appears to place petitioner at the scene:

> Q. Okay. So the guy that she brought there and introduced as her nephew, he came back with her . . . jus' before the shooting happened? But he was in . . . was he in the restaurant?
> A. Yeah. She was . . . he was . . .
> Q. She, she was and he was . . . right?
> A. Yeah. Both of them . . .
> Q. And Antoinette . . .
> A. They . . . they came twice . . .
> Q. . . . pushed you to the back to the kitchen . . .
> A. Yeah.

71

Q. . . . and he stayed in the front with the Police Officer . . . ?
A. So . . . so that I can't . . . see him . . .
Q. So you couldn't see him?
A. Yeah.
Q. And that's when you start . . . you heard shots?
A. Boom, boom, boom, boom!

*Id.* At trial, Chau Vu similarly testified that petitioner and Antoinette Frank returned to the restaurant 10–15 minutes after completing their meal and that Antoinette Frank brought her and Quoc Vu to the back of the restaurant as the gunshots began. Rec. Doc. 45-65 at 151–53. At trial, however, Chau Vu was more descriptive of how she saw Antoinette Frank's "nephew", who was "just walk[ing] past by the window" of the cooler. *Id.* at 158–59. After initially entering the back of the cooler and ducking at the noise of gunshots, Chau Vu testified that she moved to see out the cooler window. *Id.* at 186–87. She positively identified petitioner. *Id.*

Vui Vu also provided an undisclosed statement shortly after the murders. Neither her statement nor its summary in a supplemental police report were disclosed to petitioner. The supplemental report recorded:

> Vui Vu stated she was in the back kitchen area when she heard several gunshots. Chau Vu came running into the kitchen and threw Vui Vu into the glass-fronted, walk-in cooler, which is located in the kitchen. Vui Vu was crawling out of her hiding place when she spotted a man from the back. She then crawled back into the cooler. The [sic] stayed there for a few minutes then crawled back again and saw Antoinette Frank standing by a body. Vui Vu told Chau Vu that the policewoman was out there but Chau Vu told her not to go out yet because Frank might be involved. Vui Vu then stayed in the cooler until she heard the arrival of police officers in the restaurant.

> Vui Vu described the man she saw as a small-built, black man, not very tall. Vui Vu could not add anything further because she was in the kitchen the entire time and then she hid in the cooler.

Rec. Doc. 45-150 at 14. Vui Vu's first testimony was at the post-conviction hearing. *See* Rec. Doc. 28-1 at 251. Working in the kitchen on the night of the murders, Vui Vu had not ventured into the restaurant seating or bar area earlier in the night. Rec. Doc. 28-1 at 247. The sound of gunshots

first alerted Vui Vu to a conflict, at which point she followed Chau Vu into the cooler. *Id*. Although she did not see anyone's face, Vui Vu described seeing male and female "shadows" walking. *Id.* at 248–49. She identified the female as Antoinette Frank but said she could not describe the male at all. *Id.* at 249. Vui Vu recalled going to the police station following the incident, but not being asked any questions. *Id.* at 250. She was presented, however, with a photo lineup: "Q. Were you able to identify anyone in the pictures? A. No." *Id*.

The final witness at the scene, Quoc Vu, also gave a statement shortly after the shooting that was not disclosed to petitioner. In that interview, Quoc Vu stated petitioner—the Black male who had eaten with Antoinette Frank earlier that night—was involved in the shooting. Rec. Doc. 28-2 at 20. Later, however, Quoc Vu only described actions by Antoinette Frank: "Q. And . . . was she with the black male at that time? A. Um . . . she came back in the car and then . . . she, she op . . . she went like . . . tried to open the door and then she opened it." *Id.* at 21. He further described Antoinette Frank's pushing him and Chau Vu to the back of the restaurant, with gunshots occurring around five seconds later. *Id.* at 21–22. Then, after seeing Antoinette Frank going into areas where money was left, Quoc Vu described hearing gunshots ten seconds later. *Id.* at 22–23. When Quoc Vu was asked if he had seen "the persons who was doing the shootin'," he responded: "Yes. Uh . . . , I saw the partial side of her." *Id.* at 23. Shortly thereafter, however, Quoc Vu again included petitioner at the scene: "Q. The, uh, black male who had done the shooting, did you see him anymore after [Antoinette Frank's departure]? A. Um . . . no. Q. At any time? A. No. He jus' ran real quick . . . out after he shot her." *Id*. At the conclusion of his statement, Quoc Vu also admitted to identifying petitioner in a photographic lineup:

> Q. Were you able to identify this person as . . . being involved in the shooting?
> A. Yes.
> Q. Is this the person who you saw through the cooler glass . . . going through the kitchen area of the restaurant?

73

A. Yes.
Q. And is this the same person who was with Officer Antoinette sittin' at the table?
A. Yes.

*Id.* at 25. At trial, Quoc Vu testified to being pulled by Antoinette Frank to the rear of the restaurant with his sister Chau Vu as shots rang out from the front of the restaurant. Rec. Doc. 45-65 at 194. From his vantage point in the cooler, Quoc Vu stated he saw petitioner: "Q. Did you see anyone with Antoinette? A. Yes, I saw her friend that she ate with." *Id.* at 195–96. After the end of the gunfire, Quoc Vu further stated he saw petitioner and Antoinette Frank "running in and out of the store." *Id.* at 197.

Finally, petitioner points to suppressed statements from gas station attendant John Ross as *Brady* material. John Ross worked at a Chevron Station miles from the New Orleans East shooting site, on Terry Parkway on the Westbank of New Orleans. *See* Rec. Doc. 28-2 at 28. On March 30, 1995, Ross was interviewed in connection with a gas purchase at 2:29 AM on March 4, 1995. *Id.* at 29. As Ross recalled, the purchaser was a regular customer, who had a brother in a wheelchair. *Id.* at 30. Although the purchaser "always paid in cash," on the night in question—which Ross stated was "a few weeks ago" but was unclear of the actual date—he uniquely paid with a credit card. *Id.* at 31. Ross also described that a woman was seated in the passenger seat. *Id.* at 32. Two days before the interview, Ross had identified petitioner from a photographic lineup as the purchaser. *Id.* at 31. After stating that he was aware of the publicized incident, Ross denied having seen petitioner's photograph in any media coverage. *Id.* at 33. However, Ross then recalled a conversation just after the murders with his brother-in-law, who thought the male suspect looked like a gas station customer. *Id.* at 34. Ross disagreed but was stopped short of sharing his reasons: "A. Well, [my brother-in-law] asked me had I seen him since, because they had a guy that looked kinda like him . . . along with that lady. And I was tellin' him, I don't think so, cause . . . Q. Was

this conversation with your brother-in-law before I spoke to you or after? A. Well . . . it was . . . it was . . . right when it first happened." *Id.* at 34. At trial, Ross stated he recalled petitioner using a credit card in an early-morning gas purchase. Rec. Doc. 45-65 at 82 ("The exact date, I don't know, but I did see him one night. He used a credit card."). Ross recognized petitioner from his work, but only after identifying petitioner from a photo array, was Ross told petitioner's name. *Id.* at 86. He also recalled the day before the night in question he had been off, making it likely a Friday night to Saturday morning shift. *Id.* at 88–89.

> ### d.  Other Suppressed Evidence Contradicting the State's Theory that Rogers Lacaze was Inside the Restaurant with Antoinette Frank

Continuing cellphone-related arguments, petitioner contends Chau Vu and Quoc Vu's suppressed statements contain references to petitioner's possession of a cellphone during his earlier meal at Kim Anh. In her initial statement, Chau Vu mentioned amid her description of petitioner that he had a cellphone with him. *See* Rec. Doc. 28-2 at 11. As previously discussed, Chau Vu similarly included this detail in her trial testimony, expanding it to add a comment she relayed to petitioner based on his cellphone possession: "I told him, 'You look like a business man.', and he smile." Rec. Doc. 45-65 at 148–49. In his initial statement, Quoc Vu also noted "the guy that . . . came with Miss Antoinette had a phone just like my sister". Rec. Doc. 28-2 at 25. Quoc Vu did not mention the cellphone at trial.

> ### e.  Evidence Concerning Antoinette Frank's Psychological Examinations

As a final piece of evidence, petitioner faults the State for failing to disclose Antoinette Frank's NOPD-administered psychological examinations. Upon her application to the NOPD in February of 1992, Antoinette Frank underwent a series of psychological evaluations, with differing determinations as to her fitness for employment. *See* Rec. Doc. 45-246 at 84–105. In March of

1992, the results of a California Psychological Inventory indicated that she may possess an overly favorable self-portrait, with her results reflective of her possibly "faking good." *Id.* at 91. A psychologist's report from July of that year was even starker, finding in Antoinette Frank the suggestion of an "excessive over-valuation of her own worth, extreme lack of tolerance and flexibility, excessive use of repression and denial, and a conscious effort to represent herself as above even common problems." *Id.* at 88. Indicating poor impulse control and "suggestions of rebelliousness [and] problems with authorities," the report stopped short of concluding Antoinette Frank to be a "Poor Risk," but did request more information on the candidate. *Id.* Based on an interview with her, Dr. Philip Scurria concluded in September that Antoinette Frank was not suitable for the position. Dr. Scurria found her "preoccupied with making herself 'look good'" and dishonest for lying about her work history. *Id.* at 86–87. He rated her unacceptable or below average in integrity and forthrightness, personal insight and empathy, conventional and rule abiding, nondefensive and willing to accept responsibility, sound judgment and common sense, and freedom and psychopathology. *Id.* Results of a Minnesota Multiphasic Personality Inventory later in September sounded a similar theme, as Antoinette Frank was described as "claiming to be unrealistically virtuous . . . [with] rigid neurotic adjustment . . . project[ing] an overly positive self-image." *Id.* at 93.

Nonetheless, in an early November Psychiatric Interview Report Dr. Robert Barnes found Antoinette Frank suitable for an NOPD position, marking her as average or above in all recorded categories. *Id.* at 84–85. In his summary, Dr. Barnes described her as "very appropriate and professional throughout interview[,]" with "[m]otivation for career choice well thought out and based on good understanding of actual work." *Id.* at 84.

### 3. Last Reasoned State Court Decision

In the final state court decision on this matter, all *Brady* claims were summarily rejected: "Applicant also fails to show that the state withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)." *LaCaze IV*, 325 So. 3d at 362. Previously, the Louisiana Supreme Court provided reasoned decisions as to petitioner's *Brady* claims related to the firearm investigation, Adam Frank's involvement, Chau Vu's statements, and the cellphone-related statements. *See LaCaze II*, 208 So. 3d at 864–65. In his rejection of all *Brady* claims, Judge Kirby treated in detail every claim except that related to the nondisclosure of Antoinette Frank's psychological evaluations. *See* Rec. Doc. 45-8 at 39–73.

Although the claims are covered through three separate state court reviews, both the Louisiana Supreme Court and the criminal district court recite the *Brady* standard adequately: "[T]he state's failure to disclose evidence violates due process only if the withheld evidence is exculpatory or fit for impeachment use and is material to guilt or punishment." *LaCaze II*, 208 So. 3d at 865; *see also* Rec. Doc. 45-8 at 43 (quoting *Smith v. Cain*, 565 U.S. 73, 75–76 (2012)) (summarizing the *Brady* standard). Further, the Louisiana Supreme Court distinguished the materiality standard under *Brady* from one based on the sufficiency of the evidence. *LaCaze II*, 208 So. 3d at 865 n.5 ("[The cellphone] claim fails the *Brady* materiality standard because LaCaze has not shown that without the statements, he received an unfair trial resulting in a verdict not worthy of confidence, and more closely resembles an attempt to re-litigate the sufficiency of the evidence."). Review of decisions by the Louisiana Supreme Court would be aided by the court's more clearly showing its work; nonetheless, the *Brady* standard is apparent through consideration of the state high court's ruling.

### a.  Evidence Concerning Adam Frank

The Louisiana Supreme Court concluded that evidence related to Adam Frank was

"insufficient to undermine the verdict in a case in which the state presented substantial evidence of LaCaze's guilt, notably, his own custodial statement acknowledging his presence inside the restaurant during the murders and relating details only a perpetrator could have known that early in the investigation." *LaCaze II*, 208 So. 3d at 865. Key to the state high court, petitioner "ha[d] not pointed to any evidence indicating Adam was involved which the state possessed but failed to disclose." *Id*. Without clearly identifying the operative *Brady* language, the Louisiana Supreme Court evidently reasoned that the suppressed evidence related to Adam Frank did not result in the reasonable probability of a different result. This conclusion is not contrary to or an unreasonable application of clearly established federal law.

Undoubtedly, the evidence in question raises support for Antoinette Frank's possible motive for the murders. The contrast of Officer Morlier's testimony at petitioner's and Antoinette Frank's trials is stark, with Officer Williams's former partner expansively detailing Adam Frank-related issues only in the latter. *See* Rec. Doc. 28-2 at 71–72, 77–78. However, even Officer Morlier—concerned enough about Adam Frank to use an informant on the other end of the state— found Adam Frank's possible involvement limited to inspiring his sister, and not engaging in the crime. *See* Rec. Doc. 28-2 at 94, 96–97. The disclosure of evidence related to the motivation of a co-defendant may have been favorable to petitioner. However, no suppressed evidence even hints at Adam Frank's involvement. Thus, it is not unreasonable for the state court to conclude such evidence was not material. To the extent factual determinations are challenged, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings and reviewed here. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### b.  Evidence Concerning the Possible Murder Weapon

The Louisiana Supreme Court also rejected petitioner's *Brady* claim as it related to Antoinette Frank's acquisition of the possible murder weapon. The state high court concluded the evidence would have been favorable to the State, not petitioner:

> [E]vidence that his accomplice obtained the same type of gun that was used to kill the victims, in a case in which the state presented evidence that he and Frank had been acting in concert under the guise of her authority and together premeditated the murders and were equally culpable, would have only supported the state's theory and was therefore not subject to disclosure.

*LaCaze II*, 208 So. 3d at 865. The state supreme court further supported its conclusion by noting petitioner's participation in the possible planning of the murders on the afternoon preceding their execution: "[T]he day of the murders, 'a uniformed Frank and a young African-American male with gold teeth were in Wal–Mart inquiring about 9 mm cartridges. They left without making a purchase.'" *Id.* at 865 n.4 (quoting *LaCaze I*, 824 So. 2d at 1070). Judge Kirby further observed that the investigation also included inquiry into a second gun missing from the NOPD vault, a .380 caliber pistol. Rec. Doc. 45-8 at 70. After his arrest, petitioner's apartment was searched, and a box of .380 ammunition was recovered. *Id*. As Judge Kirby reasoned, "[D]isclosure of this information could not have been helpful to Mr. LaCaze since it could lead to an inference he got weapons from that source, too, notwithstanding Ofc. Talley's denial." *Id.* at 70–71.

The state court denial of this claim is not contrary to or an unreasonable application of clearly established federal law. Moreover, there was no unreasonable determination of the facts in light of the evidence presented in the state court proceedings and reviewed here. The evidence of the internal investigation did not insulate petitioner from actions related to the crime; rather, if anything, it draws him closer to Antoinette Frank's actions in the gun vault. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### c.  Evidence Concerning Eyewitness Testimony

In its rejection of suppressed statements as *Brady* claims, the Louisiana Supreme Court addressed Chau Vu's statement alone; Judge Kirby provided a reasoned decision as to the others. The courts rejected the impeachment value of each. As to Chau Vu, the Louisiana Supreme Court concluded the suppressed statement did not present an inconsistent statement: "[I]n her statement she described the male perpetrator as a short African-American whom she met earlier that evening—introduced to her and other employees as Frank's 'nephew.'" *LaCaze II*, 208 So. 3d at 866. The state high court also relied on the district court's findings as support. *See id.* ("As the district court found . . . ."). Judge Kirby laboriously dissected the transcript of Chau Vu's suppressed statement. *See* Rec. Doc. 45-8 at 39–44. Judge Kirby concluded that, although Chau Vu's statements were not as "specific" as at trial, she was "unequivocal": "Both Ms. Frank and Mr. LaCaze were there." *Id.* at 42–43. These determinations are neither contrary to nor an unreasonable application of clearly established federal law. Immediately after the murders, Chau Vu placed petitioner at the scene during their commission. *See* Rec. Doc. 28-2 at 12 ("Q. Okay. So the guy that she brought there and introduced as her nephew, he came back with her . . . jus' before the shooting happened? But he was in . . . was he in the restaurant? A. Yeah. She was . . . he was . . . Q. She, she was and he was . . . right? A. Yeah. Both of them . . ."). Pertinently, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings and reviewed here. It was not unreasonable to conclude Chau Vu's initial statement did not contain impeachment value. Petitioner is not entitled to federal habeas corpus relief as to this issue.

As to Vui Vu's statement, and its summary in the suppressed supplemental police report, Judge Kirby reasoned that hers substantially corroborated with Chau Vu and Quoc Vu's. Although limited by not having seen petitioner earlier in the evening and only seeing Antoinette Frank's

80

accomplice from the back, Vui Vu "described the man she saw as a small-built, black man, not very tall." Rec. Doc. 45-150 at 14. Judge Kirby determined her inability to provide such details during her post-conviction testimony was due to "to the dulling effect the passage of nearly two decades has on one's memory[,]" finding it appropriate to "give more weight to the statement and evidence generated closer to the time of the event." Rec. Doc. 45-8 at 45–46. This is not an unreasonable interpretation of the facts by the judge who received Vui Vu's post-conviction testimony. Further, her earlier statement does nothing to contradict or present impeachment possibilities for Chau Vu and Quoc Vu's testimony. Although more limited in what she saw, Vui Vu provides the same sequence of events and does not differ in the details she was able to offer. The state court determination was not contrary to or an unreasonable application of the *Brady* standard. Petitioner is not entitled to federal habeas corpus relief as to this issue.

Judge Kirby also dismissed petitioner's challenge as to Quoc Vu's suppressed statement. The district court opinion refused petitioner's invitation to isolate one response of Quoc Vu. *Id*. at 48 ("I do not find this statement, taken out of context, constituted material exculpatory evidence."). Instead, Judge Kirby found Quoc Vu, throughout his interview, had identified petitioner as Antoinette Frank's accomplice. *Id.* at 47. This is not an unreasonable interpretation of the facts. After providing background information, Quoc Vu immediately identified petitioner and Antoinette Frank as the "persons who did the shooting[.]" Rec. Doc. 28-2 at 19–20. Antoinette Frank pushed Quoc Vu and Chau Vu to the back of the restaurant, leaving them there and running to the front only at the sound of gunshots. *Id.* at 21–22. He then described seeing petitioner leave the restaurant. *Id.* at 23. Finally, Quoc Vu identified petitioner in a photographic lineup. *Id.* at 25. Based on these details, Judge Kirby's resolution of the facts was not unreasonable. Further, the state court determination was not contrary to or an unreasonable application of the *Brady* standard.

81

The statement does not appear favorable to petitioner and does not cast the verdict in a different light. Petitioner is not entitled to federal habeas corpus relief as to this issue.

Finally, Judge Kirby rejected the *Brady* claim relating to John Ross's suppressed statement. First, Judge Kirby determined any question of media taint could not thereby doom his identification of petitioner: "[Petitioner] cannot show that that pretrial event was tainted by an unconstitutionally suggestive procedure because any media coverage he saw was not arranged by the police." Rec. Doc. 45-8 at 50. Second, and "[m]ore troublesome," Judge Kirby considered petitioner's claim that the photographic array was suggestive "because each photograph bore the person's name and other identifying information." *Id*. Concluding the identification procedure was not unduly suggestive, Judge Kirby found "all photographs had the same information on them, in the same form and appearance." *Id.* at 51. Further, Ross did not know petitioner's name until after identifying him, making the information next to the photograph unimpactful. *Id*. Finally, and most significant to Judge Kirby, Ross recalled the memorable circumstances surrounding petitioner's credit card use, "a remarkable departure from the routine" which led him to engage petitioner in conversation. *Id.* at 52. Judge Kirby's conclusions are not unreasonable. Although clearly favorable to petitioner as impeachment evidence, the suppressed circumstances of the identification procedure—particularly the vital information next to each photograph—does not thereby undermine the verdict. If anything, though, the evidence is of "incremental" value, thus falling below the materiality standard. *See Murphy v. Davis*, 901 F.3d 578, 598 (5th Cir. 2018) (quoting *Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005)). The state court determination was not contrary to or an unreasonable application of the *Brady* standard. Moreover, to the extent factual determinations are challenged, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings and reviewed here. Petitioner is

82

not entitled to federal habeas corpus relief as to this issue.

### d. Other Suppressed Evidence Contradicting the State's Theory that Rogers Lacaze Was Inside the Restaurant with Antoinette Frank

Although making short work of it, the Louisiana Supreme Court also rejected petitioner's *Brady* claim as it related to Chau Vu and Quoc Vu's mention of petitioner's possession of a cellphone on the night of the murders. Within the previously addressed suppressed statements, Chau Vu and Quoc Vu both mentioned petitioner had a cellphone with him while he and Antoinette Frank ate. *See* Rec. Doc. 28-2 at 11 (Chau Vu); Rec. Doc. 28-2 at 25 (Quoc Vu). In a footnote, the Louisiana Supreme Court rejected the claim: "This claim fails the *Brady* materiality standard because LaCaze has not shown that without the statements, he received an unfair trial resulting in a verdict not worthy of confidence, and more closely resembles an attempt to re-litigate the sufficiency of the evidence. The district court's detailed assessment finding these claims meritless was well-founded." *LaCaze II*, 208 So. 3d at 865 n.5. The district court itself determined that because Chau Vu had stated during her trial testimony that petitioner had a cellphone that night the information was already known to the jury and the defense's use of Chau Vu or Quoc Vu's statements for this fact would be merely cumulative. *See* Rec. Doc. 45-8 at 54. Moving into the larger cellphone discussion, previously addressed in this opinion, Judge Kirby compares the testimony of various witnesses with the provided phone records to conclude the facts did not support any phone alibi theory. *See id.* at 53–59.

These state court determinations are neither contrary to nor an unreasonable application of the *Brady* standard. The Louisiana Supreme Court places its rejection within the broader concern for fair trial protection but also as connected to the more specific *Brady* caution against "a verdict not worthy of confidence." The suppressed cellphone statements do not call that verdict into question. Not only did Chau Vu volunteer the cellphone detail during her trial testimony, but she

also expanded upon it: "I told him, 'You look like a business man.', and he smile." Rec. Doc. 45-65 at 148–49. As previously noted, "merely cumulative" evidence fails to meet the *Brady* materiality standard. *Reeder v. Vannoy*, 978 F.3d 272, 279 (5th Cir. 2020) (citation omitted).

Judge Kirby's broader rejection of the cellphone alibi theory also was not an unreasonable determination of the facts considering the evidence presented in the state court proceedings and reviewed here. The jury accepted the prosecution's theory at trial, and the district court detailed reasonable grounds therefor. The cellphone-related information in Chau Vu and Quoc Vu's statements do not make these determinations unreasonable.

### e. Evidence Concerning Antoinette Frank's Psychological Examinations

Finally, petitioner contends Antoinette Frank's psychological examinations place his verdict in a new light. The Louisiana Supreme Court summarily rejected the claim. *See LaCaze IV*, 325 So. 3d at 362. Unlike other claims, neither the *LaCaze II* court nor Judge Kirby provided a reasoned determination on the claim.[10] Accordingly, we "must hypothesize the reasons that supported, or could have supported, the denial consistent with Supreme Court precedent." *Id.* (quoting *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018) (citing *Harrington v. Richter*, 562 U.S. 86, 98 (2011)). Such a decision without stated reasons is unreasonable only if there was no reasonable basis for it. *Id.* at 161 (citation omitted).

In a word, the use of Antoinette Frank's psychological evaluations for her NOPD application was a travesty. Repeatedly, medical examiners cautioned against accepting the prospective recruit, highlighting character traits in a manner tragically prescient. Although an indictment of her hiring process, we fail to see how these documents provide a reasonable

---

[10] In an oral ruling following the Louisiana Supreme Court's remand, Judge Kirby found the claim "moot" because petitioner was no longer subject to the death penalty. *See* Rec. Doc. 45-31 at 5 (determining "that only had relevance, at least as far as your argument went as to the penalty phase").

84

probability of a different verdict in petitioner's trial. Petitioner contends the various examinations reveal Antoinette Frank's "influential and exploitative nature" which would have affected petitioner's defense that he "was duped by Antoinette Frank and was set up to take the fall for her crime." Rec. Doc. 28 at 109. This Court observes various qualities at odds with a minimally competent officer—Antoinette Frank was assessed unacceptable or below average in integrity and forthrightness, personal insight and empathy, conventional and rule abiding, nondefensive and willing to accept responsibility, sound judgment and common sense, and freedom and psychopathology—but absent are the attributes petitioner cites. Moreover, if such character traits were present, their materiality would likely be limited to the penalty phase of the proceedings. Chau Vu, Quoc Vu, and Vui Vu uniformly state directly after the incident, at trial, and during post-conviction testimony that the initial shots rang out while Antoinette Frank was moving them to the back of the restaurant. Even assuming the psychological domination petitioner advocates for, the gunman—subsequently identified as petitioner explicitly by Chau Vu and Quoc Vu—rooms removed from Antoinette Frank possessed the specific intent to kill or inflict great bodily harm. Moreover, petitioner already faces the reduced penalty for a first-degree murder conviction—life imprisonment—making any new penalty phase evidence (which is lacking as to this psychological claim) unavailing.

We do not find absence of a reasonable basis for the state court summary denial of this claim. As such, the state court determination was not contrary to or an unreasonable application of the *Brady* standard. To the extent factual determinations are challenged, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings and reviewed here. Petitioner is not entitled to federal habeas corpus relief as to this issue.

### f. Cumulative Review

85

Petitioner argues his *Brady* claims should be assessed collectively. As a legal principle, he states the proper rule. A *Brady* violation occurs where the cumulative weight of the suppressed material evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. However, as applied to his case, the collective review brings no relief.

Reviewing all but the claim related to Antoinette Frank's psychological evaluations, Judge Kirby already concluded the sum yielded the same relief as its parts: "While the allegedly suppressed information may have been material, I do not find that it would have been helpful to Mr. LaCaze's case." Rec. Doc. 45-8 at 72. After review of the state court findings, we do not find that determination contrary to or an unreasonable application of clearly established federal law. We have found the state courts to have determined faint favorability for petitioner in the evidence related to Adam Frank, John Ross's identification procedure, and Antoinette Frank's psychological evaluations. Individually, none is sufficient to carry a *Brady* claim. Together, they are also insufficient. Although certainly of the type of evidence necessary to disclose, it was not unreasonable to conclude that they do not create a reasonable probability of a different result based on overwhelming evidence of petitioner's guilt. Based on a *Brady* review in light of the material presented during post-conviction, we conclude petitioner presents no actionable *Brady* claim.

### F.    Claim 5: Failure to Correct False or Misleading Testimony

#### 1.  Standard of Review

Petitioner argues that not only did the State withhold evidence related to Officer Morlier's investigation into Adam Frank, but it also failed to correct Morlier's misstatements during his testimony. As an established constitutional protection, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth

Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A new trial is the proper remedy even in situations where "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id*.

Sharing similar concerns of *Brady* challenges, testimonial misstatements are assessed for their reasonable likelihood of impact on the judgment of the jury. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing *Napue*, 360 U.S. at 269, 271). "To establish a due process violation based on the government's use of false or misleading testimony, the defendant must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false." *Isaac v. Cain*, 588 F. App'x 318, 327 (5th Cir. 2014) (quoting *Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997) (itself citing *Giglio*, 405 U.S. at 153–54)). "[E]ven though technically not perjurious," testimony that is highly misleading or that creates a false impression falls within the *Napue* protections. *Dupart v. United States*, 541 F.2d 1148, 1150 (5th Cir. 1976); *see also United States v. Barham*, 595 F.2d 231, 241 (5th Cir. 1979). However, the challenged testimony must be procured by the government. *See United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997) (citing *United States v. Aichele,* 941 F.2d 761, 766 (9th Cir. 1991)). "Thus, when the defense elicits the alleged perjury on cross-examination, no material falsehood has occurred because the government has not itself knowingly presented false testimony." *Id*.

False or misleading testimony alone is not decisive. Instead, the Fifth Circuit counsels "the critical factor is materiality." *United States v. Stanford*, 823 F.3d 814, 839 (5th Cir. 2016). *Napue* materiality is co-extensive with the materiality measure in *Brady*, with courts assessing whether there is a reasonable probability of a different outcome, such that the "nondisclosure places the case in a different light so as to undermine confidence in the verdict." *O'Keefe*, 128 F.3d at 894

(citing *Kyles v. Whitley,* 514 U.S. 419, 434 (1995)).

### 2. Claim Background

Called at trial as a defense witness, Officer Stanley Morlier denied ever witnessing an altercation between Adam Frank and Officer Williams or having occasion to arrest Adam Frank. Rec. Doc. 45-66 at 32. Called a second time to the stand by defense counsel, Officer Morlier was asked, "At any time while being in the presence of Officer Ronnie Williams did you hear Officer Antoinette Frank make a threat on his life?" *Id.* at 120. Again, Officer Morlier responded negatively. *Id.* at 121.

Petitioner argues, based on these responses, "jurors were left to believe that any disputes with Ronald Williams or threats to his life were a defense invention." Rec. Doc. 28 at 122. "Not only did Officer Morlier witness the fight with Ronald Williams and threats to his life, but he personally believed that Adam Frank was involved in the murder and tracked him down before trial." *Id.* at 123. Because of that belief, petitioner contends Officer Morlier's testimony was "blatant[ly] false" and the prosecution's failure to correct it "deprived Rogers LaCaze of favorable evidence that could have in any reasonable likelihood have affected the judgment of the jury." *Id.* at 125.

### 3. Last Reasoned State Court Decision

The Louisiana Supreme Court rejected petitioner's *Napue* claim. *See LaCaze II*, 208 So. 3d at 866. Therein, the state high court assumed, *arguendo*, that Officer Morlier's testimony "created a false impression that Frank never threatened Ofc. Williams—when in fact there was evidence she had, outside his presence[.]" *Id*. However, the *LaCaze II* court determined the claim failed on the materiality prong: "LaCaze fails [sic] show the testimony was reasonably likely to affect the jury's judgment in a case in which there was no dispute as to Frank's involvement (the

party who either threatened Ofc. Williams or not) and there existed no evidence to connect Adam to the murders." *Id*. The court also mentioned—without clearly basing its opinion on—the fact that Officer Morlier was not a prosecution witness. *Id.* at 866 n.6 (citing *Napue*, 360 U.S. at 269) ("This claim was also subject to dismissal for the reason that the witness who allegedly gave misleading testimony was, at the time of the testimony complained of a *defense* witness. The jurisprudence condemning presentation of false and misleading testimony generally pertains to the state, given that such testimony contravenes a defendant's due process rights, rights he presumably cannot himself violate.").

The state court decision is not contrary to or an unreasonable application of clearly established federal law. Although Officer Morlier's testimony was technically true—he had never seen an altercation between Adam Frank and Officer Williams nor hear Antoinette Frank threaten Officer Williams in Officer Williams's presence—it clearly gave a false impression. As his post-conviction testimony indicates, Officer Morlier believed all parties had reconciled months before the murders. *See* Rec. Doc. 28-2 at 80. However, he still believed Adam Frank to be "the root cause" of the incident. *Id.* at 94, 96–97. Although Officer Morlier faced slightly more precise questions at Antoinette Frank's trial, the contrast between his two appearances is stark. *See id.* at 71–78. In petitioner's trial, Officer Morlier gave the false impression that Antoinette Frank harbored no hostility toward Officer Williams due to the treatment of her brother.

However, the state court concluded as it did for the related *Brady* challenges: the information did not satisfy the materiality standard. As addressed previously, Officer Morlier's complete testimony would have helped establish the motivation for Antoinette Frank, petitioner's co-defendant. It is not unreasonable for the state court to conclude that such information would not place the verdict in a new light. Further, to the extent factual determinations are challenged,

there was no unreasonable determination of the facts based on the evidence presented in the state court proceedings and reviewed here. Petitioner is not entitled to federal habeas corpus relief as to this issue.

**G.      Claim 7: Defense Counsel's Conflict of Interest**

**1.    Standard of Review**

Petitioner insists Willie Turk had a conflict of interest because Judge Marullo held him in contempt of court the morning of trial. As a derivation of a defendant's right to effective assistance of counsel, the Sixth Amendment assures conflict-free representation. *See Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980). Where a conflict of interest is not asserted before or at trial, petitioner must show "an actual conflict of interest" that "adversely affected" the representation. *Id.* at 348. Thus, from the *Sullivan* rule, "prejudice is presumed if the defendant shows that an actual conflict of interest adversely affected his lawyer's performance." *Beets v. Scott,* 65 F.3d 1258, 1265 (5th Cir.1995) (en banc) (citing *Sullivan,* 446 U.S. at 348).

The Fifth Circuit has defined actual conflict as where "defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) (citing, *inter alia*, *Strickland v. Washington*, 466 U.S. at 692). "Adverse effect," in turn, is shown where "some plausible alternative defense strategy or tactic could have been pursued, but was not because of the actual conflict impairing counsel's performance." *Id.* (internal quotation and citation omitted). Discussing the *Strickland* exception, the United States Supreme Court has held "only in circumstances of . . . magnitude do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (citation omitted).

This conflict-of-interest exception from the general *Strickland* standard has not been uniformly applied outside the context of conflicts from multiple representations. Asserting that other federal circuits have "unblinkingly applied" conflict-of-interest rules "to all kinds of alleged attorney ethical conflicts," the Fifth Circuit has declined to expand the application: "*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context." *Beets,* 65 F.3d at 1265–66; *see also United States v. Gentry*, 941 F.3d 767, 776–77 (5th Cir. 2019) ("[Petitioner] argues that the conflict itself was prejudice, but this argument is foreclosed by *Beets*."). The conflict-of-interest exception supplies a specific "prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Mickens*, 535 U.S. at 176 (citing *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.")). Moreover, application of the proper standard is not merely an academic exercise, for the Fifth Circuit has noted the showing under *Sullivan* "differs substantially" from the requirements under *Strickland*. *See Perillo,* 205 F.3d at 781. Nonetheless, the United States Supreme Court has neither expanded the *Sullivan* standard into other conflict areas nor expressly limited it to the case of multiple representations. *See Mickens*, 535 U.S. at 176 ("Whether *Sullivan* should be extended to [successive representation] cases remains, as far as the jurisprudence of this Court is concerned, an open question.").

### 2. Claim Background

Before trial, Judge Marullo ordered all parties to not speak with the press. *See* Rec. Doc. 45-53 at 4 (gag order transcript). However, Turk fielded a call from a reporter the day before trial and discussed the filing of a subpoena. *Id.* at 5. Judge Marullo determined the act direct contempt and sentenced Turk to six months in prison and a $500 fine. *Id.* at 6. As the State reads the

91

transcript, "Despite Petitioner's assertions, the record does not reflect that the judge held the sentence open until after the trial." Rec. Doc. 45 at 54.[11] Following the sentence, Turk moved to have Judge Marullo recused. *See* Rec. Doc. 45-57 at 123–24. Turk cited his reason for so moving was to "protect [himself] as a lawyer". *Id.* at 124. After securing an assurance from Judge Marullo that the contempt finding would not prejudice his client, Turk waived his recusal request. *Id.* at 126, 129.

### 3. Last Reasoned State Court Decision

Little was made of this claim in state court post-conviction rulings. The Louisiana Supreme Court most thoroughly treated the issue in an unpublished appendix on direct appeal, applying federal conflict-of-interest rules and concluding that Judge Marullo's enforcement of a gag order against Turk created no divided loyalty. *See* 45-51 at 49.[12] Rather, the state high court emphasized Turk's concern in his motion to recuse "was designed to assure that Judge Marullo would not hold against his client Turk's violation of the gag order." *Id.* This conclusion is supported by Turk's questioning of Judge Marullo at the recusal hearing: "Judge Marullo, can you be fair and impartial in ruling in this particular trial with Rogers Lacaze?" Rec. Doc. 45-57 at 125. After a brief colloquy

---

[11] During a recusal hearing held in response to Judge Marullo's enforcement of the gag order, the prosecution suggested to Judge McKay that Judge Marullo may elect to not even enforce the stated punishment: "I'd like to note for the record as well that even though Judge Marullo has issued an order with respect to citing Mr. Turk for contempt and possible [sic] impose sanctions on him, Judge Marullo can at any point in time can [sic] reconsider his position and I see no prejudice to the defendant at all, Judge McKay." Rec. Doc. 45-57 at 130. Judge McKay agreed. *Id.* at 131. Judge Marullo, however, made no statement to that effect. *See* Rec. Doc. 45-53 at 4–6. Petitioner, however, insists an "unexecuted" sentence continued to hang over Turk's head at trial. *See* Rec. Doc. 48 at 83. As support, petitioner points to a post-conviction affidavit by Turk. *Id.* Therein, Turk contended that the transcript he reviewed was "deficient in many respects." Rec. Doc. 45-258 at 32. "The most glaring omission", Turk asserted, was the absence of the contempt transcript. *Id.* This transcript, however, is now part of the record, and is not cited by petitioner as support of his insufficiency-of-the-record argument. *See* Rec. Doc. 45-53. For the contention that the sentence was not executed, petitioner quotes Turk's affidavit, which itself quotes an article in the *Times-Picayune*. *See* Rec. Doc. 48 at 83; Rec. Doc. 45-258 at 32. Neither Turk himself nor the transcripts of the contempt and recusal hearings leave the matter open. The argument is unavailing.

[12] The Louisiana Supreme Court notes without elaboration that "*Holloway* [*v. Arkansas* 435 U.S. 475 (1978)] and *Sullivan* are the leading federal cases on an attorney's conflict of interest in multiple representation cases." Rec. Doc. 45-51 at 47 n.65. Absent is a *Strickland* consideration of this claim.

with Judge McKay, who was presiding over the hearing, Judge Marullo responded, "It was unfortunate what took place prior to the trial on your violation of the order, but certainly that has absolutely no reflection upon the defendant." *Id.* at 126. Clearly, Judge Marullo addressed the concern of Turk, who immediately replied, "I have no further questions, Your Honor. I am satisfied, Your Honor." *Id.*

However, in an oral ruling on December 13, 2019, Judge Kirby determined that a more thorough treatment of the issue on direct review was not possible because "[t]here was a lack of testimony regarding that." Rec. Doc. 45-31 at 6. Without stating reasons—but having heard significant testimony surrounding the topic—Judge Kirby concluded, "I don't think there's any merit there." *Id.* Subsequently, the Louisiana Supreme Court flatly rejected this claim: "As to his remaining claims, applicant fails to satisfy his post-conviction burden of proof." *Lacaze IV*, 325 So. 3d 362 (citing La. Code Crim. Proc. art. 930.2).

No matter the applicable state court decision, rejection of this claim was proper. We choose to look through *LaCaze IV* to Judge Kirby's oral ruling in December of 2019. Contrary to petitioner's contention, we do not find Judge Kirby to have rejected the claim because of its procedural bar. *See* Rec. Doc. 28 at 175. Instead, the district judge who witnessed the testimony and thoroughly considered the copious claims, rejected this claim on the merits: "And I just—you know, I don't think there's any merit there." Rec. Doc. 45-31 at 6. Although a summary ruling, Judge Kirby's decision does not appear to rely on the Louisiana Supreme Court's consideration of the claim in its unpublished appendix on direct appeal. Thus, we "must hypothesize the reasons that supported, or could have supported, the denial consistent with Supreme Court precedent." *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018) (citing *Harrington v. Richter*, 562 U.S. 86, 98 (2011)). Such a decision without stated reasons is unreasonable only if there was no reasonable

93

basis for it. *Id.* at 161 (citation omitted).

There are numerous reasonable bases for the denial of relief on this claim. Down the two distinct avenues, Judge Kirby could have reasonably denied petitioner's claim from either the *Sullivan* or *Strickland* standard. As this claim was not raised at trial, petitioner would necessarily need to show "an actual conflict of interest" that "adversely affected" the representation. *See Sullivan*, 446 U.S. at 348. It would not be unreasonable for Judge Kirby to observe neither prong satisfied. Willie Turk was found in contempt of court for violating a gag order. Turk admitted to his mistake, which he chalked up to his own absentmindedness. *See* Rec. Doc. 45-53 at 5 ("Your Honor, to be honest with you, I forgot about the gag order."). We struggle to see how a court's enforcement of a clear order could create an actual conflict. Nowhere in the trial record, Turk's affidavit, or the post-conviction hearing is it asserted that Turk felt "compelled to compromise his . . . duty of loyalty or zealous advocacy to [petitioner] by choosing between or blending the divergent or competing interests" he faced. *See Perillo*, 205 F.3d at 781. Further, nothing beyond a numinous "adverse effect" is raised by petitioner. It would not be unreasonable for Judge Kirby to have rejected this claim on *Sullivan* grounds.

An analysis through the *Strickland* standard yields the same result. Taking the Fifth Circuit's directive in *Beets*, it would not have been unreasonable for Judge Kirby to conclude that petitioner was not thereby prejudiced by the contempt and recusal matters. Because of the prejudice prong, it is unnecessary to engage in an assessment of the hypothetical grounds for a finding of Turk's effectiveness in defying a court order. "To be sure, disregarding a court order is not ordinarily 'sound trial strategy[.]'" *Khan v. United States*, 928 F.3d 1264, 1278 (11th Cir. 2019) (quoting *Strickland*, 466 U.S. at 689) (exceptionally finding counsel not deficient where "the expected costs of any adverse consequences to the representation of a client resulting from

94

noncompliance with court instructions [were] outweighed by the expected benefits of noncompliance"). Nonetheless, unlike with the *Sullivan* rule, prejudice is not presumed under *Strickland*. *See Mickens v. Taylor*, 535 U.S. 162, 166 (2002); *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995). And it is not unreasonable that Judge Kirby concluded that petitioner was not prejudiced by Turk's contempt proceeding. Through his motion for recusal, Turk put on the record Judge Marullo's assurance of a fair proceeding despite the rendered contempt sentence. *See* Rec. Doc. 45-57 at 125–26. Further, the resulting representation does not reveal decisions altered by the morning-of-trial proceedings so as to create reasonable probability of a different outcome.

The state court determination—be it guided by *Sullivan* or *Strickland*—was not contrary to or an unreasonable application of clearly established federal law. Moreover, to the extent factual determinations are challenged, there was no unreasonable determination of the facts considering the evidence presented in the state court proceedings and reviewed here. Petitioner is not entitled to federal habeas corpus relief as to this issue.

## H.    Claim 8: Reasonable Doubt Jury Instruction

### 1.    Standard of Review

Petitioner contends the reasonable doubt instruction at trial provided an unconstitutionally high burden for acquittal. As an assurance of a fair trial, the Fourteenth Amendment's Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Cage v. Louisiana*, 498 U.S. 39, 39 (1990) (quoting *In re Winship,* 397 U.S. 358, 364 (1970)). An instructional error as to the reasonable doubt standard is a "structural error" and necessitates a new trial. *See Sullivan v. Louisiana*, 508 U.S. 275, 281–82 (1993).

The reasonable doubt instruction is assessed as to "whether there is a reasonable likelihood

that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal quotation marks omitted) (quoting *Boyde v. California,* 494 U.S. 370, 380 (1990)). In that assessment, the Court has faulted treating reasonable doubt as synonymous with a "grave uncertainty," an "actual substantial doubt," and a "moral certainty." *Cage*, 498 U.S. at 41 ("It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard."). Where combined with other requirements, such as an instruction to provide an "articulatable reason," the charge becomes even more suspect. *See Humphrey v. Cain*, 120 F.3d 526, 531, *r'hrg en banc*, 138 F.3d 552 (5th Cir. 1998) (disapproving the "dubious constitutionality" of an articulation requirement, while acknowledging a circuit split related to its independent use). However, these watchwords do not create a black-letter violation themselves. "Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (quotation cleaned up) (quoting *Holland v. United States,* 348 U.S. 121, 140 (1954)).

## 2. Claim Background

At the head of the jury charges, Judge Marullo explained reasonable doubt. The reasonable doubt charge stated in its entirety:

> If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your sworn duty to give him or her the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, yet if it does not establish it beyond a reasonable doubt you must acquit the accused.

> This doubt must be a reasonable one. That is one that is founded upon a real and tangible basis. It is not upon a mere caprice, or a fancy, or a conjecture. It must be such a doubt that it would give rise to an uncertainty raised in your mind by the reason of the unsatisfactory character of the evidence, one that would make you feel that you did not have an abiding conviction of the defendant's guilt.

96

> If after giving a fair and impartial consideration to all of the facts in the case, if you find the evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as justifying a verdict of not guilty.
>
> The prosecution must establish guilt by legal and sufficient evidence beyond a reasonable doubt. But, the rule does not go further and require a preponderance of the testimony. It is incumbent upon the State to prove the offense charged or legally included in the indictment to your satisfaction and beyond a reasonable doubt.
>
> Ladies and gentlemen, a reasonable doubt is not a mere possible doubt. It should be an actual doubt. It is such a doubt that a reasonable man or woman would seriously entertain. It is a serious doubt for which you can give a good reason.
>
> You remember when we picked the jury we talked about reasonable doubt, and I know that you all have heard it over and over for this past month that you have served on juries; but it is the obligation of the people sitting at this table here, and that standard is proof beyond a reasonable doubt as to every element of the crimes—the alleged crimes.
>
> A reasonable doubt in it's [sic] most simple definition is when you have a doubt about one of the elements essential in proving the case, and you can say to the other eleven people that sit with you in making this decision, "I have a doubt." And, you can articulate and say, "And, this is the reason why I have the doubt." That is a reasonable doubt.

Rec. Doc. 45-55 at 6–8. The charge was not objected to by defense counsel. *See* Rec. Doc. 45-51 at 63. Nonetheless, on appeal petitioner insists the charge is tantamount to an earlier Orleans Parish standard the United States Supreme Court threw out in *Cage v. Louisiana*. Rec. Doc. 28 at 176–77 (discussing *Cage v. Louisiana*, 498 U.S. 39 (1990)).[13] The State counters that there is no clearly

---

[13] The jury instruction in *Cage* was different from the one in petitioner's case. In *Cage*, it stated in full:

> If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*

*Cage v. Louisiana*, 498 U.S. 39, 40 (1990) (emphasis in Supreme Court opinion).

established, federal answer to the appropriateness of the articulation language and that other violative *Cage* language is absent. Rec. Doc. 45 at 62.

### 3. Last Reasoned State Court Decision

In its unpublished appendix on direct appeal, the Louisiana Supreme Court determined petitioner's claim related to the reasonable doubt instruction meritless. *See* Rec. Doc. 45-51 at 63–64. Although noting the basis of petitioner's challenge as the reasonable doubt instruction's "*Cage*-like language," the state high court surprisingly offers little *Cage* analysis on petitioner's jury instructions. *See id.* ("It is worth noting here that apparently in response to the *Cage* decision, the trial court carefully pruned its stock instruction on reasonable doubt to delete language that served as the flashpoint of the Supreme Court's Due Process analysis in *Cage* (*e.g.* "grave doubt"; abiding conviction to a moral certainty.)[.]").

 Instead, the Louisiana Supreme Court simply determined *Cage* inapplicable: "This Court has held that a *Cage* charge is not unconstitutional and does not violate due process by diluting the state's burden to prove an accused's guilt beyond a reasonable doubt." *Id.* at 64 (first citing *State v. Penns*, 99-2916, p. 2–3 (La. 12/20/99), 758 So. 2d 776, 777 (itself citing *State v. Smith*, 91-0749, p. 13 (La. 5/23/94), 637 So. 2d 398, 406, *cert denied* 513 U.S. 1045 (1994)); then citing *State v. Jarrell*, 98-0707 (La. 7/2/98), 721 So. 2d 898). The one-sentence reasoning requires unravelling.

In both *Penns* and *Jarrell*, the state high court dealt with collateral appeals and emphasized that the Court's decision in *Victor*, rather than in *Cage*, directed the inquiry. In *Smith*, a direct appeal that challenged a reasonable doubt instruction, the Louisiana Supreme Court explained its application of federal law: "considering the instruction as a whole rather than isolating the suspect terms, noting that there are distinctions between the *Cage* instruction and the instruction in this case, and, more importantly than any of the foregoing, utilizing *Victor*'s reaffirmation of the *Boyde*

98

reasonable likelihood standard of review." *Smith*, 637 So. 2d at 406. Scattering breadcrumbs from this string citation, the Louisiana Supreme Court seems to redirect the search from that for forbidden *Cage* phrases and to that for the reasonable likelihood that the jury determined a defendant's guilt in manner violating the Constitution. Nonetheless, this hunt for the applied standard is arduous, gathering only ambiguous conclusions. Moreover, the Louisiana Supreme Court's explicit refusal to apply *Cage* is unreasonable. Despite our deferential review, we conclude the Louisiana Supreme Court's decision was contrary to clearly established federal law. Thus, as to this claim, the ADEPA relitigation bar is lifted, meriting *de novo* review.

No matter the standard of review, however, petitioner does not merit relief on the issue. Petitioner contends the instruction in his case compares favorably to that in *Cage*. Specifically, petitioner argues, "By defining reasonable doubt as '[a] *serious doubt* for which you could give a *good reason*' and, further, that a juror should be able to 'articulate' that doubt to the other eleven jurors, the charge given to Mr. LaCaze's jury diluted the State's burden and suggested a higher degree of guilt than required by the Due Process Clause." Rec. Doc. 28 at 177 (emphasis added in petitioner's brief). However, there are considerable differences in the *Cage* instruction from the isolated phrase petitioner presents. These differences, moreover, provided much of the Court's basis for determining the standard unconstitutional: "It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Cage*, 498 U.S at 41. The *Cage* Court connected the various expressions to find their collective weight to lower the prosecution's burden.

99

Such is not the case here. Amid paragraphs of instructions on the issue, we do not conclude "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *See Estelle*, 502 U.S. at 72. So far from the *Cage* composition, we question whether the emphasized phrases by themselves would alter the prosecution's constitutional burden. Even more clearly, when "taken as a whole," the instruction "correctly convey[ed] the concept of reasonable doubt to the jury." *Victor*, 511 U.S. at 5.

Further, petitioner fails to lift the articulation example in his charge to an unconstitutional level. Unconnected from otherwise worrisome phrases, articulation of a reasonable doubt has, at best, debated constitutionality. *See Humphrey*, 120 F.3d 531. We decline to find legal error in the trial court on an uncertain legal standard. In sum, the reasonable doubt charge fails to present a constitutional violation of the fair trial protection. From a *de novo* review, petitioner is not entitled to federal habeas corpus relief as to this issue.

## I.    Claim 9: Incomplete Appellate Record

### 1.    Standard of Review

Citing multiple incomplete transcripts of pretrial, trial, and post-trial hearings, petitioner argues aspects of the record are unreviewable. As a due process and equal protection assurance, a criminal defendant has a right to a transcript of trial court proceedings for meaningful appeal. *See Evitts v. Lucey*, 469 U.S. 387, 393 (1985). The transcript must be of "sufficient completeness . . . for adequate consideration of the errors assigned." *Draper v. Washington*, 372 U.S. 487, 497 (1963) (citation omitted). Thus, the Court recognized that "part or all of the stenographic transcript in certain cases will not be germane to consideration of the appeal[.]" *Id.* at 492. In assessing the sufficiency of the record, courts note the grounds for the appeal and the possible prejudice to a petitioner. *See Schwander v. Blackburn*, 750 F.2d 494, 497 (5th Cir. 1985) ("Since the only error

100

assigned on appeal with respect to Schwander was the denial of his motion for a mistrial based on improper witness testimony, we find the record was sufficient for the purposes of his appeal."); *Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987) ("[Petitioner does not] explain how the Constitution requires more or why the absence of such a transcript prejudiced his appeal in any manner."); *Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016) ("[Petitioner] fails to show that the missing portions of the transcript prejudiced his appeal".). The petitioner must demonstrate that "a substantial and significant portion of the record is missing." *United States v. Delgado*, 672 F.3d 320, 343 (5th Cir. 2012) (en banc) (internal quotation omitted) (quoting *United States v. Selva,* 559 F.2d 1303, 1306 (5th Cir. 1977)). Moreover, "[a] state is not required to furnish complete transcripts so that defendants and their counsel may conduct 'fishing expeditions' to seek out possible errors at trial." *Moore v. Wainwright*, 633 F.2d 406, 409 (5th Cir. 1980). This standard applies regardless of the appointment of new counsel on appeal. *See, e.g., Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir. 1982); *Schwander*, 750 F.2d at 497 n.1; *Delgado*, 672 F.3d at 338, 343.

### 2. Claim Background

Among matters petitioner submit are missing, no record exists of a motion to quash hearing, the identity of various voir dire speakers, objections by defense counsel to the admission of photographs and the presence of Antoinette Frank for identification purposes, discussion of a sleeping juror, and Mr. Turk's attempt to call a key police officer witness who invoked Fifth Amendment protection. *See* Rec. Doc. 28 at 179–81. Petitioner contends other portions of the transcripts are incomplete, such as the discussion of a gag order, pretrial hearings that conclude with "other matters are handled by the court," and commotion during Chau Vu's testimony. *Id*. The latter events, however, apparently were captured on an audio recording. *Id.* at 180 ("The judge appears calm and the issue is resolved quickly. However, the sound recording tells a different

101

story[.]").

### 3. Last Reasoned State Court Decision

In his oral ruling on December 13, 2019, Judge Kirby summarily denied the claim of an incomplete transcript, citing the Louisiana Supreme Court's ruling on direct appeal: "And the claim about a lack of complete record was considered and rejected by the Supreme Court already, so I find there's no merit anywhere in that claim." Rec. Doc. 45-31 at 6. Although acknowledging the record as "abysmal," the Louisiana Supreme Court determined "it contains all significant portions of the proceedings complained of by counsel and it thus provides a basis for the full judicial review guaranteed in Louisiana." *LaCaze I*, 824 So. 2d at 1078. The Louisiana Supreme Court reasoned that petitioner did not "even allege that transcripts are 'material' to proper appellate review." *Id*. Quoting a previous opinion, the Louisiana Supreme Court noted a "slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal does not require reversal of a conviction." *Id.* at 1076 (quoting *State v. Brumfield*, 96–2667 (La. 10/20/98), 737 So. 2d 660, 669).

Petitioner argues this is the wrong standard, forcing him to speculate on possible irregularities: "In this case it was impossible for counsel, who did not serve as trial counsel, to show what testimony was missing, what hearings were missing, and which jurors were questioned during voir dire." Rec. Doc. 28 at 183. As support, petitioner emphasizes the United States Fifth Circuit's grant of a new trial due to an incomplete record in *United States v. Selva*. *Id.* at 180–81 (discussing *United States v. Selva*, 559 F.2d 1303 (5th Cir. 1977)). In *Selva*, on direct appeal after a federal conviction, new appellant counsel had no record of parties' closing arguments because "the trial court reporter became ill and eventually was incapacitated to the extent that he was unable to transcribe stenographically counsels' closing arguments." *Selva*, 559 F.2d at 1304. A recording

102

device subsequently failed, and the trial judge was unable to reconstruct the arguments. *Id.* at 1304–05. Because "a substantial and significant portion of the record is missing" and the appellant had new representation, the Fifth Circuit reversed the district court's denial of a new trial. *Id.* at 1306.

However, the Fifth Circuit has repeatedly restricted *Selva*'s reach. *See, e.g., Delgado*, 672 F.3d at 343; *Austin v. Davis*, 647 F. App'x 477, 494 (5th Cir. 2016); *United States v. Rivera*, 444 F. App'x 774, 780 (5th Cir. 2011); *United States v. Gieger*, 190 F.3d 661, 667 (5th Cir. 1999). Recently, the circuit court observed the "substantial and significant portion" standard has been met only with "truly egregious omissions like an absence from the record of voir dire, opening statements, closing arguments, or even an entire transcript." *United States v. Shah*, 95 F.4th 328, 366 (5th Cir. 2024) (collecting cases).

These circuit considerations are helpful to our current habeas review. Although petitioner contends multiple gaps in the record still exist, it is not unreasonable for the state court to have concluded that a record of sufficient completeness has been provided and that no substantial and significant portion of the record is missing. Thus, denial of relief on this issue by the Louisiana Supreme Court was not contrary to nor an unreasonable application of clearly established federal law. This factual determination and application thereof were not unreasonable. To the extent factual determinations are challenged, there was no unreasonable determination of the facts in light of the evidence presented in the state court proceedings and reviewed here. In sum, petitioner is not entitled to federal habeas corpus relief as to this issue.

## J.    Claim 10: Cumulative Error

### 1.    Standard of Review

Summing up his argument, petitioner contends his trial "was tainted with multiple

103

constitutional errors." Rec. Doc. 28 at 183. From a concern of the fundamental fairness of a trial, federal appellate courts have entertained the legal theory that the cumulative errors in state courts can amount to a denial of the Fourteenth Amendment's due process protections. *See Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc) (collecting cases) ("With one exception . . . our sister circuits have held in *dicta* that federal habeas relief may issue if a defendant was denied fourteenth amendment due process by the cumulative effect of errors committed in a state trial, which together deny fundamental fairness."). Although the United States Supreme Court has not ruled definitively on cumulative effect of otherwise non-reversible errors, the Fifth Circuit has instructed courts to weigh on habeas review whether such errors deprive a trial of fundamental fairness. *See Martinez Perez v. Dretke*, 172 F. App'x 76, 82 (5th Cir. 2006); *see also Delgado*, 672 F.3d at 344 (citation and internal quotation omitted) ("Cumulative error justifies reversal only when errors so fatally infect the trial that they violated the trial's fundamental fairness."). Admittedly, "the possibility of cumulative error is often acknowledged but practically never found persuasive." *United States v. Brule*, No. 20-30571, 2021 WL 5832283, at *4 (5th Cir. Dec. 8, 2021) (quoting *Derden*, 978 F.2d at 1456). Relief through such cumulative errors is appropriate where there is (1) an error in the state trial court, (2) that is not procedurally barred, (3) that is constitutional in nature so as to deny due process, and (4) that combine to make the verdict more likely than not suspect. *Derden*, 978 F.2d at 1458.

## 2. Last Reasoned State Court Decision

State court decisions do not directly address petitioner's cumulative error argument. Rejecting all outstanding claims, the Louisiana Supreme Court does not mention the issue in its final, summary decision. *See LaCaze IV*, 325 So. 3d at 362. Neither does Judge Kirby in his two post-conviction rulings. *See* Rec. Docs. 45-8 and 45-31. In the latter opinion, however, counsel for

104

petitioner possibly alludes to the claim in an objection that follows Judge Kirby's final claim denials: "We would object to the lack of cumulative review under both *Brady* and *Strickland*." Rec. Doc. 45-31 at 7. Judge Kirby noted the objection "and made [it] general." *Id*. However, this reading is admittedly strained. As the claim has been summarily rejected and exhausted, we "must hypothesize the reasons that supported, or could have supported, the denial consistent with Supreme Court precedent." *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018) (citing *Harrington v. Richter*, 562 U.S. 86, 98 (2011)). Such a decision without stated reasons is unreasonable only if there was no reasonable basis for it. *Id.* at 161 (citation omitted).

Significantly, the *Derden* court counsels to begin with errors in the state trial court proceedings—not the subsequent direct and post-conviction rulings. Thus, the review is a deferential one, but not precisely an assessment of whether the reviewing courts' decisions were contrary to or an unreasonable application of clearly established federal law. As noted, we find concerning—but not individually sustaining a new trial—David Settle's seating on the jury considering the case of a slain police officer and police officer co-defendant, *supra* at 20–22; Victoria Mushatt's seating on the jury, *supra* at 23–24; Ernest Caulfield's performance at voir dire as it related to Mushatt, *supra* at 36–38; Willie Turk's deficient performance for failing to interview eyewitness Vui Vu, *supra* at 48–49; *Brady* material involving Adam Frank, John Ross's identification procedure, and Antoinette Frank's psychological evaluations, *supra* at 75–76; and the Louisiana Supreme Court's reluctance to engage *Cage* in its reasonable doubt review, *supra* at 88–90. These avoidable and downright lamentable errors provide a case-study for needed advancements in criminal litigation. However, they do not combine to create a verdict more likely than not suspect. Within those parameters, petitioner was afforded sufficient due process and a fundamentally fair trial. Petitioner is not entitled to federal habeas corpus relief on the cumulative

105

review claim.

### K.    Certificate of Appealability

Nonetheless, based on the foregoing analysis and in consideration of Rule 11 of the Rules Governing § 2254 Cases, a certificate of appealability will issue as to:

- Claim 1: Biased Tribunal
- Claim 2: Impartial Jury
- Claim 3: Ineffectiveness during Voir Dire
- Claim 4: *Brady* Material
- Claim 6: Ineffectiveness at Trial
- Claim 8: Reasonable Doubt Instruction
- Claim 10: Cumulative Error

*See* Rules Governing § 2254 Cases, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A certificate of appealability is appropriate only where the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Rules Governing § 2254 Cases, Rule 11(a) ("If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."). As expression of the "controlling standard" for a certificate of appealability, the United States Supreme Court requires the petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. MacDaniel*, 529 U.S. 473, 475 (2000)). As to the highlighted claims, we determine, petitioner has made a substantial showing of the denial of a constitutional right, such that reasonable jurists could debate the resolution.

New Orleans, Louisiana, this 26th day of June, 2026

_____
Senior United States District Judge

106